# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
SERGEY LEONTIEV,

                Plaintiff,                No. 16-cv-03595 (JSR)

    -against-                        **DECLARATION OF SERGEY**
                                                        **LEONTIEV**
ALEXANDER VARSHAVSKY,

                Defendant.
------------------------------------------------------------------x

I, SERGEY LEONTIEV, declare under penalty of perjury as follows:

1. I was born in Moscow, Russia in 1965. I have been an entrepreneur and businessman since 1989, when I co-founded a consulting company called Probusiness with my friend Alexander Zheleznyak.

2. In 1993, Mr. Zheleznyak and I, together with a third person, co-founded Probusinessbank ("PRBB"), a joint-stock commercial bank.

3. PRBB operated pursuant to a general banking license issued by the Central Bank of the Russian Federation. The bank provided a range of banking services to corporate and individual clients, with a focus on small to mid-sized businesses.

4. PRBB also owned numerous smaller banks that provided more specialized services. Starting in 2003, these banks were organized under the brand Financial Group 'Life' (the "Life Group").

5. I was the President of PRBB since 1996 and also served as the President of the Life Group. In addition, I served as Chairman of PRBB's Board of Directors and held a position on PRBB's Management Board.

6.  The Life Group grew to serve millions of customers across Russia. By mid-2015, there were approximately 16,000 employees in the Group.

7.  Within PRBB, the structure consisted of numerous business units, infrastructure units, and systems units, each of which was headed by a manager.

8.  Each of the business units specialized in different products or services, such as retail lending or VIP clients.

9.  My management philosophy is to provide wide-ranging autonomy and discretion to managers and employees without interference or micromanagement. To that end, PRBB employed unique hiring practices, such as logic games and mock presentations, to identify and attract self-starting and independent employees who would be able to flourish within this system.

10. The heads of the business units responsible for issuing loans were each responsible for making loan decisions with respect to their individual or corporate customers. It is an important tenet of my management philosophy that each manager is in the best position to base loan decisions on his or her own personal experience with and knowledge of the customer.

11. The managers were incentivized to exercise sound business judgment through a profit sharing model. In addition, managers received bonuses based on successful loans, but each non-payment by a customer resulted in a deduction from a manager's bonus.

12. Each head of a business unit was also responsible for proposing new business strategies and products. Those proposals were then submitted to PRBB's Treasury, which used a dynamic model to identify the best business proposals or products.

13. I worked with the Treasury to develop rules for the dynamic model, but I was not involved in the day-to-day decision-making of the business unit managers or the

2

Treasury. To do so would violate the principles of my management philosophy. I functioned as the bank's president, setting strategy and direction, but not making individual decisions on loans or other products offered to clients.

14. After the Treasury's model identified the best products, the product was presented to the financial and strategy departments before being presented to the Management Board for final approval.

15. After the products were approved, the heads of the business units and the employees under their supervision were responsible for selecting products to present to their clients, based on the clients' needs and demands.

16. One of the products developed through this system was a high-interest rate investment, commonly referred to in the emerging markets as a "wealth management product," that gave customers the opportunity to receive a rate of return of between 10 and 15%, a significantly higher rate than that available with a regular bank deposit.

17. The funds raised through the wealth management product were deposited in PRBB's treasury and were invested into PRBB's capital and used for various bank-related purposes, such as growing a retail loan portfolio, financing development projects, and managing regulatory capital ratio requirements.

18. To structure certain products or transactions, PRBB's business unit managers utilized off-balance sheet entities formed in Russia and in other jurisdictions, which were set up and administered by an operations group within PRBB.

19. I played no role in creating or managing these off-balance sheet entities.

20. I knew Alexandra Vyulkova was a senior manager at PRBB, but I do not remember ever speaking with Ms. Vyulkova about any off-balance sheet entities and I did not

direct her with respect to any of her job responsibilities, including any responsibilities that she had pertaining to the off-balance sheet entities.

21. In 2014 and 2015, PRBB started to receive inquiries from the Central Bank of the Russian Federation. PRBB cooperated with all of the inquiries. The bank's auditors concluded that PRBB was not in financial distress and that it was in compliance with the Central Bank's regulations. PRBB also received letters from the Central Bank in February and May 2015 stating that it was "satisfactory" with respect to capital, assets, liquidity, and other key factors.

22. On August 7, 2015, temporary administrators from the Deposit Insurance Agency (the "DIA") arrived and disconnected the bank from banking networks. The DIA then began the process known under Russian law as a temporary administration of the bank, during which time it would control and manage a bank's assets. The order appointing the DIA as the temporary administrator was signed by the Central Bank, but the order did not contain the standard provision requiring that news of the temporary administration be published on a public website. The Central Bank also did not notify the public or potential creditors about the time limit for submitting claims of debts owed by the bank.

23. On August 10, 2015, the DIA temporarily reconnected PRBB to its banking networks and transferred approximately 600 million RUR (approximately $8.7 million USD) to a DIA subsidiary bank, Russian Capital Bank. In January 2016, the Russian General Prosecutor's Office announced that this was an improper transfer and that the DIA failed to perform even a fundamental analysis of PRBB's finances before transferring assets to other institutions.

24. Two days later, on August 12, 2015, the Central Bank revoked PRBB's banking license, alleging that PRBB was insolvent. These actions were unjustified and an expropriation.

25. I left Moscow shortly after PRBB's license was revoked and I currently live in New York, New York.

26. Based on my experience in management and retail businesses, I developed a unique and proprietary investment approach which evaluates the tangible and intangible assets of companies in models to project companies' future performance.

27. In 2011, I started a new company called Wonderworks Investments Limited ("Wonderworks"). ███████████████████████████████

███████████████████████████████████████████████████

- ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████

- ███████████████████████████████████████████

- ███████████████████████████████

31. I currently work as the CEO of Grid Market Research, a subsidiary of Wonderworks, which provides market research reports and analysis.

- ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████

5

33. After this litigation started, I became aware that ZAO Financial Group Life ("ZAO FG Life") filed for voluntary liquidation in April 2015. I was not involved in the decision to liquidate ZAO FG Life and did not review or sign any liquidation documents.

34. In August 2015, I attended a meeting with Alexander Varshavsky, Irina Monakhova, and Mr. Zheleznyak at Avilon AG's office in Moscow. I attended this meeting because Mr. Zheleznyak begged me to mediate a dispute between him and Mr. Varshavsky regarding monies that Mr. Varshavsky claimed were owed to him.

35. My understanding was that Mr. Varshavsky was trying to turn a legal obligation of PRBB and certain other entities into a moral obligation on Mr. Zheleznyak. I understand that Mr. Zheleznyak and Mr. Varshavsky are longtime friends and that Mr. Zheleznyak was feeling constant pressure from Mr. Varshavsky to promise payment of certain funds that Avilon AG and others had invested into the bank and were not able to get out of the bank by the time PRBB's license was revoked.

36. At the Moscow meeting, we discussed a possible settlement but we never reached agreement on settlement terms.

37. I felt threatened at the Moscow meeting because throughout the meeting, Mr. Varshavsky seemed to be taking phone calls from high-level government prosecutors. To me, this was an implicit threat that unless I agreed to pay, Mr. Varshavsky might use certain government connections to retaliate.

38. Approximately one week later, I met with Mr. Varshavsky, Mr. Zheleznyak and several others in London.

6

39. Again, I attended this meeting because Mr. Zheleznyak asked me to, and because I wanted to help mediate the dispute and relieve some of the constant pressure that Mr. Zheleznyak told me he was feeling.

40. I was afraid for my safety and was worried about the possibility of additional threats, so I decided to record the meeting in London.

41. At the London meeting, Mr. Varshavsky and others mentioned the possibility that Mr. Zheleznyak may be arrested. I interpreted these statements to be a threat.

42. Again, we discussed the possibility of settling the dispute, but we never reached an agreement as to settlement terms at the London meeting.

43. In addition, I also had a phone call with Mr. Varshavsky in August 2015 when I asked him to stop pressuring Mr. Zheleznyak. Mr. Varshavsky responded that if I do not pay him, he will start a war against me that I would regret.

44. Prior to August 2015, I had never spoken with Mr. Varshavsky, any employee of Avilon, or any of the parties named in the promissory notes about the wealth management products.

45. Over the next few months, Mr. Zheleznyak told me that Mr. Varshavsky was frequently calling, texting, and emailing him, to try to persuade me to settle the dispute and agree to a payment schedule.

46. I retained several law firms to negotiate these disputes on my behalf. Those negotiations did not result in a settlement agreement.

7

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 26th day of January, 2017 in New York, New York.

_____
Sergey Leontiev

8