# EXHIBIT D

Sean Hecker
Colby A. Smith
William H. Taft V
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
Tel: (212) 909-6000
Fax: (212) 521-6836
shecker@debevoise.com
casmith@debevoise.com
whtaft@debevoise.com
*Counsel to Plaintiffs*

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AVILON AUTOMOTIVE GROUP and
KAREN AVAGUMYAN,

       Plaintiffs,

  -against-

SERGEY LEONTIEV, LEONID LEONTIEV,
WONDERWORKS INVESTMENTS LIMITED,
LEGION TRUST, and SOUTHPAC TRUST
INTERNATIONAL INC. AS TRUSTEE OF
LEGION TRUST,

       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Index No. 656007/2016

**AMENDED COMPLAINT**

   Plaintiffs Avilon Automotive Group (with its predecessors and affiliates,

"Avilon") and Karen Avagumyan, by and through their attorneys, Debevoise & Plimpton

LLP, hereby allege as follows:

**<u>INTRODUCTION</u>**

   1.  This is an action to recover tens of millions of dollars loaned by Plaintiffs

for the benefit of Defendant Sergey Leontiev and his business partner Alexander

Zheleznyak, which Mr. Sergey Leontiev possesses and controls but has refused to repay.

2.      Mr. Sergey Leontiev and Mr. Zheleznyak owned various business interests in Russia as partners, including most notably a number of companies organized under the umbrella of an entity known as Financial Group «Life».  Mr. Sergey Leontiev was the majority partner, and Mr. Zheleznyak was the minority partner.  One of the companies they owned together was a large Russian commercial bank called Probusinessbank.

3.      Mr. Sergey Leontiev instructed Mr. Zheleznyak, acting as his partner and/or agent, to raise funds for their use in their various business interests by creating a number of shell companies that they owned and/or controlled directly or indirectly, and then taking in funds through those shell companies by offering high rates of return on one-year loans that could be rolled over from year to year.

4.      On Mr. Sergey Leontiev's instructions and acting as his partner and/or agent, Mr. Zheleznyak, a longtime friend of Avilon's President, Alexander Varshavsky, and of Mr. Avagumyan's family, borrowed tens of millions of dollars from Avilon and Mr. Avagumyan, formalized through loan agreements and promissory notes involving three of Mr. Sergey Leontiev's and Mr. Zheleznyak's shell companies.

5.      When Probusinessbank collapsed and was taken over by the Russian Central Bank in August 2015, Avilon and Mr. Avagumyan became concerned about their investments and sought assurances from Mr. Sergey Leontiev and Mr. Zheleznyak that they would repay the loan proceeds or their equivalent amounts (the "Loaned Funds").

6.      When Avilon's President, Mr. Varshavsky, initially contacted Mr. Zheleznyak, Mr. Zheleznyak assured him that the Loaned Funds would be repaid and organized a meeting between himself, Mr. Varshavsky, and Mr. Sergey Leontiev.

7.     At that meeting, which took place in Moscow, and at a subsequent meeting in London, Mr. Sergey Leontiev and Mr. Zheleznyak repeatedly promised to repay the Loaned Funds, and agreed to begin formalizing guarantees and structuring the terms of repayment with assistance from legal and financial advisors.

8.     At the same time that Mr. Sergey Leontiev was providing these assurances of repayment, he was secretly directing the transfer of the Loaned Funds and his other assets to a newly-created offshore trust in the Cook Islands, a jurisdiction notorious for being used to conceal assets from creditors.

9.     This offshore trust was specifically designed to shield Mr. Sergey Leontiev's assets from creditors, and Mr. Sergey Leontiev's transfer of the Loaned Funds and his other assets into the trust was made to frustrate Avilon's and Mr. Avagumyan's ability to recoup the monies owed to them.  As part of this scheme, Mr. Sergey Leontiev's father, Mr. Leonid Leontiev, was appointed the Protector and contingent beneficiary of the trust.

10.     After Mr. Sergey Leontiev had transferred the Loaned Funds and his other assets to the trust he then promptly changed his position, and in a third meeting that took place in New York he refused to repay the Loaned Funds to Avilon and Mr. Avagumyan notwithstanding his prior repeated assurances that he would do so.

11.     Avilon and Mr. Avagumyan bring this action to recover the Loaned Funds from Mr. Sergey Leontiev and/or the offshore trust to which he transferred them.  Mr. Sergey Leontiev should not be permitted to retain the benefit of the Loaned Funds at the expense of Avilon and Mr. Avagumyan, who have not been repaid.

3

## PARTIES

12.     Plaintiff Avilon Automotive Group is a foreign corporation organized under the laws of Russia, with its principal place of business in Moscow, Russia.

13.     Plaintiff Karen Avagumyan is a Russian national residing in Moscow, Russia.

14.     Defendant Sergey Leontiev is a Russian national residing in New York County in the State of New York.  On information and belief, Mr. Sergey Leontiev has been present in New York since approximately August 26, 2015.

15.     Defendant Wonderworks Investments Limited ("Wonderworks") is a foreign corporation organized under the laws of Cyprus, with its principal place of business in Cyprus.

16.     Defendant Legion Trust is a trust registered under the laws of the Cook Islands.

17.     Defendant Southpac Trust International Inc. as Trustee of Legion Trust ("Southpac") is a foreign corporation organized under the laws of the Cook Islands, with its principal place of business in the Cook Islands.  Southpac is the trustee of Defendant Legion Trust.

18.     Collectively, Defendants Legion Trust and Southpac are referred to herein as the "Trust Defendants."

19.     Defendant Leonid Leontiev, Mr. Sergey Leontiev's father, is a Russian national residing in Austria.  Mr. Leonid Leontiev is the Protector of and a contingent beneficiary of Defendant Legion Trust.

4

## JURISDICTION AND VENUE

20.    This Court has jurisdiction because Mr. Sergey Leontiev resides within the State of New York, because Mr. Leonid Leontiev regularly receives payments from Mr. Sergey Leontiev made to bank accounts located in the State of New York, and because Mr. Sergey Leontiev, Wonderworks, and the Trust Defendants participated in tortious conduct within the State of New York, including the fraudulent conveyance of assets from Mr. Sergey Leontiev to the Trust Defendants.

21.    Venue is proper before this Court because Mr. Sergey Leontiev resides within New York County.

22.    Plaintiffs designate New York County, where Mr. Sergey Leontiev resides, as the place of trial.

## STATEMENT OF FACTS

**Plaintiffs Provided Tens Of Millions Of Dollars In Funding To Mr. Sergey Leontiev And/Or Mr. Zheleznyak, Formalized As Loans To Entities Owned And/Or Controlled By Them**

23.    Mr. Sergey Leontiev and Mr. Zheleznyak own various business interests in Russia, including entities organized under an umbrella entity known as Financial Group «Life».

24.    One of Mr. Sergey Leontiev's and Mr. Zheleznyak's most significant business interests under the Financial Group «Life» umbrella was a commercial bank called Probusinessbank.  Mr. Sergey Leontiev was Probusinessbank's founder, Chairman, and majority shareholder, and Mr. Zheleznyak was its President and a minority shareholder.

5

25.    Mr. Sergey Leontiev instructed Mr. Zheleznyak, acting as his partner and/or agent, to raise funds for their use in their various business interests by creating a number of shell companies, including but not limited to Ambika Investments Limited ("Ambika"), Vennop Trading Limited ("Vennop"), and ZAO Financial Group "Life." (ZAO Financial Group "Life" is distinct from, but falls under the umbrella of, Financial Group «Life».)

26.    At all relevant periods, Mr. Sergey Leontiev and/or Mr. Zheleznyak owned and/or controlled, directly or indirectly, these shell companies.

27.    Mr. Sergey Leontiev and Mr. Zheleznyak incorporated and registered certain of these shell companies under the names of straw men to conceal their interests in and involvement with them. In particular, Mr. Sergey Leontiev and Mr. Zheleznyak used a straw man, Aleksandr Shcheglyaev, to register several entities in Cyprus, including Ambika.

28.    Mr. Sergey Leontiev instructed Mr. Zheleznyak, acting as his partner and/or agent, to raise funds through these shell companies for their use in their various business interests, including Mr. Sergey Leontiev's trading activities conducted through Defendant Wonderworks.  This fundraising was accomplished by offering lenders a high rate of return on one-year loans that could be renewed from year to year.

29.    Mr. Sergey Leontiev and Mr. Zheleznyak instructed certain Probusinessbank employees, including but not limited to Natalia Abramova, Yanna Krisiuk, and Alexandra Vyulkova, to handle day-to-day services on the loans made to these shell companies.  These employees were directed by and reported directly to Mr. Sergey Leontiev and Mr. Zheleznyak.

6

30.     Mr. Zheleznyak was a longtime friend of both Avilon's President Alexander Varshavsky and of Mr. Avagumyan's family.

31.     Mr. Zheleznyak, instructed by and acting as the partner and/or agent of Mr. Sergey Leontiev, borrowed tens of millions of dollars from Avilon and Mr. Avagumyan for his and Mr. Sergey Leontiev's use in connection with their various business interests.  This funding was formalized as loans from Avilon and Mr. Avagumyan to Ambika, Vennop, and ZAO Financial Group "Life".  In particular:

A.     In 2005 Avilon loaned $12.5 million to a company called Probusiness Holding (the "2005 Loan"), an entity owned and/or controlled by Mr. Sergey Leontiev.  The principal of the 2005 Loan was repaid twice (rather than being rolled over at the end of its one-year term), but each time a loan in the same amount and on the same terms was made to a new borrower also owned and/or controlled by Mr. Sergey Leontiev and/or Mr. Zheleznyak.  Ultimately, Ambika became the borrower on the 2005 Loan.

B.     Avilon also loaned approximately $19.9 million to Ambika in 2008 (the "2008 Loan"), and another approximately $6.625 million to Ambika in 2011 (the "2011 Loan").  The 2008 Loan and the 2011 Loan were regularly rolled over at the end of their one-year terms, until in December 2014 the 2008 Loan was discharged and the outstanding principal and interest due thereunder were rolled into the 2011 Loan, bringing the total amount outstanding under the 2011 Loan to approximately $27.6 million.

C.     Between late 2014 and mid 2015 Mr. Avagumyan loaned approximately $4.75 million to Vennop and approximately $21.2 million to  ZAO

7

Financial Group "Life" pursuant to a series of one-year promissory notes (the "Promissory Notes").

32.    In this action, Avilon and Mr. Avagumyan seek repayment of these funds, less approximately $17 million (corresponding to the $12.5 million principal amount of the 2005 Loan plus accrued interest and penalties) that was repaid in or around September 2015 following negotiations between Messrs. Varshavsky, Leontiev, and Zheleznyak.

33.    Other than the $17 million payment, the amounts due under the loans were not repaid when due and remain unpaid.  As of August 1, 2016, the total debt owed to Avilon was approximately $29.6 million, including interest, and the total debt owed to Mr. Avagumyan was approximately $28 million, including interest.

34.    Instead, on information and belief, the Loaned Funds were transferred from the borrowing shell companies through a web of other shell companies also owned and/or controlled by Mr. Sergey Leontiev and/or Mr. Zheleznyak (identified in Exhibit A hereto).

35.    These transfers typically were papered as loans, but had no real business purpose or economic substance.  For example, although Avilon loaned money to Ambika at interest rates of between 12-14%, Defendant Wonderworks received funds through various inter-company "loans" from these shell companies at much lower rates, in the range of 3-4%.

36.    Statements of the accounts held at Probusinessbank by just two of these shell companies, Ambika and Vermenda Holdings Limited, reflect more than $2.5 billion in total transfers.

8

37.    Ultimately, the Loaned Funds were transferred, directly or indirectly, to Defendant Wonderworks.

38.    At all relevant times, Mr. Sergey Leontiev personally owned/and or controlled Wonderworks.

39.    On information and belief, as of August 2015, Wonderworks held more than $175 million in cash and securities in a Morgan Stanley trading account based in London, including the Loaned Funds.  On information and belief, Wonderworks also held millions of dollars more in various other accounts across the world.

**When Plaintiffs Sought Assurances After The Collapse Of Probusinessbank, Mr. Sergey Leontiev And Mr. Zheleznyak Repeatedly Provided Assurances That The Loaned Funds Would Be Repaid**

40.    In August 2015, the Russian Central Bank suspended and then revoked Probusinessbank's banking license and put it into receivership after finding that its liabilities exceeded its assets by more than $1 billion, in part because many of the bank's assets appeared to be "fictitious" according to Russian Central Bank deputy chairman Mikhail Surkov.

41.    After the Russian Central Bank revoked Probusinessbank's license, Avilon's President, Mr. Varshavsky, asked Mr. Zheleznyak (and through him Mr. Sergey Leontiev) to provide guarantees that Avilon's and Mr. Avagumyan's loans would be repaid.  Mr. Zheleznyak assured Mr. Varshavsky that Avilon's and Mr. Avagumyan's investments were safe and offered to organize a meeting between himself, Mr. Sergey Leontiev, and Mr. Varshavsky.

42.     Mr. Zheleznyak also showed Mr. Varshavsky an Excel schedule showing approximately $123 million invested in large-cap securities, including Apple, Google,

and other securities, which Mr. Zheleznyak claimed were being held in a brokerage account controlled by Mr. Sergey Leontiev.  Mr. Zheleznyak told Mr. Varshavsky: "[Y]our money is with Sergey [Mr. Sergey Leontiev].  Sergey is playing the stock exchange…. Your money is all there."

43.     Messrs. Leontiev, Zheleznyak, and Varshavsky then met at Avilon's offices in Moscow on August 14, 2015.

44.     At that meeting, Mr. Sergey Leontiev and Mr. Zheleznyak repeatedly assured Mr. Varshavsky that the Loaned Funds would be repaid, and agreed to begin formalizing guarantees and structuring a repayment schedule.  Messrs. Leontiev, Zheleznyak, and Varshavsky all agreed to meet again the following morning with their legal and financial advisors to finalize the terms of repayment.

45.     Mr. Sergey Leontiev, however, did not show up the following morning for their scheduled meeting; instead, he fled Russia overnight.

46.     Mr. Zheleznyak did attend the scheduled meeting the following morning, and again assured Mr. Varshavsky that the Loaned Funds would be repaid.  He also offered to organize another meeting in another country given that Mr. Sergey Leontiev had fled Russia.

47.     A week later, on or about August 21, 2015, Mr. Varshavsky, Mr. Sergey Leontiev, and Mr. Zheleznyak met in London to discuss the formalization of guarantees and structure the terms of repayment.  That meeting also was attended by Ekaterina Malygina, a partner at PwC Russia who was invited by Mr. Varshavsky to assist with the financial and legal considerations involved in structuring the repayment, and Boris Zuev, another lender who had been invited by Mr. Zheleznyak.

10

48.    Mr. Sergey Leontiev made a secret audio recording of that meeting, a certified transcription and translation of which is attached hereto as Exhibit B.

49.    At the August 21 meeting, Mr. Sergey Leontiev and Mr. Zheleznyak again repeatedly acknowledged the debts and gave assurances that they would repay the Loaned Funds.  For example, Mr. Sergey Leontiev stated that "You can be certain that we will perform our obligations to you" and "I give you my word, we will perform the obligation."

50.    Mr. Sergey Leontiev sought to characterize the debts as being Mr. Zheleznyak's personal responsibility rather than his own because Mr. Zheleznyak had raised the funds from Avilon and Mr. Avagumyan.  But over the course of the meeting he repeatedly admitted that he and Mr. Zheleznyak had been acting as partners in the scheme, stating "He and I are partners, and his obligations are my obligations, no doubt about it."

51.    Indeed, when Mr. Varshavsky stated that he had previously spoken to Mr. Zheleznyak seeking assurances of repayment, Mr. Sergey Leontiev responded that he would have to be the one to repay the Loaned Funds because he had all of the money.  In particular, he stated that "he [Mr. Zheleznyak] can't repay you … because I have the money.  I manage the business… that part of the business is managed by me."

52.    Mr. Sergey Leontiev repeatedly implored Avilon and Mr. Avagumyan to trust him and rely upon his promises of repayment just as they had trusted him and Mr. Zheleznyak in lending the Loaned Funds in the first place, stating "You've trusted us before, since 2008….  We recognize that obligation. We won't run away from you. We aren't hiding.  We are saying that we'll pay it back."

**Mr. Sergey Leontiev And Mr. Zheleznyak Made Partial Repayment Of Certain Of The Loaned Funds And Continued To Offer Assurances That They Would Repay The Balance**

53.      Following these meetings, Mr. Sergey Leontiev and Mr. Zheleznyak continued to work with their lawyers and financial advisors to discuss how to structure and formalize their repayment of the Loaned Funds.

54.      In or around September 2015 Mr. Sergey Leontiev and Mr. Zheleznyak repaid approximately $17 million of the Loaned Funds through another shell company they owned and/or controlled, Valkera Investments Limited ("Valkera").  This repayment, which was formalized as consideration for Avilon's assignment to Valkera of the 2005 Loan from Avilon to Ambika (which Ambika was unable to repay), corresponded to the $12.5 million principal amount of the 2005 Loan plus accrued interest and penalties.

55.      After Mr. Sergey Leontiev and Mr. Zheleznyak made this partial repayment, Mr. Zheleznyak continued to regularly discuss with Mr. Varshavsky the status of his and Mr. Sergey Leontiev's efforts  to repay the balance of the Loaned Funds.

56.      Mr. Sergey Leontiev's and Mr. Zheleznyak's legal advisors also continued to communicate with Avilon's lawyers concerning the parties' efforts to structure the repayment of the remaining funds.

57.      But at a third meeting between Mr. Varshavsky and Mr. Sergey Leontiev at Mr. Sergey Leontiev's lawyers' offices in New York in January 2016, Mr. Sergey Leontiev changed his position and stated that he would not repay the balance of the Loaned Funds, notwithstanding his prior repeated assurances of repayment.

58.    On information and belief, Mr. Sergey Leontiev only announced that he would not repay the Loaned Funds after he had completed surreptitiously transferring the Loaned Funds and his other assets into a protective trust, as described further below.

59.    Immediately after the January 2016 meeting in New York, Mr. Varshavsky met with Mr. Zheleznyak and an attorney who had been assisting Mr. Zheleznyak in structuring and formalizing the repayment of the Loaned Funds, Maksim Shamis.

60.    Mr. Zheleznyak informed Mr. Varshavsky that Mr. Sergey Leontiev intentionally had excluded him from attending the meeting.  Mr. Zheleznyak was upset and surprised when he learned that Mr. Sergey Leontiev had changed his position and refused to repay the Loaned Funds, and again promised to help secure repayment.

**Even As He Repeatedly Gave Assurances That He Would Repay The Loaned Funds, Mr. Sergey Leontiev Transferred Them To A Newly-Created Offshore Asset Protection Trust**

61.    At the same time that Mr. Sergey Leontiev had been stringing along Plaintiffs with promises to repay the Loaned Funds, on information and belief he instead transferred the Loaned Funds and his other assets to the Trust Defendants in order to frustrate Avilon's and Mr. Avagumyan's ability to secure repayment.

62.    In particular, on November 19, 2015 Mr. Sergey Leontiev settled Defendant Legion Trust as a new Cook Islands trust.

63.    On information and belief, Mr. Sergey Leontiev then transferred the Loaned Funds and his other assets into Defendant Legion Trust.

64.    On information and belief, Mr. Sergey Leontiev transferred those assets into Defendant Legion Trust through Defendant Wonderworks.

13

65.     This transfer rendered Mr. Sergey Leontiev and/or Wonderworks insolvent and was made without fair consideration.

66.     This transfer also was made with actual intent to hinder, delay, or defraud present or future creditors, including Avilon and Mr. Avagumyan.

67.     The Cook Islands is a jurisdiction notorious for its use by debtors to conceal and keep assets protected from recovery by creditors.

68.     The trust is a sham, created solely to put Mr. Sergey Leontiev's assets outside the reach of creditors even as he continues to have access to and control over those assets, including the Loaned Funds.

69.     Through the course of conduct alleged in this Complaint, Mr. Sergey Leontiev was able to secure the Loaned Funds for his own use and benefit.

70.     On information and belief, Mr. Sergey Leontiev effectively exercises control over the trust and the trustee, including with regard to the use and disposition of the assets in the trust.

71.     Additionally, the assets held by the trust are available to Mr. Sergey Leontiev through his immediate family.  The beneficiaries and contingent beneficiaries of the trust are Mr. Sergey Leontiev's parents and his wife, and his father Mr. Leonid Leontiev also is the Protector of the trust.

72.     On information and belief, Mr. Sergey Leontiev regularly has made payments to Mr. Leonid Leontiev into bank accounts located in the State of New York, including in connection with his parents' roles as beneficiaries of and Protector of the sham trust.

14

73.     On information and belief, Mr. Sergey Leontiev has access to and has received assets distributed from the trust to his immediate family members, including his parents.

74.     The extraordinary provisions of the trust deed governing Defendant Legion Trust, a copy of which is attached hereto as Exhibit C, demonstrate that the trust was intended to hinder claims by creditors, including Avilon and Mr. Avagumyan.

75.     In particular, the trust deed contains numerous provisions intended to defeat any attempt by creditors to obtain repayment from the assets of the trust, including defensive provisions triggered by the receipt of any court order or instruction.  Ex. C § 4.1 ("Event of Duress").

76.     These provisions provide for a trustee to simply ignore any exercise of powers under the trust deed that the trustee believes was compelled by a court order (*id.* §§ 14.0-14.2); to remove and replace any trustee who potentially could become subject to a court order by virtue of being domiciled in the same country as the settlor (*id.* § 25.11); and even to move the trust or its assets to another jurisdiction altogether in order to avoid the effect of a court order (*id.* §§ 21.2-21.3).

77.     The extraordinary nature of these provisions further demonstrates Mr. Sergey Leontiev's intent to make the Loaned Funds unrecoverable by placing them out of the reach of Avilon and Mr. Avagumyan.

## FIRST CAUSE OF ACTION
### Unjust Enrichment Against Defendant Sergey Leontiev

78.     Plaintiffs repeat and reallege the allegations stated above as if fully set forth herein.

15

79.    As set forth above, Mr. Sergey Leontiev personally took possession of the Loaned Funds.

80.    Mr. Sergey Leontiev benefitted from his possession of the Loaned Funds at the expense of Avilon and Mr. Avagumyan, to whom the Loaned Funds have not been repaid.

81.    It is against equity and good conscience for Mr. Sergey Leontiev to benefit from his possession of the Loaned Funds at the expense of Avilon and Mr. Avagumyan.

82.    Accordingly, Mr. Sergey Leontiev should be required to repay the Loaned Funds to Avilon and Mr. Avagumyan and to make them whole.

## SECOND CAUSE OF ACTION
### Unjust Enrichment Against Defendant Wonderworks Investments Limited

83.    Plaintiffs repeat and reallege the allegations stated above as if fully set forth herein.

84.    As set forth above, Mr. Sergey Leontiev directed the transfer of the Loaned Funds to Wonderworks.

85.    Wonderworks benefitted from its possession of the Loaned Funds at the expense of Avilon and Mr. Avagumyan, to whom the Loaned Funds have not been repaid.

86.    It is against equity and good conscience for Wonderworks to benefit from its possession of the Loaned Funds at the expense of Avilon and Mr. Avagumyan.

87.    Accordingly, Wonderworks should be required to repay the Loaned Funds to Avilon and Mr. Avagumyan and to make them whole.

16

### THIRD CAUSE OF ACTION
### Unjust Enrichment Against The Trust Defendants

88.     Plaintiffs repeat and reallege the allegations stated above as if fully set forth herein.

89.     As set forth above, after personally taking possession of the Loaned Funds, Mr. Sergey Leontiev transferred the Loaned Funds to the Trust Defendants.

90.     The Trust Defendants benefitted from their possession of the Loaned Funds at the expense of Avilon and Mr. Avagumyan, to whom the Loaned Funds have not been repaid.

91.     It is against equity and good conscience for the Trust Defendants to benefit from their possession of the Loaned Funds at the expense of Avilon and Mr. Avagumyan.

92.     Accordingly, the Trust Defendants should be required to repay the Loaned Funds to Avilon and Mr. Avagumyan and to make them whole.

### FOURTH CAUSE OF ACTION
### Unjust Enrichment Against Defendant Leonid Leontiev

93.     Plaintiffs repeat and reallege the allegations stated above as if fully set forth herein.

94.     As set forth above, Mr. Leonid Leontiev regularly has received payments from Mr. Sergey Leontiev, including in connection with his roles as a contingent beneficiary and Protector of the sham trust.

95.     Mr. Leonid Leontiev has benefitted from these payments at the expense of Avilon and Mr. Avagumyan, to whom the Loaned Funds have not been repaid, including as a result of the transfer of the Loaned Funds to the sham trust.

17

96.    It is against equity and good conscience for Mr. Leonid Leontiev to benefit from his receipt of these payments at the expense of Avilon and Mr. Avagumyan.

97.    Accordingly, Mr. Leonid Leontiev should be required to disgorge the payments he has received to Avilon and Mr. Avagumyan and to make them whole.

### FIFTH CAUSE OF ACTION
### Fraudulent Conveyance Against All Defendants

98.    Plaintiffs repeat and reallege the allegations stated above as if fully set forth herein.

99.    Plaintiffs were creditors of Mr. Sergey Leontiev at the time of his transfer to the Trust Defendants described above.

100.    This transfer rendered Mr. Sergey Leontiev and/or Wonderworks insolvent and was made without fair consideration, and as such was fraudulent as to Mr. Sergey Leontiev's creditors, including Avilon and Mr. Avagumyan.

101.    This transfer also was made with actual intent to hinder, delay, or defraud present or future creditors, and was therefore fraudulent as to Mr. Sergey Leontiev's creditors, including Avilon and Mr. Avagumyan.

102.    Accordingly, this transfer should be set aside and voided as a fraudulent conveyance.

### PRAYER FOR RELIEF

WHEREFORE, upon this claim for relief, Plaintiffs demand judgment against Defendants as follows:

A.    On the First Cause of Action, ordering disgorgement of Mr. Sergey Leontiev's ill-gotten gains and unjustly-obtained funds, and ordering restitution of such gains and funds to Plaintiffs, including not less than

18

approximately $29.6 million to Avilon and approximately $28 million to Mr. Avagumyan;

B.      On the Second Cause of Action, ordering disgorgement of Wonderworks' ill-gotten gains and unjustly-obtained funds, and ordering restitution of such gains and funds to Plaintiffs, including not less than approximately $29.6 million to Avilon and approximately $28 million to Mr. Avagumyan;

C.      On the Third Cause of Action, ordering disgorgement of the Trust Defendants' ill-gotten gains and unjustly-obtained funds, and ordering restitution of such gains and funds to Plaintiffs, including not less than approximately $29.6 million to Avilon and approximately $28 million to Mr. Avagumyan;

D.      On the Fourth Cause of Action, ordering disgorgement of Mr. Leonid Leontiev's ill-gotten gains and unjustly-obtained funds in connection with his role as a contingent beneficiary of and Protector of the trust, and ordering restitution of such gains and funds to Plaintiffs;

E.      On the Fifth Cause of Action, setting aside and voiding as a fraudulent conveyance the transfer to the Trust Defendants described above, and directing that the assets transferred be made available to Plaintiffs in satisfaction of judgment in this action, in amounts not less than approximately $29.6 million to Avilon and approximately $28 million to Mr. Avagumyan;

F.      Pre- and post-judgment interest;

19

G.      Attorneys' fees, costs, and other expenses; and

H.      Such other and further relief as this Court may deem just and proper.


Dated: New York, New York
December 29, 2016

                                DEBEVOISE & PLIMPTON

                                By: /s/ Colby A. Smith
                                        Colby A. Smith

                                Sean Hecker
                                Colby A. Smith
                                William H. Taft V
                                919 Third Avenue
                                New York, New York 10022
                                Tel: (212) 909-6000
                                Fax: (212) 521-6836
                                shecker@debevoise.com
                                casmith@debevoise.com
                                whtaft@debevoise.com

                                *Counsel to Plaintiffs*