UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re Application of DEPOSIT INSURANCE AGENCY for an order to conduct discovery for use in a foreign proceeding.

Petitioner.

Case No.

## DECLARATION OF DARIA DIACHENKO IN SUPPORT OF *EX PARTE* PETITION

I, Daria Diachenko, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury as follows:

1. I am a Senior Associate of Quorum, a law firm with offices in Moscow, Russia. I graduated from Law Faculty of the National Research University Higher School of Economics in 2014. I have over 6 years of experience in legal practice. I maintain a practice in asset restructuring, securities, cross-border litigation and private international law and bankruptcy, including under Federal Law No. 127-FZ "On Insolvency (Bankruptcy)" (the "Russian Bankruptcy Law"). An English translation of the Russian Bankruptcy Law, as published by the State Corporation "Deposit Insurance Agency" ("DIA") on their website,[1] is attached hereto as **Exhibit A**.

2. Although my native language is Russian, I am fluent in English, and have elected to execute and submit this declaration in English.

3. I submit this declaration pursuant to 28 U.S.C. § 1782 in support of DIA's Petition filed contemporaneously herewith, for discovery from Sergey Leontiev in aid of a bankruptcy proceeding pending in Russia over a failed bank. As set forth herein, DIA serves as

---

[1] *See* http://www.asv.org.ru/en/legislation/.

receiver/liquidator for the bankruptcy estate and seeks information material and necessary to the administration of creditor claims.

4. This declaration is comprised of matters that are statements of legal opinion and/or statements of fact. Where the statements are legal opinion, such statements represent my view of Russian law as a practicing lawyer. To the extent the statements are statements of fact, they are statements based upon my personal knowledge or based upon documents and/or information supplied to me by or on behalf of DIA, as administrator and trustee of OJSC JSCB Probusinessbank ("Probusinessbank" or the "Bank"), and are true to the best of my knowledge, information and belief. Quorum has been retained by DIA to serve as its legal counsel to assist with matters concerning the Russian insolvency proceeding in which DIA, as administrator of the Bank and the bankruptcy receiver, is actively seeking to recover assets of the Bank in order to maximize satisfaction of the claims asserted by the Bank's depositors and creditors.

I. **Overview of Russian Bankruptcy Law and the Role of DIA**

5. In Russia, the state commercial "arbitrazh courts" (also known as arbitration courts), such as the Moscow Arbitrazh Court, have exclusive jurisdiction over business issues including issues related to the bankruptcy of Russian entities. The Russian Bankruptcy Law includes a procedure for the liquidation of a bank. *See* Paragraph 4.1 of the Russian Bankruptcy Law. The Russian Bankruptcy Law provides for a controlled procedure designed to maximize the value of a bank's assets, to provide an equitable distribution among a bank's depositors and other creditors, and, where the claims of a bank's creditors have been satisfied in full, enable the bank to avoid liquidation and recover its solvency.

6. The Central Bank of Russia is the main regulator of the Russian banking industry, responsible for issuing and revoking banking licenses, the rules of banking operations and accounting standards, and serving as a lender of last resort for banks.

7. The Central Bank of Russia may appoint a temporary administrator over a bank while it investigates the bank's financial affairs and decides whether to rehabilitate or liquidate a bank.

8. The Central Bank of Russia must revoke a banking license for a number of reasons including if: (i) the capital of a credit organization falls below the minimum charter capital requirement set as of the date of the state registration of the bank, or (ii) the value of the assets of a credit organization falls below minimum capital requirements. Additionally, the Central Bank of Russia has the authority, which it may or may not elect to exercise, to revoke a license for a number of reasons including if: (i) it is found that there is significant misleading information in the bank's financial reports, (ii) the bank repeatedly fails to comply with anti-money laundering legislation within a 12 month period, or (iii) the bank repeatedly fails to comply with banking laws in a 12 month period and has been subjected to measures provided for in the Federal Law No. 86-FZ "On the Central Bank of the Russian Federation (Bank of Russia)". *See* Article 20 of the Federal Law No. 392-I "On Banks and Banking Activity."[2]

9. After a bank's license has been revoked by the Central Bank of Russia, an insolvency petition can be filed against a bank and accepted by the Russian arbitrazh court. A petition may be filed *inter alia* by the debtor, a creditor meeting certain criteria, or the Central Bank of Russia. *See* Article 189.61 of the Russian Bankruptcy Law.

---

[2] An English translation of Federal Law No. 392-I "On Banks and Banking Activity," as published by DIA, is available on its website at http://www.asv.org.ru/en/legislation/.

10. Where an insolvent bank had a license for accepting deposits from individuals, once a petition is accepted, DIA, a state owned corporation, is appointed as a trustee for the insolvent bank. *See* Article 189.77 of the Russian Bankruptcy Law. DIA exercises its authority as a trustee through an authorized representative with power of attorney for DIA. *See* Article 189.77(13).

11. The main goal of DIA is to ensure that the rights of all creditors are protected. To achieve this goal, DIA, among other things, timely verifies creditors' claims filed against a debtor, manages the bankruptcy estate, traces and challenges transactions that did not benefit the estate, takes measures focused on search, tracing and recovery of the bank's assets possessed by third parties, and pursues actions against persons that contributed to the bank's failure. In 2015, the International Association of Deposit Insurers presented DIA with the Deposit Insurance Organization of the Year award, reflecting global recognition of DIA's achievements in this regard.

12. In connection with DIA's ability to investigate the disposition of a bank's assets and to pursue actions against persons that contributed to the bank's failure, the Russian Bankruptcy Law authorizes DIA to, *inter alia,* file any application necessary to search, find and recover the subject bank's assets and perform other actions aimed at protection of rights and legitimate interests of the subject bank and its creditors. *See* Article 189.78 of the Russian Bankruptcy Law. Therefore, DIA is entitled to commence ancillary proceedings, including proceedings such as this one, to obtain discovery to aid in this goal of the bankruptcy proceeding.

## II. Probusinessbank's Insolvency

13. In August 2015, Probusinessbank, a Russian bank, of which Sergey Leontiev was the co-founder, president and largest shareholder, lost its license from the Central

4

Bank of Russia, because many of the bank's assets appeared to be "fictitious" and the Bank was insolvent.

14. According to a Declaration Leontiev filed in an action in the Southern District of New York[3] (the "Leontiev Dec."), Leontiev founded the Bank in 1993. The Bank owned numerous other banks, and they were "organized under the broad financial group 'Life'" in 2003. (Leontiev Dec. ¶ 12).

15. Leontiev was the president of the Bank, Alexander Zheleznyak was Chairman of the Board. Leontiev was the largest shareholder of Probusinessbank. Zheleznyak was a minority shareholder. Together, they owned a controlling interest in Probusinessbank through a company in Cyprus named Alivikt Holdings Limited ("Alivikt"). Alivikt together with other shareholders, namely East Capital Financials Fund AB, Haggard Financial Limited, Rekha Holdings Limited, Burmash Holdings Limited and BlueCrest Emerging Markets Fund Limited (collectively together with Alivikt, the "Shareholders", and each, a "Shareholder"), was involved in a suspicious deal of repurchasing by the Bank of its own stock in April-June 2014 which led to the damages from the Bank's collapse exceeding RUB 297 million ("Repurchase-2014"). Zheleznyak was responsible for management of the operations of the Bank, and Leontiev determined and prioritized the Bank's activities. Together, they controlled the activities of Probusinessbank from its founding until 2015.

16. On August 7, 2015, the Central Bank of the Russian Federation ordered that DIA take over provisional administration of Probusinessbank. Probusinessbank is the lead entity of a large group of companies referred to as "Financial Group Life", and which had 800 branches in 75 regions of the Russian Federation.

---

[3] Declaration of Sergey Leontiev dated January 26, 2017 filed in *Sergey Leontiev v. Alexander Varshavsky*, No. 16-cv-03595 (JSR) (Docket # 54).

17. In accordance with Article 20 of Federal Law No. FZ-395-1 "On Banks and Banking Activity", the Russian Central Bank will revoke the banking license of a bank that violates federal laws regulating banking activities and fails to maintain adequate capital. Probusinessbank was engaged in risky subprime-related credit transactions, and ultimately lost all of its assets. Through the order of Bank of Russia No. OD-2071 dated August 12, 2015, the Bank's banking license was revoked.

18. According to former employees, for the prior 10 years, Probusinessbank had been submitting false financial statements to regulators.

19. On October 28, 2015, Probusinessbank was declared insolvent by Judgment of the Commercial Arbitrazh Court of Moscow, and DIA was appointed bankruptcy manager (Trustee) of Probusinessbank by operation of law. It was determined at that time that Probusinessbank's liabilities exceeded its assets by RUB 1,271,128,000, which is roughly USD $21 million. Maxim Alexandrovich Khamchich is the DIA representative acting as Bankruptcy Manager/Trustee of Probusinessbank.

20. The bankruptcy proceeding is still open, having been extended by Judgment dated April 24, 2017. As Bankruptcy Manager/Trustee, Mr. Khamchich is charged with, among other things, responsibility for obtaining documents concerning claims of creditors of Probusinessbank, assessing the Bank's property, investigating and contesting suspicious transactions, searching for Bank property, and enforcing the property rights of the Bank.

21. Subject to Article 189.78 of Russian Bankruptcy Law, the appointment of the DIA as the Bank's official liquidator serves two objectives: namely, to marshal and collect the assets of the Bank at the highest possible value and to distribute the resulting proceeds to creditors in an orderly manner. The Receiver by his appointment is required to act in good faith

in relation to the rights and interests of the creditors and the Bank. His power includes the power to:

- accept under his jurisdiction the Bank's assets, to make up an inventory thereof;
- take measures aimed at ensuring the safekeeping of the Bank's assets;
- bring claims for recovery of amounts due to the Bank; and
- undertake investigative, search and recovery efforts for the return of the Bank's assets held by third parties.

### III. The Embezzlement Scheme That Led to the Missing Funds

22. A criminal case was initiated against former managers and employees of Probusinessbank for embezzlement through appropriation and misappropriation of funds "on an especially large scale" during 2014 and 2015. Subordinate employees of Probusinessbank and Life Financial Group provided detailed evidence to the Russian authorities of Leontiev's and Zheleznyah's direction of the embezzlement scheme.

23. According to accomplices, Probusinessbank would knowingly provide unsecured, non-performing "loans" to sham companies that do not actually conduct any business and that are controlled by Leontiev and Zheleznyak. The sham companies then transferred the loaned funds to other accounts controlled by Leontiev and Zheleznyak at Probusinessbank. The embezzled funds were then converted to dollars and transferred to the Latvian account of Vermenda Holdings Limited ("Vermenda"), a company Leontiev controls with an address in Cyprus. From there, the perpetrators, directed by Leontiev and Zheleznyak, transferred the embezzled funds elsewhere.

24. Upon information and belief, Leontiev transferred some of the embezzled funds to Vermenda and then to a Cook Islands Offshore Asset Protection Trust named Legion Trust (the "Trust"). The beneficiaries of the Trust are, nominally, Leontiev's parents and wife.

7

Leontiev's father, Leonid Leontiev, is the protector of the Trust; the trustee is Southpac Trust International Inc. ("Southpac"), a licensed asset manager based in the Cook Islands. Southpac, as trustee of the Trust, owns a Cook Islands company named Holdco Ltd. ("Holdco"), the director of which is Vadim Kolotnikov ("Kolotnikov"), who worked for Probusinessbank entities until 2015.

25. In addition to Vermenda, Leontiev and Zheleznyak used Cyprian companies Merrianol Investments Limited ("Merrianol") and Ambika Investments Limited ("Ambika"), for their "off balance sheet" transactions, and Vennop Trading Limited, Atlas – Investment Solutions (Luxembourg), CJSC Financial Group Life, Valkera Investments Ltd., Probusiness Management Limited, Lunare Trading Limited, Higold Investment Limited (BVI), Finbay Group Ltd, Morselo Investment Limited, Lancora Investments Limited (Cyprus), Fairbourne Logistics LP, Larienta Management Limited, Greenex Trading Ltd, Greenbox Trading Limited, Trustway Investments Ltd, Digitime Alliance Ltd, Kollado Inc., Solariom Limited, Vesvora Trading Limited, (collectively with Vermenda, the "Leontiev Companies").

26. Among others, the following companies, under the control of the group of perpetrators, were used in the embezzlement scheme prior to transfer of the embezzled funds (including, but not limited, to Vermenda Holdings Limited's account in Latvia):

| | |
|---|---|
| LLC | Engineering Royalty |
| LLC | Elso |
| LLC | Personal + |
| LLC | Alliance |
| LLC | Easton (alternative spelling: Iston) |
| LLC | PK Technologies |
| LLC | Sanris |
| LLC | ISK IvSpetsGarant (full name: Innovatsionno-stroitelnaya kompaniya "IvSpetsGarant") |
| LLC | Probusiness-Development |
| LLC | Debt Collection Agency Life |
| LLC | Tsentr Torgovli |

8

| | |
|---|---|
| LLC | KnewHowTrade |
| LLC | Financial Center Eskada |
| LLC | Progma Trade |
| LLC | Vostok-Cargo-Plus a/k/a KOPFA |
| LLC | Zolotoy express lombard region |
| LLC | Creditkin.ru |
| LLC | Rustorg-finance |
| LLC | Flaver |
| LLC | J R management |
| LLC | Avtoreal |
| LLC | Vanilla |
| LLC | Evromag |
| LLC | Tsentr innovatsionnykh resheniy |
| LLC | Zernoprom |
| LLC | Golden Funds |
| LLC | P and P |
| LLC | GeotorgOil |
| LLC | Iskra |
| LLC | Zolotoy express lombard south |
| LLC | Yarilo |
| LLC | North-Neft |
| LLC | Khrisaor |
| LLC | SN Trading |
| LLC | Multibrand |
| LLC | Tekhnologiyi and Oborudovanie |
| LLC | BaltAvtoTrade C |
| LLC | Business Partner |
| LLC | Investitsionnaya kompaniya "Realfinance" |
| LLC | Metall invest |
| LLC | Reformatsia |
| LLC | Flaund |
| LLC | Signal |
| LLC | Life Sreda |
| LLC | PB-Invest |
| LLC | FreeLife |
| LLC | Escada |
| LLC | Finpremium |

(collectively, the "Sham Companies", and each, a "Sham Company").

27. The Sham Companies were created by those controlling the Bank (Leontiev and Zheleznyak), and the Bank's employees were appointed nominee directors of the Sham Companies.

28. Leontiev and Zheleznyak directed the group of participants in the scheme, which group included:

> M. M. Krylova
> Ya. V. Alexeev
> V. V. Kazantsev
> A. V. Lomov
> N. V. Alexeev
> S. V. Kalachev
> M. M. Artemov
> K. V. Artemov
> I. P. Polikarpov
> A. V. Danukin
> O. E. Papakhin
> Natalia Abramova
> Yanna Krisiuk
> A.A. Vyulkova
> A.V. Simakov
> O.V. Kravchenko
> L.B. Shpagina
> N.A. Averianova
> L.E. Alkhovaya
> T.V. Balaboyko
> S.A. Batina
> F.N. Vorsin
> E.A. Gureeva
> N.V. Denisova
> A.V. Dronova
> D.V. Zhilenko
> O.P. Zarovnaya
> A.S. Zarovniy
> V.Y. Zinina
> M.A. Kosova
> N.I. Kudryakova
> D.V. Kulikov
> N.E. Lebedeva
> L.V. Legkova
> S.V. Leontiev
> A.N. Rasnikov
> A.A. Reutskiy
> V.A. Reshetov
> D.A. Samoylenko
> I.V. Safronov
> O.V. Simakova
> L.M. Tolmacheva

E.A. Khoroshikh
                    E.A. Tsybina
                    L.B. Chirkova
                    M.A. Shpagina
                    D.A. Errans
                    O.M. Yachina

(collectively, the "Conspirators").

29. Certain Conspirators pled guilty and provided the following details of the scheme. These schemes were carried out by officers of the Bank acting on the basis of powers of attorney signed by Zheleznyak, which officers, at the direction of Leontiev and Zheleznyak, would execute loan agreements to one of the Sham Companies. The loaned funds would be transferred from the Bank to the Sham Company that was designated as the borrower under the applicable loan agreement. As soon as the funds reached the account of the particular Sham Company, they were immediately transferred out to another and yet another Sham Company in a series of transfers. Ultimately, the loaned funds were transferred to Vermenda, where Leontiev and Zheleznyak had control of the funds. The division of the Bank engaging in these fictitious loans was called the "Valkyrie Directorate." This scheme of using the "off balance sheet" Sham Companies was called "Merry-Go-Round." A total of RUB 2,443,195,198 was looted from the Bank in these schemes from September 2014 to August 2015.

30. These Sham Company transactions involved numerous loan agreements including:

- Agreement No. 211-810/14u dated September 15, 2014 with LLC Isk IvSpetsGarant for a loan up to RUB 500,000,000. RUB 280,000,000 disbursed and lost by the Bank.

- Agreement No. 044-810/15u dated April 9, 2015 with LLC Engineering Royalty for a loan up to RUB 1,000,000,000. RUB 600,000,000 was disbursed and lost by the Bank.

- Agreement No. 071-810/15u dated May 15, 2015 with LLC Vostok-Cargo-Plus for a loan up to RUB 500,000,000.

- Borrower's obligations were later assigned to LLC Easton. RUB 365,000,000 was disbursed and lost by the Bank.

- Agreement No. 099-810/15u dated June 22, 2015 with LLC Tsentr Torgovli for a loan up to RUB 1,000,000,000. Borrower's obligations were later assigned to LLC PK Technologies. RUB 698,200,000 was disbursed and lost by the Bank.

- Agreement No. 137-810/15u dated June 28, 2015 with KnewHowTrade for a loan up to RUB 1,000,000,000. Borrower's obligations were later assigned to LLC Sanris. RUB 499,995,968 was disbursed and lost by the Bank.

(collectively, the "Loans"). The transactions concerning the Loans are referred to collectively as the "Transfers".

31. At times, Leontiev and Zheleznyak had certain Bank clients invest in loan transactions to the Sham Companies by providing funds directly to a Sham Company, rather than through the Bank. The clients would receive a higher interest rate than the Bank would have paid them. For such loans, the applicable Sham Company would issue a promissory note in favor of the client, and the Bank would guarantee the note. These loans, too, were fake, and the proceeds used in the same manner as the Merry-Go-Round Transfers.

### IV. Indirect Granting Of Loans And Real Estate Fraud

32. Probusinessbank, like other Russian banks, is subject to the regulatory requirements of Russian banking law and the monitoring of its compliance with those regulations by the Russian Central Bank.

33. For this reason, Leontiev and Zheleznyak developed a system by which Probusinessbank granted indirect loans to companies Leontiev and Zheleznyak controlled and of which they were the beneficial owners (the "Indirect Loans"). Because under Russian banking regulations direct loans by Probusinessbank to these companies would have required strict default provisions, among other things, the loans were granted to ostensibly creditworthy borrowers, usually other banks, one of which may have been Falcon Private Bank (Switzerland)

12

("Bogus Borrowers"), in order to avoid these requirements. The Bogus Borrowers then forwarded the loan proceeds to the true borrowers – companies owned and/or controlled by Leontiev and Zheleznyak. The Bogus Borrowers received illicit payments for their involvement or received cross financing by Probusinessbank for their projects.

34. Similar schemes were implemented outside the interbanking sector. One example of this is the project with Novaya Usadba CJSC (the "NU Project"). Upon information and belief, the grant of loans to a company named Novaya Usadba CJSC was concealed as a prepayment based on a 2015 real estate agency agreement. Pursuant to that agreement, Novaya Usadba CJSC was supposed to identify and implement real property projects for Probusinessbank. The acquisition of real property was, however, not a developed business sector of Novaya Usadba CJSC, and there was never an intention to actually undertake any real estate projects. Upon information and belief, this structure was implemented only to funnel and launder large amounts of money from Probusinessbank.

35. In exchange for its services, more than USD 10 million was transferred to Novaya Usadba CJSC by Probusinessbank. Novaya Usadba CJSC, however, did not use the money for the purported property purchases. Instead, it transferred the funds to Investitsionnye Resheniya LLC ("Resheniya"), a company ultimately owned and/or controlled by Leontiev and Zheleznyak. Resheniya was merely a shell and did not do any business.

36. Leontiev and Zheleznyak intentionally structured the Indirect Loans and the NU Project in such a way that the Bank could never recover the fund, and they could strip the Bank of its assets. As a result of this scheme, Probusinessbank incurred losses of at least RUB 600 million.

## V. Vermenda Bogus Bonds

37. Probusinessbank had a cash credit balance in various accounts with the Baltikums Bank AS, JSC Latvijas Pasta Banka and Dinosaur Merchant Bank Limited (a/k/a Dinosaur Merchant Bank Limited). Upon the instructions of Leontiev and Zheleznyak, this cash balance was exchanged for bonds of Vermenda, which Leontiev and Zheleznyak controlled and which had no assets. Hence, the bonds are worthless. As set forth above, the sole purpose of Vermenda was to further distribute the funds that Leontiev and Zheleznyak embezzled out of Probusinessbank in order to conceal their origins and insulate the funds from the reach of Probusinessbank's creditors. As a result of Leontiev and Zheleznyak's scheme to replace the cash credit balance with the worthless Vermenda bonds, the Bank lost more than RUB 14,491,629,649.90.

## VI. Acquisition Of Shares In "PK Life"

38. Leontiev and Zheleznyak also diverted the Bank's assets for their own gain by causing the Bank to acquire shares in PK Life LLC (also known as Life Processing Company LLC) in the amount of RUB 1,054,120,000.00. They caused PK Life LLC to be created. PK Life LLC's former shareholders, AstraPlus LLC, Vega LLC and Vest LLC (the sellers in the transaction), were companies which were affiliated with Probusinessbank via the Leontiev and Zheleznyak network of companies. Because PK Life LLC does not now and did not at the time of the Bank's share acquisition have any assets, the shares are worthless. Once the Leontiev and Zheleznyak-controlled sellers received the funds, they were transferred to Vermenda's account, where Leontiev and Zheleznyak then withdrew the funds for their own personal gain.

14

## VII. Additional Transactions Creating Losses For The Bank

39. Investigations have yielded information concerning other schemes to defraud the Bank's creditors (the "Additional Transactions") including:

(a) Probusinessbank's transfer of RUB 530,928,334.88 in loan proceeds to Dengi LLC and Probusiness-Development LLC (purported borrowers), and subsequent assignment of the repayment obligations to Zolotaya Rybka LLC and Holmeks LLC. These companies have no assets, do not undertake any commercial activities, and are not capable of repaying the loans.

(b) The assignment of the repayment obligation under a loan in favor of Alcologistika LLC to Dekant Rus LLC, Vient+ LLC and PK Technologies LLC, each of which were also shell companies and unable to repay the loan. The losses from this sham transaction total at least RUB 193,050,000.00.

(c) The transfer of various of the Bank's securities, totaling RUB 1 Bn to a foreign depository, including the Bank's shares in British Petroleum, to an account for which Leontiev is the beneficiary.

## VIII. Discovery Obtained In The United States Can Be Used In The Russian Bankruptcy Proceeding

40. The Conspirators went to great lengths to hide the schemes. The Central Bank of Russia questioned the legitimacy of the Sham Companies because they had "mass registration" addresses and only had bank accounts at Probusinessbank. To address these concerns, the Conspirators filled empty offices at these addresses with office furniture and equipment and sent photographs of same to the regulators. They also opened accounts for the Sham Companies at other banks.

41. Based on the most recent DIA reports, Applicant's "negative gap" is currently itemized at more than RUB 69.8 billion, which can be ascribed to the embezzlement of former management. At this time, an exact figure of the total anticipated losses cannot be defined; this will depend in particular on the final outcome of the investigations being conducted by the Applicant. At the time this motion was submitted, a loss in the amount of a minimum of 6,256,198,59.95 RUB, or over $100 million USD has been suffered as a result of these fraudulent schemes.

42. The emails of the Conspirators concerning these schemes mysteriously disappeared in August, 2015 immediately before the Bank's license was revoked, and certain Conspirators confirmed the destruction of other documents evidencing the schemes.

43. Upon information and belief, Leontiev has knowledge and possesses or controls evidence concerning these and other transactions that led to the Banks demise, and which could be most helpful to the receiver in its attempt to recover assets for creditors.

44. Leontiev left Moscow shortly after Probusinessbank's license was revoked and he currently lives in New York, New York.

45. Russian Bankruptcy Law (§ 2 Article 126) stipulates that the former managers of the legal entity which was declared bankrupt are obliged to transfer to the official liquidator all of the financial and other documentation of the entity and all its assets. Breach or evasion of this duty is considered obstruction of the liquidator's activity and consequently is an illegal action in bankruptcy proceedings.

46. Accordingly, the official liquidator is entitled to file an application to the arbitrazh court (which declared the bankruptcy of the legal entity) seeking a court order under which the former managers shall be obliged to transfer to the official liquidator all the financial

16

and other documentation and all the assets of the bankrupt entity. Such application is filed in compliance with Article 66 of the Arbitrazh Procedural Code of the Russian Federation according to which each party in a trial, that cannot on its own obtain the evidence necessary for the proceedings, is entitled to seek legal support in the court proceedings.

47. Since Leontiev resides in the United States, the assistance of the U.S. Court is necessary to implement Russian law and for DIA to discharge its duties as liquidator/receiver of the Bank.

48. Russian courts, including the court presiding over the Russian Bankruptcy Proceeding, permit the submission of evidence to substantiate a trustee and/or an administrator's position, and the Trustee is empowered to obtain discovery in ancillary proceedings in order to marshal assets of the bankruptcy estate and maximize recovery for creditors. Russian courts have few requirements or formalities regarding the admission of relevant evidence. The court will accept both documents and sworn testimony. As such, any information obtained pursuant to DIA's Application before this Court can therefore be used in the Russian Bankruptcy Proceeding. Since Leontiev is a not a party to the Russian Bankruptcy Proceeding and he resides in the United States, discovery could not be taken from him in the Russian Bankruptcy Proceeding without the aid of an American court.

49. While the discovery DIA seeks would be unavailable to it without the aid of an American court, the Russian Court will be receptive to the requested discovery. The discovery sought by DIA -- including documents relating to the Shareholders, Sham Companies, the Leontiev Companies, the Transfers, the Conspirators, Wonderworks, the Trust, Southpac, Holdco, Leonid Leontiev, Kolotnikov, the Bogus Borrowers, the NU Project, Resheniya, the Indirect Loans, the PK Life LLC transactions and the Additional Transactions, as well as

testimony from Leontiev as Probusinessbank's former President - is clearly relevant and necessary. Not only will the evidence be admissible in the Russian Bankruptcy Proceeding, but it will likely be considered critically important in DIA's investigation. There is still the equivalent of tens of millions of dollars missing. The documents and testimony sought would greatly assist the bankruptcy Trustee in his efforts to maximize recovery for those depositors and creditors who have suffered.

I declare under penalty of perjury the laws of the United States of America that the foregoing is true and correct.

Executed this 25 day of October, 2017 in Moscow, Russia.

*Diachenko*
Daria Diachenko

RUSSIAN FEDERATIVE REPUBLIC ..................................... )
MOSCOW OBLAST ................................................................ )
CITY OF MOSCOW ............................................................... )SS:
EMBASSY OF THE UNITED STATES OF AMERICA ..................... )
CONSULAR SECTION ........................................................... )
SUBSCRIBED AND SWORN TO BEFORE ME THIS
_____ DAY OF _____ OCT 2 5 2017

*Francisca Bruns*
Francisca Bruns
Consular Associate
U.S. Embassy Moscow

Commission Indefinite