# EXHIBIT 14



# Russia's Abuse of Interpol

Russia Studies Centre
Policy Paper No. 6 (2015)

David Satter

The Henry Jackson Society
July 2015



# Summary

- Russia has a history of using Interpol Red Notices to harass political opponents.

- Interpol takes little care to assure that Red Notices are not being abused.

- The Russian legal system is manipulated for political purposes.

- A person who is extradited to Russia will not have the rights which are enshrined in international law.

- To prevent abuses, Interpol should introduce sanctions against countries that file requests for Red Notices out of political motives.

# 1. Introduction

On 31 July 2014, Nikolai Koblyakov, a French-Russian businessman and human-rights activist, travelled to Bulgaria on business, where he got an unpleasant surprise. He was arrested at the airport in Sofia and held for possible extradition to Russia, where he was wanted on charges of fraud. The charges, and an order for Koblyakov's arrest, were issued in 2010; but he was only detained in Sofia on the basis of an Interpol Red Notice requested by the Russian authorities four years later, on 1 April 2014.

The timing may not have been coincidental. In France, where he has been living since 2010, Koblyakov financed *Russie-Libertés*, an organisation that campaigns for human rights in Russia. In May 2014, *Russie-Libertés* issued a report on Russian corruption; Koblyakov was one of the authors. He wrote a chapter in which he proposed rewarding transparent and ethical enterprises with the label 'without corruption'. Such an idea is not helpful in Russia, where few companies could be awarded such a title.

On 6 June, Russian President Vladimir Putin visited France for the D-Day commemoration. Mr Koblyakov was one of three Russians who demonstrated with a group of Ukrainians, under the Ukrainian flag, outside the National Assembly, where Putin was having dinner with French president François Hollande. It is possible that, with the Red Notice in place, Mr Koblyakov's participation in this demonstration may have led to plans to entrap him in Bulgaria.

Koblyakov's case ended on 21 October 2014, when a Sofia court rejected Russia's request for extradition, on the grounds of lack of evidence. Koblyakov, however, is hardly the only person to have been victimised by the Russian government's abuse of Interpol; the list of targets includes prominent opponents of the Putin regime, some of whom remain under threat.

This report seeks to show the degree to which the Russian regime is abusing Interpol by seeking Red Notices for political reasons. In addition to descriptions of individual cases, it describes the state of the justice system in Russia and argues that extradition to the country is only possible in a limited number of unambiguously criminal cases. It also contains recommendations for reducing the risk that Interpol will be abused by Russia for political purposes.

# 2. WHAT IS INTERPOL?

Interpol is an international organisation dedicated to sharing law-enforcement information among its 190 member countries (every county in the world, with the exception of North Korea).[1] Its role, as defined in Article 2 of its Constitution, is to promote the highest-possible degree of mutual assistance, within the framework of the laws that exist in different countries and in the spirit of the Universal Declaration of Human Rights.

A Red Notice is a document, circulated on Interpol's databases, identifying wanted persons, in order to effect their arrest and detention, pending extradition. It can be granted as long as a

---

[1] 'World: A global presence', *Interpol*, available at: http://www.interpol.int/Member-countries/World

domestic warrant has been issued by national agencies. Most countries consider a Red Notice to be a sufficient legal basis for arrest and detention.

As Interpol is required to act in the spirit of the Universal Declaration of Human Rights, it has the option of not publishing a Red Notice if doing so could prejudice its "image or interests" (for example, if a request has been made by a country with a dubious human-rights record).

# 3. HOW RUSSIA ABUSES INTERPOL

Russian requests for Red Notices have frequently had political motivations. Besides Koblyakov, another subject of a Russian attempt to misuse Interpol was Bill Browder, the chief executive of *Hermitage Capital Management*. Browder's efforts to achieve posthumous justice for his lawyer, Sergei Magnitsky (who was murdered in prison, after being jailed for his efforts to investigate official corruption), led to the passage, in the US, of the Magnitsky Act, in 2012, which imposed travel bans and asset freezes on those responsible for Magnitsky's death.

In response to his efforts, the Russian authorities charged Browder with tax evasion and fraud, which led to repeated attempts to obtain a Red Notice against him. On 24 May 2013, the independent Commission for the Control of Interpol's Files (CCF) concluded that the Russian request was political. It recommended that all data relating to the application be deleted from Interpol's databases. On 26 July 2013, Interpol received another request from the Russian authorities, asking them to locate and arrest Browder, with a view to his extradition on a charge of "qualified swindling".[2] Interpol denied this request as well, ruling that it was covered by the decision of 24 May.

Finally, in 2014, after Browder had been convicted *in absentia* – and Magnitsky, posthumously – of tax evasion, the Russian authorities made a third application for a Red Notice for Browder. That request was considered at a November 2014 meeting in Lyon and was rejected.

The Russian authorities have also sought to use Interpol against Akhmed Zakayev, the former Foreign Minister and Overseas Representative of the unrecognised Chechen Republic of Ichkeria (ChRI). With the aid of an Interpol Red Notice, Zakayev was arrested in Copenhagen, on 30 October 2002, where he was attending a Chechen congress. He was accused, by Russia, of involvement in planning the 2002 Moscow theatre siege, a charge which he denied. After spending 34 days in Danish custody, Zakayev was freed, due to lack of evidence supporting the Notice and extradition request. When he returned to the UK following his detainment in Copenhagen, he was briefly arrested at Heathrow Airport, on a new Red Notice. In this case, he was accused of 13 criminal acts – including terrorism and the taking of hostages – relating to his role as a commander during the First Chechen War. Interpol issued this Red Notice due to the severity of the purported crimes; but the accusations were proved to be false, and the UK granted Zakayev political asylum. On 17 September 2010, Zakayev was arrested, again, on a Red Notice – this time, in Poland. He was released on the same day, however, when the judge ruled that he could not be held because of his political-asylum status in the UK.

---

[2] 'Interpol could decide to help Russia arrest Browder', *RAPSI (Russian Legal Information Agency)*, 19 June 2014, available at: http://rapsinews.com/judicial_news/20140619/271559323.html

Two other targets of Russia's attempted misuse of Interpol are Vladimir Ashurkov, a former asset manager of the *Alfa Group*, and his common-law wife, Alexandrina Markvo (a former TV presenter). Ashurkov became involved in blogger Alexei Navalny's *Anti-Corruption Foundation*, analysing potential corruption cases and calling the attention of audit companies to potential misdeeds. In 2013, Ashurkov helped to raise money for Navalny's campaign for the post of mayor of Moscow. In February 2014, Navalny was placed under house arrest, and the Russian authorities raided Ashurkov's apartment. Simultaneously, Ashurkov noticed that he was under surveillance. In May 2014, he and Markvo left Russia, for the UK – where they requested political asylum. A month later, the Russian authorities issued a warrant for Ashurkov's arrest, claiming that he and other leaders of the *Anti-Corruption Foundation* had embezzled individual donations to the organisation.

In December 2014, the Russian Investigative Committee opened a criminal case against Markvo, accusing her of large-scale fraud in connection with the management of events to promote reading and literature in Moscow parks.[3] The Investigative Committee claimed that, for one of the events in 2012, Markvo used Moscow park facilities free of charge while reporting rental expenses – which were covered by the Moscow city government – of 2 million roubles ($32,000). The Committee placed her on the international 'Wanted' list.

On 16 February 2015, Moscow's Basmanny District Court issued a warrant for Markvo's arrest, with the Interior Ministry issuing an international arrest warrant, through Interpol, on 5 March. As of 28 April, Markvo had not appeared on Interpol's Red Notice list; but she and Ashurkov are concerned that it might happen. As Ashurkov explained, in March:

> If the regime can issue a Red Notice before we can get the slow-moving and uncertain process of asylum finished, we could face a nightmare scenario of Russia demanding an extradition, of Alexandrina being detained in Britain, or even sent back to Russia to face trial there. The Kremlin wants this. They want to have this picture of an innocent woman – the mother of a nine-month-old baby – being hunted by them around the world to send a message. 'We know no limits. We will stop at nothing to persecute our opponents.' The cruelty, the absurdity of it – that's the entire point.[4]

In addition to the most prominent cases, there are other disturbing instances of Interpol Red Notices being misused by the Russian authorities. Petr Silaev, a young political activist who fled Russia after taking part in a demonstration against the destruction of the Khimki Forest outside of Moscow three years ago, was detained in Spain after becoming the subject of a Red Notice. Eerik-Niiles Kross, an Estonian politician who upset the Russians by supporting Georgia in its NATO negotiations, was also placed on Interpol's Red Notice list, on allegations of sea piracy. Then, there is the case of Anastasia Rybachenko. Rybachenko, a 22-year-old Russian university student, was caught up in the pro-democracy protests after Vladimir Putin's re-election as president in 2012; more than a dozen persons were arrested, but Rybachenko escaped from Russia, and the Russians applied for an Interpol alert.

---

[3] 'SK zavel ugolovnoe delo v otnoshenii zeni soratnike Navaln'nogo' ['IC has opened a criminal case against the wife of Navalny's colleague'], *TV Rain*, 23 December 2014, available at: http://tvrain.ru/teleshow/makeeva_vechernee_shou/sk_zavel_ugolovnoe_delo_protiv_zheny_soratnika_navalnogo-379763/
[4] 'Exclusive: Opposition Leaders in London Are Putin's Next Target', *Newsweek*, 18 March 2015, available at: http://www.newsweek.com/2015/03/27/exclusive-opposition-leaders-london-are-putins-next-target-314743.html.

Article 3 of Interpol's Constitution is supposed to guarantee its neutrality and prevent it from being used by repressive regimes to persecute their political opponents; but, in practice, Interpol is dependent on the honesty of its member countries to make sure that it is pursuing only genuine criminals. In 2003, Interpol issued 8,857 Red Notices, and it is beyond the organisation's capacity to make sure that there are legitimate reasons for each one. In addition, given the severity of most Red Notice crimes, requests tend to be granted in a matter of hours once a member government has stated that a valid warrant exists (in Russia, therefore, the process of seeking such a red alert is a formality).

A Red Notice can render life extremely difficult for its target. Even if the subject is safe in their country of residence, they may be detained the moment that they cross a border – such was the fear for Bill Browder, during Russia's applications for his Red Notice: he was unable to leave Britain without ensuring that he would not be arrested while abroad. At the same time, Red Notices are posted on the Interpol and *LexisNexis* websites. US banks use these resources to run checks on applicants applying for new or upgraded accounts, as per the due-diligence requirements of the US Treasury; should a Red Notice be discovered, the application is rejected immediately. As the *Yukos* affair – in which Vladimir Putin imprisoned Mikhail Khodorkovsky, his political opponent, and seized control of his *Yukos* business, Russia's then-largest oil company – shows, these Notices can have dire financial consequences.

For example, Pavel Ivlev, a Russian lawyer now living in the US, was subjected to a Red Notice after Moscow charged him in connection with the case against the *Yukos* oil company. In 2014, his cash accounts with *Chase* were closed, and other banks have rejected his business. Similarly, Ilya Katsnelson, a US businessman living in Denmark, had his account at *Citibank* closed, in late 2007, because of his "problems with the Russians", and his assets were sold at a considerable loss (with a cashier's cheque sent to this attorney).[5] Katsnelson was eventually arrested in Germany, in 2008, on a Russian-requested Red Notice, accusing him of involvement with the *Yukos* affair; he was held for two months in a German maximum-security prison.

Finally, Andrei Leonovich – *Yukos*' former treasurer, now living in the UK – was accused of money laundering and was made the subject of a Red Notice. His firm was kicked out of a US private-equity fund, and a major UK asset-management firm refused his personal business. According to Ivlev, there are other cases in Britain and Spain where *Yukos* veterans were treated similarly.

# 4. RUSSIA'S JUSTICE SYSTEM

The purpose of a Red Notice is the detention of a lawbreaker, pending their extradition. With Russia, however, extradition is extremely problematic in all cases except those of the most unambiguously violent criminals. The Russian authorities promise that, for extraditions, the accused will be allowed to defend themselves fully and will have all the rights that are called for under international law; in reality, this is not so.

---

[5] Bromund, T.R. 'Putin's Long Arm', *The Weekly Standard*, 2 March 2015, available at: http://www.weeklystandard.com/articles/putin-s-long-arm_859638.html

For example, international law states that torture is illegal; yet, it is the standard operating procedure in Russia, in the first few days after an arrest. The prosecutor will then often cover up evidence of these acts, and the courts will disregard complaints. In a famous case in 1998, Alexei Mikheyev, a resident of Nizhni Novgorod, was beaten so savagely that he jumped out of a police-station window; he broke his spine and was left paralysed for life. The torture, which included electric shocks to his earlobes, was applied to get him to confess to the rape and murder of a girl who had disappeared; she later turned up unharmed, shortly after his suicide attempt.

Russian authorities also assure that an extradited person will not be treated in a way that is cruel, inhuman, or damaging to their dignity; however, these are exactly the conditions that are common in Russian pre-trial detention. According to a study carried out in 2010, by the Russian Prosecutor General, there are 55,000 persons in investigative prisons who have been infected with the AIDs virus, as well as: 40,000 with an active form of tuberculosis; 15,000 with syphilis; and 67,000 with various types of psychiatric disorders.[6]

To make matters worse, these prisons are overcrowded. In January 2014, Anatoly Tikhomirov, the head of the Moscow directorate of the Federal Service for the Execution of Punishment (FSIN), said at a press briefing that, although Moscow investigative prisons have a capacity of 8,657 inmates, on 1 January 2014, the total number of prisoners was more than 10,700 – 24 per cent above the limit. Part of the reason for this is that pre-trial detention is one of the ways of inducing prisoners to 'confess', and, as such, it goes on for months. There is also the fact that the Kremlin routinely accuses businessmen of financial violations.

Since 2000, nearly 20 per cent of Russian entrepreneurs have become the objects of criminal prosecution. Nearly 100,000 businessmen are serving sentences, and, every year, 75,000 entrepreneurs are arrested.[7] The reason for this pressure on business is that persons with influence use the organs of law enforcement to seize property. This process is called 'raiding' (*reiderstvo*), although it has nothing to do with 'corporate raiding' in the West (where a company is taken over by outsiders, but both sides benefit). In Russia, by contrast, 'raiding' is simply the seizure of assets, carried out under the threat of imprisonment. This practice is so ubiquitous now that an entire industry has grown up dedicated to taking companies away from their original owners. The costs of these operations have been published on the Russian internet, and they include: $50,000 to $200,000 for the relevant false court decision, which is the most expensive and essential part; $10,000 to $60,000 to bribe the local police; and $100 to $200 per person, per day, to rent a group of thugs to move in and take over.[8]

Today, nearly every Russian businessman operates in fear of 'raiding'. Sergei Kanev, a reporter for *Novaya Gazeta*, described the measures that some take to avoid it, in his article, "How 'roofs' are created in Russia", on 22 October 2007. According to the piece, a businessman in the Moscow region made pay-offs to virtually all local officials – "even the district police officer comes by for a present on his birthday", Kanev noted – but, "he gave the local police chief an expensive foreign car as a sign of 'special friendship'." Warehouses and large shopping centres (he wrote)

---

[6] Quoted in Irek Murtazin, special correspondent, Department of Investigations, *Novaya Gazeta*, expert testimony in the case of Nikolai Koblyakov, Sofia, Bulgaria.
[7] 'Spasti biznes ot repressiy: Kazhdyy biznesmen – vor?' [To save the business from reprials: Every businessman – a thief?], *Moscow News*, 17 January 2012, available at: http://www.mn.ru/oped/20120117/309890263.html.
[8] 'Russia's Raiders', *BusinessWeek*, 5 June 2008.

are, thus, controlled by the police leadership; shops, medium-sized firms, cafés, and small restaurants are controlled by the criminal-investigation unit; and pay-offs from sellers of pirated CDs and DVDs, of bootleg vodka, and of other forms of street trade are controlled by local police patrols. In addition, these patrols get a "substantial income" from illegal migrants and people caught intoxicated in public; they also guard spots were prostitutes gather, and extort money from the prostitutes' clients.

Mark Franchetti, the Moscow correspondent of London's *The Sunday Times*, had his own run-in with this system of police corruption, when he was stopped for riding his motorbike on the pavement in order to avoid a wedding procession. He was taken to a police station where a police captain wrote up a fictitious account of the incident, which alleged that Franchetti was guilty of resisting arrest. Franchetti, according to his version in the 29 June 2008 edition of *The Sunday Times*, said, "You know perfectly well that didn't happen. What's the point of writing lies?" The police captain answered that "this is what the prosecutor's office wants [...] You've been living here for a long time, you know the system [...] We are not bad people, but there's nothing we can do about it."[9]

The implication of the Russian judiciary in this widespread corruption merely confirmed a trend already present in public opinion. In a survey conducted in the spring of 2006, for the *Levada-Center*'s study of public opinion, most respondents believed that officials of the Prosecutor General's office were guided by "other considerations" (political expediency and direct orders from their political masters) first, and by the law second. They said that these officials were "prejudiced, inefficient, corrupt and ready to defend whoever can pay for it".[10]

Indeed, the duties and responsibilities of the Russian criminal-justice system are defined, officially, by the country's Constitution and criminal code. In practice, however, legal rules and real life often resemble parallel streams that do not intersect with each other; what keeps them apart are financial or political interests which will almost always determine the outcome of a court case. Russia's judges are appointed for life and have the status of federal judges: they cannot be removed, except with the consent of the Qualification Collegia – supervisory bodies that are elected by the judges themselves. In theory, this should be enough to guarantee their independence; but, in every region, the affairs of the court are organised by a court chairman who decides to whom to assign cases. Given that local governments can use this position to 'support' the judicial system, politically sensitive cases tend to go to judges who are thought to be reliable in following orders.

This tight relationship is also problematic because the chairman can collect material to be used in dismissing a judge: for example, that they are dilatory in hearing cases, or that they make procedural errors. Only the Qualification Collegia can actually do the firing; but, the members of the Collegia are themselves judges who, in their individual capacity, are vulnerable to pressure. As a result, they generally behave like subordinates of the chairman and defy his or her spoken or unspoken requests only at the risk of their careers.

---

[9] Franchetti, M., 'Traffic incident gives insight into Russia's corrupt legal system', *The Sunday Times*, 29 June 2008.
[10] 'Voices from Russia: Society, Democracy, Europe', EU-Russia Centre/Levada-Center Research (2007), available at: http://www.eu-russiacentre.org/assets/files/EU-RC%20Levada%20Research%20Commentary.pdf.

The state of the country's legal system is illustrated by the fact that the European Court is overwhelmed with complaints against Russia's authorities. In 2013, 24,102 complaints concerning the country were made to the European Court, more than from any of the other 46 states which make up the Council of Europe. Most of these will never be heard; but, of the 129 judgments given, all but 10 went against Russia.[11]

# 5. POLICY RECOMMENDATIONS

Interpol is an important organisation with a laudable role; but it does not have the mechanisms in place to prevent abuses by Russia and other countries that seek to use it to persecute oppositionists. Interpol's Constitution, in fact, does not envisage sanctions against members that abuse their rights; this is a situation that needs to be remedied.

There is also a problem in the practical application of regulations. Bulgaria denied a request for the extradition of Nikolai Koblyakov, for example; but he may be arrested in any other EU state. The possibility of this type of manipulation must also be eliminated.

In general, the abuse of Interpol can be reduced by the adoption of the following measures:

- Interpol should introduce and enforce stronger sanctions – up to and including expulsion – against states filing requests for Red Notices out of political motives.

- Interpol should enhance the transparency of the provision of information about a subject of a Red Notice, as well as of requests for striking off an entry.

- Red Notices should be synchronised with asylum and extradition proceedings, and Red Notice applications should be automatically deleted where asylum is granted or extradition has been refused.

Russia has consistently used Western institutions in order to serve its own purposes, and without respect for their underlying rationale. The hope was that these organisations would facilitate Russia's transition to democracy; but the result has been to undermine the institutions themselves. In the wake of the invasion of Ukraine and other Russian actions that make clear the extent to which the country does not share Western values, the West's first priority should be to strengthen the integrity of the international bodies, like Interpol, on which it (the West) depends. The inability of Russia to subvert the purposes of these organisations may prepare for the day when it will be able to participate in them while respecting their true purpose.

---

[11] 'Russia, Press country profile', European Court of Human Rights (July 2014).

## About the Author

**David Satter** is Associate Fellow of The Henry Jackson Society. He is a former Moscow correspondent for the *Financial Times* of London, is the author of three books on Russia, and is the director of a documentary film on Russia. He is a long-time observer of Russia and, in December 2013, became the first U.S. correspondent to be expelled from Russia since the end of the Cold War. He is also a senior fellow at the Hudson Institute and a fellow of the Foreign Policy Institute of Johns Hopkins University School of Advanced International Studies (SAIS).



## About the Russia Studies Centre

The Russia Studies Centre is a research and advocacy unit operating within The Henry Jackson Society dedicated to analysing contemporary political developments and promoting human rights and political liberty in the Russian Federation.



## About The Henry Jackson Society

The Henry Jackson Society is a think tank and policy-shaping force that fights for the principles and alliances which keep societies free - working across borders and party lines to combat extremism, advance democracy and real human rights, and make a stand in an increasingly uncertain world.



The Henry Jackson Society
Millbank Tower,
21-24 Millbank, London, SW1P 4QP
Tel: 020 7340 4520

www.henryjacksonsociety.org
Charity Registration No. 1140489

The views expressed in this publication are those
of the author and are not necessarily indicative of
those of The Henry Jackson Society or its Trustees

© The Henry Jackson Society, 2015
All rights reserved

