# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
:
In re Application of DEPOSIT INSURANCE :
AGENCY for an order to conduct discovery :
for use in a foreign proceeding, :
:
                    Petitioner. :   Case No. 1:17-mc-00414-GBD
:
:
:
:
:
:
:
-------------------------------------------------------x

## RESPONDENT SERGEY LEONTIEV'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO QUASH SUBPOENA ISSUED PURSUANT TO 28 U.S.C. § 1782

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

*Attorneys for Respondent Sergey Leontiev*

January 16, 2018

# TABLE OF CONTENTS

Page

I. Preliminary Statement .......................................................................................... 1

II. Statement of Facts .............................................................................................. 2

    A.    Sergey Leontiev ..................................................................................... 2

    B.    The Russian State's Unlawful Expropriation and Looting of PRBB .......... 3

    C.    The Corrupt Individuals at the Helm of the DIA's Wrongdoing.................. 5

    D.    The Russian State's Pattern of Unlawful Expropriation of Private Assets.................. 7

    E.    Baseless Russian Criminal Proceedings to Confiscate Private Assets ........................ 8

    F.    Mr. Leontiev's Victories in Related New York Litigation ........................... 9

III. Argument ...................................................................................................... 10

    A.    The Requested Discovery Would Violate U.S. Sanctions .......................... 10

    B.    Petitioner Fails to Meet One of the Statutory Requirements of Section 1782 Because the Requested Discovery Is Not "For Use" in the Russian Bankruptcy Action.................................................................................................. 12

    C.    Discretionary Considerations Weigh in Favor of Quashing the Subpoena ............... 14

            1.    The Application Is a Bad Faith Attempt to Aid the Russian State's Unlawful Expropriation of Private Assets and Persecution of Political Adversaries ................................................................................. 14

            2.    The Application Is Premised on Unsupported and Demonstrably False Accusations ........................................................................ 15

            3.    The Application's Lack of Candor Regarding Prior U.S. Litigation Involving Mr. Leontiev Indicates Bad Faith ................................ 18

            4.    The Application Attempts to Circumvent U.S. and Russian Law and Policy................................................................................ 20

                 a.    The Requested Discovery Would Interfere With Mr. Leontiev's Right Not to Testify Against Himself in the Russian Criminal Actions.................................................. 20

                 b.    The Application Attempts to Circumvent Policies of the Russian Courts That Forbid the Requested Discovery.................... 21

                 c.    The DIA's Fishing Expedition into Respondent's Personal Assets Contravenes Both U.S. and Russian Law .............................. 22

            5.    The Subpoena Is Unduly Burdensome and Intrusive .................................... 22

    D.    Any Discovery Ordered By This Court Should Be Reciprocal ................................. 24

IV. Conclusion ................................................................................................... 25

# TABLE OF AUTHORITIES

Pages

**Cases**

*In re 650 Fifth Ave.*,
2013 WL 2451067 (S.D.N.Y. June 6, 2013) ........................................................................10

*In re Apotex Inc.*,
2009 WL 618243 (S.D.N.Y. Mar. 9, 2009) ...........................................................................23

*In re Appl. of Esses*,
101 F.3d 873 (2d Cir. 1996)..................................................................................................25

*In re Appl. of Auto-Guadeloupe Investissement S.A.*,
2012 WL 4841945 (S.D.N.Y. Oct. 10, 2012)........................................................................20

*In re Appl. of Consorcio Minero, S.A. v. Renco Grp., Inc.*,
2012 WL 1059916 (S.D.N.Y. Mar. 29, 2012)........................................................................25

*In re Appl. of OOO Promnefstroy*,
2009 WL 3335608, at *9 (S.D.N.Y. Oct. 15, 2009) ..............................................................23

*In re Barnes*,
365 B.R. 1 (Bankr. D.D.C. 2007) ..........................................................................................22

*Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*,
798 F.3d 113 (2d Cir. 2015)............................................................................................12, 14

*In re Certain Funds, Accounts, &/or Inv. Vehicles Managed by Affiliates of Fortress Inv. Grp. LLC*,
2014 WL 3404955 (S.D.N.Y. July 9, 2014), *aff'd*, 798 F.3d 113 (2d Cir. 2015)...................22

*Euromepa S.A. v. R. Esmerian, Inc.*,
51 F.3d 1095 (2d Cir. 1995).............................................................................................14, 25

*In re Fuhr*,
2014 WL 11460502 (S.D.N.Y. Aug. 6, 2014)........................................................................24

*In re Glitnir banki hf.*,
2011 WL 3652764 (Bankr. S.D.N.Y. Aug. 19, 2011) ............................................................24

*Green Dev. Corp. S.A. De C.V. v. Zamora*,
2016 WL 2745844 (S.D. Fla. May 10, 2016) ........................................................................20

*Intel Corp. v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004)......................................................................................14, 20, 23, 25

*In re Ishihara Chem. Co., Ltd.*,
121 F. Supp. 2d 209 (E.D.N.Y. 2000), *vacated on other grounds*,
251 F.3d 120 (2d Cir. 2001)..................................................................16

*Leontiev v. Varshavsky*,
2017 WL 1737654 (S.D.N.Y. May 2, 2017) .................................9, 18

*In re Letter of Request from Crown Prosecution Serv. of United Kingdom*,
870 F.2d 686 (D.C. Cir. 1989) ..........................................................12

*Mees v. Buiter*,
793 F.3d 291 (2d Cir. 2015)..............................................................14

*Minatec Fin. S.a.r.l. v. SI Group Inc.*,
2008 WL 3884374 (N.D.N.Y. Aug. 18, 2008) .................................25

*In re an Order Pursuant to 28 U.S.C. §1782 to Conduct Discovery for Use in a Foreign Proceeding*,
2017 WL 3708028 (D.D.C. Aug. 18, 2017) ......................................23

*In re Sarrio, S.A.*,
119 F.3d 143 (2d Cir. 1997)..............................................................24

*In re Ex Parte Shagang Shipping Co., Ltd.*,
2014 WL 1744264 (S.D.N.Y. Apr. 28, 2014)....................................22

*U.S. v. Jones*,
1989 WL 66668 (S.D.N.Y. June 14, 1989) ......................................16

*U.S. v. Prevezon Holdings Ltd.*,
839 F.3d 227 (2d Cir. 2016)................................................................6

*U.S. v. Letter of Request for Legal Assistance from the Deputy Prosecutor Gen. of the Russian Fed'n*,
235 F.3d 1200 (9th Cir. 2000) ..........................................................15

*In re WinNet R CJSC*,
2017 WL 1373918 (S.D.N.Y. Apr. 13, 2017)...............................16, 20

**Statutes**

28 U.S.C. § 1782...................................................................... *passim*

Sergei Magnitsky Rule of Law Accountability Act of 2012,
Pub. L. No. 112-208, 126 Stat. 1496, 1504 (2012)...................... *passim*

**Regulations**

31 C.F.R. § 584 (2017), *et seq.* ...................................................10, 11

**Other Authorities**

163 Cong. Rec. S8170 (statement of Sen. Cardin) ....................................................................7, 10

Office of Foreign Assets Control, Specially Designated Nationals and Blocked
Persons List, https://www.treasury.gov/ofac/downloads/sdnlist.pdf.........................................7

U.S. Department of State – Bureau of Consular Affairs, Country Information,
Russian Federation, https://travel.state.gov/content/travel/en/legal/Judicial-
Assistance-Country-Information/RussianFederation.html ......................................................21

Respondent Sergey Leontiev respectfully submits this memorandum of law in support of his Motion to Quash the subpoena *duces tecum* and *ad testificandum* (the "Subpoena") served on him by Petitioner Deposit Insurance Agency ("Petitioner" or the "DIA") following Petitioner's *ex parte* application, dated October 26, 2017 (the "Application"), for discovery pursuant to 28 U.S.C. § 1782, and this Court's Order of November 1, 2017 (Dkt. 6) regarding the same.

## I. Preliminary Statement

The DIA, a corrupt instrument of the Russian state, is asking this Court to assist it in its unlawful expropriation of private assets and persecution of political enemies. While Petitioner claims that its Application for discovery is in aid of the Probusinessbank ("PRBB" or the "Bank") bankruptcy proceeding pending in Russia (the "Russian Bankruptcy Action"), the information sought from Mr. Leontiev—including details relating to personal financial transactions and assets—has nothing to do with any claims that could be brought in the Russian Bankruptcy Action and will be used for other nefarious purposes. This litigation is just one part of the Russian government's extensive campaign against Mr. Leontiev and his business associates, consistent with the Russian state's pattern in recent years of expropriating private businesses, especially private banks, and abusing the legal system for the benefit of politically connected insiders. Mr. Leontiev has engaged in no wrongdoing, and PRBB's unlawful seizure by the Russian state, and its subsequent looting by the DIA, were wholly unjustified.

The primary orchestrator, and a direct beneficiary, of the DIA's wrongful campaign against Mr. Leontiev is Russian attorney Andrei Pavlov and his law firm, Quorum. Pavlov was recently added to the Magnitsky List and is now subject to U.S. sanctions for his central role in a $230 million tax fraud, including his perpetration of false claims in Russian courts, that led to the unjust imprisonment, torture, and death of Sergei Magnitsky—an attorney who uncovered the fraud. While Pavlov's specific involvement in this proceeding was not disclosed to this Court, he has

1

been personally retained by the DIA to help conduct this litigation.  Indeed, the only purported evidence that is proffered in support of the wide-ranging and false allegations found in Petitioner's *ex parte* Application is an unsupported attorney declaration from Daria Diachenko, one of Pavlov's subordinates at Quorum.  Diachenko has no personal knowledge of the so-called facts discussed in her declaration, which includes no documentary support and holds no value.

Petitioner's Application not only is unsupported by competent evidence, but it also is premised on demonstrably false and misleading information, as explained below.

For a number of independent reasons, the DIA's pretextual and bad faith request for discovery from Mr. Leontiev should be rejected.  First, permitting discovery here would result in a violation of U.S. sanctions because Pavlov and Quorum have orchestrated the DIA's entire campaign against Mr. Leontiev, are playing an integral role in this specific action, and have a financial stake contingent on its outcome.  Second, the DIA has failed to meet a core statutory requirement of Section 1782 because the requested discovery is not actually "for use" in the Russian Bankruptcy Action.  Third, various discretionary considerations weigh in favor of Mr. Leontiev and against providing assistance to the DIA.  Among other things:  (1) Petitioner's Application purports to be in aid of a foreign proceeding that is illegitimate and unlawful; (2) the Application was premised on unsupported and demonstrably false accusations; (3) the DIA's lack of candor with the Court indicates bad faith; (4) the requested discovery would allow the DIA to circumvent the laws and policies of both Russia and the United States; and (5) the requested discovery would be unduly intrusive and burdensome.

## II.  Statement of Facts

### A.    Sergey Leontiev

Mr. Leontiev is a well-known and highly regarded Russian entrepreneur and businessman. In 1993, Mr. Leontiev and others founded PRBB, a full-service commercial bank headquartered

in Moscow. *See* Declaration of Sergey Leontiev ("Leontiev Decl."), ¶ 2. PRBB provided a wide range of banking services to corporate and individual clients, and eventually grew to become the 51st largest bank in Russia in terms of assets and the fourth largest in terms of branches. *Id.* ¶¶ 3-4. PRBB served as the parent entity to numerous smaller banks, which employed more than 13,000 people and operated hundreds of offices and branches throughout Russia. *Id.* ¶¶ 5-6.

Until August 2015, Mr. Leontiev served as PRBB's President and Chairman of the Board of Directors. *Id.* ¶ 7. Following the Russian government's illegal seizure of PRBB, described below, Mr. Leontiev was forced to flee Russia with his family out of fear for their safety. *Id.* ¶¶ 12-13. He has remained in the United States since September 2015, taking refuge from the continued threat of physical harm and political persecution in Russia. *Id.* ¶ 13.

## B. The Russian State's Unlawful Expropriation and Looting of PRBB

In August 2015, the Central Bank of Russia (the "Central Bank"), Russia's primary bank regulator, withdrew the Bank's license, seized its assets, and forced it into bankruptcy, despite the fact that Probusinessbank had not violated any law and was not in financial distress. Leontiev Decl. ¶¶ 10-12; *see also* Declaration of Anders Aslund ("Aslund Decl."), ¶¶ 14-16. In the two years preceding PRBB's unfounded seizure, PRBB's independent auditor, ZAO Deloitte & Touche CIS ("Deloitte"), issued unqualified audit opinions that found that the Bank was financially sound and in compliance with the Central Bank's rules and regulations, including those involving mandatory liquidity ratios and capital requirements. *See* Leontiev Decl. Exs. 1 & 2. The clean opinion for 2014 was dated April 15, 2015, just months before the Bank was seized, and was consistent with contemporaneous letters from the Central Bank. *Id.* ¶ 9, Exs. 3 & 4. In June 2015, only 10 weeks before revoking PRBB's license, the Central Bank also prepared a memorandum reporting on the Bank's financial position, which concluded that PRBB was solvent and faced no serious financial problems. *See* Declaration of Marshall R. King ("King Decl."), Ex. 1.

Despite PRBB's solvency and regulatory compliance, the Central Bank appointed the DIA as temporary administrator of the Bank on August 7, 2015. Leontiev Decl. ¶ 10. Five days later, the Central Bank revoked PRBB's operating license and forced it into bankruptcy, falsely claiming that the Bank was insolvent and had failed to comply with Russian banking laws. *Id.* ¶ 12.

Because PRBB had succeeded in the Russian banking industry without close government ties, it was susceptible to this government takeover. *See* Aslund Decl. ¶ 11. Additionally, Mr. Leontiev's long-term relationship with the U.S. Embassy (*see* Leontiev Decl. ¶¶ 17-22) and his association with Alexei Navalny, the most prominent political opponent of the Kremlin (*see id.* ¶¶ 23-25; *see also* Aslund Decl. ¶ 20), made him and his businesses targets of political persecution.

In the aftermath of PRBB's unwarranted seizure, the Russian state began to loot the Bank's assets and redistribute them to entities associated with political insiders. The DIA choreographed and executed this theft, and a subsequent investigation by the Russian General Prosecutor's Office concluded that the DIA had improperly transferred assets to its own subsidiaries and others. *See* Leontiev Decl. Ex. 5. Indeed, the day that the DIA arrived at PRBB's offices, it disconnected PRBB's access to banking networks, and then on August 10, 2015, temporarily reconnected it for the sole purpose of transferring 604 million rubles (approximately $9.6 million) to a DIA subsidiary bank, the Russian Capital Bank. *See* King Decl. Ex. 2. Soon thereafter, a significant portion of PRBB's assets (valued at 25 billion rubles (approximately $367 million)) was transferred to Binbank (a.k.a. B&N Bank), a well-connected Kremlin favorite. King Decl. Exs. 3 & 4. Notably, Binbank had been only a minor player in the Russian banking industry a few years prior, but by September 2015, it had transformed into Russia's fifth-largest private bank due to its regular receipt of bank assets seized by Russian authorities. *Id*. Ex. 5; Aslund Decl. ¶ 15.

In October 2015, a Russian bankruptcy court found only a minor shortfall between PRBB's

total assets and liabilities (approximately $19.7 million), nearly half of which could be accounted for by the illegal DIA transfer of PRBB's assets to Russian Capital Bank in August 2015. *See* King Decl. Ex. 6.

## C. The Corrupt Individuals at the Helm of the DIA's Wrongdoing

The scheme to deliver PRBB's assets to the Kremlin's inner circle has been led by the DIA's Vasiliy Bednin and lawyer Andrei Pavlov. In October 2015, the DIA appointed Bednin as the individual serving on its behalf in its role as PRBB's bankruptcy receiver (*see* Declaration of Yuri Monastyrsky ("Monastyrsky Decl."), ¶ 7), despite Bednin's prior arrest and indictment on commercial bribery and extortion claims in connection with the takeover of another Russian bank (King Decl. Ex. 7).[1] The DIA hired the law firm Quorum, of which the sanctioned Andrei Pavlov is the founder and senior partner (indeed the only partner listed on Quorum's website, *see* http://quorumlegal.ru/en/), to lead the Russian Bankruptcy Action and to take action against PRBB's former management. Monastyrsky Decl. ¶¶ 8-13. Quorum, and Pavlov specifically, also have been personally retained to oversee the DIA's "initiat[ion of] legal proceedings in foreign jurisdictions," including discovery proceedings "against S. Leontiev in the United States District Court for the Southern District of New York." Monastyrsky Decl. ¶ 11 & Ex. 2 at 2-3. Daria Diachenko, the Russian attorney who submitted a declaration in support of the DIA's *ex parte* Application here, is an Associate at Quorum working under Pavlov.

Pavlov has been widely condemned for his participation in criminal activities and is subject to U.S. sanctions as a result of his involvement in what has become known as the Magnitsky Affair. Aslund Decl. ¶ 22. The Magnitsky Affair involved an elaborate $230 million tax fraud scheme,

---

[1] Petitioner names the recently appointed Maxim Khamchich as the face of the DIA in the Russian Bankruptcy Action, but fails to mention that it was Bednin in the lead role until August 24, 2017. Monastyrsky Decl. ¶ 7.

in which corrupt Russian officials and others raided corporate offices, used stolen documents to hijack companies and forge fake contracts, and initiated "fraudulent legal proceedings" in order to obtain "sham judgments" that were the basis for tax refunds. *U.S. v. Prevezon Holdings Ltd.*, 839 F.3d 227, 230 (2d Cir. 2016); Aslund Decl. ¶ 12. The fraud was discovered by attorney Sergei Magnitsky, who came forward to officials with details of the scheme. Shortly thereafter, as part of a broad conspiracy to cover up the fraud, Russian authorities falsely imprisoned Magnitsky. *Prevezon*, 839 F.3d at 230-31; Aslund Decl. ¶12. After almost a year of pre-trial confinement and abuse, he died in custody. "Russia's Human Rights Council determined that Magnitsky's arrest and detention were illegal, that on the last day of his life Magnitsky was beaten by guards wielding rubber batons, and that necessary medical care was withheld." *Prevezon*, 839 F.3d at 231.

Congress passed the Sergei Magnitsky Rule of Law Accountability Act of 2012 (the "Magnitsky Act"), Pub. L. No. 112-208, 126 Stat. 1496, 1504 (2012), in order to "advance democracy, human rights, and the rule of law" in connection with Russia's relationship with the U.S.[2] Magnitsky Act § 402(a)(1). As part of the Act, Congress created the "Magnitsky List," which levies sanctions against individuals involved in the original tax scheme uncovered by Magnitsky; his detention, death and the related cover-up; and commission of other human rights violations or participation in the Russian government's repression of human rights. *Id.* § 404(a); *see also* Aslund Decl. ¶ 21. Individuals on the Magnitsky List are barred from a broad range of transactions, including receipt of any "property and interests in property," and their U.S.-based assets become frozen and nontransferable. Magnitsky Act § 406(a)(1). On December 20, 2017, Congress placed Andrei Pavlov on the Magnitsky List for "play[ing] a central role orchestrating

---

[2] Congress found that "Sergei Magnitsky's experience . . . appears to be emblematic of a broader pattern of disregard for the numerous domestic and international human rights commitments of the Russian Federation and impunity for those who violate basic human rights and freedoms." Magnitsky Act § 402(a)(12).

the false claims used in the $230 million tax fraud that Sergei Magnitsky uncovered." 163 Cong. Rec. S8170 (statement of Sen. Cardin). The Congressional report added that "[Pavlov's] addition to the Magnitsky list is long overdue, as he played an essential role in the plot." *Id.*[3]

## D. The Russian State's Pattern of Unlawful Expropriation of Private Assets

PRBB and Mr. Leontiev are not alone in facing the unlawful seizure of private assets by the Russian state. Various examples show a common course of conduct in the Russian government's pretextual seizure of private businesses, and the seizure and looting of PRBB is consistent with this pattern. *See* Aslund Decl. ¶ 14. In perhaps the most well-known example, the Russian government expropriated the assets of Yukos Oil Company, once Russia's largest crude oil producer. *Id.* ¶¶ 9-10; King Decl. Ex. 8. The Russian government began its attack on Yukos Oil in October 2003 when, in a widely criticized political move, it jailed Yukos Oil's CEO. Subsequently, the Russian government effectively nationalized Yukos Oil by manufacturing its bankruptcy, forcing the sale of its assets in a series of rigged bankruptcy auctions, and then acquiring those same assets for state-owned entities. Aslund Decl. ¶¶ 9-10; King Decl. Ex. 8. Other high-profile examples include the expropriations of Moskomprivatbank ("MPB")[4] and Bashneft. *See generally* King Decl. Exs. 9-11.

The Kremlin has focused on banks in recent years, and the Russian government's illegal seizure of PRBB took place against the backdrop of a massive forced state consolidation of the

---

[3] Pavlov also was added to the Treasury Department's Specially Designated Nationals and Blocked Persons List. *See* Office of Foreign Assets Control, https://www.treasury.gov/ofac/downloads/sdnlist.pdf, at 693.

[4] In March 2014, under circumstances almost identical to the seizure of PRBB, the Central Bank placed MPB, the Russian subsidiary of a Ukrainian bank, under the DIA's temporary administration, despite a Central Bank finding two months earlier that MPB was in compliance with relevant regulatory requirements. King Decl. Ex. 9. The DIA claimed that MPB was insolvent, despite the fact that the bank's assets were reportedly worth 50 billion rubles (approximately $1.4 billion). *Id.* As with PRBB, MPB assets were acquired by Binbank following the DIA takeover. *Id.* Commentators observed that MPB was targeted by the Russian government because of political tensions between Russia and Ukraine. *Id.*

Russian banking industry.  Aslund Decl. ¶ 15.  Hundreds of banks have had their banking licenses revoked by the Russian state in the last five years, including over 100 in 2015 alone.  King Decl. Ex. 12.  These events have primarily benefitted Russian state-owned banks and centralized control of the Russian banking sector with the Kremlin and its allies.  *See* Aslund Decl. ¶¶ 15-17.

### E.    Baseless Russian Criminal Proceedings to Confiscate Private Assets

Following PRBB's seizure in August 2015, the Investigative Committee of the Russian Federation conducted an investigation concerning the potential liability of the owners and managers of PRBB as a result of the Bank's closure.  In a December 1, 2015 decree, the senior investigator noted the absence of evidence that a crime had occurred and concluded that no criminal proceedings should be initiated against any of the owners or managers of PRBB.  Monastyrsky Decl. Ex. 4.  Russian authorities nevertheless commenced criminal proceedings against Mr. Leontiev and his business associate, Alexander Zheleznyak, in October 2016 (the "Russian Criminal Actions").  *Id.* ¶ 23.  Importantly, the baseless Russian Criminal Actions were filed only after Mr. Zheleznyak refused an attempted shakedown on behalf of the DIA in early 2016, during which he was pressured to transfer personal assets to Quorum to avoid retaliation.  Leontiev Decl. ¶ 15.  Victor Grin, the Deputy Prosecutor General overseeing the criminal proceedings against former PRBB executives in Russia, is, like Pavlov, on the Magnitsky List and subject to U.S. sanctions.  Monastyrsky Decl. ¶ 26; King Decl. Ex. 13.

The Russian Criminal Actions are emblematic of the Russian government's abusive actions against private businesses and their owners.  *See* Aslund Decl. ¶¶ 18-19.  Russian authorities regularly institute criminal actions against law-abiding businessmen for improper purposes, including the seizure of their assets.  Indeed, the U.S. Department of State has expressed concerns about this illegitimate use of criminal proceedings, noting that of the 200,000 economic crime cases Russia initiated in 2014, 75% never went to court, and over 80% of the individuals whose

cases were dropped still lost their business in the process. King Decl. Ex. 11 at 4. The State Department concluded that "[t]here is little recourse for Russian businesses caught in the legal system." *Id.* Similarly, a recent study by the Russia Studies Centre in London found that 75,000 Russian entrepreneurs are arrested every year, and that since 2000, nearly 20% of Russian entrepreneurs have become the subjects of criminal prosecutions. *Id.* Ex. 14 at 7. The study explained that "[t]he reason for this pressure on business is that persons with influence use the organs of law enforcement to seize property . . . carried out under the threat of imprisonment." *Id.*

**F.  Mr. Leontiev's Victories in Related New York Litigation**

Mr. Leontiev has recently vindicated himself against false allegations similar to those at issue here in federal and state actions in New York. In May 2016, Mr. Leontiev filed a suit for declaratory and injunctive relief against Alexander Varshavsky, a purported creditor with close ties to the Kremlin, in *Leontiev v. Varshavsky*, No. 16 CIV. 3595 (JSR) (S.D.N.Y.) (the "Federal Court Action"). King Decl. ¶ 30. Mr. Leontiev sought to end Varshavsky's harassment of him following PRBB's seizure, seeking a declaration that Mr. Leontiev had no obligation to pay the debts of PRBB or affiliated third-party entities. *Id.* During the litigation, Varshavsky made false assertions similar to those made by the DIA here about purported transfers of PRBB assets among "shell companies" and entities owned or controlled by Mr. Leontiev. *Id.* Such arguments proved unavailing, and after more than seven months of extensive discovery, Varshavsky consented to the entry of summary judgment against him. *Id.* ¶ 34. When Judge Rakoff awarded Mr. Leontiev costs following this win, he noted that Mr. Leontiev's victory was "hard-won and substantial." *Leontiev v. Varshavsky*, 2017 WL 1737654, at *2 (S.D.N.Y. May 2, 2017).

In November 2016, parties related to Varshavsky filed an action in New York state court, *Avilon Automotive Group v. Leontiev*, Index No. 656007/2016 (Sup. Ct. N.Y. County) (the "State Court Action"), making almost the same allegations as Varshavsky made in the Federal Court

Action and seeking to impose liability on Mr. Leontiev for the same purported debts. On October 5, 2017, Mr. Leontiev won the State Court Action when the court dismissed it with prejudice on res judicata grounds. *See* King Decl. ¶ 35. The State Court Action is now on appeal.

### III. Argument

#### A. The Requested Discovery Would Violate U.S. Sanctions

The Court should quash the DIA's Subpoena, even before engaging in any Section 1782 analysis, because allowing the DIA to obtain discovery from Mr. Leontiev would have the effect of delivering discovery materials to, and also enriching, sanctioned Russian attorney Andrei Pavlov, in violation of the Magnitsky Act and the Office of Foreign Assets Control's ("OFAC") Specially Designated Nationals and Blocked Persons List ("SDN List"). As explained above, Pavlov was recently added to the Magnitsky List and the SDN List for his "essential role" in the Magnitsky Affair. 163 Cong. Rec. S8170 (statement of Sen. Cardin). Accordingly, Pavlov is subject to strict sanctions that broadly prohibit transactions "in all property or interests in property." Magnitsky Act § 406(a)(1); *see also In re 650 Fifth Ave.*, 2013 WL 2451067, at *4-6 (S.D.N.Y. June 6, 2013) (holding that parties' mere inclusion on SDN List was sufficient to reject their attempt to evade sanctions because OFAC's designation was entitled to substantial deference).[5] Any transaction that has the "effect of . . . creat[ing] . . ., transfer[ring], or alter[ing,] directly or indirectly, any right . . . or interest with respect to any property" is sufficient to constitute a violation of these sanctions. 31 C.F.R. § 584.312. Transfers of property or interests by means of "a judgment . . . or other judicial or administrative process or order" are specifically contemplated. *Id.* Moreover, in addition to any direct violation, an act which "evades or avoids"

---

[5] Because Pavlov is the founder, principal, and senior partner of the Russian law firm Quorum, Quorum is subject to the same sanctions as Pavlov is personally. *See* 31 C.F.R. § 584.410 (2017) (if an individual on the Magnitsky List holds a majority interest in an entity, that entity also shall be sanctioned regardless of whether the entity is specifically named); *see also* Monastyrsky Decl. ¶¶ 8-9.

or "causes a violation of" the relevant sanctions also is prohibited.  *Id.* § 584.205(a).  Here, the mere act of transferring property, in the form of discovery materials, to Pavlov could be considered non-compliance with the sanctions.  *See id.* § 584.201(b)(1).  Such a transfer would be especially problematic here because it would result in financial benefits to Pavlov and would enable him to avoid the punitive effects of the U.S. sanctions regime.

As in the Magnitsky Affair itself, Pavlov is once again at the center of a fraudulent legal enterprise—aiding the DIA in its looting of PRBB and acting as the chief architect of the DIA's wrongful pursuit of Mr. Leontiev.  Pavlov and Quorum receive RUB 8.5 million (approximately $148,000) *per month* in connection with their role in the Russian Bankruptcy Action.  Monastyrsky Decl. ¶ 11.  Moreover, minutes from an April 2017 meeting of PRBB's Creditors' Committee disclose that Pavlov is being paid an additional RUB 1.5 million (approximately $26,000) *per month*, specifically "to prepare a comprehensive strategy of legal and out-of-court actions" against Mr. Leontiev and his business associates.[6]  Pavlov and Quorum also receive a separate contingency fee of 15% for all amounts recovered by the DIA through their litigation efforts.  Monastyrsky Decl. ¶¶ 12-13.  Importantly, the sanctions cover transfers of "any . . . property . . . or interests therein, present, future, or *contingent*."  31 C.F.R. § 584.310 (emphasis added).

Since Pavlov and Quorum represent the DIA in the Russian Bankruptcy Action and this litigation, and have a contingency fee arrangement in place with the DIA, they are direct beneficiaries of any Section 1782 aid and its subsequent use in Russia.  *See, e.g.*, Monastyrsky Decl. Ex. 2 at 4 ("[U]pon the completion of discovery procedures in the United States, [Pavlov will] prepar[e] a strategy for further actions" to be taken in Russia.).  Pavlov receives a known

---

[6]  Although the DIA's Application only discloses the involvement of Quorum attorney Daria Diachenko, a Pavlov subordinate, Pavlov's stated duties include working with the DIA's U.S. counsel on a variety of tasks ranging from "arranging for applications to be filed" to "preparing procedural documents," and "participating in witness depositions."  Monastyrsky Decl. Ex. 2 at 3-4.

financial benefit based on his continued employment in these matters, and he will be further enriched if the DIA recovers any amounts based on discovery from Mr. Leontiev. Such a result would have the effect of lining Pavlov's pockets and would contravene the Magnitsky Act, OFAC sanctions, and the U.S. government's punitive goals in sanctioning Pavlov for his role in the fraud and human rights violations culminating in Sergei Magnitsky's death. Because this Court's assistance would result in discovery materials being delivered to Pavlov, and financial benefits to Pavlov, in violation of U.S. sanctions and policy goals, the Court should quash the Subpoena.

**B.      Petitioner Fails to Meet One of the Statutory Requirements of Section 1782 Because the Requested Discovery Is Not "For Use" in the Russian Bankruptcy Action**

While Petitioner's Application contends that the requested discovery is in aid of the Russian Bankruptcy Action, this is a mere pretext. The true purpose is to aid the Russian state's campaign to seize and expropriate Mr. Leontiev's personal assets and to exert improper pressure on him to forfeit his assets, whether through vexatious litigation, baseless criminal proceedings, or other harassment. The DIA cannot demonstrate, as it must under Section 1782, that the discovery it seeks is intended "for use" in the Russian Bankruptcy Action "rather than for some other purpose." *In re Letter of Request from Crown Prosecution Serv. of United Kingdom*, 870 F.2d 686, 691 (D.C. Cir. 1989); *Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 117 (2d Cir. 2015) (denying § 1782 discovery because "[Petitioners] failed to establish that the discovery they seek is 'for use' in a foreign proceeding").

The fact that Petitioner's discovery requests go far beyond the scope of PRBB's businesses and transactions, and seek information about Mr. Leontiev's personal financial transactions and assets,[7] undermines the DIA's purported explanation that the discovery is for use in the Russian

---

[7]   *See, e.g.*, Flynn Decl. Ex. A, Subpoena at Request No. 8 (regarding Wonderworks, a company Mr. Leontiev previously owned indirectly), Nos. 9-12 (regarding Trust transactions and assets purportedly belonging to Mr. Leontiev and his family).

Bankruptcy Action.  Under Russian bankruptcy law, the DIA, as receiver, only has the authority to seek information to challenge transactions where PRBB was itself a participant or that were made at the expense of PRBB.  Monastyrsky Decl. ¶ 15.  Here, the DIA has had control of PRBB and all of its records since August 2015 and should already have all of the information it would need regarding transactions directly affecting the Bank.  *Id*. ¶ 14.  Moreover, Russian law limits any findings regarding personal liability for a company's bankruptcy to a special civil action initiated separately from the bankruptcy proceeding.  No such action is pending against Mr. Leontiev.  *Id.* ¶ 16.  Thus, the sweeping discovery requested in the Subpoena, which includes requests seeking information about Mr. Leontiev's personal assets and transactions not involving PRBB, indicates that the discovery would be used outside of the Russian Bankruptcy Action.

Furthermore, it appears extremely likely that the requested discovery will be used for the undisclosed purpose of pursuing baseless criminal charges against Mr. Leontiev.  Pavlov's stated duties in the DIA's pursuit of Mr. Leontiev include "interaction[s] with the Russian law-enforcement agencies."  *Id.* Ex. 2 at 3.  The DIA is in regular communication with the investigators behind the corrupt Russian Criminal Actions, and on numerous occasions, the DIA has, on its own initiative, influenced which documents are included in the criminal case files.  *Id.* ¶ 24.  On these occasions, the DIA suggested that investigators add certain documents to their case files, and then the DIA provided the investigators with the same documents soon thereafter or informed them where the documents could be obtained.  *Id*. Exs. 5-7.  The corrupt Russian criminal justice system has been widely condemned by outside observers and is regularly used as a tool to confiscate the assets of law-abiding citizens.  *See, e.g.*, Aslund Decl. ¶¶ 8-13, 18-20.  Congress has noted "serious concerns about the right to a fair trial and the independence of the judiciary in the Russian Federation."  Magnitsky Act § 402(a)(13).  Given that Mr. Leontiev likely will be denied due

process in the Russian Criminal Actions, which are themselves being led by a known human rights violator who appears on the Magnitsky List, the DIA's propensity to funnel documents to the Russian criminal authorities should be a matter of substantial concern to this Court.[8]

Because Petitioner cannot establish that the requested discovery is actually for use in the Russian Bankruptcy Action rather than for other purposes, as required by Section 1782, this Court need not look any further before quashing the Subpoena. *See Certain Funds*, 798 F.3d at 117.

## C. Discretionary Considerations Weigh in Favor of Quashing the Subpoena

Even if an applicant meets all statutory threshold requirements, Section 1782 assistance is entirely discretionary and "a district court is not required to grant a § 1782(a) discovery application simply because it has the authority to do so." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264 (2004). This Court should reject Petitioner's bad faith request for Section 1782 assistance based on a number of discretionary considerations.

### 1. The Application Is a Bad Faith Attempt to Aid the Russian State's Unlawful Expropriation of Private Assets and Persecution of Political Adversaries

Among the discretionary considerations relevant to whether Section 1782 assistance should be granted or denied are "the nature of the foreign tribunal" and "the character of the proceedings underway abroad." *Intel*, 542 U.S. at 264. Moreover, "if a § 1782 application is made in bad faith, [or] for the purpose of harassment, . . . the court is free to deny the application *in toto*." *Mees v. Buiter*, 793 F.3d 291, 302 n.18 (2d Cir. 2015) (internal quotations omitted); *Euromepa S.A. v. R. Esmerian, Inc*., 51 F.3d 1095, 1101 n.6 (2d Cir. 1995).

Here, even if the requested discovery were to be used in the Russian Bankruptcy Action,

---

[8] In December 2017, the Russian court overseeing a related criminal proceeding pending against other former PRBB executives found evidence of prosecutorial misconduct and the violation of the Russian rules of criminal procedure. Monastyrsky Decl. ¶ 27. This recent development further calls into question the legitimacy of the Russian Criminal Actions.

Section 1782 assistance should be denied because that action is itself illegitimate. The Russian Bankruptcy Action is merely one more step in the illegal expropriation of PRBB, enabling the stolen assets to be sold off in sweetheart deals and divvied among Kremlin cronies. As discussed above, the Central Bank and the DIA orchestrated the takeover of PRBB in August 2015 despite the fact that PRBB was solvent and in compliance with Russian regulations at the time. Among other things, the clean audit opinions issued by Deloitte, and the Central Bank's own statements in advance of the seizure of PRBB, demonstrate that the Bank was not in financial distress and that PRBB's bankruptcy was manufactured. The tactics used against PRBB are consistent with the Russian government's pattern of illegal expropriation of private companies, especially within the banking sector (*see* Aslund Decl. ¶¶ 14-15), and this Court should not endorse such unlawful conduct by aiding its perpetrators in the pursuit of forced bankruptcy proceedings.

Likewise, because the Russian Bankruptcy Action is politically motivated, this Court should refuse to exercise its discretion in favor of the DIA. Section 1782 "provides considerable discretion to district courts to decline to . . . assist in situations where the foreign government . . . is simply seeking to harass political opponents." *United States v. Letter of Request for Legal Assistance from the Deputy Prosecutor Gen. of the Russian Fed'n*, 235 F.3d 1200, 1205 (9th Cir. 2000). Here, the Russian Bankruptcy Action and this discovery proceeding are both part of the Russian authorities' wide-reaching campaign to punish Mr. Leontiev and his businesses for their affiliations with the U.S. Embassy and Alexei Navalny, the leader of Russia's political opposition and enemy number one of the current regime. This Court should not allow itself to contribute to such political reprisals and should quash the DIA's Subpoena outright.

## 2. The Application Is Premised on Unsupported and Demonstrably False Accusations

Petitioner's *ex parte* Application is premised on accusations of wrongdoing by Mr.

Leontiev and others that are unsupported by facts and are demonstrably false. For this reason, too, the Subpoena should be quashed. *See, e.g.*, *In re WinNet R CJSC*, 2017 WL 1373918, at *9 (S.D.N.Y. Apr. 13, 2017) (denying § 1782 application premised on misrepresentations).

Tellingly, the DIA has had full access to all of PRBB's documents and information since August 2015, and it could have supported any allegations, if true, with evidence. Yet all it has submitted is the conclusory declaration of Quorum attorney Daria Diachenko, a Pavlov subordinate, which is completely devoid of personal knowledge and contains no documentary support. Ms. Diachenko provides no evidence or explanation whatsoever for the basis of her supposed knowledge regarding over 100 companies, individuals, and transactions. *See, e.g.*, Diachenko Decl. ¶¶ 25-28.[9] Her declaration includes claims as outrageous as the assertion that PRBB "ultimately lost all of its assets" (Diachenko Decl. ¶ 17) – a claim that can only be explained by Petitioner's bad faith. *See, e.g.*, King Decl. Ex. 6 (order in Russian Bankruptcy Action showing that PRBB had over $2.27 billion in assets as of August 2015). Accordingly, Ms. Diachenko's declaration holds no evidentiary value, and because the DIA proffers no other support for the false allegations in its Application, the Subpoena cannot stand. *See In re WinNet*, 2017 WL 1373918, at *9 (quashing § 1782 subpoenas that "relie[d] solely on . . . Russian lawyer's affidavit"); *In re Ishihara Chem. Co., Ltd.*, 121 F. Supp. 2d 209, 217 (E.D.N.Y. 2000) (finding that "[t]he conclusory allegations of the parties in their declarations and memoranda are insufficient" in § 1782 dispute), *vacated on other grounds*, 251 F.3d 120 (2d Cir. 2001).

Moreover, the Application alleges that various business transactions were improper when the DIA has, or should have, information making the propriety of those transactions clear. For

---

[9] Several passing references to the hearsay statements of anonymous "former employees" and "accomplices" (Diachenko Decl. ¶¶ 18, 23), add no probative value to Ms. Diachenko's declaration. *See U.S. v. Jones*, 1989 WL 66668, at *5 (S.D.N.Y. June 14, 1989) ("These affidavits . . . are laced with hearsay and are of no value.").

example, Petitioner alleges "a suspicious deal of repurchasing by the Bank of its own stock in April to June 2014" (Br. at 2-3), but there was nothing suspicious about this stock repurchase, which was done in connection with the spin-off of Bank24, a PRBB subsidiary. Not only was PRBB's stock repurchase approved by its non-controlling shareholders, but it also was specifically approved by Russia's Central Bank and was disclosed in PRBB's financial statements. *See* Leontiev Decl. Ex. 2 at 83; King Decl. Exs. 15-17. Another example is Petitioner's wrongful assertion that Messrs. Leontiev and Zheleznyak "diverted assets for their own gain by causing the Bank to acquire shares in PK Life LLC," claiming that "[b]ecause PK Life LLC does not now and did not at the time of the Bank's share acquisition have any assets, the shares are worthless." Br. at 11. However, PK Life was a valuable card processing software and infrastructure company, and the DIA is well aware of its value. Not only is there publicly available information about PK Life's registered intellectual property and its financial activity, but the DIA itself attempted to auction off PRBB's 58.889% equity stake in PK Life at a starting price of RUB 1.06 billion (approximately $16.5 million). *See* King Decl. Exs. 18-20.

Similarly, Petitioner's Application contains a laundry list of purported "Sham Companies" and other entities which allegedly "have no assets" and "do not undertake any commercial activities." Br. at 6-7, 12. However, Petitioner provides no evidentiary support for the notion that any of the named entities were illegitimate or engaged in improper activities. Indeed, for nearly all of the purported "Sham Companies" included in Petitioner's list, Petitioner provides *no information at all*. *See* Diachenko Decl. ¶ 26.[10] The fact that many of the entities listed were actually brick-and-mortar companies with tangible assets, and publicly engaged in commercial

---

[10] Similarly, Petitioner provides zero information about the almost 50 individuals named in its sprawling list of purported "Conspirators." *See* Diachenko Decl. ¶ 28.

activity, contradicts the DIA's bare assertions. For example, Probusiness Development and Holmeks were financially healthy construction companies with visible construction projects. *See* King Decl. Exs. 21-24. Not only did they advertise their construction projects publicly, but also Russian federal authorities were familiar with their businesses. *Id.* Exs. 25-28. Likewise, upon information and belief, Zolotoy Express Lombard Region, Zolotoy Express Lombard South, Dengi, and Zolotaya Rybka were affiliated companies with extensive operations and numerous storefronts in Russia, with the first two operating pawn shops and the latter two operating retail jewelry stores. Given this context, the DIA's conclusory assertion that these myriad companies were valueless and did not engage in commercial activity indicates bad faith.[11]

### 3. The Application's Lack of Candor Regarding Prior U.S. Litigation Involving Mr. Leontiev Indicates Bad Faith

In an attempt to conceal relevant information from this Court, Petitioner omitted from its *ex parte* Application key facts about two related lawsuits in New York which concerned similar, false allegations about Mr. Leontiev, PRBB, and its management. *See* Flynn Decl. ¶¶ 5-6.

While the DIA informed this Court that the Federal Court Action "was recently closed" (Flynn Decl. ¶ 5), it omitted that Mr. Leontiev was victorious in that litigation against Alexander Varshavsky, a purported creditor with close ties to the Kremlin. A few weeks before trial, following substantial discovery and litigation, Mr. Varshavsky consented to the entry of summary judgment against him. King Decl. ¶ 34. Petitioner's incomplete presentation of the Federal Court Action was an attempt to obscure that Judge Rakoff found that "[Mr.] Leontiev's victory was, in fact, hard-won and substantial. . . . and he [wa]s the prevailing party" in that suit. *Varshavsky*, 2017 WL 1737654, at *2.

---

[11] Other assertions by the DIA are simply illogical. For instance, Petitioner does not adequately allege how the "Indirect Loans" would have harmed PRBB when the Bank could collect from "ostensibly creditworthy borrowers." Br. at 10. Simply labeling a borrower "bogus" or a payment "illicit," does not make it so. *Id.*

Similarly, the Application stated that Mr. Leontiev "is also presently a defendant" in the State Court Action. Flynn Decl. ¶ 6. But nearly a month before Petitioner filed its Application, the State Court Action was dismissed with prejudice on res judicata grounds, and Petitioner was well aware of this fact. *See id.* Ex. E at 11 (docket sheet from State Court Action).

Moreover, while the Subpoena includes a broad request for Mr. Leontiev to provide documents from both the Federal Court Action and the State Court Action, Petitioner neglects to mention that a protective order governed discovery in the Federal Court Action and that Mr. Varshavsky and the state court Plaintiffs made unsuccessful overtures *in both courts* to obtain the discovery from the Federal Court Action for use in the State Court Action. *See* King Decl. ¶¶ 30-35. Varshavsky also unsuccessfully attempted to obtain a broad exemption to the protective order for any requests from governmental entities, which Mr. Leontiev opposed based on the ease with which Russian authorities could then obtain his confidential information. *See id.* ¶ 32. Allowing the DIA to obtain that same discovery here would reward individuals and entities affiliated with the Russian government for taking a third bite at the apple. Russian authorities often operate through proxies who, despite having no official title, pursue their objectives abroad. Aslund Decl. ¶¶ 23-25. Varshavsky and the state court Plaintiffs epitomize such proxies, not only because of Varshavsky's close personal ties to the Kremlin, but also because they all are dependent upon, and beholden to, their patrons in the highest levels of the Russian government for lucrative contracts and their overall business success.[12] *See* Aslund Decl. ¶¶ 26-27.

Regardless, Petitioner's lack of candor regarding related litigation is further evidence of the DIA's bad faith and is yet another reason why the requested discovery should be denied. *See,*

---

[12] Varshavsky and the state court Plaintiffs were represented by the same law firm that represented Andrei Pavlov when he sought to avoid EU sanctions for his role in the Magnitsky Affair. *See* King Decl. ¶ 36 & Ex. 33.

*e.g.*, *In re WinNet*, 2017 WL 1373918, at *9 (quashing subpoenas where petitioner "did not forthrightly explain" relevant litigation and "did not frankly or fully describe" adverse rulings); *In re Appl. of Auto-Guadeloupe Investissement S.A.*, 2012 WL 4841945, at *10 (S.D.N.Y. Oct. 10, 2012) (quashing certain document requests because applicant's dubious representations and omissions led the court to "be concerned [petitioner] filed its § 1782 claim in bad faith"); *Green Dev. Corp. S.A. De C.V. v. Zamora*, 2016 WL 2745844, at *5 (S.D. Fla. May 10, 2016) (quashing subpoenas because "selective, belated disclosures . . . about related proceedings are inconsistent with the good faith requirements imposed on Section 1782 applicants, especially those submitting requests on an *ex parte* basis").

### 4. The Application Attempts to Circumvent U.S. and Russian Law and Policy

In determining whether to grant Section 1782 assistance, a district court should consider, among other factors, whether the application "conceals an attempt to circumvent foreign proof-gathering limits or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 244-45. In addition to the fact that the requested discovery would violate current U.S. sanctions, Petitioner's Application constitutes a strategic, bad faith attempt to circumvent the laws and policies of the United States and Russia for several independent reasons.

### a. The Requested Discovery Would Interfere With Mr. Leontiev's Right Not to Testify Against Himself in the Russian Criminal Actions

Criminal defendants in Russia have a right to protect themselves from self-incrimination that is analogous to the same right found in the Fifth Amendment of the U.S. Constitution. The Russian right to remain silent is enshrined in Russia's Constitution, in Russia's Code of Criminal Procedure, and in Constitutional Court Resolutions. *See* Monastyrsky Decl. ¶ 25, Exs. 8-11. Here, the DIA is attempting to violate this important procedural protection, knowing that by forcing Mr. Leontiev's deposition pursuant to Section 1782, it can then deliver a transcript of his testimony to

Russian prosecutors for use in the corrupt Russian Criminal Actions. As discussed above, it is extremely likely that any discovery provided as a result of the DIA's Application here will be used in the Russian Criminal Actions, in an attempt to bolster the Russian state's manufactured charges against Mr. Leontiev. Indeed, the DIA has regularly coordinated with investigators in the corrupt Russian Criminal Actions and has influenced which evidence is added to the criminal case files.

### b. The Application Attempts to Circumvent Policies of the Russian Courts That Forbid the Requested Discovery

As an initial matter, pre-trial depositions are not allowed under Russian law, even in civil commercial cases, and the DIA seeks to depose Mr. Leontiev here knowing that such discovery would be prohibited if the DIA were to try to obtain it from a Russian court. *See* Monastyrsky Decl. ¶ 20. The U.S. State Department has noted that Russia "does not permit" depositions in civil and commercial matters even when they are voluntary and involve "willing witnesses."[13]

Additionally, in order to circumvent Russian policies restricting document discovery, Petitioner requests discovery in the U.S. because it knows identical requests likely would be denied in Russia. *See* Monastyrsky Decl. ¶ 18. Russian courts require an affirmative demonstration of relevance for each piece of evidence in advance of requiring production, and the burden of proving relevance rests with the party seeking discovery. *See id.* ¶¶ 18-19, Ex. 3. Because the DIA would be unable to show that much of the information requested in the Subpoena is relevant to the subject matter of the Russian Bankruptcy Action, it strategically chose to avoid approaching the Russian court and to request discovery here instead.[14]

---

[13] The State Department also has noted Russia's "unilateral suspension of judicial cooperation [with the U.S.] in civil and commercial matters" and Russia's failure to honor discovery requests under the Hague Convention. Country Information, Russian Federation, U.S. Department of State – Bureau of Consular Affairs, https://travel.state.gov/content/travel/en/legal/Judicial-Assistance-Country-Information/RussianFederation.html.

[14] Petitioner acknowledges that it could have sought discovery in the Russian court pursuant to Article 66 of the Arbitrazh Procedural Code, which allows parties unable to obtain evidence on their own to apply to the Russian court for assistance (*see* Br. at 13-14), but the DIA has chosen not to do so. *See* Monastyrsky Decl. ¶ 18.

**The DIA's Fishing Expedition into Respondent's Personal Assets Contravenes Both U.S. and Russian Law**

The Subpoena would allow the DIA to engage in an improper fishing expedition designed to obtain information about Mr. Leontiev's personal financial transactions and assets. It demands identification of bank account numbers, bank names, and other highly confidential financial. *See* Flynn Decl. Ex. A, Subpoena at 14-17. While it is likely that the DIA would use such information to engage in the unlawful seizure and confiscation of personal assets, as it did with PRBB's assets, even if the DIA's ultimate goal is less nefarious, such as identifying assets for potential satisfaction of a future judgment against Mr. Leontiev, discovery aimed at acquiring information about Mr. Leontiev's personal assets still would circumvent both U.S. and Russian law because no judgment has been entered against him. *See In re Ex Parte Shagang Shipping Co., Ltd.*, 2014 WL 1744264, at *2 (S.D.N.Y. Apr. 28, 2014) ("[A]sset discovery is properly reserved for post-judgment proceedings."); *In re Barnes*, 365 B.R. 1, 6 (Bankr. D.D.C. 2007) ("The proposition seems so obvious" that "prejudgment discovery into assets from which a prospective judgment may be collected is generally not allowed in civil actions."); Monastyrsky Decl. ¶¶ 16-17. In fact, given that no judgment can be obtained against Mr. Leontiev in the Russian Bankruptcy Action, and no separate action seeking to hold him personally liable for the PRBB bankruptcy has been filed, Petitioner's fishing expedition into Mr. Leontiev's personal finances is all the more inappropriate and should be denied. *See, e.g.*, *In re Certain Funds, Accounts, &/or Inv. Vehicles Managed by Affiliates of Fortress Inv. Grp. LLC*, 2014 WL 3404955, at *6 (S.D.N.Y. July 9, 2014) ("[C]ourts must guard against efforts by parties to engage in fishing expeditions before actually launching litigation."), *aff'd*, 798 F.3d 113 (2d Cir. 2015).

**5.** **The Subpoena Is Unduly Burdensome and Intrusive**

District courts have broad discretion to quash "unduly intrusive or burdensome" discovery

requests under Section 1782. *Intel*, 542 U.S. at 245. The Subpoena's requests are unduly burdensome because, among other things, they are unjustifiably overbroad—seeking more than six years' worth of documents pertaining to transactions, accounts, and other financial information relating to over fifty companies and dozens of individuals across multiple countries. Even identifying potentially responsive material would require Mr. Leontiev "to devote substantial resources to perform onerous searches and then review voluminous documents." *In re Apotex Inc.*, 2009 WL 618243, at *3 (S.D.N.Y. Mar. 9, 2009); *In re Appl. of OOO Promnefstroy*, 2009 WL 3335608, at *9 (S.D.N.Y. Oct. 15, 2009) (quashing unduly burdensome § 1782 requests). This burden is particularly unreasonable given the minimal relevance of the information sought to the Russian Bankruptcy Action; indeed, the DIA does not even try to explain the relevance of most of the companies and individuals mentioned in the Subpoena. *See In re an Order Pursuant to 28 U.S.C. §1782 to Conduct Discovery for Use in a Foreign Proceeding*, 2017 WL 3708028, at *5 (D.D.C. Aug. 18, 2017) (quashing § 1782 subpoenas where "[i]n contrast to the thin relevance of the requested discovery, the burden it would impose on the respondents [was] substantial").

The discovery requests also are unduly burdensome in that other parties, including the DIA itself, are more likely than Mr. Leontiev to possess the requested materials and would be better situated to respond to the requests. Importantly, the DIA has had full access to PRBB's operations, files, data servers, and more since its takeover of the Bank in August 2015. Monastyrsky Decl. ¶ 14. Accordingly, it is unclear why the DIA requires discovery from third parties. Moreover, consistent with Russian corporate law, Mr. Leontiev's former roles as President and Chairman of the Board at PRBB involved no record-keeping responsibilities. *Id*. In these supervisory roles, Mr. Leontiev was not involved in the day-to-day decision-making of PRBB's executive managers or the management of its individual business units. Leontiev Decl. ¶ 8. Thus, he has limited

knowledge of the entities and transactions referenced in the Subpoena and is unlikely to possess responsive materials for many of the requests.

Furthermore, many of the discovery requests seek documents concerning foreign entities and locales—for example, Russia, Cyprus, Latvia, and the Cook Islands. Because extraterritorial documents (*i.e.* documents held outside of the U.S.) are beyond Section 1782's reach, Petitioner's requests for documents located abroad should be quashed. *See In re Sarrio, S.A.*, 119 F.3d 143, 147 (2d Cir. 1997) ("[T]here is reason to think that Congress intended [for § 1782] to reach only evidence located within the United States.").[15]

Finally, the Subpoena is unduly intrusive in that it requests highly sensitive personal, financial, and proprietary information that effectively would be made public if provided to the DIA. Indeed, various Subpoena requests demand bank account details and seek information about Mr. Leontiev's personal financial transactions. These sorts of information often are protected from disclosure. *See, e.g.*, *In re Glitnir banki hf.*, 2011 WL 3652764, at *5-8 (Bankr. S.D.N.Y. Aug. 19, 2011). However, because the case files in the Russian Bankruptcy Action are open to the nearly 8,000 purported creditors of PRBB, any discovery provided to the DIA here essentially will be made public in Russia. Monastyrsky Decl. ¶ 21. Under this scenario, Mr. Leontiev's sensitive data could be abused in infinite ways by almost anyone seeking to harm him. As such, the requested discovery would be unduly intrusive and should not be allowed.

**D.    Any Discovery Ordered By This Court Should Be Reciprocal**

If the Court orders discovery, it should permit Mr. Leontiev to take reciprocal document and deposition discovery from the DIA. Courts retain discretion in Section 1782 proceedings to

---

[15]    Although the Second Circuit has never squarely held whether Section 1782 applies extraterritorially, "[t]he bulk of the authority in this district suggests that a § 1782 respondent cannot be compelled to produce documents located abroad." *In re Fuhr*, 2014 WL 11460502, at *2 (S.D.N.Y. Aug. 6, 2014).

"condition relief upon [the parties'] reciprocal exchange of information," and they routinely do so. *Intel*, 542 U.S. at 262; *In re Appl. of Esses*, 101 F.3d 873, 876 (2d Cir. 1996) (affirming order of reciprocal discovery under § 1782); *Euromepa*, 51 F.3d at 1102. Here, Mr. Leontiev's need for discovery is dire given the Russian state's coordinated campaign to target him and confiscate personal—as opposed to Bank—assets. Any discovery obtained from the DIA would allow him to shine a light on the wrongful actions of the DIA and other Russian officials involved in PRBB's seizure, to counter the falsehoods included in the DIA's Application, to defend against similar allegations if the DIA were to bring claims against Mr. Leontiev, and to defend himself against the trumped up criminal charges being pursued by the DIA in coordination with corrupt Russian prosecutors. Proposed discovery requests to the DIA are submitted herewith. King Decl. Ex. 34.

Reciprocal discovery is particularly appropriate here given Mr. Leontiev's disadvantage in obtaining discovery through the Russian legal system and the fact that the DIA's only presence in the district is via this proceeding. *See In re Appl. of Consorcio Minero, S.A. v. Renco Grp., Inc.*, 2012 WL 1059916, at *4 (S.D.N.Y. Mar. 29, 2012) (ordering reciprocal discovery where respondent could not initiate its own § 1782 application because petitioner was not present in the district). Because reciprocal discovery here "would lend parity to the disclosure mix" and be material to Mr. Leontiev's ability to defend himself against various legal attacks by the Russian state, the Court should authorize it. *Minatec Fin. S.a.r.l. v. SI Group Inc.*, 2008 WL 3884374, at *9-10 (N.D.N.Y. Aug. 18, 2008) (granting "reciprocal discovery . . . including depositions").

## IV. Conclusion

For the reasons set forth above, Respondent Sergey Leontiev respectfully requests that this Court quash the Subpoena served on him by Petitioner.

Dated: January 16, 2018
       New York, New York

GIBSON, DUNN & CRUTCHER, LLP

By: _s/ Marshall R. King_

Robert L. Weigel
    rweigel@gibsondunn.com
Marshall R. King
    mking@gibsondunn.com
Alison L. Wollin
    awollin@gibsondunn.com
Brad L. Schoenfeldt
    bschoenfeldt@gibsondunn.com

200 Park Avenue
New York, NY 10166-0193
Telephone: 212-351-4000
Facsimile: 212-351-4035

*Attorneys for Respondent Sergey Leontiev*