UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re Application of DEPOSIT INSURANCE
AGENCY for an order to conduct discovery for use
in a foreign proceeding,

                              Petitioner.

Case No. 1:17-mc-00414-GBD

**DECLARATION OF SERGEY LEONTIEV**

------------------------------------------------------------x

I, SERGEY LEONTIEV, declare under penalty of perjury as follows:

1. I was born in Moscow, Russia in 1965. I have been an entrepreneur and businessman since 1989, when I co-founded a consulting company called Probusiness with my friend and business associate Alexander Zheleznyak.

2. In 1993, Mr. Zheleznyak and I, together with a third individual, co-founded Probusinessbank ("PRBB" or the "Bank"), a full-service commercial bank headquartered in Moscow.

3. PRBB operated pursuant to a general banking license issued by the Central Bank of the Russian Federation. The Bank provided a wide range of banking services to corporate and individual clients, with a focus on small to mid-sized businesses.

4. By August 2015, PRBB had grown to become the 51st largest bank in Russia in terms of assets and the fourth largest in terms of branches.

5. PRBB also owned and served as the parent entity to several smaller banks that provided more specialized services. Starting in 2003, PRBB and these subsidiary banks were organized under the brand Financial Group 'Life' (the "Life Group").

1

6. The Life Group grew to serve millions of customers across Russia. At the close of 2014, it employed more than 13,000 people and operated hundreds of offices and branches throughout Russia.

7. I was the President of PRBB from 1996 onward and also served as the President of the Life Group. In addition, I served as Chairman of PRBB's Board of Directors. I stopped serving in these roles in August 2015, when the Russian government illegally seized PRBB.

8. In these supervisory roles, I was not involved in, and did not interfere with, the day-to-day decision-making of PRBB's executive managers or the management of its individual business units. My positions also did not involve record-keeping responsibilities. Accordingly, I have limited personal knowledge of the various entities and transactions referenced in the subpoena issued to me by the Russian Deposit Insurance Agency (the "DIA"), which is at issue in this action (the "Subpoena"), and I am unlikely to possess responsive materials, or any relevant information, for many of the Subpoena's requests.

9. For fiscal years 2013 and 2014, the Bank's independent auditor, ZAO Deloitte & Touche CIS ("Deloitte"), issued unqualified audit opinions that found that the Bank was financially sound and in compliance with the Central Bank's rules and regulations, including those involving mandatory liquidity ratios and capital requirements. Attached hereto are Exhibit 1, a true and correct copy of the consolidated financial statements and an independent auditor's report prepared by Deloitte for Probusinessbank Group for the year ended December 31, 2013, and Exhibit 2, a true and correct copy of the consolidated financial statements and an independent auditor's report prepared by Deloitte for Probusinessbank Group for the year ended December 31, 2014. The clean audit opinion for fiscal year 2014 was dated April 15, 2015.

PRBB also received letters from the Central Bank in February and May 2015 stating that it was "satisfactory" with respect to capital, assets, liquidity, and other key factors. Attached hereto are Exhibit 3, a true and correct copy of a letter from the Central Bank to A. D. Zheleznyak on behalf of PRBB, dated February 13, 2015, and Exhibit 4, a true and correct copy of a letter from the Central Bank to D. G. Dylnov on behalf of PRBB, dated May 7, 2015.

10. Despite PRBB's solvency and regulatory compliance, the Central Bank appointed the DIA as temporary administrator of the Bank on August 7, 2015. On that same day, representatives of the DIA arrived at PRBB's offices and disconnected the Bank from its access to banking networks. The DIA then began the process known under Russian law as temporary administration of a bank, during which time the DIA controlled and managed the bank's assets.

11. On August 10, 2015, the DIA temporarily reconnected PRBB to its banking networks and transferred approximately 600 million rubles (approximately USD $10 million) to a DIA subsidiary bank, the Russian Capital Bank. In January 2016, the Russian General Prosecutor's Office announced that this was an improper transfer and that the DIA had failed to perform even a fundamental analysis of PRBB's finances before improperly transferring assets to its own subsidiaries and other recipients. Attached hereto as Exhibit 5 is a true and correct copy of an article regarding this announcement by Svetlana Dementieva and Olga Shestopal entitled "The Prosecutor's Office Makes a Deposit with the DIA," Kommersant, dated January 28, 2016, available at https://www.kommersant.ru/doc/2902123, and a certified translation thereof.

12. On August 12, 2015, the Central Bank revoked PRBB's operating license and forced the Bank into bankruptcy, falsely alleging that PRBB was insolvent and had failed to comply with Russian banking laws. These actions by the Central Bank were wholly unjustified.

13. Shortly after PRBB's license was revoked, I left Russia with my family out of fear for our safety. I arrived in New York soon thereafter and continue to live here today. I have remained in the United States since September 2015, taking refuge from the continued threat of physical harm and political persecution in Russia.

14. Regrettably, my fears have proven well-founded. In October 2016, Russian authorities commenced criminal proceedings against me and Mr. Zheleznyak based on manufactured charges. All allegations of wrongdoing at issue in those criminal proceedings, as well as any similar allegations underlying the DIA's request for discovery in this action, are false. I never engaged in any wrongdoing whatsoever in the operation of PRBB, nor did I ever improperly transfer any funds outside of the Bank.

15. In January 2016, Mr. Zheleznyak participated in a meeting, at the behest of the DIA's Valeriy Miroshnikov, in which a DIA representative pressured Mr. Zheleznyak to transfer assets to Quorum Law Firm in exchange for favorable treatment in any future criminal actions and other benefits. Despite an understanding that refusal could result in retaliation, Mr. Zheleznyak rejected the deal. Notably, it was not until after this failed shakedown attempt that any criminal proceedings were commenced against PRBB's former management.

16. I spent 22 years of my life building a successful financial enterprise, within which honesty, integrity, and compliance with the rule of law were always of paramount significance. The accusations leveled against me by the DIA and their co-conspirators, here and in Russia, are part of transparent attempts to justify the Russian government's theft of the business that my colleagues and I worked over two decades to build, and to extract further assets from me personally.

17. I believe that there are two main reasons that PRBB, and the Life Group, were initially targeted by the Russian government for expropriation. First, these businesses were successful in the Russian market based on their own merit, rather than connections to the Russian government. Without ties to the Kremlin, the businesses were susceptible to government takeover. Second, my associations with the U.S. Embassy and Alexei Navalny, a prominent political opponent of the current Russian regime, made me and my businesses targets of political persecution.

18. In May 2002, during President Bush's visit to Russia, U.S. Embassy officials invited me to take part in a presentation to the leaders of the two nations by representatives of the U.S.-Russia Banking Dialogue, which was launched for bankers from both countries to promote Russia's integration into the global banking sector. Each country designated one banker to speak at the presentation, and U.S. representatives lobbied for me as Russia's representative. I was selected as a result of these lobbying efforts, despite the Kremlin's strong preference for its ally, the head of the Russian Banking Association to be chosen.

19. At the event, I made a presentation to the presidents of the two nations, and then I responded to President Bush's follow-up questions. The Russian leadership appeared visibly perturbed. Afterward, one of the Kremlin advisors privately gathered the group of Russian bankers in attendance at the event and admonished me for responding to President Bush.

20. I maintained my positive relationship with the U.S. Embassy until I left Russia in August 2015, attending around 30 to 40 meetings at the Embassy over the years. Most of these meetings involved discussions of Russian banking issues. U.S. Embassy representatives

generally seemed to appreciate my Western values, and I enjoyed the opportunity to speak frankly about the political and economic climate in Russia.

21. Some of my meetings at the U.S. Embassy were one-one-one meetings with U.S. Embassy staff and/or visiting U.S. officials. Others were group meetings, often with other bank owners in attendance. One group of Russian bank owners, including myself, was invited back to the U.S. Embassy on a recurring basis.

22. Evidently, the Russian authorities took note of our participation in these meetings. Many of us have had our banks seized by the Russian government and now reside outside of Russia in exile.

23. Life Group's association with Alexei Navalny further placed me and my businesses at odds with the Kremlin. While I was President of Life Group, we held quarterly strategy sessions that were attended by several hundred managers and employees. These meetings often included presentations by successful leaders, who were invited to speak with the goal of engaging and motivating our team. In April 2012, we invited Alexei Navalny to speak at one of these quarterly strategy sessions. Mr. Navalny was at the time, and continues to be, the key opposition figure in Russian politics, the Kremlin's enemy number one, and a devoted anti-corruption activist.

24. After Mr. Navalny's presentation, we continued communicating with him and soon reached an agreement to have Bank24, one of PRBB's subsidiary banks, partner with Mr. Navalny to create a credit card designed to help finance Mr. Navalny's Anti-Corruption Fund. Every purchase made with the "Navalny Card" would result in a 1% cashback reward to the Anti-Corruption Fund, which in turn would help Mr. Navalny investigate Russian government agencies and officials and uncover corrupt activity.

25. Despite efforts to keep our plans for the Navalny Card a secret, Life Group's involvement in the project was leaked by the press in May 2012. This put our partnership with Mr. Navalny on the Russian authorities' radar. Soon thereafter, Bank24's management began receiving threatening calls from the Central Bank in relation to the Navalny Card. The Russian government's swift and hostile reaction was intimidating, causing us to succumb to their pressure to distance ourselves from, and ultimately abandon, the Navalny Card.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this _16_ day of January, 2018 in New York, New York.

_____
Sergey Leontiev