UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re Application of DEPOSIT INSURANCE
AGENCY for an order to conduct discovery for use
in a foreign proceeding.

             Petitioner.

Case No. 1:17-mc-00414-GBD

## DECLARATION OF ANASTASIA ZHIDCHENKO
## IN OPPOSITION TO QUASH SUBPOENA

I, Anastasia Nikolaevna Zhidchenko, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury as follows:

1.     My native language is Russian and I am executing this declaration in Russian with the understanding that it will be translated into English and submitted to the Court in opposition to the motion filed by Sergey Leontiev ("Leontiev") to quash the subpoena served upon Leontiev by the counsel of State Corporation "Deposit Insurance Agency" ("DIA").

2.     I graduated from Moscow State Social University and Institute for the Management and Law in 2004 and have practiced law in Russia since 2002 for total of 16 years including 2 years being clerk of judge.

3.     I was admitted to the Moscow Bar on December, 18th, 2013 with registration No 77/11627 in the Moscow regional advocate registry.

4.     I am the founder and a partner of Moscow Bar Bureau "Quorum" (registered under No 1147799002790, tax identification number 7704281858). On the January, 10th 2017, this legal entity has been dissolved due to transformation to a new legal entity called Moscow Bar Association "Quorum" (registered under No 1177700000851, tax identification number 7704386699), hereinafter referred as "Quorum". Since February 14th, 2018, I am the Chairman of Quorum. A true and correct extract from the state corporate registry in respect of Moscow Bar Bureau "Quorum" is attached hereto as an Exhibit 1, a true and correct extract from the state corporate registry in respect of Moscow Bar Association "Quorum" is attached hereto as an Exhibit 2, available at https://egrul.nalog.ru/ (and certified translation thereof.)

1

5.     Quorum is a universal Russian law firm specializing in dispute resolution. According to Russian national law firm rating "Pravo.ru-300" Quorum is the 14th biggest firm in Russia based on both number of lawyers and its income.

6.     Prior to Quorum I was employed in a few large Russian commercial banks and I am well familiar with bank system of Russia as well as Russian banking practice and this type of business. I am personally specializing in bankruptcy law, litigation, asset tracing and white collar crimes.

7.     It is true that up until February 2018 Mr. Andrey Pavlov, advocate, member of Moscow bar, used to be the Chairman of Quorum and one of its partners. However, just after it became known that he was included to the Special Designated Nationals (SDN List) by the US Treasury on December, 20th 2017, Mr. Pavlov has made a decision to quit the firm and is no longer a Charmain of Quorum or its partner. A true and correct copy of an extract from the minutes of the partners meeting is attached thereto as an Exhibit 3 and a certified translation thereof. A true and correct copy of the application form No R14001 to the state corporate registry for update of the information included into the registry is attached thereto as an Exhibit 4 and a certified translation thereof.

8.     Quorum is accredited as a dispute resolution law firm with DIA. A list of the law firm accredited with DIA is available at the official DIA website at https://www.asv.org.ru/orders/org_lawyer/. A true and correct copy of it is attached hereto as an Exhibit 5 and a certified translation thereof. Based on the competition criteria and upon reviewing offers of several law firms DIA made a decision to instruct Quorum for the provision of legal service for the OJSC JSCB "Probusinessbank" ("PBB") matter.

9.     Although Mr. Andrey Pavlov indeed had a minor role in legal service provision for bankruptcy manager of PBB and DIA, his personal involvement was very limited. Since entering the agreements with PBB I personally was a firm's partner, responsible for the provision of legal service including bankruptcy procedure in Russia and various foreign

2

proceedings, as well as current US Section 1782 Action against Leontiev. All Quorum's lawyers and employees are supervised by me and report to me during day-by-day law service provision including but not limited to litigation, bailiff procedures etc.

10.     There were several banks joined under the Financial Group called "Life" including: PBB, JSC "JSCB Express-Volga", OJSC "VUZ-Bank", CJSC "National bank of savings", OJSC "Gazenergobank", JSC "CB Solidarnost", OJSC "Poidem!" as well as some separate business entities (companies) including: Probusiness-Development Ltd, Life Factoring company Ltd, Life Collection agency Ltd and some other entities.

11.     Up until April 2014 PBB owned "Bank24.Ru" (OJSC) and at the moment of the license revocation in August, 2015 PBB owned just CJSC "National bank of savings" and OJSC "Poidem!".

12.     Initially, a provisional administration was appointed over the bank in order to check the existence and quality of PBB's assets. PBB's banking license was revoked after it was discovered that a significant part of the PBB's assets that had been registered with two foreign depositaries were gone. These assets had been pledged by PBB for the benefit of third-party companies to the clear detriment of PBB and its creditors.

13.     Namely, during inspection of provisional administration over PBB, it was revealed that a foreign depository "Otkritie Capital International Limited" (Republic of Cyprus) ("OCIL") kept in total more than 430 million USD of PBB's assets. However, at least 266 million USD of PBB's assets were used by OCIL to repay outstanding debts of Ambika Investments Limited, a company for which PBB had issued a guaranty. True and correct copies of the PBB's assets withdrawal notices issued by Otkritie Capital International Limited on August, 11, 2015 and September, 15, 2015 are attached thereto as Exhibits 6-7.

14.     In the same way, a foreign depository BROCERCREDITSERVICE (CYPRUS) LIMITED withdrew at least 360.000 USD of PBB's assets that were pledged as a guarantee for the outstanding debt of MERRIANOL INVESTMENTS LIMITED. A true and

3

correct copy of the encumbrance notices issued by BROCERCREDITSERVICE (CYPRUS) LIMITED and showing a pledge of PBB's assets are attached thereto as Exhibits 8-9.

15.    These circumstances were widely discussed in the media. A true and correct copy of the official press-release issued by the Central Bank of the Russian Federation ("the Regulator") regarding PBB's assets dated October 16, 2015, is attached hereto as an Exhibit 10, available at http://www.cbr.ru/eng/press/PR/?file=19102015_145926eng2015-10-19T14_56_52.htm. A true and correct copy of an article "Central bank has uncovered a massive leak of the PBB assets" dated October 16, 2015, Russian business-media company "RBK", available at online at https://www.rbc.ru/finances/16/10/2015/562104449a7947b8c6f4429d is attached hereto as an Exhibit 11 and certified translation thereof.

16.    Senior management of PBB was carefully hiding the fact that a significant part of its assets were not owned free and clear by PBB, but had been pledged as collateral to the foreign depositaries. These pledges were not disclosed in PBB's financial statements, and no third party, including "Delloite and Touche CIS", which was responsible for PBB's 2013 and 2014 audits, "could be aware of the pledge. The pledge information was not considered by the auditor and not included in the annual audit reports. Therefore, the auditor's conclusions could not be accepted as reliable because they were based on the incorrect information provided by PBB. In the same manner, the pledge information was not available to the Regulator; therefore, its notices dated February 02, 2015 and May, 07, 2015, to which Leontiev refers in his declaration cannot be relied upon for the same reason.

17.    PBB's license was not revoked upon the appointment of provisional administration over PBB. The Regulator's decree revoking PBB's license was issued after the provisional administration's inspection, which uncovered a significant deficiency in PPB's assets. As a result, the lack of the PBB's assets available to repay PBB's outstanding debts forced the Regulator pursuant to Russian bankruptcy legislation to file an insolvency application against PBB to the competent court.

4

18.     Former owners of insolvent banks often disagree with the Regulator's conclusions and actively challenge its decrees appointing provisional administration or revoking a bank's license. There is also due process and an appeal procedure available according to Russian legislation in order to challenge the court's bankruptcy order. Such procedures permits any interested party seeking to challenge the order to file any evidence of wrongdoing by the Regulator or showing the expropriation of asset. However, Leontiev failed to take advantage of these available procedures despite that he now claims that PBB was illegally confiscated.

19.     Leontiev's argument that he was not aware of PBB's day-to-day operations is immaterial to his motion to quash the court order issued under Article 1782 (Section 1782 Action) because PBB's bankruptcy manager has specific questions regarding PBB's activity and assets in the pre-bankruptcy period that Leontiev should be able to answer. Leontiev is a majority shareholder of PBB; he was the Chairman of the Board of Directors and a member of the Management Board. The Charter (Articles of Association) states that the governing bodies of PBB are the Shareholders, the Board of Directors, the Management Board (collective executive body) and the Chairman of the Management Board (sole executive body). The Operating activity of PBB shall be managed by the sole executive body (Chairman of the Management Board) and collective executive body (Management Board). Executive bodies shall be accountable to the Board of Directors and the Shareholders. Therefore, by virtue of his office and functions, Leontiev has to have information and documents (evidence) sought by the DIA. Furthermore, voluntary testimony by former PBB employees M.M. Krylova and N.V. Alekseev provide detailed information about PBB's meetings organized directly by Leontiev. Exhibit 12 attached hereto is a true and correct copy of N.V. Alekseev's witness statement dated April 25, 2017 and certified translation thereof. Exhibit 13–14 attached hereto are true and correct copies of M.M. Krylova's witness statement dated May 15, 2017 and M.M. Krylova's additional witness statement dated May 25, 2017 and certified translation thereof.

20.     It is true that following the date when the temporary administration was introduced, the Regulator restricted access to PBB's correspondent account opened at the Bank of Russia and disconnected PBB from the Banking Electronic Speedy Payment ("BESP") system. On August 10, 2015, PBB again became able to exchange electronic documents in correspondent account transactions. Taking into account the statutory requirement to effect payments imposed on PBB and the existence of such possibility, PBB effected clients' payments and ordinary payments from August 10 to August 11, 2015, based on clients' payment documents received by PBB from August 7 to August 10, 2015, which included RUB 604.1 million in claims of BANK ROSSIYSKY CAPITAL (PJSC) under a banking guarantee. Later, the DIA found that the payment to BANK ROSSIYSKY CAPITAL (PJSC) was made erroneously due to PBB's employees improper entries in a register of payments. As a result, BANK ROSSIYSKY CAPITAL (PJSC) was requested to return the funds to PBB, which it did. Therefore, this transaction did not cause any damage to PBB's creditors.

21.     Article 183.9 of Federal Law No. 127-FZ of 26.10.2002 (On Insolvency (Bankruptcy)) (hereinafter, the Law on Bankruptcy) provides that the head (chief officer) of the financial institution shall hand over to the temporary administrator accounting and other documents that reflect commercial activity of the financial institution for a period of three years prior to the imposition of the temporary administration. Furthermore, the head (chief officer) and other employees of the financial institution shall be held administratively and criminally liable if they obstruct the temporary administration's activity (including when they obstruct access to documents and other data storage devices and refuse to hand over documents).

22.     Considering the testimony of M.M. Krylova and N.V. Aleskeev, regarding off-balance sheet companies that were created and controlled by PBB, and the lack of documentation shown during the inventory conducted by the bankruptcy manager, the bankruptcy manager does not have all documents related to PBB's activity that it requires in order to fulfill its

function. In view of the above mentioned circumstances, the DIA respectfully applied to the competent court to conduct Article 1782 discovery from Leontiev (the Section 1782 Action).

23.     In his declaration, Leontiev is trying to convince the Court that he left Russia because he was afraid for his life. What he is not telling the Court, however, is that he planned to leave Russia even before PBB's license was revoked. He said goodbye to his employees in his personal corporate blog when he wrote, "Russia has not grown up to the level where such financial groups like LIFE may function properly. Probably, LIFE's time has not yet come in this country. Though over the next 50 years I will do LIFE in other parts of the world". In that post Leontiev did not indicate that he was being threatened or that he was afraid for his life or the lives of his family members. The fact that he did not make the claims then that he makes now casts doubt on their veracity. Exhibit 15 attached thereto is a true and correct copy of the Article "Life time not yet come. Sergey Leontiev stopped showing up in the office", dated August 14, 2015, available at https://www.rbc.ru/newspaper/2015/08/14/56bcaaf69a7947299f72bcc0 and certified translation thereof.

24.     In their description of the criminal prosecution of Leontiev and Mr. Zheleznyak in the criminal case initiated in Russia Yury Monastyrsky ("Monastyrsky ") and Leontiev intentionally misrepresent the facts, and mislead the Court by selectively "interpreting" provisions of the legislation of the Russian Federation.

25.     Initially, in October 2015, the Regulator informed the enforcement body that it was discovered that the owners and the managers of LIFE financial group (which included PBB) had committed criminal offenses and provided specific egregious examples where the assets owned by PBB were, among other things, siphoned and transferred outside the Russian Federation.

26.     It is correct that initially (on December 1, 2015) the investigative body issued a decree refusing to initiate the criminal case. The refusal to initiate the criminal case was based on an insufficiency of time to study the evidence and dubious transactions of PBB. However, in January 2016 it was confirmed that the decree was issued preliminarily without the review of

all of the evidence and the implementation of necessary procedures. Attached hereto as an Exhibit 16 is a true and correct copy of the official document (Decree of Investigative Committee of the Russian Federation dated January 20, 2016) and certified translation thereof.

27.     The criminal case was initiated under Decree dated February 17, 2016 based on the results of a proper procedural examination and on the basis of an Application of the Chairman of the Central Bank of the Russia No. 01-33-3/8573 dated October 1, 2015; an Application of DIA regarding the crime under the No. 1-1/153 dated January 14, 2016; and a report of FSB (Russian Federal Security Service) regarding discovery of indicia of crime dated January 18, 2016. Attached hereto as an Exhibit 17 is a true and correct copy of the document – Decree to initiate a criminal case dated February 17, 2016 and a certified translation thereof.

28.     Through the criminal investigation, grounds for charging Leontiev with a crime pursuant to article 160.4 of the Criminal Code of the Russian Federation (Misappropriation or embezzlement, that is, the stealing of other people's property entrusted to the convicted person, which are committed by an organized group or on an especially large scale) were discovered. Attached hereto as an Exhibit 18 is a true and correct copy of the document (Decree on impleading as accused dated October 13, 2016) and a certified translation thereof.

29.     Thereafter, Leontiev was accused of committing a crime specified by article 33.3 and 160.4 of the Criminal Code of the Russian Federation (accomplice in misappropriation that is, the stealing of other people's property entrusted to the convicted person, performed by abusing of his \ her position, which are committed by an organized group or on an especially large scale). Attached hereto as an Exhibit 19 is a true and correct copy of the document (Decree on impleading as accused dated July 10, 2017) and a certified translation thereof.

30.     Former employees of PBB, who performed the orders of the managing group of PBB, were criminally charged and sentenced, and the sentences were implemented. It should be noted that the employees received severe sentences for their crimes and were sentenced to imprisonment. Attached hereto as an Exhibit 20 is a true and correct copy of the document

8

(Court verdict of Ostankino district court of Moscow dated April 26, 2017 against N. V. Alekseev) and a certified translation thereof. Attached hereto as an Exhibit 21 is a true and correct copy of the document (Court verdict of Ostankino district court of Moscow dated May 25, 2017 against M. M. Krylova) and a certified translation thereof.

31. The legislation of the Russian Federation specifies that the investigative bodies independently lead criminal investigations and decide on commencing investigative or procedural activity. Hence, accusing DIA of somehow influencing the investigation or causing the prosecution is an unjustified attempt to discredit DIA.

32. Leontiev contends that he built PBB over into a successful business over 22 years. The testimony of M. M. Krylova and N. V. Alekseev paint a different picture of PBB: the bank was faced with problems after the crisis of 1998. Initially PBB covered its problems through transferring its problem credit portfolio to LIFE Debt Collection Agency (LLC) with the purpose of avoiding the establishment of obligatory reserves for possible losses. Subsequently, the bank management decided to create a number of companies under the control of the management group – called "carousel", and these companies were intended to cover a hole in a balance sheet. But, PBB's problems were increasing at an exponential rate. New business directions financed by PBB were not profitable and brought losses, and PBB assets were stripped for Leontiev's personal purposes (see details in deposition of M. M. Krylova). Krylova in particular was responsible for managing the network of companies. Krylova confirms that the accounts of these companies were used for misappropriation of assets on a grand scale. At the same time, N. V. Alekseev had a power of attorney issued by PBB which allowed him to sign and issue sham credits. These actions were evaluated by the investigation bodies and the court. Leontiev was charged not because he was managing PBB and performed actual control over PBB's activity, but because a sufficient number of witnesses questioned in the criminal investigation testified and implicated Leontiev as the one who directly gave the orders to perform the activities aimed at stripping the assets of PBB.

33.     Leontiev contends that his business was appealing to the government entities due to its profitability. But, a significant portion of PBB's assets were lost to foreign depositories, and PBB was thus insolvent. Other businesses in the Life group were close to insolvency. LIFE Factoring company (LLC) filed for bankruptcy on October 19, 2015. A monitoring procedure was initiated on it and on September 20, 2016 the court declared the company insolvent. A ruling of the court dated November 9, 2016 initiated a monitoring procedure against Probusiness Development (LLP). LIFE Financial group (LLC) was liquidated rapidly and was struck from the state corporate registry on August 06, 2015, shortly before PBB's license was revoked . Later on, the company was restored in the state corporate registry on September 6, 2016.

34.     The DIA has specific questions about numerous dubious transactions undertaken by PBB shortly before the bankruptcy. Leontiev's reluctance to cooperate creates grounds for reasonable suspicion that he is withholding information deliberately. DIA's efforts to obtain information about PBB transactions have no connection with Mr. Navalny as a political figure or with Leontiev's visits to the US Embassy. About 8000 creditors and claims worth over RUB 84 bn are listed on PBB's register of creditors' claims. As of now, most of the creditors' claims have not been repaid due to the insufficiency of PBB's assets. These claims were brought by various companies, including small enterprises. Creditors lost their savings and assets because of the PBB bankruptcy, and this posed a threat to their very existence. PBB's bankruptcy manager represented by the DIA is acting for the benefit of PBB's creditors, and not for its own gain or in favour of some third parties. If PBB was financially sound (as Leontiev attempts to assure), there would be no claims from the creditors.

35.     Leontiev's allegation that his support for a public interest initiative by Mr. Navalny in 2012 was the reason for the Regulator's enforcement of regulations against PBB three years later lacks any factual support and logic. His allegation that the fact that he was invited to the U.S. embassy 13 years earlier led to the taking over of PBB is even more outrageous.

36.     Leontiev's explanation that the financial condition of PK LIFE (LLC) justified the purchase of shares in this company by PBB is not correct. PK LIFE (LLC) was a legal entity affiliated with PBB. PBB employees were founders and managers of the company. It was founded in 2010, but not active until 2014 when its founders devised this plan for PBB to buy its shares. In order to create some support for the sale, a report regarding the market value of the shares of the company was prepared that was based on a 10 year business plan, not any real financial activity of PK Life, and the software sale agreement referenced in the report was preliminary only. The value of the shares was overestimated. DIA tried to sell them at their suggested value, but has not succeeded.

37.     The validity of suspicious transaction of selling of Bank24.ru (OJSC) shares is currently being litigated in the Russian bankruptcy proceeding. These transactions resulted in significant losses to PBB and were done at the expense of its creditors.

38.     The statements made by declarant Anders Aslund ("Aslund), who is a prominent critic of the Russian government, the country, and governing bodies at large, are his subjective opinion. Following his logic, even Leontiev himself should be faulted for making his fortune under the described circumstances. When Leontiev learned that the source of his enrichment would be investigated, Leontiev, trying to avoid such investigation, left Russia and decided to take advantage of the US legal system.

39.     Aslund's assertions have no bearing on the necessity of investigating the loss of PBB's assets and of recovering the assets to fulfill creditors' claims.

40.     Respondent's motion is filled with speculation in which the same "facts" are used conversely depending upon an objective. For instance, Leontiev states that the reason PBB's license was revoked was its lack of "ties to the Kremlin". Aslund states that Binbank, with its close ties to the Kremlin, received a substantial portion of PBB assets following PBB's license revocation. However, in Autumn, 2017 the Regulator imposed provisional administration over Binbank, which revealed substandard asset quality. Significantly, Binbank shareholders recover

lost assets at their own expense (not insurance). These circumstances were not pointed out in Auslund's Declaration. Because of this, the solution regarding financial rehabilitation of BINBANK (PJSC) was adopted. Attached thereto as an Exhibit 22 is a true and correct copy of an article «BINBANK ready to write-off subordinated debts», Vedomosti, dated December 01, 2017, available at https://www.vedomosti.ru/finance/articles/2017/12/01/743851-binbank-gotov-spisat-subordinirovannie-dolgi and a certified translation thereof.

41. In his declaration, Aslund includes irrelevant "facts" and neglects to include key facts that contradict his premise. Contrary to the impression Aslund attempts to create, when the assets of PBB were transferred to BINBANK (PJSC), BINBANK also got the equivalent liabilities of PBB (to PBB's creditors – individuals are the first-category creditors). BINBANK (PJSC) accepted all liabilities to individuals in the amount exceeding at RUB 24 billion, as well as part of PBB's property (funds, receivables, securities, real estate items). The property was evaluated in equal proportion to the amount of liabilities (the assessment was performed on a basis of balance sheet assets).

42. Aslund criticizes generally the Prosecutor General office of the Russian Federation, and personally Yury Yakovlevich Chaika (Head of the Office) and his deputy Viktor Yakovlevich Grin, stating that the Prosecutor General office is "supervising" Leontiev's criminal case in Russia. Aslund neglects to mention that the Inquiry department of the Ministry of Internal Affairs (which is supervised by the prosecutor's office) is not in charge of the investigation. Rather, the criminal case is assigned to the Investigative Committee of the Russian Federation, a body which is completely autonomous and independent from prosecutor's office. Charges against Leontiev were brought by the Investigative Committee of the Russian Federation, and the Prosecutor General's office of the Russian Federation did not participated in the approval of these charges.

43. Contrary to Monastyrsky's allegations, DIA as a bankruptcy manager for PBB acts strictly within the law. Particularly, the Law On Insolvency provides following

objectives for bankruptcy proceedings: formation of bankruptcy estate to the extent of its capacity, fulfilling creditors' claims most efficiently, reveal and dispute deals made by a credit organization to the detriment of its property interests (suspicious deals), searching for, detection, and return of the credit organization's property, and ensure accountability of those responsible for causing the insolvency of the credit organization. Attached hereto as Exhibit 23 is a true and correct copy of Article 189.78 of Federal Law dated 26.10.2002 №127-FZ On insolvency (bankruptcy), available at https://www.asv.org.ru/en/legislation/.

44.    DIA has currently revealed sufficient facts for holding persons controlling PBB accountable for subsidiary liability; however, a detailed examination of all the facts is essential to confirm or negate the current findings.

45.    In accordance with Arbitrazh Procedural Code of Russian Federation ("Arbitrazh Code") each person participating in a case shall be obliged to prove the circumstances to which he refers as to the ground of his claims or objections. Each person participating in a case shall have to disclose the circumstances he refers to as to the ground of his claims.

46.    Arbitrazh Code determines what can be admitted as evidence: evidence with regard to a case shall be data on the facts thereof obtained in the procedure provided for by law which serves as a basis for establishing the presence or absence of circumstances substantiating the claims and objections of the persons participating in the case. There shall be admitted as evidence written and material evidence, explanations of the persons participating in a case, expert opinions, consultations of specialists, testimonies of witnesses, sound recordings and videotapes, other documents and materials. Written evidence shall be taken to be contracts, acts, references, business mail and other documents in the form of digital or graphical records, or in any other form which contain data on the circumstances significant for a case and permit the establishment of the reliability of a document. Records of court sessions, records of committing individual procedural actions and enclosures thereto shall likewise pertain to written evidence. Thus, legislation has not narrowed the form in which evidence can be presented.

47. Arbitrazh Code states following requirements for evidence: (1) there shall not be allowed use of evidence obtained by breaking federal laws, (2) the evidence should be relevant to the case under consideration - relevance of evidence, (3) The circumstances of a case which under the laws have to be confirmed by certain evidence and may not be confirmed by other evidence – admissibility of evidence. Provisions of Russian civil litigation can serve as an example: The failure to comply with the simple written form of a transaction shall deprive the parties of the right to refer, in the event of a dispute, to witness testimony in confirmation of the transaction and its conditions. Yet, parties are not deprived of the right to give written and other evidence in that case.

48. Current legislation of the Russian Federation specifies different mechanisms allowing interested persons to acquire required evidence even before initiating relevant legal proceeding.

49. Particularly, under Article 72 of Arbitrazh Code persons participating in a case who have reason to believe that it will be impossible or difficult to present evidence to the court, may file an application for securing the evidence. An Arbitrazh court is also entitled to take measures aimed at securing evidence prior to filing a claim.

50. Furthermore, an opportunity to secure evidence is provided by Rules of Notaryship (Notary Law) of the Russian Federation – a notary is entitled to conduct pre-trial depositions, inspect and examine evidence.

51. Thereafter, an ability of the advocate to obtain information and documents through the pre-trial process is provided by Federal Law "On Advocacy in the Russian Federation" dated 31.05.2002 № 63-FZ. Discovery can be subsequently used in the trial proceedings.

52. Contrary to the arguments of the opposing party, subject to Article 61.16 of the Law on Insolvency an application for holding the persons controlling a debtor accountable for subsidiary liability shall be considered by an Arbitrazh court within the bankruptcy proceedings.

Thus, discovery sought by DIA is aimed specifically in support of a foreign proceeding – namely, the Russian bankruptcy proceeding against PBB.

53.    The Discovery requests are geared to the framework of the PBB insolvency case and aimed at tracing and securing assets and avoiding harm to PBB's creditors. Failure to trace the assets may lead to difficulties or the impossibility of enforcing a court order. Additionally, PBB was designated the Injured Party in the criminal case initiated in Russia, and a civil plaintiff having suffered damages of not less than RUB 2.4 billion. Attached hereto as Exhibit 24 is a true and correct copy of the Decree Designating PBB the Injured Party on the criminal case dated March 10, 2016 and certified translation thereof. The Decree was issued by Investigative Committee of the Russian Federation. Attached thereto as Exhibit 25 is a true and correct copy of the Decree Designating representative of the PBB as the Civil Plaintiff dated March 10, 2016 and certified translation thereof. The Decree was issued by Investigative Committee of the Russian Federation.

54.    Under Russian law, evidence can be obtained in accordance with the provisions of the procedural law of the jurisdiction within which the evidence is sought. Therefore, discovery obtained from Leontiev pursuant to 28 U.S.C. §1782 will be qualified as admissible evidence in the Russian bankruptcy proceeding against PBB.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 14 day of February, 2018 in Moscow, Russia.

/signature/

Zhidchenko Anastasia Nikolaevna

15

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Russian into English of the attached Declaration of Anastasia Zhidchenko in opposition to quash subpoena [In re Application of DEPOSIT INSURANCE AGENCY for an order to conduct discovery for use in a foreign proceeding].

I, Kuliev Bairam Durdyklychevich, hereby confirm that I am certified English language translator. Higher education diploma No.: 0009569 issued by decision of the State Examination Board of Turkmen State University named after Magtymguly, on June 11, 1997. Registration No. 22.

Executed this 20ᵗʰ day of February, 2018 in Moscow, Russia.

*KuBa*

B.D. Kuliev

RUSSIAN FEDERATIVE REPUBLIC ..................................... )
CITY OR OBLAST ..................................... )
..IN THE MOSCOW ..................................... )ss.

EMBASSY OF THE UNITED STATES OF AMERICA ..................... )
PROVINCE OR SECTION ..................................... )
SUBSCRIBED AND SWORN TO BEFORE ME THIS
20ᵗʰ DAY OF FEBRUARY , 2018

**Lilia Lally**
**Consular Associate**
**U.S. Embassy Moscow**

| | |
|---|---|
| В ответ на заявление ГК АСВ о выдаче приказа о раскрытии доказательств в поддержку иностранного судебного производства | Дело No |
| Заявитель | |

## ВОЗРАЖЕНИЯ АНАСТАСИИ ЖИДЧЕНКО
## НА ХОДАТАЙСТВО ОТВЕТЧИКА ОБ ОТМЕНЕ СУДЕБНОЙ ПОВЕСТКИ

Я, Анастасия Николаевна Жидченко, будучи предупрежденной об уголовной ответственности за предоставление заведомо ложных сведений согласно §1746 раздела 28 Свода законов США, настоящим заявляю:

1. Моим родным языком является русский и я предоставляю настоящие Возражения на русском языке, осознавая, что они будут переведены на английский язык и поданы в Суд в качестве возражений на ходатайство Сергея Леонтьева (далее – Леонтьев) об отмене судебной повестки, врученной Леонтьеву консультантом Государственной корпорации «Агентство по страхованию вкладов» (далее - АСВ).

2. В 2004 году я окончила Московский Государственный Социальный Университет и Институт Управления и права по специальности «юриспруденция». С 2002 года до настоящего времени я занимаюсь юридической деятельностью в Российской Федерации. Общий стаж моей юридической работы составляет 16 лет, включая 2 года работы в должности секретаря судебного заседания судьи.

3. «18» декабря 2013 года в Российской Федерации мною получен адвокатский статус, присвоен регистрационный номер 77/11627 в реестре адвокатов г. Москвы.

4. Я являюсь основателем и партнером Адвокатского бюро г. Москвы «Кворум» (ОГРН 1147799002790, ИНН 7704281858). 10 января 2017 года деятельность Адвокатского бюро г. Москвы «Кворум» была прекращена путем реорганизации в форме преобразования в Московскую коллегию адвокатов «Кворум» (ОГРН 1177700000851, ИНН 7704386699) (далее - Кворум). С «14» февраля 2018 года я являюсь Председателем Кворума. В приложении № 1 находится выписка из Единого реестра регистрации юридических лиц в отношении Адвокатского бюро г. Москвы «Кворум», являющаяся точной и верной копией официальных сведений, внесенных в Единый государственный реестр юридических лиц (https://egrul.nalog.ru/), и сертифицированный перевод. В приложении № 2 находится выписка из Единого реестра регистрации юридических лиц в отношении Московской коллегии адвокатов «Кворум», являющаяся точной и верной копией официальных сведений, внесенных в Единый государственный реестр юридических лиц (https://egrul.nalog.ru/), и сертифицированный перевод.

5. Кворум является универсальной юридической компанией, специализирующейся на судебном разрешении споров. Согласно национальному рейтингу юридических

компаний «Pravo.ru-300», Кворум занимает 14-ое место крупнейших юридических компаний России как по размеру выручки, так и по количеству юристов компании.

6. До Кворума я работала в нескольких крупных коммерческих банках в России и хорошо знакома с банковской системой страны и практикой ведения бизнеса. Я специализируюсь на спорах в области банкротства, судебного взыскания, розыске утраченных активов, в уголовном праве.

7. Действительно, до начала февраля 2018 года адвокат Андрей Павлов, член Адвокатской палаты города Москвы, являлся Председателем Кворума и одним из его партнеров. Однако, после введения в отношении него персональных санкций «20» декабря 2017 года, адвокат Андрей Павлов решил покинуть коллегию и больше не является Председателем Кворума или его партнером. В приложении № 3 находится выписка из протокола №3 общего собрания членов Кворума, являющаяся точной и верной копией, и сертифицированный перевод. В приложении № 4 находится нотариально удостоверенная копия Заявления о внесении изменений в сведения о юридическом лице, содержащиеся в Едином государственном реестре юридических лиц – Форма Р14001, являющаяся точной и верной копией, и сертифицированный перевод.

8. Кворум является аккредитованным юридическим консультантом при АСВ. Перечень юридических консультантов размещен на официальном сайте АСВ и доступен по ссылке https://www.asv.org.ru/orders/org_lawyer/. В приложении № 5 находится точная и верная копия перечня и сертифицированный перевод. По результатам отбора (конкурса) АСВ в номинации «Юридические консультанты» Кворум был объявлен победителем по юридическому сопровождению ОАО АКБ «Пробизнесбанк» (далее - ПРББ), предложив наиболее выгодные условия по сотрудничеству по сравнению в другими юридическими компаниями.

9. При этом, хотя адвокат Андрей Павлов действительно имел незначительную роль при оказании юридических услуг конкурсному управляющему ПРББ и АСВ, его непосредственное участие было крайне ограниченным. С момента заключения соглашений с ПРББ, ответственным партнером коллегии за оказание юридических услуг, включая сопровождение процедуры банкротства и различных судебных процессов в иностранных юрисдикциях, в том числе, процедуру раскрытия информации в отношении г-на Сергея Леонтьева в соответствии со статьей 1782 (the «Section 1782 Action»), являюсь непосредственно я. Юристы и сотрудники Кворума работают под моим началом и отчитываются передо мной относительно ежедневно оказываемых услуг, включая судебную работу и работу по принудительному исполнению судебных решений.

10. В финансовую группу «Лайф» входило несколько банков: ПРББ, АО АКБ «ЭКСПРЕСС-ВОЛГА», АО «ВУЗ-банк», ЗАО «НАЦИОНАЛЬНЫЙ БАНК СБЕРЕЖЕНИЙ», АО «Газэнергобанк», АО КБ «Солидарность», ОАО КБ «Пойдём!», а также различные коммерческие организации: ООО «Пробизнес-Девелопмент», ООО «Факторинговая компания «Лайф», ООО «Коллекторское агентство «Лайф» и другие организации.

11. До апреля 2014 года ПРББ являлся владельцем «Банк24.РУ» (ОАО). На момент введения временной администрации в ПРББ, банк владел только ЗАО «НАЦИОНАЛЬНЫЙ БАНК СБЕРЕЖЕНИЙ» и ОАО КБ «Пойдём!».

12. Первично, в целях проверки качества активов ПРББ «07» августа 2015 года была введена временная администрация по управлению кредитной организацией. Банковская лицензия ПРББ была отозвана после обнаружения отсутствия значительной части активов ПРББ, размещенных в иностранных депозитариях, которые вопреки интересам банка и во вред кредиторам ПРББ были заложены в качестве обеспечения исполнения обязательств иных компаний.

13. Так, на момент действия временной администрации в ПРББ установлено, что в депозитарии Otkritie Capital International Limited (Республика Кипр) («OCIL») были размещены активы ПРББ совокупной стоимостью более 430 млн. долларов США. При этом, депозитарием OCIL за счет активов ПРББ были погашены обязательства компании Ambika Investments Limited, в отношении которой ПРББ выступал поручителем, как минимум в сумме 266 миллионов долларов США. В приложении № 6-7 находятся уведомления Otkritie Capital International Limited от 11.08.2015 года и от 15.09.2015 года о списании активов по гарантии, являющиеся точными и верными копиями документов.

14. Аналогичным образом, депозитарий BROCERCREDITSERVICE (CYPRUS) LIMITED осуществил списание активов ПРББ в сумме не менее 360 тыс. долларов США по гарантии, предоставленной ПРББ в обеспечение значительных обязательств компании MERRIANOL INVESTMENTS LIMITED. В приложении № 8-9 находятся документы, подтверждающие наличие обременения активов ПРББ по гарантии за обязательства третьих лиц, являющиеся точными и верными копиями документов

15. Данные обстоятельства также широко обсуждались в средствах массовой информации. В приложении № 10 находится распечатка официального сообщения Регулятора от 16.10.2015 года о результатах обследования финансового состояния ПРББ, являющаяся точной и верной копией документов, размещенных на официальном сайте Регулятора (http://www.cbr.ru/eng/press/PR/ ?file=19102015_145926eng2015-10-19T14_56_52.htm). В приложении № 11 находится распечатка статьи «ЦБ раскрыл масштабную операцию по выводу активов Пробизнесбанка» от 16.10.2015 года, опубликованной на официальном сайте РБК (https://www.rbc.ru/finances/16/10/2015/562104449a7947b8c6f4429d), являющаяся точной и верной копией документов, и сертифицированный перевод.

16. Руководство ПРББ тщательно скрывало от Регулятора факт обременения значительной части активов, размещенных в иностранных депозитариях. Гарантии не были отражены в бухгалтерской базе ПРББ, сведения о них не были доступны третьим лицам – в том числе аудиторам «Deloitte & Touche CIS», проводившим проверку банка за 2013 и 2014 год. Сведения об обременениях не были исследованы аудиторами и не включены в годовые отчеты, соответственно, выводы аудитора не могут расцениваться как заслуживающие доверие, поскольку основаны на недостоверной информации, представленной ПРББ. Подобным образом, информация о предоставленных ПРББ гарантиях за обязательства третьих лиц не была доступна Регулятору – соответственно, уведомления Регулятора об «удовлетворительном»

качестве активов ПРББ от 13.02.2015 и 07.05.2015, на которые ссылается Леонтьев в своей декларации, не могут быть приняты во внимание по той же причине.

17. Отзыв лицензии у ПРББ не являлся одномоментным с введением в банк временной администрации. Приказ Регулятора об отзыве у ПРББ лицензии был вынесен по итогам проверки, проведенной временной администрацией, которая выявила факт отсутствия значительной части активов. Как следствие, ввиду недостаточности имущества ПРББ для удовлетворения требований кредиторов банка, Регулятор, в соответствии с законодательством Российской Федерации, был вынужден обратиться в компетентный суд с заявлением о признании ПРББ банкротом.

18. Бывшие собственники кредитных организаций нередко не согласны с позицией Регулятора и предпринимают активные действия по обжалованию приказов Регулятора о введении временной администрации и отзыве лицензии. Также законом предусмотрена процедура обжалования судебного решения о признании кредитной организации банкротом. Подобная процедура обжалования позволяет заинтересованной стороне представлять доказательства незаконности действий Регулятора и факта незаконной конфискации имущества. Однако г-н Сергей Леонтьев не воспользовался доступными механизмами, в то время как сейчас голословно утверждает об экспроприации банка.

19. Довод г-на Сергея Леонтьева об отсутствии осведомленности об оперативной деятельности ПРББ не имеет значения для разрешения вопроса по отмене судебного приказа, выданного в соответствии со статьей 1782 (the «Section 1782 Action»), поскольку у конкурсного управляющего ПРББ имеются довольно конкретные вопросы о деятельности ПРББ и его активах в предбанкротный период. Г-н Сергей Леонтьев является мажоритарным владельцем акций ПРББ, занимал пост Председателя Совета директоров Банка и входил в состав Правления Банка. Согласно Уставу, органами управления Банка являются: общее собрание акционеров Банка, Совет директоров Банка, Правление Банка (коллегиальный исполнительный орган), Председатель Правления Банка (единоличный исполнительный орган). Руководство текущей деятельностью Банка осуществляется единоличным исполнительным органом (Председателем Правления Банка) и коллегиальным исполнительным органом (Правлением Банка). Исполнительные органы подотчетны Совету директоров Банка и Общему собранию акционеров. Таким образом, г-н Сергей Леонтьев в силу своих должностных обязанностей не может не располагать сведениями и документами (доказательствами), которые АСВ просит раскрыть. Более того, из добровольно полученных показаний других лиц – бывших сотрудников ПРББ Крыловой М.М. и Алексеева Н.В., получена достаточно подробная информация о проводимых в ПРББ совещаниях, которые были организованы непосредственно г-ном Сергеем Леонтьевым. В приложении № 12 находятся свидетельские показания Алексеева Н.В. от 25.04.2017 года, являющиеся верной и точной копией документа, и сертифицированный перевод. В приложениях № 13-14 находятся свидетельские показания Крыловой М.М. от 15.05.2017 года и дополнительные свидетельские показания Крыловой М.М. от 25.05.2017 года, являющиеся верной и точной копией документов, и сертифицированный перевод.

20. Действительно, с даты введения в банк временной администрации Регулятор заблокировал доступ к корреспондентскому счету ПРББ в Банке России, а также

отключил банк от системы БЭСП (система банковских электронных срочных платежей). «10» августа 2015 года участие ПРББ в обмене электронными документами при совершении операций по корреспондентскому счету банка в Банке России было возобновлено. Принимая во внимание законодательно установленную обязанность проведения банком платежей, а также учитывая наличие такой возможности, в период с «10» по «11» августа 2015 года ПРББ проводились клиентские и хозяйственные платежи, сформированные на основании платежных документов клиентов, поступивших с «7» по «10» августа 2015 года, в числе которых также были требования АКБ «РОССИЙСКИЙ КАПИТАЛ» (ПАО) по банковской гарантии на общую сумму 604,1 млн. рублей. Вместе с тем, впоследствии АСВ было установлено, что платеж в пользу АКБ «РОССИЙСКИЙ КАПИТАЛ» (ПАО) был ошибочно осуществлен вследствие некачественного формирования реестра платежей сотрудниками ПРББ. В связи с этим, в АКБ «РОССИЙСКИЙ КАПИТАЛ» (ПАО) направлено требование о возврате полученных средств, после чего указанные денежные средства были возвращены в ПРББ. Таким образом, данная операция не нанесла ущерба для кредиторов банка.

21. Статьей 183.9. Федерального закона от 26.10.2002 № 127-ФЗ «О несостоятельности (банкротстве)» (далее – Закон о банкротстве) установлена обязанность руководителя финансовой организации передать руководителю временной администрации бухгалтерскую и иную документацию, отражающую экономическую деятельность финансовой организации за три года до назначения временной администрации. Более того, воспрепятствование со стороны руководителя и других работников финансовой организации осуществлению функций временной администрации (в том числе воспрепятствование доступу к документации и иным носителям информации и отказ в передаче документов) влечет за собой наступление административной и уголовной ответственности.

22. Исходя из представленных свидетельских показаний Крыловой М.М. и Алексеева Н.В. об имеющихся «забалансовых» компаниях, созданных и контролируемых Банком, а также учитывая тот факт, что в ходе инвентаризации, проведенной конкурсным управляющим, выявлена недостача документации, в настоящее время конкурсный управляющий ПРББ не располагает полным объемом документов, относящихся к деятельности ПРББ и необходимых для выполнения им своих функций. В связи с изложенными обстоятельствами, на основании статьи 1782 (the «Section 1782 Action») АСВ обратилось к уважаемому компетентному суду с соответствующим ходатайством о раскрытии доказательств в отношении г-на Сергея Леонтьева.

23. Г-н Сергей Леонтьев в своей декларации уверяет, что был вынужден покинуть Россию в связи с опасениями за свою жизнь. Однако он умалчивает перед Судом о том, что выезд за границу он запланировал еще до отзыва у ПРББ лицензии, при этом попрощавшись с сотрудниками банка в корпоративном блоге и указав: «Россия пока еще не доросла до того, чтобы в ней могла работать такая финансовая группа, как «Лайф». Видимо, время «Лайф» в этой стране еще не пришло. Поэтому в ближайшие 50 лет я буду делать «Лайф» в других частях земного шара». В своем обращении г-н Леонтьев не указывал, что ему поступают угрозы, что он опасается за свою жизнь или жизнь членов семьи. Сам факт того, что Леонтьев не делал тех заявлений, которые делает сейчас, вызывает сомнение в их искренности. В приложении № 15 находится точная и верная копия статьи от 14.08.2015 «Время «Лайф» еще не пришло. Сергей

Леонтьев перестал появляться в офисе», опубликованной на официальном сайте газеты РБК (https://www.rbc.ru/newspaper/2015/08/14/56bcaaf69a7947299f72bcc0), и сертифицированный перевод.

24. Описывая обстоятельства уголовного преследования г-на Леонтьева и г-на Железняка в рамках уголовного дела в Российской Федерации, Юрий Монастырский и г-н Леонтьев намерено искажают факты и субъективно, в свою пользу, толкуют российское законодательство, чем вводят Суд в заблуждение.

25. Первоначально, в октябре 2015 года Регулятор уведомил правоохранительные органы о возможном наличии в действиях собственников и руководителей финансовой группы «Лайф», в которую входил ПРББ, признаков преступлений, выявив вопиющие факты о незаконном выводе активов ПРББ, в том числе за пределы Российской Федерации.

26. Действительно, первично 01.12.2015 года следственным органом вынесено постановление об отказе в возбуждении уголовного дела. Отказ в возбуждении уголовного дела связан с недостаточностью времени на исследование доказательств и сомнительных сделок в ПРББ. Между тем, уже в январе 2016 года указанное постановление отменено, как вынесенное преждевременно, без получения и исследования всех доказательств и производства дополнительных процессуальных действий, необходимых для принятия законного решения. В приложении № 16 находится точная и верная копия официального документа - Постановления Следственного комитета Российской Федерации от 20.01.2016 года и сертифицированный перевод.

27. Находящееся в настоящий момент в производстве следственных органов уголовное дело было возбуждено Постановлением от 17.02.2016 по результатам надлежащей процессуальной проверки на основании заявления Председателя Банка России №01-33-3/8573 от 01.10.2015, заявления АСВ о преступлении №1-1/153 от 14.01.2016, рапорта об обнаружении признаков преступления ФСБ России от 18.01.2016. В приложении № 17 находится точная и верная копия официального документа - Постановления о возбуждении уголовного дела от 17.02.2016 года и сертифицированный перевод.

28. В рамках расследования по данному уголовному делу установлены обстоятельства, послужившие основанием для предъявления г-ну Леонтьеву обвинения в совершении преступления, предусмотренного ч. 4 ст. 160 Уголовного кодекса Российской Федерации (хищения путем присвоения чужого имущества, вверенного виновному, лицом с использованием своего служебного положения, организованной группой, в особо крупном размере). В приложении № 18 находится точная и верная копия официального документа - Постановления о привлечении в качестве обвиняемого от 13.10.2016 года и сертифицированный перевод.

29. Позже г-ну Леонтьеву предъявлено обвинение в совершении преступлений, предусмотренных ч. 3 ст. 33 ч. 4 ст. 160 Уголовного кодекса Российской Федерации (пособничество в совершении хищения путем присвоения чужого имущества, вверенного виновному, лицом с использованием своего служебного положения, организованной группой, в особо крупном размере). В приложении № 19 находится

точная и верная копия официального документа - Постановления о привлечении в качестве обвиняемого от 10.07.2017 года и сертифицированный перевод.

30. В настоящий момент уже вынесены и вступили в законную силу приговоры в отношении бывших сотрудников ПРББ, выполнявших указания руководства банка. Следует отметить, что указанные сотрудники понесли суровое наказание за совершенные преступления в виде реального лишения свободы. В приложении № 20 находится точная и верная копия Приговора Останкинского районного суда г. Москвы от 26.04.2017 года в отношении Алексеева Н.В., и сертифицированный перевод В приложении № 21 находится точная и верная копия Приговора Останкинского районного суда г. Москвы от 25.05.2017 года в отношении Крыловой М.М и сертифицированный перевод

31. Законодательством Российской Федерации предусмотрено, что следственные органы самостоятельно направляют ход расследования, принимают решение о производстве следственных и иных процессуальных действий. Таким образом, доводы об оказании АСВ тем или иным образом влияния на следствие также представляются необоснованной попыткой дискредитировать АСВ.

32. Г-на Леонтьев заявляет, что он строил законный бизнес в течение 22 лет. Из добровольно данных свидетельских показаний бывших сотрудников Банка Крыловой М.М. и Алексеева Н.В. следует совсем другая история деятельности ПРББ: проблемы у банка начались после кризиса 1998 года. Сначала банк прикрывал потери путем передачи в созданное ООО «Коллекторское агентство «Лайф» проблемного кредитного портфеля, чтобы не создавать обязательные резервы на возможные потери. Затем руководством банка было принято решение о создании множества подконтрольных компаний – так называемой «карусели», для прикрытия «дыры в балансе». Но проблемы ПРББ росли в геометрической прогрессии: новые бизнес-направления, финансируемые активами банка, не приносили доходность и являлись убыточными, а активы банка выводились уже в личных целях г-на Леонтьева (см. показания Крыловой М.М.). В частности, Крылова М.М. отвечала за управление многочисленной сетью компаний и подтвердила, что через счета этих компаний из ПРББ выводились денежные средства в значительном объеме. В свою очередь Алексеев Н.В., имея доверенность от имени банка, имел возможность подписывать и выдавать фиктивные кредиты. Именно конкретные действия указанных лиц были оценены следствием и судом. Г-ну Сергею Леонтьеву предъявлено обвинение не только в связи с тем, что он являлся руководителем ПРББ и осуществлял фактический контроль за деятельностью банка, а также в связи с тем, что на него указали достаточное количество свидетелей, допрошенных в рамках уголовного дела, как на лицо, от кого исходили указания на совершение тех или иных действий, направленных на вывод активов банка.

33. Г-н Леонтьев указывает на то, что его бизнес был интересен государственным структурам ввиду его доходности. Однако следует отметить, что ПРББ была утрачена значительная часть активов, размещенных в иностранных депозитариях, впоследствии Банк признан банкротом. Иные бизнес-направления находились в предбанкротном состоянии: ООО «Факторинговая компания «Лайф» 19.10.2015 года самостоятельно обратилось в компетентный суд о признании компании банкротом. По результатам рассмотрения данного заявления в отношении ООО «Факторинговая

компания «Лайф» 17.12.2015 года введена процедура наблюдения, 20.09.2016 года решением компетентного суда компания признана банкротом. Определением суда от 09.11.2016 года в отношении ООО «Пробизнес-Девелопмент» введена процедура наблюдения. ООО «Финансовая группа «Лайф» спонтанно ликвидировано и исключено из ЕГРЮЛ 06.08.2015 года – то есть непосредственно перед отзывом у банка лицензии. Впоследствии указанная компания была восстановлена в системе ЕГРЮЛ только 06.09.2016 года.

34. У АСВ довольно конкретные вопросы относительно многочисленных сомнительных операций в ПРББ, совершенных в преддверии банкротства банка. При этом, нежелание г-н Сергея Леонтьева сотрудничать наводит на обоснованные подозрения об умышленном сокрытии информации. Действия АСВ по истребованию информации об операциях ПРББ никоим образом не связаны с политической фигурой г-на Навального либо с визитами г-на Леонтьева в посольство США. Всего в реестре требований кредиторов ПРББ учтены требования около 8 000 кредиторов в совокупной сумме свыше 84 млрд. рублей. До настоящего времени большая часть установленных требований кредиторов не погашена ввиду недостаточности активов банка. Это требования кредиторов в лице множества компаний, которые в том числе представляют малый бизнес. Кредиторы потеряли свои сбережения и оборотные средства в связи с банкротством ПРББ, что создало угрозу самого их существования. Конкурсный управляющий ПРББ в лице АСВ осуществляет свою деятельность именно в интересах кредиторов банка, а не в собственную пользу или в пользу третьих лиц. При финансово-устойчивом положении банка, о чем уверяет г-н Леонтьев, требований кредиторов не имелось бы вовсе.

35. В доводах г-на Леонтьева о том, что его действия в поддержку общественных инициатив г-на Навального в 2012 году привели, спустя три года, к изданию Регулятором предписаний в отношении ПРББ, отсутствует фактическое обоснование и логика. Ссылка г-на Леонтьева на то, что его участие в групповой встрече в Посольстве США более 13-ти лет назад, привело к утрате им ПРББ, еще более абсурдны.

36. Доводы г-на Леонтьева относительно финансового положения ООО «ПК «Лайф» и, соответственно, обоснованности расходов на приобретение доли в уставном капитале этой компании не соответствуют действительности. Компания ООО «ПК «Лайф» являлась аффилированным по отношению к ПРББ юридическим лицом, работники ПРББ являлись учредителями и руководителями данной компании. Компания была основана в 2010, но до 2014 года, когда был разработан план по покупке ПРББ ее акций, активной деятельности не вела. Для целей извлечения наибольшей выгоды отчет о рыночной стоимости долей ООО «ПК «Лайф» основывался на 10-летнем бизнес-плане, а не на реальном финансовом положении ООО «ПК «Лайф», и на предварительных договорах купли-продажи лицензий на использование разрабатываемого ООО «ПК «Лайф» программного обеспечения. Стоимость акций была существенно завышена. Попытка АСВ реализовать данный актив ПРББ на торгах по аналогичной стоимости не увенчалась успехом.

37. Действительность подозрительной сделки по реализации акций Банка24.ру (ОАО) в настоящий момент оспаривается в рамках банкротного дела ПРББ. Данные сделки привели к значительным убыткам ПРББ и были осуществлены за счет его кредиторов.

38. Изложенная в декларации позиция г-на Anders Aslund, является его личным субъективным мнением, явного критика российский властей, страны, органов управления в целом. Следуя логике г-на Anders Aslund, то и самому г-ну Леонтьеву можно вменить в вину создание своего состояния при описанных им обстоятельствах. При возникновении угрозы расследования источника его обогащения г-н Леонтьев покинул Россию и решил воспользоваться преимуществами американской правовой системы, уклоняясь от расследования источника своего обогащения.

39. Как бы не уверял эксперт г-н Anders Aslund, приводимые им обстоятельства не находятся в причинно-следственной связи с необходимостью расследования пропавших активов ПРБ Б и возврата средств кредиторам банка.

40. Процессуальные оппоненты спекулируют понятиями – одни и те же факты используются ими прямо противоположным образом в зависимости от поставленных целей. Так, например, г-н Сергей Леонтьев в своей декларации утверждает, что отсутствие «связи с Кремлем» является основанием для отзыва у ПРБ Б лицензии. При этом, г-н Anders Aslund указывает, что ПАО «БИНБАНК», имевший «тесную связь с Кремлем», после отзыва у ПРБ Б лицензии получил все активы ПРБ Б. Однако, осенью 2017 года Регулятор в ПАО «БИНБАНК» также ввел временную администрацию и также выявил неудовлетворительное качество активов. Следует отметить, что акционеры ПАО «БИНБАНК» компенсируют утраченные активы за счет собственных средств, а не за счет страховых фондов. Данные обстоятельства г-н Anders Aslund не приводит. В связи с указанными факторами принято решение о санации (оздоровлении) ПАО «БИНБАНК». В приложении № 22 находится точная и верная копия статьи «Бинбанк готов списать субординированные долги» от 01.12.2017 года в газете «Ведомости» https://www.vedomosti.ru/finance/articles/ 2017/12/01/743851-binbank-gotov-spisat-subordinirovannie-dolgi), и сертифицированный перевод.

41. В своем заключении г-н Anders Aslund ссылается на неотносимые «факты» и не упускает крайне важные обстоятельства, вступающие в противоречие с его доводами. Так, при передаче активов ПРБ Б в ПАО «БИНБАНК» в сопоставимой сумме были переданы и обязательства ПРБ Б перед кредиторами банка – физическими лицами, требования которых подлежат удовлетворению в составе кредиторов первой очереди. ПАО «БИНБАНК» принял на себя все обязательства ПРБ Б перед физическими лицами в размере свыше 24 млрд. рублей, а также часть имущества ПРБ Б (денежные средства, права требования, ценные бумаги, недвижимое имущество) по балансовой стоимости на эквивалентную сумму.

42. Г-н Anders Aslund критикует Генеральную прокуратуру России, лично Генерального прокурора Чайку Юрия Яковлевича и его заместителя Гриня Виктора Яковлевича, указывая что прокуратура «надзирает» за проведением расследования уголовного дела в России в отношении г-на Сергея Леонтьева. Однако эксперт умалчивает, что уголовное дело в отношении г-на Леонтьева расследуется не подконтрольными прокуратуре органами дознания МВД, а Следственным комитетом Российской Федерации, который является автономным и совершенно не зависимым от прокуратуры органом. Обвинения г-ну Леонтьеву предъявлялись именно Следственным комитетом России, а Генеральная прокуратура России не участвовала в их утверждении.

43. Вопреки доводам г-на Юрия Монастырского, АСВ, как конкурсный управляющий ПРББ, действует строго в рамках Закона о банкротстве. В частности, Законом о банкротстве предусмотрены следующие задачи конкурсного производства: формирование конкурсной массы в максимально возможном размере, проведение расчетов с кредиторами в минимальные сроки и в наиболее полном размере, выявление и оспаривание сделок, заключенных кредитной организацией в ущерб ее имущественным интересам (сомнительные сделки), поиск и истребование от третьих лиц незаконно удерживаемого имущества кредитной организации, обеспечение привлечения к ответственности лиц, виновных в доведении кредитной организации до банкротства. В приложении № 23 находится точная и верная выкопировка статьи 189.78 Закона о банкротстве, опубликованного на официальном сайте АСВ (https://www.asv.org.ru/en/legislation/).

44. В настоящее время АСВ выявлены обстоятельства, достаточные для привлечения контролирующих ПРББ лиц к субсидиарной ответственности. Однако, для подтверждения или опровержения выявленных обстоятельств необходима детальная проверка всех фактов.

45. В силу норм, закрепленных в Арбитражном процессуальном кодексе Российской Федерации (далее – АПК РФ), каждое лицо, участвующее в деле, должно доказать обстоятельства, на которые оно ссылается как на основание своих требований и возражений. Каждое лицо, участвующее в деле, должно раскрыть доказательства, на которые оно ссылается.

46. АПК РФ устанавливает, что может являться доказательством по делу: доказательством могут являться только полученные законным образом сведения о фактах, обосновывающих требования и возражения лиц. В качестве доказательств допускаются письменные и вещественные доказательства, объяснения лиц, участвующих в деле, заключения экспертов, консультации специалистов, показания свидетелей, аудио- и видеозаписи, иные документы и материалы. К письменным доказательствам относятся сведения об обстоятельствах, имеющих значение для дела, договоры, акты, справки, деловая корреспонденция, иные документы, выполненные в форме цифровой, графической записи или иным способом, позволяющим установить достоверность документа. К письменным доказательствам также относятся протоколы судебных заседаний, протоколы совершения отдельных процессуальных действий и приложения к ним. Таким образом, законодатель не ограничил форму доказательств.

47. АПК РФ устанавливает следующие требования к доказательствам: (1) не допускается использование доказательств, полученных с нарушением закона, (2) доказательства должны иметь отношение к рассматриваемому делу – относимость доказательств, (3) обстоятельства, которые согласно закону должны быть подтверждены определенными доказательствами, не могут подтверждаться в арбитражном суде иными доказательствами – допустимость доказательств. Примером подобной нормы может служить положения гражданского законодательства в России, согласно которым сторона не вправе ссылаться на свидетельские показания в случае несоблюдения простой письменной формы сделки. Однако и в этом случае стороны не лишены права на использование письменных и иных доказательств.

48. Действующее законодательство Российской Федерации предусматривает различные механизмы, позволяющие заинтересованным лицам получить необходимые доказательства и до инициирования соответствующих судебных разбирательств.

49. В частности, статья 71 АПК РФ закрепляет, что лица, участвующие в деле, имеющие основания опасаться, что представление в арбитражный суд необходимых доказательств станет невозможным или затруднительным, могут обратиться с заявлением об обеспечении этих доказательств. Арбитражный суд вправе принять меры по обеспечению доказательств и до момента предъявления мотивированного иска в компетентный суд.

50. Также Основами законодательства Российской Федерации о нотариате предусмотрена возможность обеспечения доказательств через нотариуса – нотариус в досудебном порядке может допрашивать свидетелей, производить осмотр доказательств.

51. Помимо прочего, Федеральным законом от 31.05.2002 N 63-ФЗ «Об адвокатской деятельности и адвокатуре в Российской Федерации» также предусмотрена возможность получения адвокатом в досудебном порядке сведений и документов, которые могут быть в дальнейшем использованы в судебном разбирательстве.

52. Вопреки доводам процессуальных оппонентов, в силу статьи 61.16. Закона о банкротстве заявления о привлечении контролирующих лиц к субсидиарной ответственности подлежат рассмотрению арбитражным судом в рамках дела о банкротстве должника. Таким образом, истребуемые АСВ сведения и доказательства направлены именно на поддержку иностранного судебного процесса – банкротного дела ПРББ в России.

53. Требование о раскрытии информации обусловлено необходимостью выявления активов ПРББ и принятия обеспечительных мер в рамках дела о банкротстве ПРББ и предотвращения причинения значительного ущерба кредиторам Банка. Непринятие подобных мер может затруднить или сделать невозможным исполнение судебного акта, принятого по заявлению о привлечении контролирующих банк лиц к субсидиарной ответственности. Помимо прочего, ПРББ признан потерпевшим и гражданским истцом по уголовному делу, возбужденному в России с суммой ущерба не менее 2,4 млрд. рублей. В приложении № 24 находится точная и верная копия Постановления Следственного комитета Российской Федерации о признании представителя ПРББ потерпевшим по уголовному делу и сертифицированный перевод. В приложении № 25 находится точная и верная копия Постановления от 10.03.2016 года Следственного комитета Российской Федерации о признании ПРББ гражданским истцом и сертифицированный перевод.

54. В соответствии с действующим законодательством Российской Федерации, доказательства могут быть получены с соблюдением процессуальных особенностей, установленных законом соответствующей страны. Таким образом, доказательства, полученные в рамках статьи 1782 (the «Section 1782 Action») в отношении г-на Сергея Леонтьева, будут являться относимыми и допустимыми доказательствами в рамках дела о банкротстве ПРББ в России.

Осознавая ответственность за предоставление ложных сведений в соответствии с законами Соединенных Штатов Америки, я подтверждаю, что вышеизложенная информация является верной.

Подписано 14 февраля 2018 года в городе Москве, Российская Федерация

Жидченко Анастасия Николаевна

<u>CERTIFICATION</u>

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Russian into English of the following documents attached:

EXHIBIT 1:    An extract from the state corporate registry in respect of Moscow Bar Bureau "Quorum";

EXHIBIT 2:    An extract from the state corporate registry in respect of Moscow Bar Association "Quorum";

EXHIBIT 3:    A copy of the Extract from the minutes №3 of Quorum partners meeting dated February 13, 2017;

EXHIBIT 4:    A copy of the application form No R14001 to the state corporate registry for update of the information included into the registry;

EXHIBIT 5:    A list of the law firm accredited with State Corporation "Deposit Insurance Agency";

EXHIBIT 6:    A copy of notice issued by Otkritie Capital International Limited dated August 11, 2015;

EXHIBIT 7:    A copy of notice issued by Otkritie Capital International Limited dated September 15, 2015;

EXHIBIT 8:    A copy of notice issued by BROCERCREDITSERVICE (CYPRUS) LIMITED;

EXHIBIT 9:    A copy of notice issued by BROCERCREDITSERVICE (CYPRUS) LIMITED dated November 9, 2015;

EXHIBIT 10: A copy of the official press-release issued by Central Bank of Russia dated October 16, 2015;

EXHIBIT 11: A copy of the article "Central bank has uncovered a massive leak of the Probusinessbank assets" dated October 16, 2015, Russian business-media company "RBK";

EXHIBIT 12: A copy of N.V. Alekseev's witness statement dated April 25, 2017;

EXHIBIT 13: A copy of M.M. Krylova's witness statement dated May 15, 2017;

EXHIBIT 14: A copy of M.M. Krylova's additional witness statement dated May 25, 2017;

EXHIBIT 15: A copy of the article "Life time not yet come. Sergey Leontiev stopped showing up in the office", dated August 14, 2015, Russian business-media company "RBK";

EXHIBIT 16: A copy of the Decree of Investigative Committee of the Russian Federation dated January 20, 2016;

EXHIBIT 17: A copy of the Decree to initiate a criminal case dated February 17, 2016;

EXHIBIT 18: A copy of the Decree on impleading as accused dated October 13, 2016;

EXHIBIT 19: A copy of the Decree on impleading as accused dated July 10, 2017;

EXHIBIT 20: A copy of the Court verdict of Ostankino district court of Moscow dated April 26, 2017 against N. V. Alekseev;

EXHIBIT 21: A copy of the Court verdict of Ostankino district court of Moscow dated May 25, 2017 against M. M. Krylova;

EXHIBIT 22: A copy of the article "BINBANK ready to write-off subordinated debts", dated December 01, 2017, Vedomosti;

EXHIBIT 23: A copy of Article 189.78 of Federal Law dated 26.10.2002 №127-FZ On insolvency (bankruptcy);

EXHIBIT 24: A copy of the Decree Designating Probusinessbank the Injured Party on the criminal case dated March 10, 2016

EXHIBIT 25: A copy of the Decree Designating representative of the Probusinessbank as the Civil Plaintiff dated March 10, 2016.


I, Kuliev Bairam Durdyklychevich, hereby confirm that I am certified English language translator. Higher education diploma No.: 0009569 issued by decision of the State Examination Board of Turkmen State University named after Magtymguly, on June 11, 1997. Registration No. 22.


Executed this 20th day of February, 2018 in Moscow, Russia.

RUSSIAN FEDERATIVE REPUBLIC )
MOSCOW OBLAST )
CITY OF MOSCOW )SS.
EMBASSY OF THE UNITED STATES OF AMERICA )
CONSULAR SECTION )

SUBSCRIBED AND SWORN TO BEFORE ME THIS
20th DAY OF FEBRUARY, 2018

B.D. Kuliev

Lilia Lally
Consular Associate
U.S. Embassy Moscow