# EXHIBIT 12

# WITNESS STATEMENT OF
## NIKOLAY VICTOROVICH ALEKSEEV

April 25, 2017

I, Nikolay Victorovich Alekseev, hereby testify as follows:

1. I was born on May 9, 1969 in settlement Kupanovskoe of Pereslavskiy District of Yaroslavskaya Region.

2. In 1994-1995, I graduated from technical and economic departments of Bauman Moscow State Technical University. I have the following specializations: rocket manufacturing, engineering business and management

3. From 1999 to 2015, I was employed at Probusinessbank CJSB (hereinafter, the Bank). In the course of my professional activity, I became aware of circumstances related to the transfer of assets (and methods of conducting thereof) out of the Bank by controlling persons – Sergey Leonidovich Leontiev and Aleksander Dmitrievich Zheleznyak (hereinafter, the controlling persons) – who were assisted by their fiduciaries (confidants), including, but not limited to the Bank's employees holding management positions in the structural subdivisions, that is Departments and Directorates, such as Vice-Presidents of the Bank, Deputy Chairmen of the Managment Board of the Bank.

4. I had been working at the Bank for about 16 years. During this period, I interacted directly with shareholders and top-managers of the Bank, their fiduciaries, and was involved as a person who performed and witnessed actions of the Bank's employees carrying out instructions and orders of the controlling persons.

5. In 2009, Sergey Leonidovich Leontiev and Aleksander Dmitrievich Zheleznyak, with assistance of their fiduciaries, created a complex and inextricable infrastructure that facilitated activity of the Bank's shadow sector. The main purpose of this structure was transfer of assets out of the Bank, creation, at the Bank's expense, parallel budgets for personal enrichment of the controlling persons. From 2009 to 2015, the share of the Bank's "technical" transactions had substantially increased.

6. As indicated further in this document and if not stated otherwise, my awareness of the stated facts is predominately based on my personal participation in carrying out of the instructions given by the controlling persons.

7. In cases when I received information about the facts stated in this Witness Statement from third parties, this will be indicated in the text via reference to the source of such information.

8. For the avoidance of doubt, I declare that this testimony has been given by me voluntarily, and nobody exerts or has exerted any degree of pressure over me or

influenced me otherwise. Content of this Witness Statement is true, and it is my belief that all facts stated in this Statement are true to the best of my knowledge.

9. Since many of the events described herein had been taking place relatively long time ago, dates, position titles, and names of the structural subdivisions of the Bank may be given only approximately. However, they will be detailed as necessary to avoid ambiguous construction or impossibility to identify truthfulness of the facts stated by me.

10. Facts stated herein has been structured in accordance with the timeline of my work (Part 1), with the separate description of the Bank's management structure and decision-making process (Part 2), with the separate description of episodes related to the stripping of the Bank's assets (Part 3), as well as description of the events after the Bank's license has been revoked (Part 4).

## Part 1

11. In the second half of 1999, I was employed by the Bank as, as one can approximately call it, "credit expert" or "credit analyst". Irrespective of the title, I was engaged in credit activity under the World Bank's Enterprise Support Programme (hereinafter, the Programme). After 6 months, the Programme was suspended for insignificant amount of time - appr. 3 (three) months during which I had not been working at the Bank. However, after the Programme had resumed, I returned to the Bank and worked there for about 16 years in total (from 1999 to 2015 when the Bank's license was revoked).

12. The Programme continued in operation until it was closed in 2004. By that moment, I had already been appointed as Deputy Head of the directorate of the Bank which had been providing support and assistance for this Programme.

13. After the Programme had been closed, the Directorate was dissolved. I had been relocated to another subdivision of the Bank, where I then worked until 2007.

14. From 2004 to 2007, the name of the structural subdivision (nominally called as the division of large/corporate business) where I worked, as well as the title of my position, had been changing frequently (including for the reasons of career development). However, in fact, my work had always been reduced to credit activity (with certain administrative functions) with large corporate clients (that brought us annual revenue of more than 60m RUB). I was engaged in interaction with our borrowers, collection of documents necessary to execute credit and security documentation, execution of credit and security transactions, including transactions with complex structure and transactions connected with project financing, as well as in further work with bad loans.

15. By 2007, I had risen through the ranks to the Deputy Head of the directorate stated above, which included 10-12 employees who answered directly to me. My work had been guided by Vyacheslav Victorovich Kazantsev, Natalia Yurievna Demidova, and Aleksander Dmitrievich Zheleznyak, with whom I interacted directly and received orders and instructions regarding my work.

16. Natalia Yurievna Demidova was in charge of the Corporate Business Division, including my subdivision, using so called niche strategies, that is by granting loans to the companies of the specialized sectors of the economy (subdivision for excisable goods, oil traders, corn traders, metal traders, pharmacy, factoring, electric energy, IT).

17. Vyacheslav Victorovich Kazantsev was in charge of other credit strategies, except for the strategies where Natalia Yurievna Demidova was in charge.

18. Aleksander Dmitrievich Zheleznyak as a shareholder and a top-manager was in charge of my subdivision as regards provision of loans for large clients attracted by A.D. Zheleznyak and carried out overall strategic leadership over the Corporate Business Division.

19. In 2007, this subdivision was reorganized for the reason of reallocation of responsibilities connected with direct clients' acquisition. I was appointed as a Head of the newly created subdivision. I had been holding this position up to early 2009.

20. World economic crisis had started in 2008, and, as the result, the share of the Bank's distressed assets (non-performing loans, debts of insolvent borrowers, and other toxic debts) increased. In 2009, management of the Bank tasked me to engage in working on "alive" distressed assets, that is overdue outstanding loans that could be repaid through development of a borrowing company's business and further sale thereof as well as through refinancing or liquidation. A subdivision of 7-8 employees with me in charge had been created for this purpose and existed appr. until mid-2013.

21. When working on distressed assets, I had been aware of the volume of the credit portfolio (which included bad loans) that were the responsibility of my subdivision and subdivisions headed by Aleksander Vyacheslavovich Zuev and Pavel Busygin. Proceeding from the accounting statement for that period, the total volume of the portfolio amounted to 30-40bn RUB, of which 20-25bn RUB were consumer loans and 12-15bn RUB were corporate loans (of which 1.5bn RUB were bad corporate loans) of corporate clients, with creation of provisions amounting to 50%-100% supported and assisted by my subdivision. Apart from that, each subdivision (including so called niches) that provided lending had its own share of bad loans.

22. Appr. in mid-2013, the task related to the distressed assets I was assigned with was completed. After that, I found out that Eduard Vladimirovich Panteleev together with Dmitriy Gennadievich Dylnov had been starting a new franchise-funding project for the Life companies group. This project was pertinent to my specialization, and I started working on it.

23. In the second half of 2013, we had been preparing for the start of the project. In 2014, we launched about 50 (fifty) enterprises under the project. However, due to the fact that we had not managed to realize our plans, the project was stopped in late 2014.

24. In early 2015, Yaroslav Vladimirovich Alekseev offered me to be in charge of Banking Project Directorate (hereinafter, the Directorate), which was headed by Kirill Vladimirovich Artemov back then and answered directly to Yaroslav Vladimirovich Alekseev. I accepted his offer and became in charge of the Directorate, which soon would be renamed in Corporate Finances Department (hereinafter, the Department).

25. Taking into account the state of affairs in the Department when I just became its head, it was evident that only 15%-20% of the Directorate's work under Yaroslav Vladimirovich Alekseev was dedicated to real loan transactions; although, even these transactions were entered into with the Bank's affiliates and its controlling persons. 80%-85% of the work was dedicated to "technical" transactions, including provision of fictitious loans.

26. The Directorate had been existing since 2009, and employees of the Bank knew, in one way or another, that it was engaged in "technical" transactions. These transaction were portrayed (including by Yaroslav Vladimirovich Alekseev) as necessary in order to maintain the Bank's capital and submit to the regulator, that is Central Bank of the Russian Federation, such reporting documents and key indicators that would not reflect real losses incurred by the Bank, including losses connected with retail lending crisis.

27. It was not a secret for any employee of the Bank that Yaroslav Vladimirovich Alekseev's Directorate, by entering into "technical" transaction, had been engaged in dubious activity. This Directorate was even unofficially named as the Valkyrie Directorate. It was named after the heroine of Scandinavian folklore who accompanies the fallen warriors on the their way to Valhalla. In the intercompany electronic correspondence, all transaction made by the Directorate were named as "Valkyrian". Financial performance indicators had been hidden in the official accounting statements in section "Miscellaneous" and had never been detailed and specified.

28. Although the Valkyrie Directorate fully comprised of the Bank's employees, it had always been considered as a suprabanking structure and had not been a part of the corporate business block.

29. Yaroslav Vladimirovich Alekseev, being an appointee and fiduciary of Sergey Leonidovich Leontiev, was some sort of a "grey eminence", who realized plans and carried out instructions of the controlling persons.

30. In February 2015, Yaroslav Vladimirovich Alekseev, when transferring control over the Department to me, explained that the whole Life companies group was sustaining significant losses. For this reason, the amount of transactions would be increasing, and, due to more strict requirements of the Central Bank concerning banks' reporting documents, the quality of the documents executed under such transactions must improve.

31. The Department performed its activity in the following 4 (four) directions:

    31.1. Providing loans to 2-3 borrowers who had friendly relations with Yaroslav Vladimirovich Alekseev for the amount exceeding 100m RUB, which in comparison to other directions was completely insignificant.

    31.2. Providing loans to pawnshop businesses of the Life companies group; for example, to YARILO OOO (OOO «ЯРИЛО») for the amount of about 500m RUB (see paragraph 32 below).

    31.3. Executing letters of credit (LOC) used to disguise the transfer of funds out of the Bank to the offshore companies, beneficiaries of which had been the persons controlling the Bank (see paragraphs 33-38 below).

    31.4. Providing loans to false borrowers used to disguise the transfer of funds out of the Bank to the companies, beneficiaries of which had been the persons controlling the Bank (see paragraphs 39-44 below).

32. Pawnshop business of YARILO OOO was presented as an independent business. In fact, it was a business-project of the Bank's shareholders financed through the irrevocable transfer of the Bank's funds.

33. LOC scheme had been organized through foreign companies. Transactions with these companies had been supported by International Cooperation Division headed by Denis Evgenievich Korablev, who answered directly and formally to Mikhail Olegovich Zavgorodniy (until 2014), and virtually - to Sergey Leonidovich Leontiev. Even the offices of Denis Evgenievich Korablev and Sergey Leonidovich Leontiev

were located in close proximity (within walking distance) in one building at Petrovka st. (Moscow).

34. According to the employees of this subdivision, the LOC scheme was carried out as follows. The Bank reached general arrangements with a multinational corporation, based on which companies in the corporation entered into a contract (mostly, international supply contracts). Official terms and conditions of the contract provided for a payment to the Supplier through execution of the LOC issued by the Bank. In fact, settlements between the affiliated companies in the corporation had been conducted otherwise. Uncovered LOC was necessary for the Bank in order to transfer the funds to the Supplier, which, in its turn, transferred these funds to Vermenda Holdings Limited (Cyprus) (hereinafter, Vermenda), which was controlled by the Bank's employees (Aleksandra Aleksandrovna Viulkova and/or Kirill Vladimirovich Artemov) and beneficiary of which were persons controlling the Bank, to the account opened with Trasta KommercBanka (Latvia). Settlements related to the uncovered LOC between the Buyer and the Bank were made by giving the Bank the rights of claim to Vermenda. Before consummation of the transaction, these rights had been granted by the Bank to the Buyer as a guarantee. Assignment transactions had never been recognized in the Bank's balance, which helped to cover up a fact that the whole structure had been closed.

35. Economic rationale for the multinationals (including, but not limited to Cargill, USA and Xangbo, Singapore) behind this LOC scheme was receiving a fee of 0.5%-1.5% of the transaction amount.

36. Participation of Cargill and Xangbo in the LOC scheme was organized by Yaroslav Vladimirovich Alekseev, who reached agreements on terms and conditions of the "technical" transaction.

37. As of February 2015, Vermenda received about 20m USD as the result of the LOC scheme. Then, the amount of funds transferred to Vermenda increased appr. to 30m USD (i.e. 1.8bn RUB as of the stated period).

38. In fact, the LOC scheme is a provision of unjustified, gratuitous, and irrecoverable loans to Vermenda, which constitutes a "technical" transaction.

39. As of February 2015, the amount of fictitious loans was about 2-2.5bn RUB, as of the early August 2015 - 4-5bn RUB.

40. Fictitious loans granted to the companies, beneficiaries of which were the persons controlling the Bank, were provided under the pretext of the transactions specified in paragraphs 41-44 below.

41. Formal provision of loans (reflected in documents) to the operating companies that were not affiliated with the Bank, but that had general arrangements to receive loans with the sole purpose to further transfer the funds to other companies in chain order. For example, one nominal borrower filed a request to the Bank asking for an unsecured loan. It also filed confirmation of its solid financial positions supported, inter alia, by high credit rating and total balance indicators. Further, the company underwent an approval procedure, received a loan, and, for various reasons, transferred the funds to the companies, beneficiaries of which were the persons controlling the Bank (including, but not limited to Sunrise OOO , PC-Techologies OOO , Iston OOO , ELSO OOO , Personell+ OOO). The transaction took appr. 3-4 months. Upon consummation of the transaction, the rights of claim were assigned to one of the companies controlled by the Bank. Assignment transactions had never been recognized in the Bank's balance and were secret because their purpose was not to allow to recover funds from the nominal borrowers that received loans.

42. Economic rationale for the nominal borrowers (including, but not limited to KnewHowTrade OOO, Centr Torgovli part of IMAC GROUP) was receiving a fee of 3.6%-5% of the transaction amount, which were paid to the heads of such companies. Therewith, taking into account the shadow nature of the transactions and limited number of companies ready to act as a nominal borrower, the fee was subject to change. For instance, there was an arrangement reached with IMAC GROUP to pay a fee of 12.5m RUB if the transaction amount exceeds 1.5bn RUB.

43. Loans for a personal investment project of Aleksander Dmitrievich Zheleznyak, despite the fact that the latter controlled the VIP clients subdivision, were provided through the Department. An employee of the stated VIP-subdivision of the Bank, Dmitriy Dmitrievich Zakharov (who was afterwards relocated to Life Factoring Company OOO), had been appointed as as Director of the German company Immoger Group GmbH through which Aleksander Dmitrievich Zheleznyak carried out his own project to buy real property in the neighbourhood of Potsdam (Germany) with the purpose of further reconstruction and resale.

44. Provision of a loan to the company controlled by the Bank was disguised by the transaction used by the Bank to acquire the real property. The Bank entered into agency agreement with Novaya Usadba CJSC. According to this agreement, the Bank undertook to transfer 600m RUB, and Novaya Usadba allegedly undertook to buy the real property for the Bank using these funds. Novaya Usadba CJSC is a real market-oriented company, with which, just as in the abovestated episodes, Yaroslav Vladimirovich Alekseev (through an intermediary known to him named Taimyr) reached an arrangement with Novaya Usadba's Director D.O. Rogovskiy to pay him a fee for his formal participation in the transaction under which the final recipient of the funds must be Investitsionnye Resheniya OOO, that is the company that was created by Yaroslav Vladimirovich Alekseev and had remained inactive up to that

moment. It was a dummy corporation. Accounting services were provided by one of the Bank's subdivision headed by Marina Mikhailovna Krylova.

45. Therefore, the Valkyrie Directorate, being a structural subdivision of the Bank, in fact was a separate structure engaging in transfer of the Bank's assets out of the Bank to the controlling persons using sophisticated transactions with complex structure with foreign element.

46. As the result of the transactions conducted under the direction of the Valkyrie Directorate, monetary funds transferred, in fact embezzled, out of the Bank were accumulated on the accounts of the companies registered by the Bank's employees for the benefit of the persons controlling the Bank. The abovestated funds had been disposed by the Bank's employees, that is fiduciaries of Sergey Leonidovich Leontiev and Aleksander Dmitrievich Zheleznyak, upon instructions, and for the benefit, of these persons.

47. Even after I became in charge of the Department that answered directly to Yaroslav Vladimirovich Alekseev certain employees continued to carry out instructions given solely by Yaroslav Vladimirovich.

48. For instance, Dmitriy Aleksandrovich Bakhlanov with other employees of the Bank ensured activity of the controlled companies, their nominal directors and/or nominal beneficiaries, including dealing with issues related to opening/closing of bank accounts, submission of reporting documents, etc.

49. Kirill Vladimirovich Artemov was some sort of a "treasurer" of all cash flows of the companies (including offshore ones), beneficiaries of which were the persons controlling the Bank. He was the main source of my information about Vermenda and transaction related with it.

50. Persons controlling the Bank, that is Sergey Leonidovich Leontiev and Aleksander Dmitrievich Zheleznyak, who were the beneficiaries of the companies receiving the assets transferred out of the Bank through the abovestated transactions, knew for sure about the deteriorating financial position of the Bank and about all transaction because they were conducted by the fiduciaries answering directly or indirectly to Sergey Leonidovich Leontiev and Aleksander Dmitrievich Zheleznyak. Without any doubt, all of the abovestated transactions had been conducted not only with the knowledge, but also upon the instructions of the controlling persons, which becomes evident from the Bank's management and decision-making structure stated further.

**Part 2**

51. When I received a job in the Bank in 1999, the Bank shareholders and top-managers were Sergey Leonidovich Leontiev and Alexander Dmitrievich Zheleznyak. To the best of my belief, their trusting partnership is based on their friendship started when they were children.

52. Sergey Leonidovich Leontiev had always actually been the Head of the Bank's Board of Directors, and had been signing all the contracts personally up to 2005.

53. Sergey Leonidovich Leontiev and Alexander Dmitrievich Zheleznyak had never hidden the fact that they are the Bank's shareholders.

54. In mid-2000s, Eduard Vladimirovich Panteleev had become a minority shareholder of the Bank (about 5%). Probably, this had been motivated by the fact that Eduard Panteleev attracted foreign clients to the Bank.

55. Approximately at the same time, Eldar Victorovich Bikmaev had become a minority shareholder (about 10%) of the Bank. I believe this happened because of his active role in the development of the Bank's retail sector.

56. Up to 2003, Aleksander Grigorievich Yastrib had also been a minority shareholder (about 5%) of the Bank. When divesting himself of his shareholding interests, he had transferred his shares to Aleksander Dmitrievich Zheleznyak.

57. Approximately it was in 2013-2014 when Eldar Victorovich Bikmaev had left the Bank as its shareholder. Then, in the second half of 2014, Eduard Vladimirovich Panteleev had left the Bank as its shareholder. He had also left the post of Vice-President of the Bank; however, he stayed as Sergey Leonidovich Leontiev's advisor on international issues.

58. I have met personally Sergey Leonidovich Leontiev and Aleksander Dmitrievich Zheleznyak in 2000, at the time when Credit Committee had its meetings. Sergey Leonidovich Leontiev and Aleksander Dmitrievich Zheleznyak directly participated in those meeting along with other members of the Credit Committee, totalling 8-10 persons. Sergey Leonidovich Leontiev had always been the Chairman of the Credit Committee, which subsequently was abolished.

59. Up to 2003, Aleksander Grigorievich Yastrib had been in charge of the Corporate Business Division, and Aleksander Dmitrievich Zheleznyak – Division of Small and Medium Business.

60. After Aleksander Grigorievich Yastrib's resignation, Aleksander Dmitrievich Zheleznyak had become the Head of the Corporate Business Division. I had quite often communicated with him personally on work issues, as during that period there

was no VIP-subdivision yet, so, my directorate was responsible for support of the clients brought by Aleksander Dmitrievich Zheleznyak.

61. Sergey Leonidovich Leontiev's office had always been located at Petrovka st. (Moscow). Aleksander Dmitrievich Zheleznyak had also had his office in the same building; however, it was temporary and had been used only for meetings held in the office located at Petrovka st. (Moscow).

62. Aleksander Dmitrievich Zheleznyak's office was located in business-centre Avilon-Plaza (Moscow). In 2015, I had found out that there was a third office of A. D. Zheleznyak on Pudovkina St. (Moscow).

63. Scope of responsibility and areas of interest of Sergey Leonidovich Leontiev and Aleksander Dmitrievich Zheleznyak were strictly segregated.

64. For instance, Sergey Leonidovich Leontiev was defining a common strategy for the whole Life companies group, exercising control over the retail division, division of small and medium business and subdivision responsible for working with financial markets. Sergey Leonidovich Leontiev had always directly participated in business-process management.

65. Aleksander Dmitrievich Zheleznyak, in his turn, had been overseeing the operation of the so-called functional subdivisions (lawyers, security services etc.) individually and exercising control over the Corporate Business Division in cooperation with Sergey Leonidovich Leontiev, and was responsible for communication with the Central Bank of the Russian Federation.

66. The fiduciary of Aleksander Dmitrievich Zheleznyak was Aleksander Lomov, who had been actually working on the strategy of communication with the Central Bank of the Russian Federation and creating official reporting documents of the Bank. In fact, he was a Chief Accountant of the whole Life companies group with all companies group's accountants answering directly to him.

67. Aleksander Dmitrievich Zheleznyak, Aleksander Vladimirovich Lomov and Yaroslav Vladimirovich Alekseev (mostly in the last years) had been cooperating with the Bank's auditors, which had likely caused the fact that such a substantial withdrawal of the Bank's assets came unnoticed by the auditors.

68. Both Aleksander Dmitrievich Zheleznyak and Aleksander Vladimirovich Lomov had no chance not to know about the Valkyrie Directorate's activity, despite the fact that Yaroslav Vladimirovich Alekseev had only been answering to A. D. Zheleznyak formally, and to Sergey Leonidovich Leontiev - actually and exclusively.

69. Yaroslav Vladimirovich Alekseev, being a fiduciary of Sergey Leonidovich Leontiev, was acting not much as in cooperation as alongside with Aleksander Vladimirovich Lomov.

70. Without any doubts, Sergey Leonidovich Leontiev and Aleksander Dmitrievich Zheleznyak could only take a decision to create the Valkyrie Directorate, which represented the shadow sector of the Bank's activity, acting together.

71. Neither Sergey Leonidovich, nor Aleksander Dmitrievich Zheleznyak had been hiding their interest in the development of personal business-projects (Life.Sreda, innovation projects in Singapore and investment projects in Germany, respectively), financing of which could be made at the expense of the Bank's assets transferred out of the Bank as the result of the abovestated transactions.

72. Actual distribution of the cash flow transferred to the companies, beneficiaries of which were the controlling persons, had been organized according to the instructions given by the latter to their fiduciaries – Yaroslav Vladimirovich Alekseev, Kirill Vladimirovich Artemov, Aleksandra Aleksandrovna Viulkova and Marina Mikhailovna Krylova, taking into account segregation of their duties and access to the information and resources (particularly, banking accounts).

## Part 3

73. According to the instructions of Aleksander Dmitrievich Zheleznyak, VIP-subdivision of the Corporate Business Department and its other subdivisions had been raising funds from their clients in the form of loans received by the companies controlled by the Bank (mostly, Kollektorskoe Agentstvo Life OOO) and secured by bank guaranties granted by the Bank, which had not been recognized in the Bank's balance. Economic rationale behind such transactions was the bigger interest rate for the client and minimization of the Bank's expenses caused by the compulsory regulations of the Central Bank of the Russian Federation, which had not had to be followed. Apart from that, the Bank did not need to use other schemes (both abovestated and others) for the subsequent transferring of the funds out of the Bank.

74. The controlling persons were not just aware of such transactions; they had been incentivizing their employees, who had been entering into these dubious transactions, by taking into account their performance when paying annual bonuses.

75. Placement of securities (according to the instruction of Yaroslav Vladimirovich Alekseev) and funds for securities operations were overseen by Elena Valerievna Rozhkova, an employee of the Financial Markets Department. According to Elena Valerievna Rozhkova and Yaroslav Vladimirovich Alekseev, the Bank had problems with certain securities. At the same time when this problem emerged, Yaroslav

Vladimirovich Alekseev had made two business trips with a small interval to Cyprus, where BrokerCreditServices (BCS), broker of the Bank, was registered. However, I can only guess about the connection between these circumstances.

76. At the same time, I can confirm that Elena Vladimirovna Rozhkova had personally met Oleg Vladimirovich Mikhasenko – the President of BCS financial group.

77. Apart from Vermenda, the companies controlled by Sergey Leonidovich Leontiev and Aleksander Dmitrievich Zheleznyak were the Cyprian companies Merrianol Investments Limited and Ambika Investments Limited, mentioned by Yaroslav Vladimirovich Alekseev as controlled by the Bank's employees.

78. One of the transactions that caused transfer of the Bank's assets out of the Bank was an acquisition of the stake in Protsessingovaya Kompaniya Life OOO (hereinafter, PK Life) for an overcharged price. PK Life belonged to the companies affiliated with the Bank, and had not been a valuable asset, acquisition of which could cost about 1bn RUB. Assistants of Chairman of the Bank's Management Board – Anna Veniaminovna Gordeeva and Yaroslav Vladimirovich Alekseev – had been preparing a transaction to purchase an ownership interest in authorized capital of PK Life based on the "assessed" value, which was calculated on the basis of controlled assessment results, which, in its turn, was based on the discounting of future cash flows in accordance with the business-plan. In anticipation of the preparation of this business-plan, the Bank's employees had taken actions to give a semblance of assets presence in PK Life, which let the appraiser to interpret the indicators as showing the profitability of PK Life and reasonability of the transaction of assets purchase at the price of 1bn RUB. Stated funds were transferred to the accounts of the Sellers, and subsequently – to the Vermenda account.

79. In addition to the abovestated episodes, presented in the stated Part are additional methods used by the controlling persons to transfer the Bank's assets out of the Bank. At the same time, without any doubt, the Bank's assets had been transferred out of the Bank through the use of other schemes as well, which, however, I am not aware of for certain.

## Part 4

80. By May 2015, the Bank faced growing anxiety of the employees, who were concerned about an obvious deterioration of the Bank's financial positions, which, as many of them feared (as it turned out, reasonably), could lead to the revocation of license. Particularly concerned were the employees who were more knowledgeable of the Valkyrie Directorate's activity and were aware that the number and amount of "technical", non-existing loans was continuing to increase rapidly.

81. The Bank management had been saying that the employees should not worry, explaining this by the absence of grounds for the revocation of license. Yaroslav Vladimirovich Alekseev drew attention to the fact that despite all the "technical" transactions of the Valkyrie Directorate, the Bank assets had not been stolen.

82. Dmitriy Dylnov, calming down my personal anxiety, cited to me the words of the management that there were no reasons to worry in relation to the Valkyrie Directorate's activity and that the shareholders would take all the responsibility.

83. After the appointment of a temporary administration on August 7, 2015, it became clear that the fears of the Bank's employees were reasonable, same as the subsequent revocation of license, which was not possible to avoid with such breaches of fundamental regulations of the Central Bank of the Russian Federation. The temporary administration had found discrepancies in the reporting documents right after the first inspection of the Bank's financial positions. Yaroslav Vladimirovich Alekseev and Aleksander Lomov, and a Bank employee specially engaged by A. Lomov gave explanations to all the questions and requests of temporary administration.

84. 2 days after the temporary administration appointment, Yaroslav Vladimirovich Alekseev had tasked me to prepare a project of the Bank's legal position (particularly, of the management and employees involved in the assets transfer transactions) to disguise the unlawful actions of the Bank's management and employees directed to the embezzlement of the Bank's property before the Central Bank of the Russian Federation and the law enforcement agencies. I prepared the project with explanations, which seemed to Yaroslav Vladimirovich Alekseev naive and not sufficient to escape criminal and / or other liability for the committed actions. As a short period lapsed, Yaroslav Vladimirovich Alekseev left the Russian Federation.

85. When it became clear to the Bank's management that in the very near future all their actions aimed at the unlawful transfer of the Bank assets out of the Bank would be disclosed, they started taking measures to intimidate me and coerce me to commit actions necessary to protect the Bank's shareholders.

86. The Bank's Vice-President for legal matters Sergey Letunov informed me about the initiation of the criminal proceedings in connection with the transfer of the Bank's assets and told me to seek legal representation in Zheleznyak and Partners, a Moscow law firm, the managing partner of which was a brother of Aleksander Dmitrievich Zheleznyak.

87. My spouse hired me an attorney from Zheleznyak and Partners – Anita Vitalievna Ageeva. When I found out that the attorney (Ageeva) was affiliated with former shareholders of the Bank, I started to have reasonable doubts in her ability to provide

me with an independent and expert legal assistance. My doubts were confirmed after it had become obvious to me that the attorney (Ageeva) did not provide me with the full information and my protection and representation was not her priority.

88. I refused her services and hired an attorney who was more qualified and interested in my defence.

89. After a retrospective analysis of all the circumstances of the Bank's quasi-economic activity related to the "technical" transactions aimed to embezzle the Bank's property, taking into account the attorney's advice, I have taken a decision to enter into a pre-trial agreement on cooperation with the Prosecutor and give this witness statement contributing to establishing the truth and recovering stolen funds to the Bank.

_____ /signature/ _____

My client, Alekseev Nikolay Victorovich, has signed the Witness Statement in my presence on May 25, 2017

Attorney_____ /signature/ _____ _____Oleg Alekseevich Zvyagin

In total 16 (sixteen) pages are stitched and numbered

\Signature \

\Signature \

# ПРИЛОЖЕНИЕ 12

# СВИДЕТЕЛЬСКИЕ ПОКАЗАНИЯ
## НИКОЛАЯ ВИКТОРОВИЧА АЛЕКСЕЕВА

Я, Николай Викторович Алексеев, настоящим свидетельствую о нижеследующем:

1. Я родился 9 мая 1969 года в поселке Купанское Переславского района Ярославской области.

2. В 1994-1995 годах я окончил технический и экономический факультеты по специальностям – ракетостроение, инженерный бизнес и менеджмент в Московском государственном техническом университете им. Н.Э. Баумана.

3. С 1999 года по 2015 год я являлся сотрудником ОАО АКБ «Пробизнесбанк» (далее – Банк). В ходе моей трудовой деятельности мне стало известно об обстоятельствах и способах вывода активов Банка контролирующими лицами – Сергеем Леонидовичем Леонтьевым и Александром Дмитриевичем Железняком (далее вместе – контролирующие лица), в чем им содействовали их доверенные лица, включая, но не ограничиваясь, сотрудников Банка, занимавших должности руководителей структурных подразделений – Департаментов и Управлений Банка, Вице-Президентов Банка и Заместителей Председателя Правления Банка.

4. Я работал в Банке порядка 16 лет, в течение которых взаимодействовал напрямую с акционерами и топ-менеджерами Банка и их доверенными лицами и был вовлечен как исполнитель или свидетель в действия сотрудников Банка, по исполнению инструкций и поручения контролирующих лиц.

5. В 2009 году Сергеем Леонидовичем Леонтьевым и Александром Дмитриевичем Железняком при содействии доверенных им лиц была создана сложная и витиеватая инфраструктура, обеспечивающая деятельность «теневого» сектора Банка. Основной целью данной структуры являлся вывод активов, создание за счет средств Банка параллельных бюджетов для личного обогащения контролирующих лиц. В период с 2009 года по 2015 года доля «технических» сделок Банка существенно возросла.

6. Как будет указано далее в данном документе, моя осведомленность об изложенных фактах преимущественно основана на моем личном участии в выполнении инструкций контролирующих лиц, если не указано иное.

7. В тех случаях, когда об обстоятельствах, изложенных в данных свидетельских показаниях, мне стало известно от третьих лиц, это будет указано в тексте с соответствующей ссылкой на источник получения информации.

8. Во избежание сомнений, заявляю, что настоящие свидетельские показания даны мной добровольно, никто не оказывал и не оказывает на меня давления или иного влияния. Содержание настоящих свидетельских показаний достоверно, и я считаю, что факты, изложенные в настоящих показаниях верны, насколько мне известно.

9. Так как многие из описанных событий происходили сравнительно давно, то даты, названия должностей и структурных подразделений Банка могут быть указаны ориентировочно, однако с такой степенью детализации, которая позволит избежать двоякого толкования или невозможности установления достоверности изложенных мной фактов.

10. Структура изложения настоящих свидетельских показаний построена по хронологии моей работы (Часть 1) с отдельным описанием структуры управления Банком и принятия решений (Часть 2), отдельных эпизодов по выводу активов Банка (Часть 3), а также событий, последовавших после отзыва лицензии Банка (Часть 4).

## Часть 1

11. Во втором полугодии 1999 года я был принят на работу в Банк в должности, наименование которой звучало примерно как «кредитный эксперт» или «кредитный аналитик». Вне зависимости от наименования должности, я занимался кредитной работой в рамках Программы поддержки предприятий Мирового банка (далее – Программа). Деятельность Программы была приостановлена по истечении полугода работы на незначительный период – около 3 (трех) месяцев, в течение которых я в Банке не работал. Однако после возобновления Программы я вернулся на работу в Банк и проработал в общей сложности (с 1999 года вплоть до 2015 года, когда у Банка была отозвана лицензия) порядка 16 лет.

12. Работа Программы продолжалась до закрытия ориентировочно в 2004 году. К тому моменту я уже стал заместителем начальника управления Банка, сопровождавшего эту Программу.

13. После закрытия Программы, управление Банка, занимавшееся ее сопровождением, было расформировано. Я был переведен на работу в другое подразделение Банка, где проработал до 2007 года.

14. В период с 2004 года по 2007 год наименование структурного подразделения (условно называемого дивизионом крупного/корпоративного бизнеса), в котором я работал, равно как и наименование моей должности, в том числе в связи с карьерным ростом, неоднократно менялось, однако в сущности мой

функционал всегда сводился к кредитной работе с крупными корпоративными клиентами, годовая выручка по которым превышала 60 миллионов рублей, с определенной долей административных функций. Так, я занимался взаимодействием с клиентами-заемщиками, сбором документов, необходимых для оформления кредитно-обеспечительной документации, оформлением кредитно-обеспечительных сделок, в том числе сложно-структурированных и связанных с проектным финансированием, последующим сопровождением кредитов (так называемым мониторингом возврата кредитов) и работой с проблемной задолженностью.

15. К 2007 году я прошел путь до заместителя начальника управления, указанного выше, в составе 10-12 сотрудников, находившихся в моем подчинении. Руководство моей работой осуществляли Вячеслав Викторович Казанцев, Наталья Юрьевна Демидова и Александр Дмитриевич Железняк, с которыми я общался напрямую, в том числе получал от них указания и инструкции по работе.

16. Наталья Юрьевна Демидова осуществляла руководство Дивизионом корпоративного бизнеса, в том числе применительно к моему подразделению, так называемыми нишевыми стратегиями, под которыми понималось кредитование компаний специализированных секторов экономики (подразделение по работе с подакцизными товарами, ниша нефтетрейдеров, ниша зернотрейдеров, ниша металлотрейдеров, фарманиша, ниша факторинга, ниша электроэнергетики и IT-ниша).

17. Вячеслав Викторович Казанцев осуществлял руководство всеми иными кредитными стратегиями, за исключением тех, которые относились к сфере деятельности Натальи Юрьевны Демидовой.

18. Александр Дмитриевич Железняк как акционер и топ-менеджер Банка осуществлял руководство деятельностью моего подразделения в части кредитования крупных клиентов, которых в Банк привел сам А.Д. Железняк, и общее стратегическое руководство Дивизионом корпоративного бизнеса.

19. В 2007 году указанное подразделение было реорганизовано, в связи с перераспределением функций, связанных с непосредственным привлечением клиентов. Я был назначен руководителем вновь созданного подразделения. На указанной должности я проработал до начала 2009 года.

20. В связи мировым экономическим кризисом 2008 года, доля проблемных активов Банка (невозвратные кредиты, задолженность неплатежеспособных заемщиков и иная «токсичная» задолженность») увеличилась, и в 2009 году руководство Банка поставило передо мной задачу по работе с «живыми»

проблемными активами, под которыми понималась просроченная ссудная задолженность, которая могла быть погашена за счет развития и последующей продажи бизнеса компании-заемщика, перекредитования или ликвидации бизнеса. Для этой работы было создано подразделение из 7-8 сотрудников под моим руководством, которое существовало примерно до середины 2013 года.

21. В период работы с проблемными активами мне были доступны сведения о размере портфеля кредитов (в том числе проблемных), которые находились в ведении моего подразделения и подразделений под руководством Александра Вячеславовича Зуева и Павла Бусыгина. Исходя из отчетности того периода, общий размер кредитного портфеля Банка составлял порядка 30-40 миллиардов рублей, из которых 20-25 миллиардов рублей составляли кредиты физических лиц, а 12-15 миллиардов рублей – юридических лиц, из который около 1,5 миллиардов рублей составляла проблемная задолженность юридических лиц – корпоративных клиентов с формированием резервов в размере 50%-100%, которую сопровождало мое подразделение. Помимо этого, на каждое подразделение (в том числе так называемые ниши), занимавшееся кредитованием, приходилась своя доля проблемной задолженности.

22. Примерно к середине 2013 года поставленная мне задача по работе с проблемными активами была выполнена, после чего я узнал о том, что Эдуард Владимирович Пантелеев совместно с Дмитрием Геннадьевичем Дыльновым начинают новый проект группы компаний «Лайф», связанный с проектным финансированием франчайзинга. Проект являлся для меня профильным, я начал работу в рамках этого проекта.

23. Вторая половина 2013 года была посвящена подготовке к началу проекта. В течение 2014 года было запущено порядка 50 (пятидесяти) предприятий по проекту, однако в связи с тем, что воплотить планы в жизнь не удалось, деятельность по проекту была прекращена в конце 2014 года.

24. В начале 2015 года Ярослав Владимирович Алексеев предложил мне возглавить Управление банковских проектов (далее – Управление), которое на тот момент возглавлял Кирилл Владимирович Артемов и было подотчетно Ярославу Владимировичу Алексееву. Я согласился и возглавил это Управление, которое очень скоро переименовали в Департамент корпоративных финансов (далее – Департамент).

25. Исходя из состояния дел в Департаменте на момент, когда я только преступил к руководству им, было очевидно, что лишь 15%-20% работы Управления под руководством Ярослава Владимировича Алексеева приходилось на реальные кредитные сделки, хотя и те заключались с лицами, аффилированными с

Банком и его контролирующими лицами, тогда как 80%-85% приходилось на «технические» сделки, в том числе фиктивные кредиты.

26. Управление существовало примерно с 2009 года, и так или иначе все сотрудники Банка знали, что оно занимается «техническими» сделками, которые, как позиционировалось, в том числе самим Ярославом Владимировичем Алексеевым, необходимы для поддержания капитала Банка и для представления регулятору – Центральному Банку Российской Федерации (далее – ЦБ РФ) – такой отчетности и ключевых показателей, которые бы не отражали реальных убытков, которые несет Банк, в том числе в связи с кризисом розничного кредитования.

27. Ни для кого из сотрудников Банка не было секретом, что Управление Ярослава Владимировича Алексеева осуществляет сомнительную деятельность, заключая «технические» сделки. Этому Управлению даже было дано неофициальное наименование – Управление «Валькирия» как одноименная героиня скандинавского фольклора, сопровождающая павших воинов в Вальхаллу, а все сделки Управления во внутрикорпоративной электронной переписке именовались «валькирийскими». Финансовые показатели Управления скрывались в официальной отчетности в разделе «Прочее» и никогда не детализировались.

28. Несмотря на то, что Управление «Валькирия» полностью состояло из сотрудников Банка, оно всегда считалось надбанковской структурой и не являлось частью блока корпоративного бизнеса.

29. Ярослав Владимирович Алексеев, будучи ставленником и доверенным лицом Сергея Леонидовича Леонтьева, являлся своего рода «серым кардиналом», воплощавшим в жизнь планы и указания контролирующих лиц.

30. В феврале 2015 года, передавая мне руководство Департаментом, Ярослав Владимирович Алексеев пояснил, что вся группа компаний «Лайф» несет существенные убытки, в связи с чем объем «технических» сделок будет только расти, а вследствие ужесточения требований ЦБ РФ к банковской отчетности, и качество оформления документации по таким сделкам должно увеличиваться.

31. Деятельность Департамента осуществлялась по следующим 4 (четырем) направлениям:

    31.1. Кредитование 2-3 заемщиков, связанных дружескими отношениями с Ярославом Владимировичем Алексеевым, на сумму не более 100 миллионов рублей, что в масштабах иных направлений деятельности является совсем незначительным.

31.2. Кредитование ломбардного бизнеса группы компаний «Лайф» на примере ООО «ЯРИЛО» на сумму порядка 500 миллионов рублей (см. пункт 32 ниже).

31.3. Оформление аккредитивов, прикрывавших вывод денежных средств на оффшорные компании, бенефициарами которых являются контролирующие Банк лица (см. пункты 33-38 ниже).

31.4. Выдача фиктивным заемщикам кредитов, прикрывавших вывод денежных средств на компании, бенефициарами которых являются контролирующие Банк лица (см. пунктах 39-44 ниже).

32. *Ломбардный бизнес ООО «ЯРИЛО»* представлялся как независимый бизнес, однако на самом деле являлся бизнес-проектом акционеров Банка, который финансировался за счет вывода денежных средств Банка на безвозвратной основе.

33. Аккредитивная схема осуществлялась через иностранные компании, сделки с которыми сопровождал Отдел международного сотрудничества, руководство которым осуществляли Денис Евгеньевич Кораблев, который формально подчинялся Михаилу Олеговичу Завгороднему (до 2014 года), а де-факто – Сергею Леонидовичу Леонтьеву. Даже кабинеты Дениса Евгеньевича Кораблева и Сергея Леонидовича Леонтьева находились в шаговой доступности друг от друга в одном офисном здании на ул. Петровка (г. Москва).

34. Со слов сотрудников указанного подразделения аккредитивная схема осуществлялась следующим образом. Банк достигал понятийные договоренности с транснациональной корпорацией, в соответствии с которыми между компаниями корпорации заключался контракт (преимущественно международной поставки). Официальные условия контракта предусматривали оплату в пользу Поставщика посредством раскрытия аккредитива, выпущенного Банком, тогда как в реальности расчеты между аффилированными компаниями из состава корпорации происходили иным путем. Использование непокрытого аккредитива было необходимо Банку для того, чтобы вывести денежные средства на компанию-Поставщика, которая, в свою очередь, перечисляла эти денежные средства в пользу компании Vermenda Holdings Limited (Республика Кипр) (далее – Vermenda), бенефициарами которой являются контролирующие Банк лица и управляемая в их интересах сотрудниками Банка (Александрой Александровной Вьюлковой и/или Кириллом Владимировичем Артемовым), на счет, открытый в Trasta KommercBanka (Латвийская Республика). Расчеты компании-Покупателя с Банком по оплате непокрытого аккредитива осуществлялись предоставлением Банку прав требования к Vermenda, которые до закрытия всей сделки

предоставлялись со стороны Банка в пользу компании-Покупателя в качестве гарантии. Сделки по уступке никогда не отражались на балансе Банке, что позволяло скрывать тот факт, что вся структура сделки замыкалась.

35. Экономический смысл аккредитивной схемы для вовлеченных транснациональных корпораций (включая, но не ограничиваясь, Cargill (США) и Xangbo (Республика Сингапур)) заключался в получении комиссии, которая составляла от 0,5% до 1,5% от суммы сделки.

36. Участие Cargill и Xangbo в аккредитивной схеме было организовано Ярославом Владимировичем Алексеевым, который достигал договоренностей об условиях «технических» сделок.

37. По состоянию на февраль 2015 года по аккредитивной схеме в пользу Vermenda было выведено порядка 20 миллионов долларов США. Впоследствии объем выведенных в пользу Vermenda денежных средств увеличился ориентировочно до 30 миллионов долларов США (что составляет примерно 1,8 миллиарда рублей по курсу валюты на указанный период).

38. Фактически аккредитивная схема представляет собой безосновательное, безвозмездное и невозвратное кредитование компании Vermenda, что и представляет собой «техническую» сделку.

39. По состоянию на февраль 2015 года размер фиктивных кредитов составлял порядка 2-2,5 миллиардов рублей, а к началу августа 2015 года их объем увеличился до 4-5 миллиардов рублей.

40. Фиктивные кредиты на компании, бенефициарами которых являются контролирующие Банк лица, выдавались под видом заключения следующих сделок, указанных в пунктах 41-44 ниже.

41. Формальная (по документам) выдача кредитов действующим компаниям, которые не были аффилированными с Банком, но с которыми были достигнуты понятийные договоренности о получении этими формальными заемщиками кредита исключительно с целью последующего перечисления денежных средств далее по цепочке компаний. Так, компания – формальный заёмщик подавала в Банк заявку на получение кредита без обеспечения, однако с доказательствами устойчивого финансового положения, подтвержденного, в том числе высоким кредитным рейтингом и показателями валюты баланса. Далее компания проходила процедуру одобрения, получала кредит и по различным основаниям, в конечно итоге, перечисляла полученные кредитные средства в пользу компаний, бенефициарами которых являются контролирующие Банк лица (включая, но не ограничиваясь, ООО «Санрис»,

ООО «ПК-Технолоджис», ООО «Истон», ООО «ЭЛСО», ООО «Персонал+»). Вся сделка занимала порядка 3-4 месяцев. При закрытии сделки в пользу Банка производилась уступка прав требования к одной из подконтрольных Банку компаний. Сделки по уступке никогда не отражались на балансе Банке и являлись секретными, так как были направлены на недопущение взыскания с компаний – формальных заемщиков ссудной задолженности.

42. Экономический смысл для компаний – формальных заемщиков (включая, но не ограничиваясь ООО «НьюХауТрейд», ООО «Центр Торговли», входящее в группу компаний IMAC GROUP) заключался в получении комиссии, которая составляла от 3,6% до 5% от суммы сделки и выплачивалась наличными руководителю такой компании. Вместе с тем, с учетом теневого характера сделок и ограниченного спектра компаний, готовых выступать в роли формальных заемщиков, размер комиссии мог варьироваться. Например, с группой компаний IMAC GROUP была достигнута договоренность о выплате комиссии в размере 12,5 миллионов рублей, если сумма сделок превысит 1,5 миллиарда рублей.

43. Кредитование личного инвестиционного проекта Александра Дмитриевича Железняка, несмотря на наличие подконтрольного последнему подразделения по работе с VIP-клиентами, производилось через Департамент. Сотрудник указанного VIP-подразделения Банка – Дмитрий Дмитриевич Захаров, впоследствии переведенный в ООО «Факторинговая компания «Лайф», был назначен директором немецкой компании Immoger Group GmbH, через которую Александр Дмитриевич Железняк реализовывал личный инвестиционный проект по приобретению недвижимого имущества в районе г. Потсдама (Германия) с целью его реконструкции и дальнейшей перепродажи.

44. Выдача кредита на подконтрольную компанию Банка, прикрываемая исполнением сделки по приобретению Банком недвижимого имущества. Банк заключил с ЗАО «Новая усадьба» агентский договор, в соответствии с которым Банк должен перечислить 600 миллионов рублей, а ЗАО «Новая усадьба» якобы приобрести на эти деньги недвижимость для Банка. ЗАО «Новая усадьба» является реальной рыночной компанией, с которой также, как и в указанных выше эпизодах, Ярославом Владимировичем Алексеевым (через знакомого ему посредника – Таймыра) была достигнута договоренность с директором ЗАО «Новая усадьба» – Д.О. Роговским – о выплате ему комиссии за формальное участие в сделке, деньги по которой должны быть в итоге перечислены в пользу ООО «Инвестиционные решения» – компании, созданной Ярославом Владимировичем Алексеевым и находившейся до этого в неактивном состоянии. Компания была «пустышкой». Бухгалтерским обслуживанием

занималось одно из подразделений Банка, под руководством Марины Михайловны Крыловой.

45. Таким образом, Управление «Валькирия», будучи структурным подразделением Банка, на самом деле являлось обособленной структурой, осуществлявшей деятельность, направленную на вывод активов Банка в пользу контролирующих лиц с использованием изощренных сложно-структурированных сделок, в том числе с иностранным элементом.

46. В результате сделок, совершенных под руководством Управления «Валькирия» выведенные из Банка, а в сущности похищенные, денежные средства аккумулировались на счетах компаний, зарегистрированных сотрудниками Банка в интересах контролирующих Банк лиц. Фактические действия по распоряжению указанными средствами совершались сотрудниками Банка – доверенными лицами Сергея Леонидовича Леонтьева и Александра Дмитриевича Железняка по их указанию и в их интересах.

47. Даже после того, как я возглавил Департамент, который был подотчетен Ярославу Владимировичу Алексееву, ряд сотрудников продолжал выполнять исключительно распоряжения Ярослава Владимировича.

48. Так, Дмитрий Александрович Бахланов наряду с иными сотрудниками Банка обеспечивал деятельность подконтрольных компаний, их номинальных директоров и/или номинальных бенефициаров, включая разрешение вопросов открытия/закрытия банковских счетов, сдачи отчетности и т.д.

49. Кирилл Владимирович Артемов являлся своего рода «казначеем» всех денежных потоков компаний (в том числе оффшорных), бенефициарами которых являлись контролирующие Банк лица. Он преимущественно и является источником моих сведений касательно Vermenda и сделок, связанных с ней.

50. Контролирующие Банк лица – Сергей Леонидович Леонтьев и Александр Дмитриевич Железняк, являющиеся бенефициарами компаний, в пользу которых выводились активы Банка с использованием вышеуказанных сделок, совершенно точно знали об ухудшении финансового состояния Банка и обо всех совершаемых сделках, т.к. осуществлявшие их сотрудники Банка были доверенными лицами, подотчетными прямо или косвенно как Сергею Леонидовичу Леонтьеву, так и Александру Дмитриевичу Железняку. Несомненно, все вышеуказанные сделки совершались не только с ведома, но и по указанию контролирующих лиц, что очевидно следует из структуры управления Банком и принятия решений, описанной далее.

**Часть 2**

51. Когда в 1999 году я устроился на работу в Банк, акционерами и топ-менеджерами Банка являлись Сергей Леонидович Леонтьев и Александр Дмитриевич Железняк. Насколько мне известно, их доверительные партнерские отношения основаны на дружбе детства.

52. Сергей Леонидович Леонтьев всегда фактически являлся главой Совета директоров Банка, а вплоть до 2005 года лично подписывал все договоры.

53. Сергей Леонидович Леонтьев и Александр Дмитриевич Железняк никогда не скрывали, что являются акционерами Банка.

54. В середине 2000-х годов миноритарным акционером (около 5%) Банка стал Эдуард Владимирович Пантелеев. Вероятно, это было мотивировано привлечением Эдуардом Пантелеевым иностранных клиентов Банка.

55. Примерно в это же время миноритарным акционером (около 10%) Банка стал Эльдар Викторович Бикмаев. Полагаю, что это было обусловлено его активной ролью в развитии розничного сектора Банка.

56. До 2003 года миноритарным акционером (около 5%) Банка также являлся Александр Григорьевич Ястриб, который при выходе из акционеров Банка передал свои акции Александру Дмитриевичу Железняку.

57. Ориентировочно в 2013-2014 годах Эльдар Викторович Бикмаев вышел из состава акционеров Банка. А во второй половине 2014 года из состава акционеров вышел Эдуард Владимирович Пантелеев, который также ушел с должности Вице-Президента Банка, однако остался консультантом Сергея Леонидовича Леонтьева по международным вопросам.

58. Я лично познакомился с Сергеем Леонидовичем Леонтьевым и Александром Дмитриевичем Железняком в 2000 году во время заседаний Кредитного комитета, в которых они принимали непосредственное участие, наряду с иными членами Кредитного комитета, общая численность которого составляла около 8-10 человек. Сергей Леонидович Леонтьев всегда был Председателем Кредитного комитета, который впоследствии был упразднен.

59. До 2003 года Александр Григорьевич Ястриб руководил дивизионом корпоративного бизнеса, а Александр Дмитриевич Железняк – дивизионом малого и среднего бизнеса.

60. После ухода Александра Григорьевича Ястриба руководителем дивизиона корпоративного бизнеса стал Александр Дмитриевич Железняк, с которым я лично довольно часто общался по рабочим вопросам, так как в тот период времени еще не было VIP-подразделения, то мое управление занималось сопровождением клиентов, которых привел Александр Дмитриевич Железняк.

61. Рабочий кабинет Сергея Леонидовича Леонтьева всегда находился в офисе на ул. Петровка (г. Москва). У Александра Дмитриевича Железняка также был рабочий кабинет в этом здании, однако он являлся временным и использовался исключительно при проведении совещаний в офисе на ул. Петровка (г. Москва).

62. Рабочий кабинет Александра Дмитриевича Железняка находился в бизнес-центре Авилон-Плаза (г. Москва). В 2015 году мне также стало известно о наличии третьего рабочего кабинет А.Д. Железняка на ул. Пудовкина (г. Москва).

63. Зоны ответственности и сферы интересов Сергея Леонидовича Леонтьева и Александра Дмитриевича Железняка были четко разграничены.

64. Так, Сергей Леонидович Леонтьев определял общую стратегию всей группы компаний «Лайф», осуществлял контроль за деятельностью розничного дивизиона, дивизиона малого и среднего бизнеса и подразделения, ответственного за работу с финансовыми рынками. Сергей Леонидович Леонтьев всегда принимал непосредственное участие в управлении бизнес-процессами.

65. Александр Дмитриевич Железняк, в свою очередь, обособленно курировал работу так называемых функциональных подразделений (юристов, службы безопасности и т.д.) и во взаимодействии с Сергеем Леонидовичем Леонтьевым осуществлял контроль за деятельностью дивизиона корпоративного бизнеса, а также отвечал за взаимодействие с ЦБ РФ.

66. Доверенным лицом Александра Дмитриевича Железняка являлся Александр Ломов, который фактически прорабатывал стратегию взаимодействия с ЦБ РФ, формировал официальную отчетность Банка, де-факто был главным бухгалтером всей группы компаний «Лайф», которому подчинялись все бухгалтеры компаний группы.

67. Александр Дмитриевич Железняк, Александр Владимирович Ломов и Ярослав Владимирович Алексеев (преимущественно – в последние годы) взаимодействовали с аудиторами Банка, чем вероятно обусловлен тот факт, что такие существенные выводы активов Банка остались незамеченными аудиторами.

68. Как Александр Дмитриевич Железняк, так и Александр Владимирович Ломов не могли не знать о деятельности Управления «Валькирия», несмотря на то, что Ярослав Владимирович Алексеев лишь формально подчинялся А.Д. Железняку, фактически – только Сергею Леонидовичу Леонтьеву.

69. Ярослав Владимирович Алексеев, будучи доверенным лицом Сергея Леонидовича Леонтьева, действовал не столько совместно, сколько наряду с Александром Владимировичем Ломовым.

70. Вне всяких сомнений, лишь совместно Сергей Леонидович Леонтьев и Александр Дмитриевич Железняк могли принять решение о создании Управления «Валькирия», являющегося теневым сектором деятельности Банка.

71. Ни Сергей Леонидович Леонтьев, ни Александр Дмитриевич Железняк не скрывали заинтересованности в развитии личных бизнес-проектов («Лайф.Среда», инновационные проекты в Сингапуре и инвестиционные проекты в Германии, соответственно), финансирование которых могло производиться за счет активов Банка, выведенных в результате вышеописанных сделок.

72. Фактическое распределение денежных потоков, выведенных на компании, бенефициарами которых являются контролирующие лица, производилось по указаниям последних их доверенными лицами – Ярославом Владимировичем Алексеевым, Кириллом Владимировичем Артемовым, Александрой Александровной Вьюлковой и Мариной Михайловной Крыловой, с учетом распределения их функционала и доступа к информации и ресурсам (в частности, банковским счетам).

## Часть 3

73. VIP-подразделение Департамента корпоративного бизнеса и другие его подразделения по указанию Александра Дмитриевича Железняка практиковали привлечение средств клиентов в виде займов, получаемых подконтрольными Банку компаниями (преимущественно ООО «Коллекторское агентство «Лайф»), в обеспечение которых Банк выдавал банковские гарантии, которые не учитывались на балансе Банка. Экономический смысл таких сделок заключался в большей процентной ставке дохода для клиента и в минимизации расходов Банка, обусловленных обязательными нормативами ЦБ РФ, которые не требовалось соблюдать. Помимо этого, Банку не требовалось применение иных схем (как из вышеописанных, так и других) для последующего вывода денежных средств из Банка.

74. Контролирующие лица были не просто осведомлены о подобных сделках, но они поощряли сотрудников, заключавших такие сомнительные сделки, учитывая показатели такой работы при выплате годовых бонусов.

75. Размещение ценных бумаг (по указанию Ярослава Владимировича Алексеева) и денежных средств для операций с ценными бумагами курировала Елена Валерьевна Рожкова, сотрудник Департамента финансовых рынков. Со слов Елены Валерьевны Рожковой и Ярослава Владимировича Алексеева, у Банка были проблемы с некими ценными бумагами. Одновременно с обозначившейся проблемой Ярослав Владимирович Алексеев с небольшим интервалом совершил две командировки в Республику Кипр, где зарегистрирован BrokerCreditServices (BCS) – брокер Банка. Однако о связи этих обстоятельств я могу лишь догадываться.

76. Вместе с тем, я могу утверждать, что Елена Владимировна Рожкова лично знакома с Олегом Владимировичем Михасенко – Президентом финансовой группы BCS.

77. Помимо Vermenda, компаниями, подконтрольными Сергею Леонидовичу Леонтьеву и Александру Дмитриевичу Железняку, являются кипрские компании Merrianol Investments Limited и Ambika Investments Limited, упоминавшиеся Ярославом Владимировичем Алексеевым как управляемые сотрудниками Банка.

78. Одной из сделок, повлекшей вывод активов Банка стала сделка по приобретению пакета акций ООО «Процессинговая компания «Лайф» (далее – ПК «Лайф») по завышенной цене. ПК «Лайф» принадлежала компаниям, аффилированным с Банком, и не была ценным активом, приобретение которого стоило порядка 1 миллиарда рублей. Помощник Председателя Правления Банка – Анна Вениаминовна Гордеева и Ярослав Владимирович Алексеев осуществляли подготовку сделки по покупке долей участия в уставном капитале ПК «Лайф» по «оценочной» стоимости, которая определялась на основании результатов контролируемой оценки, основанной на дисконтировании будущих денежных потоков в соответствии с бизнес-планом. В преддверие подготовки этого бизнес-плана сотрудниками Банка были совершены действия, направленные на создание видимости наличия у ПК «Лайф» активов, что позволило оценщику интерпретировать показатели как свидетельствующие о доходности сделки и обоснованности сделки по покупке актива по цене в 1 миллиард рублей. Указанные денежные средства были перечислены на счета компаний-Продавцов, а впоследствии — на счет Vermenda.

79. В указанной части свидетельских показаний, в дополнение к ранее изложенным эпизодам, представлены дополнительные способы, использованные контролирующими лицами для вывода активов Банка. Вместе с тем, вне всяких сомнений, активы Банка выводились и с использованием иных схем, которые, однако, доподлинно мне неизвестны.

**Часть 4**

80. К маю 2015 года в Банке нарастали волнения сотрудников, обеспокоенных очевидным ухудшением финансового состояния Банка, которое, по опасениям многих (и как оказалось, обоснованным), могло привести к отзыву лицензии. Особенно обеспокоены были сотрудники, в большей степени осведомленные о деятельности Управления «Валькирия», которые знали, что количество и объем «технических», несуществующих кредитов продолжает быстро расти.

81. Руководство Банка предлагало сотрудникам не волноваться, обосновывая это отсутствием основанием для отзыва лицензии. Ярослав Владимирович Алексеев обращал внимание на тот факт, что, несмотря на все «технические» сделки Управления «Валькирия», активы Банка не были похищены.

82. Дмитрий Дыльнов, успокаивая мои личные волнения, транслировал мне слова руководства о том, что поводов для беспокойства в связи с деятельностью Управления «Валькирия» нет и что вся ответственность ляжет на акционеров.

83. После назначения временной администрации 7 августа 2015 г. стало понятно, что опасения сотрудников Банка были обоснованными, равно как и последующий отзыв лицензии, избежать которого с подобными нарушениями основополагающих нормативов ЦБ РФ не представлялось возможным. Временная администрация при первичном изучении финансового состояния Банка сразу же установила несоответствия в отчетности. Пояснения по всем вопросам и запросам временной администрации предоставляли Ярослав Владимирович Алексеевич и Александр Ломов, а также специально привлеченный А. Ломовым сотрудник Банка.

84. Через 2 (двух) дней после назначения временной администрации Ярослав Владимирович Алексеев поручил мне подготовить проект правовой позиции Банка (в частности, руководства и сотрудников, вовлеченных в сделки по выводу активов) для прикрытия перед ЦБ РФ и правоохранительными органами незаконных действий руководства и сотрудников Банка, направленных на хищение имущества Банка. Я подготовил проект пояснений, которые Ярославу Владимировичу Алексееву показались наивными и недостаточными для уклонения от уголовной и/или иной ответственности за совершенные деяния.

По прошествии незначительного периода времени Ярослав Владимирович Алексеев покинул территорию Российской Федерации.

85. Когда руководству Банка стало понятно, что в самое ближайшее время все их действия по незаконному выводу активов Банка будут раскрыты, они стали предпринимать меры, направленные на мое запугивание и принуждение к совершению действий, необходимых для того, чтобы обезопасить акционеров Банка.

86. Вице-Президент Банк по юридическим вопросам Сергей Летунов уведомил меня о возбуждении уголовного дела в связи с выводом активов Банка и велел мне обратиться за помощью адвоката в МКА «Железняк и партнеры», управляющим партнером в которой является родной брат Александра Дмитриевича Железняка.

87. Моя супруга наняла для меня адвоката из МКА «Железняк и партнеры» - Аниту Витальевну Агееву. Когда я узнал, что адвокат Агеева аффилирована с бывшим акционеров Банка, то у меня возникли разумные сомнения в ее возможности оказать мне независимую и квалифицированную юридическую помощь. Мои сомнения подтвердились после того, как мне стало очевидно, что адвокат Агеева не предоставляет мне полный объем информации и ее приоритетом является не моя защита.

88. Я отказался от услуг адвоката Агеевой и нанял более квалифицированного и заинтересованного в моей защите адвоката.

89. Проанализировав в ретроспективе все обстоятельства квази-хозяйственной деятельности Банка, связанной с «техническими» сделками по хищению имущества Банка, с учетом совета адвоката, мной было принято решение о заключении досудебного соглашения о сотрудничестве с Прокурором и предоставлении настоящих свидетельских показаний, которые будут способствовать установлению истины и возврату в пользу Банка похищенных активов.

Настоящие показания подписаны в моем присутствии моим подзащитным Алексеевым Николаем Викторовичем 25 апреля 2017 года

Адвокат_____ Олег Алексеевич Звягин

Принято и проверено

16 (заместитель) школы

Директор