# EXHIBIT 13

# WITNESS STATEMENT OF
## MARINA MIKHAILOVNA KRYLOVA

May 15, 2017

I, Marina Mikhailovna Krylova, hereby testify as follows:

1. I was born on March 17, 1973 in Moscow.

2. In 1996, I received a degree in economics at Moscow State University of Economics, Statistics and Informatics.

3. From 2005 to 2015, I was employed at Probusinessbank CJSB (hereinafter, the Bank) as a nominal director of several companies controlled by the Bank's shareholders, that is Sergey Leonidovich Leontiev and Aleksander Dmitrievich Zheleznyak; as a head of an accountants group, I controlled the support of economic activity of shell companies that existed with the only purpose - to ensure 'shadow' (murky) transactions in order to transfer the Bank's assets out of the Bank and conceal such embezzlement from the regulator, that is the Central Bank of the Russian Federation.

4. For the avoidance of doubt, all references to the shareholders and beneficiaries of the Bank hereinafter will include only Sergey Leonidovich Leontiev and Aleksander Dmitrievich Zheleznyak. I am aware that, apart from S.L. Leontiev and A.D. Zheleznyak, Eduard Vladimirovich Panteleev and Eldar Victorovich Bikmaev were among minority shareholders. Eldar Victorovich Bikmaev was less of a minority shareholder and more of a nominal holder of the Bank's shares in favour of S.L. Leontiev. However, neither E.V. Panteleev nor E.V. Bikmaev had been beneficiaries, in favour of whom the embezzlement stated herein had been perpetrated, nor had they taken part in the decision-making process that resulted in the transfer of the Bank's assets and subsequent revocation of its license. The only such persons were S.L. Leontiev and A.D. Zheleznyak.

5. All employees of the Bank and related companies clearly understood that S.L. Leontiev and A.D. Zheleznyak were the actual shareholders of the whole business-structure (which included not only the registered activity of the Bank but also its 'shadow' business). Employees also understood that these persons did not have an equal partnership. Taking into account the complicated structure of the offshore companies in the form of a corporate veil created in order to cast a veil over the real shareholders and beneficiaries of the business, it is difficult to accurately assess the proportion of the equity stake. However, with some confidence I can claim that the proportion constituted about 70% (S.L. Leontiev )/30% (A.D. Zheleznyak).

6. In this witness statement, I will describe the most sophisticated schemes devised by the Bank's shareholders and their fiduciaries (including, but not limited to the

Bank's employees who were in charge of the purposefully created 'shadow' structures of the Bank) which had been used for a decade not only to embezzle the Bank's assets for personal enrichment by establishing a 'shadow' treasury at the Bank's expense but also to cover the 'hole' in the Bank's balance that appeared as a result of the asset's transfer. This 'shadow' schemes were not only complicated and veiled but also named with striking names that fully illustrated the nature of such schemes. For example, "Merry-go-round" (Valkyrie), 'Time Machine', 'Flickering Notes', etc.

7.  Schemes had been implemented by the fiduciaries of the Bank's shareholders through the controlled Russian and foreign companies, founders and/or directors of which were nominal persons engaged on a fee basis, including the Bank's employees. These shell companies performed bogus activity because they had been used as an instrument to build a chain of transactions in order to transfer the Bank's assets in the private use of the Bank's shareholders.

8.  I had been working at the Bank for about 10 years. During this period, I interacted directly with shareholders and top-managers of the Bank, their fiduciaries, and was involved as a person who performed or witnessed actions of the Bank's employees carrying out instructions and orders of the Bank's shareholders.

9.  As indicated further and if not stated otherwise, my awareness of the abovestated facts is predominately based on my personal participation in carrying out of the instructions given by the Bank's shareholders.

10. When I received information about the facts stated in this Witness Statement from third parties, this will be indicated in the text via reference to the source of such information.

11. For the avoidance of doubt, I declare that this testimony has been given by me voluntarily, and nobody exerts or has exerted any degree of pressure over me or influenced me otherwise. Content of this Witness Statement is true, and it is my belief that all facts stated in this Statement are true to the best of my knowledge.

12. Dates, position titles, and names of the structural subdivisions of the Bank and the controlled companies may be given only approximately. However, they will be detailed as necessary to avoid ambiguous construction or impossibility to identify truthfulness of the facts stated by me.

## Part 1

13. In April 2005, I became an employee of the Bank. Before I was officially employed I had had a conversation with A.D. Zheleznyak who was a friend of one of my

fellows. Despite the fact that accounting in credit organizations, which is significantly different from accounting in general Russian companies, was not my field of specialization, A.D. Zheleznyak decided to give me a job.

14. As it became clear later, this was necessary to fill one of the nominal positions at the Bank with an accountant who would provide accounting services during economic activity of the shell companies controlled by the Bank's shareholders and the companies-shareholders of the Bank and included in the so called 'corporate veil' structure. After the conversation, A.D. Zheleznyak sent me to Aleksander Vladimirovich Lomov who then became my direct superior and from whom (among others) I had been receiving instructions of the Bank's shareholders.

15. I obtained a nominal position, that is the Head of the economic accounting group. Officially, my superior was Lyubov Emanuilovna Alkhovaya.

16. I do not remember exactly for long I had been holding this position. However, irrespective of the changes in title (which was mainly caused not so much by my career development (in the literal meaning of this word) as by increasing number of the employees subordinated to me, which was directly linked to the growing number of shell companies, sham transactions, and 'shadow' schemes), everything rested basically the same.

17. I had always been engaged in providing accounting assistance for the companies owned by the Bank's shareholders (through which the share capital structure was built) and shell companies that participated in the 'merry-go-round' of the transactions which had been used as a veil in order to cover a 'hole' in the Bank's balance that appeared as a result of the asset's embezzlement.

## Part 2

18. Alivikt LLC (OOO) was at the top of the corporate pyramid that represented the ownership structure of the Bank and its affiliated companies. Further, at the bottom of the pyramid, the number of related companies (subsidiaries) had been increasing, and at some point Russian companies were taking turns with offshore companies (predominately registered in the Republic of Cyprus).

19. Based on the request from the Bank's shareholders, I, as a head of the accounting group that maintained accounting records in all Alivikt's subsidiaries, was appointed as a nominal director of Alivikt OOO, which was the head company of the whole Life Group, including the Bank, Life Factoring Company OOO, etc. As a nominal director, I acted in the interests of the Bank's shareholders and in accordance with their instructions. Along with that, I had been issuing powers of

attorney in the name of S.L. Leontiev. On the basis of such POAs, he, for instance, voted at shareholders meetings.

20. For the avoidance of doubt, shell companies controlled by the Bank's shareholders included not only the Russian companies but also the offshore ones. Aleksandra Aleksandrovna Viulkova and employees of her subdivision provided legal support for such offshore companies. I have a knowledge about the names of certain offshore shell companies and about sham transactions entered into by them to the extent that they had been entered into with the Russian shell companies. My employees and I provided support for such transactions.

21. Employees of A.A. Viulkova were responsible not only for making payments to the accounts of the offshore shell companies but also for execution of all documents: contracts, payment orders, transaction certificates, etc. Furthermore, taking into account the extraordinary speed of appearance of new documents in the Bank signed by the foreign directors, I can say that employees of A.A. Viulkova had seals of the offshore shell companies, and there is a good likelihood that employees of A.A.
Viulkova had facsimiles of the relevant signatures and/or these signatures had been appended by the Bank's employees and, therefore, were forged.

22. As of 2014, A.A. Viulkova was in charge of about 20 offshore companies. To the best of my knowledge, the main offshore shell companies were Vermenda Holdings Limited, Vresospin, Lankora, Biovilak. The primary focus of these companies was security transactions.

23. Since the purpose of all 'shadow' schemes was the transfer of the Bank's assets abroad using shell companies administered by A.A. Viulkova, this is A.A. Viulkova who kept the books of the treasury because she had all the information that she carefully tried to hide.

24. Corporate ownership structure of the Bank built by A.A. Viulkova was not just branched. It also was complex and secret.

25. For instance, in 2010, Alivikt OOO created a Cyprus-based company with the similar name Alivikt Holdings Limited. Authorized capital of this company consisted of the Bank's shares owned by Alivikt. Alivikt Holdings Limited and Alivikt OOO had never engaged in any form of economic activity, never interacted with third parties, and had only acted as the holders of the Bank's shares.

26. Fiduciaries of the Bank's shareholders, including the Bank's employees, had been appointed as nominal directors of all shell companies included in the corporate pyramid. For instance, among the nominal directors were the following persons:

Aleksander Dmitrievich Torando (director of Russkiy Legion OOO, Teploenergosvyaz OOO), Boris Aleksandrovich Shagarov (director of Signal Security Agency OOO (Private Security Company), Vladimir Georgievich Semenov (director of Probusiness Real Estate Agency), Aleksander Gennadievich Saltykov (director of Khimplast OOO), Anastasia Smirnova (Chernikova) (a relative of A.D. Zheleznyak), Svetlana Makovskaya (Mishustina) (director of Neftekhimproduct OOO), Raisa Aleksandrovna Batalova (a relative of A.V. Lomov) (director of Nauchstroiproekt OOO), Victor Yakovlevich Sudarev (a security guard at the private residence of A.D. Zheleznyak) (director of Probusiness-Holding OOO), personal driver of E.V. Panteleev whose name I do not remember (director of Rodina OOO, previously - Rodina Insurance Company), and other persons.

27. This corporate pyramid was created not only to cast a veil over the real shareholders and beneficiaries of the Bank but also to conceal the fact that the Bank's authorized capital (created in 1993) was formed using fictitious accommodation notes (bills). Notes sales and purchase transactions, through which the Bank's authorized capital was created, had been structured by an employee of Internal Control Service of the Bank Elena Shilova under Elvira Yakovleva's guidance. Up to this moment, liabilities under these notes obviously have not been discharged and settled.

28. As an economist, I understood that the authorized capital of the Bank was fictitious. However, this fact had been thoroughly concealed, but, apart from the Bank's shareholders, it was known to A.V. Lomov, E. Yakovleva, E. Shilova, and Nikolay Nikolaevich Firsov (Head of the Directorate for Corporate Legal Support of the Legal Department).

**Part 3**

29. In 2008, the stated group of persons made and realized a plan in order to return the assets previously transferred to Probusiness-Holding OOO to the Bank and in order for S.L. Leontiev to repurchase the Bank's shares for a significantly lowered price that were previously owned by Probusiness-Holding OOO (previously Holding ZAO) for the benefit of its shareholder - S.L. Leontiev. This became necessary due to the unfavourable outcome of the indirect lending provided by the Bank to Probusiness-Holding OOO through Electronica CJSB (OAO).

30. Due to Probusiness-Holding's bad financial standing, the Bank could not provide loans to it directly (without significant expenses reserved for loan loss provisions). The idea of indirect lending was that in order to circumvent the legislative provisions and regulations of the Central Bank of the Russian Federation the Bank's management reached an agreement with Electronica to provide a formal loan which was used by Electronica to provide monetary funds to Probusiness-Holding OOO.

31. On December 25, 2008, Electronica's banking license was revoked. Deposit Insurance Agency was appointed as a bankruptcy manager and took measures to enforce the debt from Probusiness-Holding. Repayment of this debt would result in the Bank's loss of its assets and in S.L. Leontiev's loss of the Bank's shares.

32. I am not aware of details and mechanisms of the abovestated plan. However, I know that the plan had been implemented by entering into sham transactions (offset agreements, accord and satisfaction agreements, etc.), including backdated transactions, which were a part of "Time Machine" scheme. Based on the instructions from E. Yakovleva, I simply made journal entries about the purportedly made transactions.

33. As a result of this plan, all the relevant assets of the Bank that in fact had been kept by Probusiness-Holding OOO were returned, and S.L. Leontiev purchased shares of the Bank from Probusiness-Holding OOO for 5% of their market value. Payment in consideration of Shares Sale and Purchase Agreement was effected by S.L. Leontiev using monetary funds of the Bank that were provided via E. Yakovleva.

34. A similar scheme of 'shadow' lending had been used afterwards by the Bank from 2009 up to 2015. For instance, Life Factoring Company OOO was credited by the Bank through interbank loans provided to Obrazovanie Joint Stock Innovative Bank (AO), Solidarnost Bank (OA), Project Financing Bank (ZAO).

35. Internal Control Service was intended to monitor the Bank's compliance with regulations and requirements of the Bank of Russia. However, it did not just ignore all violations but, on the contrary, was directly involved in implementation of illegal schemes for the benefit of the Bank's shareholders.

36. In short, indirect lending scheme had been organized by the Bank's shareholders and their fiduciaries and had been used as a cover for provision of loans to the companies controlled by the Bank. Other banks that were receiving interbank loans, in their turn, received a benefit in the form of an unofficial fee and/or cross financing of the companies controlled by other banks on a reciprocal basis.

37. The Bank's employees understood that this scheme fell outside the scope of normal activity of a Russian bank. But they did not deem it as illegal since the whole scheme was based on the arrangements made by the Bank's management (for instance, A.V. Lomov and A.A. Viulkova as fiduciaries of A.D. Zheleznyak personally made arrangements with Project Development Bank (ZAO)) with others banks.

38. Indirect lending scheme had been implemented not only by means of interbank loans but also otherwise as it was done in a transaction with Novaya Usadba ZAO.

In this transaction, provision of loan was disguised as an advance payment under the Agency agreement. In accordance with this agreement, the party (here - Novaya Usadba ZAO) shall render real estate search and acquisition services to the Bank. Acquisition of property is not the real intention of the Bank. Subject matter of the agency agreement and its relation to the real estate market can be explained by a necessity to transfer a large amount of money out of the Bank; it is more simple to justify the transfer of this large amount of money by a significant cost of real estate which is a matter of interest for the Bank. Transaction with Novaya Usadba ZAO was structured by Nikolay Victorovich Alekseev.

39. Securities sale and purchase agreements entered into between the Bank and the shell companies, which provided for a significant deferment period, was nothing more than indirect lending. Shell companies (such as Reformatsia OOO, Flaund OOO, Realfinance OOO, etc.) of the Bank, where securities had been transferred, were so called "treasury bag" containing accumulated assets transferred out of the Bank. The author of this type of indirect lending scheme was Kirill Vladimirovich Artemov. Accounts and records and other financial entries related to the transactions were kept and made by Elena Rumyantseva. Initially, parties did not have to make any payments in these transactions. Partial payments had been effected in order to avoid claims from the Bank of Russia.

## Part 4

40. The Bank's shareholders and its top-management, especially A.V. Lomov and E.A. Tsybina, started trying to 'save the Bank's balance' 10 years before the license was revoked. Not only did the Bank backdate transactions, it also implemented 'Time Machine' scheme and backdated entries on bank accounts, including those on correspondent accounts of the Bank.

41. Until 12:00 of each day, account entries made in the previous day may be adjusted. Then, all account entries of the previous day go to the archive and shall be sent to the Bank of Russia.

42. In order to submit a favourable and positive financial statement to the Bank of Russia, the Bank had been regularly adjusting accounts entries, as it was presented by those multiple employees who participated in 'Time Machine'.

43. In fact, since 2005, the Bank had been submitting false financial statements to the regulator. If it is not for "Time Machine", the Bank would have to write off more transactions as losses and, as a result, would have to explain this to the Bank of Russia. The Bank's management apparently wanted to avoid this.

## Part 5

44. Despite the fact that in 2009 the Bank's financial standing did not raise any specific concerns, it turned out to be that in 2006-2009 the Bank had already been using fraudulent schemes, particularly the one called 'Flickering Notes'. Under this scheme, the Bank sold one note (bill) to different parties at the same time and in different transactions. I do not know the specific details of the scheme , but without any doubt it has an illegal nature.

## Part 6

45. Until 2009, I had been mostly interacting with A.D. Zheleznyak and A.V. Lomov. In 2008, I became the Head of Shareholders and Subsidiaries Cooperation Directorate. However, this happened due to the renaming of my positions title, not changing of my responsibilities.

46. Since 2009, the number of employees in my subdivision had been increasing. With me in charge, the subdivision gained more autonomy, including in financial terms. The Bank's subdivisions were financed based on the estimated budget approved by the management. This was called SLA.

47. My Directorate's budget was negotiated by me directly with S.L. Leontiev because he was the main 'client' of my Directorate who used our services. It is 2009 when I became acquainted with S.L. Leontiev. Afterwards, I met S.L. Leontiev at other meetings as well.

## Part 7

48. 2009 was the beginning of the end for the Bank. Back then, I did not realize this. However, retrospectively looking into the events of 2009-2015, I do understand that since 2009 the number of shell companies, the 'hole' in the Bank's balance, and sham transactions started growing exponentially.

49. In summer of 2009, S.L. Leontiev had transferred securities (shares of British Petroleum and other issuers) amounting to 1bn RUB out of the Bank. I do not know why and how did he do this. The Bank's employees were aware that the shares owned by the Bank and placed in a Russian depository were transferred to a foreign depositary in favour of S.L. Leontiev. Yaroslav Vladimirovich Alekseev and Kirill Vyacheslavovich Lvov told me personally about that. This transaction made in favour of S.L. Leontiev was structured and executed by Filipp Arnoldovich Samarets who was the treasurer of the Bank back then and had always been a fiduciary of S.L. Leontiev.

50. Obviously, the transfer of 1bn RUB affected the Bank's financial standing. As a result of the abovestated actions, the 'hole' appeared in the Bank's balance. Up to

2015, it had been increasing. All subsequent sham transactions and 'shadow' schemes were presented as means to cover this 'hole'. However, in fact they had been worsening the financial standing.

51. In 2010, A.V. Lomov created a special subdivision in the Bank. It was engaged in capital forecasting which was necessary in order to understand when the Bank had difficulties covering the 'hole'. Back then, A.V. Lomov understood that the Bank would sooner or later not be able to adjust its financial standing through dubious transactions. I must say that A.V. Lomov did not only implement these transactions, but he also tried to devise new 'shadow' schemes.

52. Apart from Russian shell companies and companies of the corporate pyramid representing the share capital structure, my Directorate also supported so called business companies. These companies belonged to the Bank's shareholders (through offshore structures) but were not used in 'shadow' transactions. These business companies were engaged in economic activity which needed financing. This financing was provided through the Bank's funds.

53. The shareholders were in control of the Bank and used its assets in order to finance their personal business projects. During the implementation of projects, the assets transferred out of the Bank had been embezzled. For instance, Probusiness-Development OOO carried out constructions projects in favour of A.D. Zheleznyak. When I just started working at the Bank, I found the signs that Probusiness-Development's assets had been embezzled. I informed a fiduciary of A.D. Zheleznyak (Dmitriy Kimovich Kovalchuk) about this. However, not only he took no measures in this regard, but he also refused to listen to me, saying that it was not my business. It is logically to assume that D.K. Kovalchuk and A.D. Zheleznyak, whose friendship started when they were children, knew about the assets transfer and that all this had been done with intent. A.D. Zheleznyak could not have been unaware of the situation because he was the person who approved (personally signed the cash flow plan) extremely overstated expenses for the financing of Probusiness-Development by the Bank.

54. It is worth noting that each personal business area (direction) of a Bank's shareholder had been supported by one structural subdivision of the Bank headed by an employee who was a part of the relevant business company's management. For instance, D.K. Kovalchuk was the Head of the Bank's Department for Investment and Finances and CEO of Probusiness-Development. Vladimir Akimov, who were an employee of the Bank (one of the business managers who supervised activity of Life Pay OOO), had also been a director of Life Pay OOO. Therefore, the shareholders had been presenting and using the Bank and its assets as a mean to establish their own projects to the detriment of the Bank's interests.

**Part 8**

55. In 2009, it became cleat that simple assignment of bad debts was not an effective tool to improve the Bank's financial statement. As it is known, the 'hole' in the Bank's balance appeared not only after the transfer of liquid assets but also as a result of mounting toxic, that is illiquid, assets that severely affected the Bank's statement for the Central Bank. Then, K.V. Lvov (Deputy Head of the Directorate for Distressed Assets) had implemented another scheme in order to cover-up the 'hole' in the Bank's balance. In order to hide negative financial performance of the Bank from the regulator and having at the same time constraints of the implemented schemes, K. V. Lvov 'packed' illiquid assets as a property of a mutual fund. As a result, toxic assets on the Bank's balance had been replaced by more liquid assets, that is investment units of mutual funds. Ya.V. Alekseev actively endorsed this scheme.

56. At the same time, K.V. Lvov used his connections with investment companies, particularly with VELES Capital Investment Company OOO, and entered into sham loan transactions with further sale and purchase of securities and recognition thereof on the Bank's balance as of the reporting dates. For example, one of the foreign subsidiaries of VELES Capital Investment Company provided an instrumentary loan (transfer of shares and/or bonds) to a Bank's shell company. This was so called 'long-term money', that is transactions with performance date (date of return of the borrowed securities) falling not later than one year following the contract date. The shell company sold these borrowed securities to the Bank on the dates prior to the dates of submission of the reporting documents to the Central Bank. The Bank, respectively, transferred the money to the shell company. The shell company then transferred the money back to the Bank, which had a positive effect on the Bank's balance and helped to cover the 'hole'.

57. Instrumentary loans bore low interests, and this was not in line with market conditions and interest of VELES Capital companies group. I believe, this was compensated via an unofficial fee that had been paid from the 'shadow' treasury.

58. Instrumentary loans were quite big transactions. Hence, the parties to the transactions had been chosen accordingly. For instance, Elso OOO, Life Collection Agency OOO.

**Part 9**

59. In summer of 2009, S.L. Leontiev organized a meeting with the following persons in attendance: Ya.V. Leontiev, A.A. Viulkova, K.V. Lvov, E.A. Tsybina, an employee of her Credit and Economic Directorate N.N. Firsov, O.M. Samoylova, and A.V. Lomov. In summer and autumn of 2009, the meetings had been held regularly, and

I directly participated in them. Back then, at the first stage, S.L. Leontiev directly and actively participated in these meetings. By the end of 2009, the meetings stopped. The possible reason was that 'Merry-go-round' scheme had already been set up by that moment and all the implemented mechanisms in this scheme were planned to be thoroughly hidden.

60. At one of the first meetings, A.V. Lomov tasked N.N. Firsov to buy 10 Russian companies in order to expand the number of the shell companies of the Bank.

61. I was tasked to maintain accounting records of these 10 companies. E.A. Tsybina and/or her employees in Credit and Economic Directorate informed me of crediting credit funds to an account of a shell company. At the same time, K.V. Lvov, A.V. Lomov and/or Ya.V. Alekseev communicated to me instructions from the Bank's shareholders (often referring directly to A.D. Zheleznyak) as where to transfer the credit funds further. Usually, the funds had been transferred through a number of shell companies under notes sales and purchase contracts (that was the abovestated 'merry-go-round'). At a certain stage of each transaction chain, the monetary funds from the accounts of the Russian companies had been transferred to the offshore shell companies of the Bank. I had no information about the further cash flow; as it was stated above, cash flow of offshore companies were controlled by A.A. Viulkova and her employees.

62. The number of shell companies started growing fast when the 'Merry-go-round' started. In 2009, the number was about 10 companies. In 2015, the number grew to 50 companies.

63. The Bank's management informed the employees that they might have additional earnings (appr. 20 000 RUB/month) if they acted as nominal directors and/or founders. Some of the employees were forced to become nominal directors and/or founders. For instance, A.S. Levonenkova was appointed as a nominal director upon the instruction of Vyacheslav Victorovich Kazantsev. Some of the employees received such instructions directly from A.D. Zheleznyak. He had such a public status and universal respect that nobody never tried to argue with him, not mentioning refusing to follow his instructions.

64. "Merry-go-round" scheme had also been known as 'Valkyrie' - name coined by S.L. Leontiev. Valkyrie was the name of one the Bank's Directorates headed by Ya.V. Alekseev. This Directorate structured and implemented transactions under 'Merry-go-round' and other 'shadow' schemes.

65. At the meetings conducted by S.L. Leontiev in 2009, K.V. Lvov regularly reported about the progress reached in implementing 'Merry-go-round' scheme, about planned events, and required financing. Back then, the information had not been as

secret as it became in 2010; all information (including about the Bank's VIP-clients, offshore shell companies, etc.) and plans were disclosed for all participants of the meetings. Further, as stated above, upon A.A. Viulkova's request, the names of offshore shell companies and information on their activity had been concealed. Only a limited circle of persons retained access to the information.

66. All the abovestated meeting were held in the conference rooms of the Bank at Petrovka st. (Moscow). A.D. Zheleznyak did not take part in these meetings. However, without any doubt A.D. Zheleznyak knew about 'Merry-go-round' scheme and activity of the Valkyrie Directorate, which had been acting in favour of both shareholders of the Bank.

67. In 2010, the Bank created a team of employees that was engaged in planning and controlling the cash flows from the Bank to the Bank's shell companies with Ya.V. Alekseev in charge. At the time, I had a database at my disposal that contained information about all Russian companies related to the Bank. I had been maintaining this database since 2006 upon the instruction of A.V. Lomov in order to consolidate the financial statement. This database was transferred to Ya.V. Alekeev's employees, who then complemented it with information about the offshore companies and mutual funds, after the Valkyrie Directorate commenced its work. Shortly before the Bank's license was revoked, the database had been deleted.

68. Valkyrie Directorate was personally headed by Ya.V. Alekseev. All transactions entered into under control were made upon the instruction, and in favour, of A.D. Zheleznyak and S.L. Leontiev.

69. K.V. Artemov (the 'shadow' treasurer) exercised general control over all transactions and shell companies (both Russian and offshore) He gathered all information about the size of the 'hole' in the Bank's balance and looked for possible internal resources that could be used in sham transactions. K.V. Artemov supervised the work of Elena Valerievna Rozhkova (whose superior was S.A. Bokach - deputy head of financial markets department) as regards 'shadow' transactions with securities.

70. Olga Shchurenkova  technically belonged to E.A. Tsybina's subdivision through which Ya. V. Alekseev gave tasks to O. Shchurenkova, who executed and granted fictitious loans and maintained records thereof.

71. Maria Aleksandrovna Khudokormova was a risk manager and was responsible for making false but convincing explanations for the Central Bank. She regularly covered for illegal actions of the Bank's shareholders and their fiduciaries. Together with M.A. Khudokormova, A.A. Viulkova was responsible for interaction with the

regulator. She also supervised the work with the Bank's auditors, including Deloitte.

72. O. M. Samoylova was employed by Ya.V. Alekseev. The nature of her responsibilities was inconceivable to me. She informed me about what companies needed to be prepared for liquidation. She worked in cooperation with Dmitriy Aleksandrovich Bakhlanov. Together they were looking for nominal directors, assigning them to their corporate positions, and approving their remuneration.

## Part 10

73. Because of the constantly growing 'hole' in the Bank's balance and accelerating 'merry-go-round' of sham transactions, the Bank's shareholders in cooperation with their fiduciaries had introduced schemes to attract the funds of the Bank's clients 'off-balance'.

74. Under this scheme, the Bank's clients, instead of depositing their funds directly with the Bank (within the scope of legal activity), provided these funds as loans for shell companies by transferring them to settlement accounts of the companies opened with the Bank. Initially, the funds under this scheme were taken to the accounts of Life Collection Agency OOO, Life Factoring Company OOO, Free Life OOO, etc.

75. This 'shadow' scheme was more profitable for the clients in comparison to interest rates on bank deposits. For example, if an interest rate on bank deposits was 8%, a loan interest rate was higher by few percentage points - 12%. The difference between interest rates on bank deposits and loan interest rates increased upon the increase of the repayment period for the funds granted under these 'shadow' loans. Interest rate that the Bank might offer to a client was determined by F.A. Samarets.

76. In order to guarantee the return of invested funds, one of the Bank's shell companies, most of the time - Free Life OOO (nominal director of this company was Sergey Vladimirovich Leontiev, who served in the army together with A.V. Lomov and was often mistaken for S.L Leontiev), issued a note for the client, which was subsequently guaranteed (avalized) by the Bank. However, these notes had never been given to the clients. Most of the time they had been kept in a safe in Avilona-Plaza business-centre (Moscow) and were likely held by E.A. Tsybina and her employees. An aval added to a note had been removed as it never existed.

77. In order to keep records of all notes (bills), the Bank used software called 'Front'. Duplicate of this programme had been developed in order to maintain records of the notes of the Bank's shell companies fictitiously guaranteed (avalized) by the Bank.

78. I saw only copies of the notes. In fact, the repayment guarantee for the clients was not the notes, which they would never receive, but the 'word of honour' from A.D. Zheleznyak. The whole scheme had been based on personal arrangements.

79. Investments in 'shadow deposits' had been predominately attracted by A.D. Zheleznyak, A.V. Lomov, V.V. Kazantsev. On her side, A.A. Viulkova kept records of 'shadow deposits' in the specific programme. Fedor Fedorovich Brazhnikov, subordinated to her, also had access to the programme. Certain employees were offered to attract clients in accordance with the abovestated scheme on condition that they would receive bonuses.

80. In its form, this scheme obviously was fraudulent, but I saw that monetary funds had been returned to the clients, and it is up to a client to decide whether to take a risk that a loan may be not repaid.

81. The more egregious example of such scheme was when monetary funds invested by the clients sometimes were not even transferred to the accounts of the shell companies. Funds transfers had not even being reflected anywhere. As if the monetary funds had never been provided by the clients. Natalia Yurievna Abramova (Vice-president of the Bank, Head of VIP-clients Department) was in charge of taking such pseudo-bank deposits, cooperating with clients, entering into sham transactions, etc. As in the case of 'shadow deposits', records of such transactions were kept by A.A. Viulkova Such deposits had been executed through the notes of Life Financial Group ZAO I had a seal of this company and blank forms for notes. Upon the instruction of A.D. Zheleznyak, I put the stamp of Life Financial Group ZAO on the blank forms and sent them to the subdivision of E. A. Tsybina. Employees of this subdivision - Tatiana Vyacheslavovna Osipova and Tatiana Vyacheslavovna Plyakina - executed Notes Sales and Purchase Contract, notes transfer and acceptance certificate, and the note itself. In 2011-2012, A.G. Saltykov was the Chairman of the Bank's management Board . Few people knew him in the Bank, he was a "grey eminence", who was in charge of 'black' cash department until this duty was transferred to A.A. Viulkova. According to A.G. Saltykov, I know that in 2011-2012 A.D. Zheleznyak had been persuading him to sign the notes on behalf of Life Financial Group ZAO. The notes were also avalized by the Bank.

82. For the avoidance of doubt, I deem it necessary to explain that shell companies (particularly, Vermenda Holdings Limited and Life Collection Agency OOO) provided subordinated loans to the Bank. However, these subordinated loans had been provided through the Bank's funds. These funds had been transferred to the shell companies as a part of 'shadow' schemes. Hence, the subordinated loans represented a part of 'Merry-go-round' scheme. Therefore, no monetary funds from independent resources had been provided by the shell companies to the Bank in the form of subordinated loans.

83. Using the Bank as their disguise, the shareholders and their fiduciaries created a secret 'shadow' structure and thoroughly hid it from the the Central Bank and most of the Bank's employees.

### Part 11

84. Several successive contracts to buy equity stakes in Life Processing Company constituted one of the transactions to transfer the Bank's assets out of the Bank. The idea was that the contracts were entered into with the shell companies of the Bank at a significantly overstated price which had been determined based on the fake assessment report that was ordered and paid for by the Bank. In fact, the same assessment had been conducted by a female employee of the Valkyrie Directorate. Initially, Life Processing Company was planned to be a successful business model. However, by the time the abovestated contracts had been concluded in the manner opposite to the arm's length basis, the shares (equity stakes) of Life Processing Company held no value.

85. All IT employees from the Bank were relocated to Life Processing Company.

86. Shares of Life Processing Company were acquired not only by the Bank but also by other banks of Life group: Poidem! CJSB, Gazenergobank OAO, Solidarnost Bank (OA).

87. The purpose of Life Processing Company was that its IT employees should have developed software for the banking group. However, they just duplicated existing systems and made sure that these 'purportedly newly developed' assets had been recognized on the balance of Life Processing Company.

### Part 12

88. In 2014, the Central Bank carried out its inspection of the Bank. Financial standing of the Bank had significantly deteriorated at the time. Concerns appeared that the Bank's license might be revoked after the inspection. Those concerns were legitimate as it was confirmed by the employees of the Bank's accounting department, including L.E. Alkhovaya - chief accountant of the Bank.

89. Too many shell companies and sham transaction had appeared; most of the companies had already been known to the Bank of Russia as unreliable, and their further use was impossible. O.E. Papakhin proposed to solve this problem by providing fictitious loans to the market-based companies of IMAC GROUP that had positive rating and relevant turnovers. Such companies also received a loan. Then,

based on the sham securities sale and purchase contracts or credit contracts allegedly entered into by the parties, monetary funds had been transferred to the Bank's shell companies, including offshore ones. O.E. Papakhin received a remuneration - a fee - for such 'shadow' schemes.

90. In 2014, it became almost impossible to administratively cover this 'hole' in the Bank's balance. Revocation of license was just a matter of time. But everyone still hoped that A.D. Zheleznyak would be able to address this issue. Filipp Samarets as the Bank's treasurer perfectly understood financial standing of the Bank. For that reason, he left his job in late 2014.

91. The fact that the Bank's shareholders and other persons involved in 'shadow' schemes were aware of the Bank's unsound financial standing at the time when the regulator carried out its inspection in 2014 can be confirmed by appearance of Arsen Akopovich Kasumyan in the Bank. He was invited by A.D. Zheleznyak. It is A.A. Kasumyan who supervised the whole inspection.

92. Upon the instructions of A.D. Zheleznyak, A.A. Kasumyan removed Sergey Victorovich Tokmakov (father-in-law of A.D. Zheleznyak) and A.D. Zheleznyak himself from the structure of all shell companies of the Bank.

93. Following that, A.A. Kasumyan, having considered the claims from the Central Bank to the shell companies raised because of their location at mass registration addresses, presence of settlement accounts opened exclusively with the Bank and not with other credit organizations, and presence of other signs of "fly-by-night companies", tasked the employees of the Valkyrie Directorate to bridge all the gaps identified by the regulator.

94. Of course, in such a short period of time it was impossible to provide a real proof that the Bank's shell companies were in fact real and operating companies, rather than "fly-by-night companies".

95. For this reason, the Valkyrie Directorate created the impression that the regulator had reached false conclusions. In order to make this impression, deserted and empty offices of the shell companies located at their registered addresses were filled up with office furniture and equipment. Afterwards, inspection reports with photographs of these offices had been created in order to confirm that these companies were real.

96. Accounts of the shell companies opened with the Bank were hastily closed. And, on the contrary, there were attempts to open at least one settlement account in other credit organizations.

97. As a result, all these twists and turns and fabricated evidence allowed to mislead the inspectors of the Central Bank. Once again, the Bank used the veil effect.

98. It is important to note that the Bank's shareholders had already previously authorized the use of forged documents in the economic activity of Life companies group. For example, factoring business had not initially been concentrated in Life Factoring Company; it was run by the Bank. Other than the transactions that had been entered into with shell "fly-by-night" companies, which broadly corresponds to the 'shadow' approach of the Bank share, primary documents, that is bills of lading, etc., were forged. Victor Alekseevich Vernov, CEO of Life Factoring Company, subsequently used the same approach. He was a fiduciary of one of the Bank's shareholders (before him, Aleksander Karelin was the company's CEO, appr. until 2013).

99. One of the controversial outcomes of A.A. Kasumyan's work was dismissal of Vladimir Alekseevich Ponomarev (Head of the Bank's Financial Monitoring Service). By virtue of his professional responsibilities, V. Ponomarev had exact information about the size of the 'hole' and about all 'shadow' schemes used in the course of the Bank's activity. V. Ponomared reached to A.D. Zheleznyak and explained that all dubious transactions had to be stopped. But the Bank's shareholders ignored his warnings.

100. After the Central Bank had carried out its inspection, the Banks employees were not informed about the Instructions received afterwards. The Bank's shareholders said that everything was fine and there was not reasons for concern.

101. In 2013-2014, I saw a dramatic increase in the number of shell companies and their liabilities. As an economist, I understood that the 'hole' in the Bank's balance would continue to grow and sooner or later it would not be possible to cover it. We discussed this issue with Ya. V. Alekseev, and he told me that it was time to close the 'hole' once and for all. He also said that this can be done only by S.L. Leontiev if he returned securities to the Bank that he had transferred out of it in 2009. Furthermore, Ya.V. Alekseev approached S.L. Leontiev and informed him that almost all resources used to cover the 'hole' had been exhausted. He asked S.L. Leontiev to return the transferred assets. But this attempt proved to be futile.

102. In 2015, I saw a draft multilateral agreement between the Bank, the Central Bank, and the shell companies that had an outstanding debt owed to the Bank related to the securities transactions with a significant deferment period. Under this agreement, the shell companies must return the securities to the Bank in several stages. All the shell companies were Russian. For example, Business Partner OOO, P&P OOO, etc. Since my subdivision provided support for all of these companies, M.A. Khudokormova, who was an employee of Ya.V. Alekseev's subdivision and

responsible for risk assessment, sent me this draft agreement to determine whether it corresponds to the balance sheet figures of the Bank's shell companies.

103. I have not seen a signed copy of this multilateral agreement. However, from March 2015 to May 2015, it had been partially performed.

104. At the same time from April 2015 to July 2015, significant amounts of funds for unknown reasons and on fictitious grounds had been transferred to the shell companies registered in Yekaterinburg. These companies were outside the scope of my work. I received instructions from Ya.V. Alekseev and effected payments in accordance therewith. Nothing more had come to my knowledge in this regard. However, taking into account all the 'shadow' schemes used by the Bank and circumstances thereof, I consider these payments as more than doubtful.

## Part 13

105. Upon the revocation date, I just returned from my vacation, and for this reason I know about all the events happened before only according to the oral information provided mostly by my colleagues.

106. On August 5-6, 2015, the Bank started having problems with its e-mail. At some point of time, e-mails of the employees started disappearing in the literal meaning of this word. I opened my e-mail on my personal laptop. Everything was as usual. I got distracted for 15 minuted, and my e-mail box became empty. Then, I had been receiving e-mails that were disappearing right after I received them. I did not even have enough time to open them. It turned out that different employees of the Bank consistently experienced the same situation. On August 7, 2015, there were no e-mails to talk about. It it worth noting that not all of the Bank's employees lost their e-mails - only those who were somehow involved in the 'shadow' schemes aimed at transferring the Bank's assets out of the Bank.

107. Since the absolute majority of the instructions and tasks were given via e-mail, its total elimination played a significant part in concealment of the evidence related the Bank's shadow schemes.

108. Late in the evening of August 6, 2015, that is the day before the temporary administration had been introduced and the Bank had been disconnected from Banking Electronic Speed Payment System, A.V. Lomov called about 5 employees of my subdivision and instructed them to promptly transfer the funds from the accounts of the controlled companies opened with the Bank to the accounts in other credit organizations. These payments had not been effected.

109. To the best of my knowledge, shortly before the license had been revoked, E.A. Tsybina destroyed certain documents that she had at her disposal. In accordance with the instructions received from the Bank's management, I handed the documents to Sergey Vasilievich Kalachev, Stanislav Vladimirovich Tuitsyn, Sergey Vyacheslavovich Letunov, and Dmitriy Valerievich Tarasov.

**Part 14**

110. S.L. Leontiev and A.D. Zheleznyak had never made a secret that they were the only shareholders and beneficiaries of the Bank. Even when, in the run-up to the revocation, A.D. Zheleznyak left his position of the Chairman of the Management Board, and Dmitriy Gennadievich Dylnov was de jure appointed on this position, it was evident that D.G. Dylnov was just a nominal person, a cover, and all powers and authorities of the Chairman remained with A.D. Zheleznyak.

111. Sergey Leonidovich Leontiev's office had always been located at Petrovka st. (Moscow). Aleksander Dmitrievich Zheleznyak's office was located in Avilon-Plaza business centre (Moscow).

112. Without any doubt, S.L. Leontiev and A.D. Zheleznyak jointly reached all decisions that led to the creation of 'shadow' structures in the Bank, the purpose of which was to cover the illegal actions committed by the Bank's shareholders in order to transfer the assets for personal purposes.

113. The Bank's shareholders did not make a secret that they had an interest in developing personal business projects using the Bank's funds. In part, this was the reason behind the abovestated transactions.

114. Without any doubt, S.L. Leontiev and A.D. Zheleznyak are the beneficiaries of the assets transferred out of the Bank. Even though their ownership structure is disguised through corporate pyramids.

**Part 15**

115. Right after the Bank's licence had been revoked, the question appeared as what would happen next to the shell companies to which I had been providing support. Upon the instruction of S.V. Letunov, I prepared and sent a consolidated report about all Russian shell companies indicating the amount of outstanding debt owed to the Bank. To the best of my knowledge, information provided by me should have been the subject matter of a discussion with A.D. Zheleznyak.

116. After the Bank's license had been revoked, I did not interact with the Bank's shareholders. I only had a telephone conversation with A.V. Lomov which cannot be considerer as meaningful.

117. Appr. 2 days after I had been arrested and when the Bank's management became aware that I refused services of the attorneys from Zheleznyak and Partners, the managing partner of which was a brother of A.D. Zheleznyak, M.D. Zheleznyak and an attorney of V.V. Kazantsev came to my attorney A.V. Sapronov and tried to pressed on him and persuaded to stick to the line of the Bank's shareholders, that is to remain silent and/or deny all accusations. This act complemented actions of the Bank's shareholders to assist the most informed and involved in the 'shadow' schemes employees in leaving the Russian Federation and hiding from the law enforcement agencies. This act was connected with the Bank's shareholders desire to affect the investigation by creating all possible hindrances.

118. Over time, I realized that all 'shadow' schemes organized upon the Bank's shareholders request were nothing more but a method of personal enrichment through embezzlement of the Bank's property Taking into account my attorney's advice, I have taken a decision to enter into a pre-trial agreement on cooperation with the Prosecutor and give this witness statement. I hope that the information provided by me will contribute to recovering assets stolen from the Bank by S.L. Leontiev and A.D. Zheleznyak. In this case, the justice will be restored.

_____ /signature/ _____

This Witness Statement has been signed in the presence of my client Marina Mikhailovna Krylova on May 15, 2017.

Attorney_____ /signature/ _____ Aleksander Vitalievich Sapronov

In total 23 (twenty three) pages are stitched and numbered

\Signature \

\Signature \

# ПРИЛОЖЕНИЕ 13

# СВИДЕТЕЛЬСКИЕ ПОКАЗАНИЯ
## МАРИНЫ МИХАЙЛОВНЫ КРЫЛОВОЙ

15 мая 2017 г.

Свидетельские показания М.М. Крыловой

Я, Марина Михайловна Крылова, настоящим свидетельствую о нижеследующем:

1.  Я родилась 17 марта 1973 в г.Москве.

2.  В 1996 году я получила экономическое образование в Московском экономико-статистическом институте (МЭСИ).

3.  С 2005 года по 2015 год я являлась сотрудником ОАО АКБ «Пробизнесбанк» (далее – Банк), номинальным директором ряда компаний, подконтрольных акционерам Банка – Сергею Леонидовичу Леонтьеву и Александру Дмитриевичу Железняку, а также как руководитель группы бухгалтеров я осуществляла контроль за сопровождением хозяйственной деятельности технических компаний, единственной целью существования которых являлось обеспечить реализацию теневых сделок, направленных на вывод активов Банка и сокрытие от регулятора – Центрального Банка Российской Федерации (далее также – Банк России) – совершенных хищений.

4.  Во избежание сомнений, далее по тексту все ссылки на акционеров и бенефициаров Банка будут включать в себя исключительно Сергея Леонидовича Леонтьева и Александра Дмитриевича Железняка. Мне известно, что в разное время помимо бенефициаров – С.Л. Леонтьева и А.Д. Железняка, миноритарными акционерами Банка также являлись Эдуард Владимирович Пантелеев и Эльдар Викторович Бикмаев, который был не столько миноритарием, сколько номинальным держателем акций Банка в интересах С.Л. Леонтьева. Однако ни Э.В. Пантелеев, ни Э.В. Бикмаев не являлись бенефициарами, в интересах которых совершались хищения, описанные в тексте настоящих свидетельских показаний, равно как и не участвовали в принятии решений, последствия которых привели к выводу активов Банка и последующему отзыву его лицензии. Единственными такими лицами являлись С.Л. Леонтьев и А.Д. Железняк.

5.  Всем сотрудникам Банка и связанных с ним компаний, было очевидно, что реальными акционерами всей бизнес-структуры (включающей в себя не только официальную деятельность Банка, но и теневой бизнес) являются С.Л. Леонтьев и А.Д. Железняк, как и то, что они не являются равными партнерами. С учетом сложной корпоративной структуры оффшорных компаний – корпоративной вуали, созданной для сокрытия истинных акционеров и бенефициаров бизнеса, сложно определить точное процентное соотношение акционерных пакетов, однако с определенной долей уверенности я могу утверждать, что соотношение было около 70% (С.Л. Леонтьев) на 30% (А.Д. Железняк).

Свидетельские показания М.М. Крыловой

6.  В настоящих свидетельских показаниях мной будут описаны самые изощренные схемы, придуманные акционерами Банка и их доверенными лицами (включая, но не ограничиваясь, сотрудников Банка, занимавших должности руководителей специально созданных теневых структурных подразделений Банка), которые использовались на протяжении десятилетия не только для хищения активов Банка посредством создания за счет средств Банка теневого казначейства для личного обогащения акционеров, но и для сокрытия той «дыры» в балансе Банка, которая образовалась в результате вывода активов. Эти теневые схемы были не только сложными и завуалированными, но им присваивались яркие названия, в полной мере иллюстрирующие суть таких схем как «Карусель» («Валькирия»), «Машина времени», «Мерцающие векселя» и пр.

7.  Реализация схем осуществлялась доверенными лицами акционеров Банка через подконтрольные им российские и оффшорные компании, учредителями и/или директорами которых являлись номинальные лица, привлеченные на платной основе, в том числе из состава сотрудников Банка. Деятельность этих технических компаний была фиктивной, так как они использовались исключительно как инструмент для выстраивания цепочки сделок по передаче активов Банка в личное пользование акционеров Банка.

8.  Я работала в Банке на протяжении 10 лет, в течение которых взаимодействовала напрямую с акционерами и топ-менеджерами Банка и их доверенными лицами и была вовлечена как исполнитель или свидетель в действия сотрудников Банка, по исполнению инструкций и поручений акционеров Банка.

9.  Как будет указано далее, моя осведомленность об изложенных фактах преимущественно основана на моем личном участии в выполнении инструкций акционеров Банка, если не указано иное.

10. В тех случаях, когда об обстоятельствах, изложенных в данных свидетельских показаниях, мне стало известно от третьих лиц, это будет указано в тексте с соответствующей ссылкой на источник получения информации.

11. Во избежание сомнений, заявляю, что настоящие свидетельские показания даны мной добровольно, никто не оказывал и не оказывает на меня давления или иного влияния. Содержание настоящих свидетельских показаний достоверно, и я считаю, что факты, изложенные в настоящих показаниях верны, насколько мне известно.

12. Даты, названия должностей, структурных подразделений Банка и подконтрольных компаний могут быть указаны ориентировочно, однако с той

степенью ясности, которая позволяет установить достоверность изложенных мной фактов.

## Часть 1

13. В апреле 2005 года я была принята на работу в Банк. Моему формальному трудоустройству предшествовала беседа с А.Д. Железняком, который является знакомым одного из моих товарищей. Несмотря на то, что я не была специалистом в бухгалтерском учете кредитных организаций, который существенно отличается от учета в неспециализированных российских компаниях, А.Д. Железняк принял решение о моем трудоустройстве.

14. Как выяснилось позже, это было обусловлено необходимостью принять в штат сотрудников Банка бухгалтера на одну из номинальных должностей, в функции которого будет входить бухгалтерское сопровождение хозяйственной деятельности технических компаний, подконтрольных акционерам Банка, и компаний-акционеров Банка, входящий в структуру так называемой «корпоративной вуали». По результатам разговора А.Д. Железняк направил меня на встречу с Александром Владимировичем Ломовым, который впоследствии стал моим фактическим руководителем, через которого (помимо прочих) я получала инструкции акционеров Банка.

15. Я была оформлена в номинальной должности – Начальник группы учета хозяйственных операций. Моим формальным руководителем являлась Любовь Эмануиловна Альховая.

16. Я точно не помню, сколько проработала именно в этой должности, но вне зависимости от смены наименования должности (которая была обусловлена не столько карьерным ростом, в прямом смысле этого слова, сколько увеличением штата подчиненных мне сотрудников, что было напрямую связано с увеличением количества технических компаний, фиктивных сделок и теневых схем) в сущности ничего не менялось.

17. Я всегда занималась бухгалтерским сопровождением деятельности личных компаний акционеров Банка (посредством которых была выстроена структура акционерного капитала) и технических компаний, участвовавших в «карусели» сделок, которые были ширмой, скрывавшей «дыру» в балансе Банка, образованную в результате хищения активов Банка.

## Часть 2

18. Во главе корпоративной пирамиды, оформляющей структуру владения Банком и аффилированными с ним компаний, стояло Общество с

Свидетельские показания М.М. Крыловой

ограниченной ответственностью «Аливикт». Далее – ближе к основанию «пирамиды» - количество зависимых (дочерних) компаний возрастало и на каком-то этапе пирамиды российские компании сменялись оффшорными компаниями (преимущественно, зарегистрированными в Республике Кипр).

19. По просьбе акционеров Банка, я как руководитель группы бухгалтеров, осуществлявших ведение бухгалтерского учета во всех дочерних компанях ООО «Аливикт», была назначена номинальным директором ООО «Аливикт», которое было головной компанией всей группы «Лайф», включая Банк, Общество с ограниченной ответственностью «Факторинговая компания «Лайф» и пр. Будучи номинальным директором, я действовала в интересах акционеров Банка и в соответствии с их инструкциями. Вместе с тем, я выдавала доверенности на имя С.Л. Леонтьева, на основании которых он, например, голосовал на собраниях акционеров.

20. Во избежание сомнений, в число технических компаний, подконтрольных акционерам Банка, входили не только российские компании, но и оффшорные компании, сопровождением деятельности которых занималась Александра Александровна Вьюлкова и сотрудники ее подразделения Банка. Мне известны наименования некоторых из оффшорных технических компаний и заключенные ими фиктивные сделки в той мере, в какой они совершались с российскими техническими компаниями, сопровождение которых осуществляла я и мои подчиненные.

21. Сотрудники А.А. Вьюлковой отвечали не только за непосредственное осуществление платежей по счетам оффшорных технических компаний, но и оформление всех документов – договоров, платежных поручений, паспортов сделок и пр. Более того, с учетом той немыслимой скорости, с которой в Банке появлялись подписанные иностранными директорами документы с печатями, то у сотрудников А.А. Вьюлковой в распоряжении были печати оффшорных технических компаний и  велика вероятность того, что у сотрудников А.А Вьюлковой были факсимиле необходимых подписей, и/или они проставлялись сотрудниками Банка, а, значит, являлись подложными.

22. По состоянию на 2014 год в ведении А.А. Вьюлковой было порядка 20 оффшорных компаний. Насколько мне известно, основными оффшорными техническими компаниями являлись Vermenda Holdings Limited, Vresospin, Lankora, Biovilak. Эти компании специализировались на сделках с ценными бумагами.

23. Так как все теневые схемы были направлены на вывод активов Банка за рубеж, с использованием технических компаний, находившихся в ведении А.А. Вьюлковой, то именно А.А. Вьюлкова вела учет альтернативного казначейства,

так как обладала всей полнотой информации, которую она старалась тщательно скрывать.

24. А.А. Вьюлкова построила не просто разветвленную, но сложную и скрытую корпоративную структуру владения акционерным капиталом Банка.

25. Так, в 2010 году ООО «Аливикт» была создана одноименная кипрская компания Alivikt Holdings Limited, уставный капитал которой был сформирован принадлежавшими ООО «Аливикт» акциями Банка. Компания Alivikt Holdings Limited, равно как и ООО «Аливикт» никогда не вели никакой хозяйственной деятельности, не взаимодействовали с третьими лицами и являлись лишь держателями акций Банк.

26. Номинальными директорами всех технических компаний, входивших в корпоративную пирамиду, являлись доверенные лица акционеров Банка, в том числе из состава сотрудников Банка. Так, номинальными директорами выступали Александр Дмитриевич Торандо (директор ООО «Русский легион», ООО «Теплоэнергосвязь»), Борис Александрович Шагаров (директор ООО ЧОО «Агентство безопасности «Сигнал»), Владимир Георгиевич Семенов (директор ООО «Агентство недвижимости «Пробизнес»), Александр Геннадьевич Салтыков (директор ООО «Химпласт»), Анастасия Смирнова (Черникова) (родственница А.Д. Железняка), Светлана Маковская (Мишустина) (директор ООО «Нефтехимпродукт»), Раиса Александровна Баталова (родственница А.В. Ломова) (директор ООО «Научстройпроект»), Виктор Яковлевич Сударев (охранник в частном доме А.Д. Железняка) (директор ООО «Пробизнес-Холдинг»), личный водитель Э.В. Пантелеева, имя которого я не помню (директор ООО «Родина», ранее ООО «Страховая компания «Родина») и иные лица.

27. Вышеописанная корпоративная пирамида была создана не только для сокрытия настоящих акционеров и бенефициаров Банка, но и с целью скрыть тот факт, что уставный капитал Банка (при его создании в 1993 г.) был создан фиктивными безденежными векселями. Структурированием сделок купли-продажи векселей, за счет которых был сформирован уставный капитал Банка, занималась сотрудница Службы внутреннего контроля Банка (под руководством Эльвиры Яковлевой) – Елена Шилова. Разумеется, до настоящего момента обязательства по указанным векселям не исполнены.

28. Как экономист я понимала, что уставный капитал Банка фиктивен, однако данное обстоятельство тщательно скрывалось, но о нем, несомненно, помимо акционеров Банка знали А.В. Ломов, Э. Яковлева, Е. Шилова и Николай Николаевич Фирсов (Начальник Управления правового обеспечения корпоративной деятельности Правового департамент).

Свидетельские показания М.М. Крыловой

### Часть 3

29. Указанная группа лиц впоследствии в 2008 году составляла и реализовывала план по возврату в Банк ранее выведенных в пользу ООО«Пробизнес-Холдинг» активов и по выкупу С.Л. Леонтьевым по существенно заниженной цене акций Банка, которыми владел ООО «Пробизнес-Холдинг» (ранее ЗАО «Пробизнес-Холдинг») в интересах своего акционера – С.Л. Леонтьева. Необходимость в подобных мерах возникла в связи с неблагоприятным исходом сделок по скрытому кредитованию Банком ООО «Пробизнес-Холдинг» через Акционерный коммерческий банк «Электроника» (ОАО).

30. Из-за плохого финансового состояния ООО «Пробизнес-Холдинг» Банк не мог напрямую его кредитовать (без существенных затрат на формирование резервов по ссудам на возможные потери). Суть схемы скрытого кредитования заключалась в том, что для обхода положений законодательства и нормативов Центрального Банка Российской Федерации руководством Банка была достигнута договоренность с банком «Электроника» о предоставлении формального межбанковского кредита, за счет которого банк «Электроника», в свою очередь, выдает кредитные денежные средства ООО «Пробизнес-Холдинг».

31. 25 декабря 2008 года у банка «Электроника» была отозвана лицензия. ГК «АСВ» была назначена конкурсным управляющим и предпринимала меры по взысканию с ООО «Пробизнес-Холдинг» задолженности, возврат которой привел бы к утрате Банком активов и утрате С.Л. Леонтьевым своих акций Банка.

32. Мне не известны детали и механизмы вышеуказанного плана, однако известно, что план реализовывался посредством заключения фиктивных сделок (соглашений о взаимозачете, соглашений об отступном и пр.), в том числе «задним числом», что является одним из воплощений схемы «машина времени». На основании инструкций Э. Яковлевой я делала лишь бухгалтерские проводки о якобы совершенных сделках.

33. В результате реализованного плана необходимые активы Банка, которые фактически лишь хранило ООО «Пробизнес-Холдинг», были возвращены, а С.Л. Леонтьев приобрел у ООО «Пробизнес-Холдинг» акции Банка за 5% от реальной рыночной стоимости. Оплату по Договору купли-продажи акций С.Л. Леонтьев производил за счет денежных средств Банка, предоставление которых было организовано Э. Яковлевой.

34. Аналогичная схема скрытого кредитования применялась Банком и впоследствии с 2009 года вплоть до 2015 года. Так, ООО «Факторинговая

~ 7 ~

Свидетельские показания М.М. Крыловой

компания «Лайф» кредитовалась Банком через межбанковские кредиты, выданные Акционерному коммерческому инновационному банку «Образование» (АО), Банку «Солидарность» (ОА), Акционерному банку «Банк проектного финансирования» (ЗАО).

35. Служба внутреннего контроля Банка, призванная следить за соблюдением Банком законодательства и требований Банка России, не только игнорировала все нарушения, но, напротив, принимала непосредственное участие в реализации незаконных схем в интересах акционеров Банка.

36. Резюмируя, схема скрытого кредитования была организована акционерами Банка и их доверенными лицами и прикрывала кредитование подконтрольных Банку компаний. Иные банки – получатели межбанковских кредитов, в свою очередь, получали выгоду в виде неофициальной комиссии и/или перекрестного финансирования компаний, подконтрольных иным банкам, на условиях взаимности.

37. Сотрудники Банка понимали, что эта схема выходит за пределы обычной деятельности российского банка, но не видели в этом противозаконных действий, ведь вся схема основывалась на договоренностях руководства Банка (например, с АБ «Банк проектного финансирования» (ЗАО) договаривались лично А.В. Ломов и А.А. Вьюлкова как доверенные лица А.Д. Железняка) с иными банками.

38. Схема скрытого кредитования воплощалась не только с использованием межбанковских кредитов, но и иным образом, как например это было сделано в сделке с ЗАО «Новая усадьба»: выдача кредита прикрывается перечислением аванса по Агентскому договору, в соответствии с которым контрагент (в данном случае – ЗАО «Новая усадьба») должен оказать Банку услуги по поиску и приобретению объекта недвижимости. Реальной цели по приобретению недвижимости Банк не преследует. Выбор предмета агентского договора и его связь именно со сферой рынка недвижимости обусловлен необходимостью вывода крупной суммы денег, которую проще объяснить существенной стоимостью интересующего Банк объекта недвижимости. Структурированием сделки с ЗАО «Новая усадьба» занимался Николай Викторович Алексеев.

39. Ничем иным как скрытым кредитованием не являются и Договоры купли-продажи ценных бумаг, заключенные Банком с техническими компаниями и предусматривающие существенную отсрочку платежа. Технические компании (такие как ООО «Реформация», ООО «Флаунд», ООО «Реалфинанс» и др.) Банка, на которые выводились ценные бумаги, являлись так называемым «казначейским мешком», в котором аккумулировались выведенные активы Банка. Автором такого воплощения схемы скрытого кредитования является

Свидетельские показания М.М. Крыловой

Кирилл Владимирович Артемов. Отражение в отчетности и иные финансовые проводки по сделкам проводила Елена Румянцева. По указанным сделкам изначально не планировалось, что контрагенты будут производить хоть какие-либо выплаты. Частичная оплата производилась лишь для вида, чтобы избежать претензий со стороны Банка России.

**Часть 4**

40. Акционеры Банка и его топ-менеджмент, в частности А.В. Ломов и Е.А. Цыбина начали предпринимать меры по «спасению баланса» за десятилетие до отзыва лицензии Банка. Банк заключал «задним числом» не только сделки, но и, реализовывая схему «Машина времени», «задним числом» вносил банковские проводки по счетам, в том числе по корреспондентским счетам Банка.

41. До 12:00 каждого дня есть возможность корректировать записи по счетам, совершенные в предыдущий день. После этого все записи предыдущего дня становятся архивными и направляются в Банк России.

42. Для представления в Центральный Банк Российской Федерации выгодной Банку и положительной отчетности, на регулярной основе записи по счетам корректировались, как это позиционировалось теми многочисленными сотрудниками Банка, которые были вовлечены в схему «машина времени».

43. Фактически с 2005 года Банк предоставлял регулятору фальсифицированную отчетность. Если бы не схема «машина времени», то Банку пришлось бы больше операций списывать на убытки и, как следствие, давать пояснения Банку России, чего, судя по всему, руководство Банка хотело избежать.

**Часть 5**

44. Несмотря на то, что до 2009 года финансовое положение Банка не вызывало особых опасений, оказалось, что в 2006-2009 года в Банке уже применялись махинации, в частности была распространена схема под говорящим названием «Мерцающие векселя». Суть этой схемы заключалась в том, что 1 вексель Банк продавал одновременно разным контрагентам по разным сделкам. Детали схемы мне доподлинно неизвестны, но сама ее сущность, несомненно, представляет собой действие в обход закона.

**Часть 6**

45. До 2009 года я главным образом общалась с А.Д. Железняком и А.В. Ломовым. В 2008 году я стала Начальником Управления по обеспечению взаимодействия

– 9 –

с акционерами и дочерними организациями, однако это было изменением лишь наименования должности, но не моих функций.

46. С 2009 года мое подразделение численно увеличилось, Управление под моим руководством стало автономнее, в том числе в части финансирования. Финансирование подразделений Банка осуществлялось на основании согласованного руководством Банка планируемого бюджета. Эта система называлась SLA.

47. Бюджет моего Управления я согласовывала напрямую с С.Л. Леонтьевым, так как фактически он являлся главным заказчиком услуг моего подразделения. Именно в 2009 году произошло мое знакомство С.Л. Леонтьевым. Впоследствии я встречалась с С.Л. Леонтьевым и на иных совещаниях.

### Часть 7

48. 2009 год ознаменовал собой начало конца для Банка. Тогда я этого еще не понимала. Но, рассматривая события 2009 – 2015 годов в ретроспективе, я понимаю, что с 2009 года количество технических компаний начало расти в прогрессии, равно как и «дыра» в балансе Банка и фиктивные сделки.

49. Летом 2009 года С.Л. Леонтьев вывел из Банка ценные бумаги (акции British Petroleum и иных эмитентов) общей стоимостью предположительно порядка 1 млрд. рублей. Зачем и каким образом это было реализовано, я не знаю. Но сотрудники Банка были осведомлены о том, что акции, принадлежащие Банку и размещенные в российском депозитарии, были выведены в иностранный депозитарий в пользу С.Л. Леонтьева. Мне об этом рассказывали лично Ярослав Владимирович Алексеев и Кирилл Вячеславович Львов. Сделку по выводу из Банка ценных бумаг за рубеж для С.Л. Леонтьева структурировал и оформлял Филипп Арнольдович Самарец, который тогда был казначеем Банка и всегда являлся доверенным лицом С.Л. Леонтьева.

50. Разумеется, вывод активов стоимостью около 1 млрд. рублей не мог не отразиться на финансовом положении Банка. В результате вышеуказанных действий в балансе Банка сформировалась «дыра», которая вплоть до 2015 года продолжала увеличиваться, а все последующие фиктивные сделки и теневые схемы, которые изначально позиционировались как прикрывающие эту «дыру», на самом деле только ухудшали финансовое положение Банка.

51. В 2010 году А.В. Ломов создал специальное подразделение в Банке, которое занималось прогнозированием капитала, чтобы понимать в какой момент у Банка возникают сложности с сокрытием «дыры» в балансе. Уже тогда А.В. Ломов понимал, что рано или поздно Банк окажется не в состоянии исправить

финансовую ситуацию даже посредством сомнительных сделок, которые, надо сказать, А.В. Ломов не просто реализовывал, но постоянно пытался придумывать новые теневые схемы.

52. Помимо российских технических компаний и компаний из корпоративной пирамиды, составлявшей структуру акционерного капитала, на сопровождении моего Управления находились так называемые бизнес-компании. Это компании, принадлежащие акционерам Банка (также через оффшорные структуры), но не использовавшиеся в теневых сделках. Эти бизнес-компании осуществляли хозяйственную деятельность, однако она требовала финансирования, которое производилось за счет средств Банка.

53. Акционеры как контролирующие лица использовали активы Банка для финансирования своих личных бизнес-проектов, в ходе реализации которых выведенные из Банка средства расхищались. Например, ООО «Пробизнес-Девелопмент» осуществляло строительные проекты в интересах А.Д. Железняка. В начале моей работы в Банке я обнаружила признаки хищения средств в ООО «Пробизнес-Девелопмент» и сообщила об этом доверенному лицу А.Д. Железняка – Дмитрию Кимовичу Ковальчуку, который не только не предпринял никаких мер в этой связи, но даже не стал меня слушать со ссылкой на то, что это не мое дело. Логично предположить, что и Д.К. Ковальчук и А.Д. Железняк, которые были близкими друзьями детства, знали о выводе активов и все этот делалось умышленно. А.Д. Железняк не мог не знать о происходящем, так как именно он согласовывал (лично проставляя свою подпись на плане денежных потоков) чрезвычайно завышенные расходы по финансированию Банком ООО «Пробизнес-Девелопмент».

54. Необходимо отметить, что каждому личному бизнес-направлению акционера Банка соответствовало структурное подразделение Банка, которое возглавлялось сотрудником, принимавшим непосредственное участие в руководстве соответствующей бизнес-компании. Например, Д.К. Ковальчук являлся Начальником Инвестиционно-финансового департамента Банка и генеральным директором ООО «Пробизнес-Девелопмент», а Владимир Акимов, будучи сотрудником Банка – одним из бизнес-менеджером, курировавшим деятельность ООО «Лайф Пэй», являлся также директором ООО «Лайф Пэй». Таким образом, акционеры позиционировали и использовали Банк и его активы как ресурс для выстраивания своих личных проектов в ущерб интересам Банка.

**Часть 8**

55. В 2009 году стало очевидным, что простое цессирование проблемной задолженности не является эффективным способом улучшить показатели в

финансовой отчетности Банка. Как известно, «дыра» в балансе Банка образовывается не только вследствие вывода ликвидных активов, но и в результате накапливания токсичных, то есть неликвидных, активов, которые крайне негативно влияют на отчетность Банка перед Центральным Банком Российской Федерации. Тогда К.В. Львовым (Заместитель начальника Управления по работе с проблемными активами) была воплощена очередная схема по сокрытию «дыры» в балансе Банка. Чтобы скрыть от регулятора негативные финансовые показатели Банка в условиях ограниченности уже применяемых теневых схем, К. В. Львов «запаковывал» неликвидные активы в виде имущества ПИФа. В результате токсичные активы на балансе Банка заменялись более ликвидным имуществом – инвестиционными паями. Указанную схему активно поддержал Я.В. Алексеев.

56. Наряду с этим, К.В. Львов, используя свои обширные связи, с инвестиционными компаниями, в особенности с ООО «Инвестиционная компания ВЕЛЕС Капитал», осуществлял фиктивные сделки займа и последующей купли-продажи ценных бумаг и постановку их на баланс Банка на отчетные даты. Так, одна из иностранных дочерних компаний ООО «ИК ВЕЛЕС Капитал» предоставляла технической компании Банка инструментарный заем (передавались акции и/или облигации). Это были так называемые «длинные деньги», то есть сделки со сроком исполнения обязательства (возврата заемных ценных бумаг) не ранее чем через год с даты заключения договора. Техническая компания Банка в даты, предшествующие дням предоставления отчетности Банка в Центральный Банк Российской Федерации, продавала эти заемные ценные бумаги Банку, а Банк, соответственно, перечислял технической компании денежные средства. Полученные денежные средства техническая компания вновь возвращала Банку, что было положительным показателем для баланса Банка и прикрытия «дыры».

57. Проценты по инструментарным займам были небольшими, что не соответствовало рыночным условиям и интересам группы компаний ВЕЛЕС Капитал. Полагаю, что это компенсировалось неофициальной комиссией, которая выплачивалась за счет теневой казны.

58. Так как сделки с инструментарными займами были довольно крупными, то и контрагенты из числа технических компаний Банка подбирались соответствующие, такие как ООО «Элсо» и ООО «Коллекторское агентство «Лайф».

**Часть 9**

59. *Летом 2009 года С.Л. Леонтьевым было организовано совещание с участием Я.В. Алексеева, А.А. Вьюлковой, К.В. Львова, Е.А. Цыбиной, сотрудника ее Кредитно-экономического управления, Н.Н. Фирсова, О.М. Самойловой и А.В. Ломова. Летом и осенью 2009 года встречи проводились регулярно, я принимала в них непосредственное участие. Тогда, на первоначальном этапе, С.Л. Леонтьев принимал непосредственное и активное участие в этих совещаниях. К концу 2009 года совещания прекратились, вероятно потому что к тому моменту работа схемы «Карусель» уже была налажена, и реализованные механизмы по данному направлению планировалось тщательно скрывать.*

60. *На одном из первых совещаний А.В. Ломов поставил перед Н.Н. Фирсовым задачу купить 10 российских компаний, чтобы пополнить базу технических компаний Банка.*

61. *По этим 10 компаниям я должна была обеспечить ведение бухгалтерского учета. Е.А. Цыбина и/или сотрудники ее Кредитно-экономического управления сообщали мне о том, что на счет технической компании Банком перечисляются кредитные денежные средства. Вместе с этим, К.В. Львов, А.В. Ломов и/или Я.В. Алексеев транслировали мне инструкции акционеров Банка (зачастую со ссылкой непосредственно на А.Д. Железняка) о том, куда дальше должны быть перечислены кредитные денежные средства. Обычно они проходили через целый ряд технических компаний по договорам купли-продажи векселей (что и представляет собой ту самую «карусель»). На определенном этапе каждой цепочки сделок денежные средства со счетов российских компаний выводились в пользу оффшорных технических компаний Банка. Далее движение денежных потоков было мне недоступно; как было указано выше, контроль за денежными потоками оффшорных компаний осуществляла А.А. Вьюлкова и ее сотрудники.*

62. *Когда началась «Карусель», количество технических компаний начало стремительно расти. Если в 2009 году таких российских компаний было около 10, то к 2015 году их количество возросло до 50 компаний.*

63. *Руководство Банка распространило среди сотрудников информацию о возможности дополнительного заработка (около 20 тыс. рублей в месяц), выступая в роли номинальных директоров и/или учредителей. Кого-то из сотрудников Банка заставили дать согласие на назначение в роли «номинала». Например, А.С. Левоненкова была назначена номинальным директором по указанию Вячеслава Викторовича Казанцева. Кому-то из сотрудников такие указания поступали напрямую от А.Д. Железняка. Он обладал таким статусом и всеобщим уважением, что никто и никогда даже не пытался с ним спорить, не говоря о том, чтобы отказаться от исполнения его указаний.*

Свидетельские показания М.М. Крыловой

64. Схема «Карусель» в Банке также была известна под названием «Валькирия», которое придумал сам С.Л. Леонтьев. Именно так – «Валькирия» - называлось одно из Управлений Банка под руководством Я.В. Алексеева, ответственное за структурирование и реализацию сделок в рамках схемы «Карусель» и иных теневых схем.

65. На тех совещаниях, которые проводились С.Л. Леонтьевым в 2009 года, регулярно К.В. Львов отчитывался об уже проделанной работе по внедрению схемы «Карусель», планируемых мероприятиях и необходимом финансировании. Тогда информация еще не была столь скрываема как после 2010 года; все сведения (в том числе о VIP-клиентах Банка, оффшорных технических компаниях и т.д.) и планы были доступны всем участникам совещаний. Впоследствии, как было указано выше, по просьбе А.А. Вьюлковой названия оффшорных технических компаний и сведений об их деятельности стали скрывать; доступ к этой информации остался лишь у крайне ограниченного круга лиц.

66. Все вышеуказанные совещания проводились в переговорных в офисе Банка на ул. Петровка (г. Москва). А.Д. Железняк не принимал участие в этих совещаниях. Но, вместе с тем, несомненно, А.Д. Железняк был осведомлен о схеме «Карусель» и деятельности Управления «Валькирия», которое действовало в интересах обоих акционеров Банка.

67. В 2010 году в Банке была сформирована команда сотрудников, которые занимались планированием и контролем денежных потоков от Банка в пользу технических компаний Банка, под руководством Я.В. Алексеева. На тот момент в моем распоряжении находилась база данных по всем связанным с Банком российским компаниям, которую я вела с 2006 года по поручению А.В. Ломова для консолидации финансовой отчетности. После начала работы Управления «Валькирия» указанная база данных была передана сотрудникам Я.В. Алексеева, которые дополнили ее сведениями об оффшорных компаниях и ПИФах. В преддверие отзыва лицензии база данных была ликвидирована.

68. Управление «Валькирия» непосредственно руководил Я.В. Алексеев. Все сделки, совершаемые под контролем управления, были проведены по указанию и в интересах А.Д. Железняка и С.Л. Леонтьева.

69. Общий контроль за всеми сделками и техническими компаниями (как российскими, так и оффшорными) осуществлял К.В. Артемов – теневой казначей. Он аккумулировал всю информацию о текущем размере «дыры» в балансе Банка, а также изыскивал возможные внутренние источники, которые могут быть использованы в фиктивных сделках. К.В. Артемов курировал работу Елены Валерьевны Рожковой (начальником которой являлся С.А. Бокач –

Свидетельские показания М.М. Крыловой

заместитель руководителя департамента финансовых рынков ) в части теневых сделок с ценными бумагами.

70. Ольга Щуренкова формально являлась сотрудницей подразделения Е.А. Цыбиной, через которую Я.В. Алексеев ставил задачи О. Щуренковой, которая занималась оформлением и выдачей фиктивных кредитов, а также вела их учет.

71. Мария Александровна Худокормова являлась риск-менеджером и отвечала за подготовку фальшивых, но правдоподобных объяснений для Центрального Банка Российской Федерации, регулярно прикрывая незаконные действия акционеров Банка и их доверенных лиц. Наряду с М.А. Худокормовой за взаимодействие с регулятором отвечала и А.А. Влюлкова, которая также курировала работу с аудиторами Банка, в том числе компанией Deloitte.

72. О. М. Самойлова была принята на работу Я.В. Алексеевым. Ее функции мне непонятны. Она сообщала мне, какие компании необходимо подготовить к процедуре ликвидации. Она работала совместно с Дмитрием Александровичем Бахлановым. Совместно они занимались поиском номинальных директоров, их корпоративным назначением и утверждением их окладов.

**Часть 10**

73. Из-за постоянно растущей «дыры» в балансе Банка и набиравшей обороты «карусели» фиктивных сделок, акционерами Банка совместно с их доверенными лицами были внедрены схемы привлечения денежных средств клиентов Банка «на забаланс».

74. Суть этой схемы заключалась в том, что клиенты Банка вместо размещения денежных средств на депозите непосредственно в Банке (при законной деятельности) предоставляли эти средства в качестве займа техническим компаниям Банка посредством внесения их на расчетные счета компаний, открытые в Банке. Изначально, привлечение денежных средств осуществлялось по такой схеме на счета ООО «Коллекторское агентство «Лайф», ООО «Факторинговая компания «Лайф», ООО «Фри Лайф» и пр.

75. Для клиентов эта теневая схема была выгодна более высокими процентами по займам по сравнению с процентными ставками по депозитам. Так, например, при ставке по вкладу в размере 8%, по займам процент был на несколько пунктов выше – около 12%. Разница в размере процентных ставок по вкладам и привлеченным займам увеличивалась при увеличении срока возврата денежных средств по этим теневым займам. Размер процентной ставки,

которую Банк мог предложить конкретному клиенту, определял Ф.А. Самарец.

76. В качестве гарантии возврата «вложенных» денежных средств одна из технических компаний Банка, чаще всего ООО «Фри Лайф» (номинальным директором которого являлся армейский сослуживец А.В. Ломова – Сергей Владимирович Леонтьев, которого часто путали с С.Л. Леонтьевым), выпускала в пользу клиента вексель, который впоследствии авалировался Банком. Но эти векселя никогда не выдавались клиентам, а в большинстве случаев хранились в сейфе в офисе в бизнес-центре Авилон-Плаза (г. Москва), скорее всего у Е.А. Цыбиной и ее сотрудников. А аваль на векселе просто срезался, как будто его никогда и не было.

77. В Банке работала программа «Фронт», в которой учитывались все векселя Банка. Для упорядочения учета векселей технических компаний Банка, фиктивно авалированных Банком, был создан дубликат этой программы.

78. Я видела лишь копии векселей. Фактически, гарантией возврата клиентам их денежных средств являлся даже не столько вексель, который они никогда не получали, сколько просто «честное слово» А.Д. Железняка. Вся схема основывалась на личных договоренностях.

79. Привлечение теневых «вкладов» осуществлял преимущественно А.Д. Железняк, А.В. Ломов, В.В. Казанцев. В свою очередь, А.А. Вьюлкова вела учет теневых «вкладов» в специально созданной программе, доступ к которой также был у подчиненного ей Федора Федоровича Бражникова. Отдельным сотрудникам Банка также предлагалось привлекать клиентов по вышеописанной схеме с условием получения бонусов.

80. Очевидно, что это была мошенническая схема по своей форме, но я видела, что денежные средства возвращаются клиентам и это должно быть решение клиента – принимать или не принимать риск невозвратности предоставленного займа.

81. Более вопиющей была схема привлечения «вкладов», при которой денежные средства, предоставленные клиентами, даже не перечислялись на счета технических компаний. Денежные переводы вообще нигде не отражались – так, как будто денежные средства никогда и не предоставлялись. Привлечением таких псевдо-вкладов занималась Наталья Юрьевна Абрамова (Вице-президент Банка, Начальник Департамента по работе с VIP-клиентами), обеспечивавшая взаимодействие с клиентами, заключение фиктивных сделок и пр.). Учет таких операций также, как и теневых вкладов, осуществляла А.А. Вьюлкова. Оформление таких вкладов осуществлялось

преимущественно векселями ЗАО «Финансовая группа «Лайф». В моем распоряжении была печать этой компании, а также пустые бланки векселей. По указанию А.Д. Железняка я проставляла печать ЗАО «Финансовая группа «Лайф» на пустых бланках векселей и передавала их в подразделение Е. А. Цыбиной, в котором сотрудники – Татьяна Вячеславовна Осипова и Татьяна Вячеславовна Плякина – оформляли Договор купли-продажи векселей, акт приема-передачи векселей и непосредственно сам вексель. В 2011-2012 годах Председателем Правления ЗАО «Финансовая группа «Лайф» был А.Г. Салтыков. Его мало кто знал в Банке, он был «серым кардиналом», который заведовал черной кассой до того, как эта функция была передана А.А. Вьюлковой. Со слов А.Г. Салтыкова, мне известно, что в 2011-2012 годах А.Д. Железняк убеждал его подписывать векселя от имени ЗАО «Финансовая группа «Лайф». Векселя также были авалированы Банком.

82. Во избежание сомнений, полагаю необходимым пояснить, что технические компании (в частности Vermenda Holdings Limited и ООО «Коллекторское агентство «Лайф») предоставляли Банку субординированные кредиты. Однако, эти субординированные кредиты выдавались за счет денежных средств самого Банка, которые в рамках реализации теневых схем перечислялись на технические компании, а, значит, также являлись лишь составной части схемы «Карусель». Таким образом, фактически никакие денежные средства из независимых источников не предоставлялись техническими компаниями в пользу Банка в форме субординированных кредитов.

83. Под прикрытием Банка, акционерами и их доверенными лицами была создана структура секретной теневой деятельности, которая тщательно скрывалась от Центрального Банка Российской Федерации и большинства сотрудников Банка.

## Часть 11

84. Одной из сделок по выводу активов Банка была серия Договоров покупки долей участия в ООО «Процессинговая компания «Лайф». Вывод активов заключался в том, что Договоры заключались с техническими компаниями Банка по существенно завышенной цене, которая определялась на основании сфабрикованного отчета об оценке, который был заказан и оплачен Банком. Фактически же эту оценку производила сотрудница Управления «Валькирия». Изначально, при создании ООО «Процессинговая компания «Лайф» планировалось построить эффективную бизнес-модель, однако к моменту заключения вышеуказанных Договоров на совершенно нерыночных условиях, доли участия в ООО «Процессинговая компания «Лайф» не представляли никакой ценности.

85. В компанию ООО «Процессинговая компания «Лайф» были переведены все IT-сотрудники, ранее входящие в штат Банка.

86. Доли ООО «Процессинговая компания «Лайф» были приобретены не только Банком, но и другими банками группы «Лайф» - АО «КБ «Пойдем!», ОАО «Газэнергобанк», Банк «Солидарность» (ОА).

87. Смысл деятельности ООО «Процессинговая компания «Лайф» состоял в том, что IT-сотрудники должны были разрабатывать для банковской группы программное обеспечение, однако они просто дублировали имеющиеся системы и обеспечивали постановку данных «якобы вновь разработанных» активов на баланс ООО «Процессинговая компания «Лайф».

**Часть 12**

88. В 2014 году в Банке проводилась проверка Центрального Банка Российской Федерации. Финансовое положение Банка к тому моменту существенно ухудшилось. В Банке зародились опасения об отзыве лицензии по итогам проверки регулятора. И эти опасения были обоснованными, что подтверждали сотрудники бухгалтерии Банка, в том числе главный бухгалтер Банка – Л.Э. Альховая.

89. Технических компаний и фиктивных сделок стало слишком много; существенная часть компаний уже была известна Банку России как неблагонадежные и их дальнейшее использование было невозможно. Эту проблему предложил решить О.Е. Папахин путем представления для фиктивного кредитования ряда рыночных компаний IMAC GROUP, которые имели положительный рейтинг и соответствующие обороты. Подобным компаниям также предоставлялся кредит, в последующем денежные средства по основаниям якобы заключаемых фиктивных договоров купли-продажи ценных бумаг либо договоров займа перечислялись на технические компании Банка, в том числе оффшорные. За подобные теневые схемы О.Е. Папахин получал соответствующее вознаграждение - комиссию.

90. Уже в 2014 году администрировать «дыру» в балансе Банка было практически невозможно. Отзыв лицензии Банка был лишь вопросом времени, хотя все надеялись, что А.Д. Железняку удастся урегулировать этот вопрос. Филипп Самарец как казначей Банка прекрасно понимал финансовое положение Банка, в связи с чем уволился из Банка в конце 2014 года.

91. Тот факт, что к моменту проверки регулятора в 2014 году акционеры Банка и иные вовлеченные в теневые схемы сотрудники Банка были осведомлены о крайне неблагоприятном финансовом положении Банка, подтверждается появлением в Банке Арсена Акоповича Касумяна, которого пригласил А.Д. Железняк. Именно А.А. Касумян курировал всю проверку регулятора.

92. Во исполнение инструкций А.Д. Железняка, А.А. Касумян вывел из структуры всех технических компаний Банка Сергея Валентиновича Токмакова (тестя А.Д. Железняка) и самого А.Д. Железняка.

93. После этого, проанализировав претензии Центрального Банка Российской Федерации к технически компаниям Банка в связи с их нахождением по адресам массовой регистрации, наличием расчетных счетов исключительно в Банке, а не в иных кредитных организациях, и наличием иных признаков «фирм-однодневок», А.А. Касумян поставил перед сотрудниками Управления «Валькирия» задачу по нивелированию выявленных регулятором недостатков.

94. Разумеется, в столь сжатые сроки невозможно было представить настоящие подтверждения того, что технические компании Банка на самом деле являются реальными и функционирующими, а не «фирмами-однодневками».

95. Поэтому Управление «Валькирия» просто создало видимость ошибочности выводов регулятора. Безлюдные и необустроенные до этого офисы технических компаний по их юридическим адресам были заполнены офисной мебелью и оборудованием. После были составлены акты осмотра этих офисов с фотографиями в качестве подтверждения реальности этих компаний.

96. Счета технических компаний в Банке были наспех закрыты, а в иных кредитных организациях, напротив, пытались открыть для них хотя бы один расчетный счет.

97. Все эти ухищрения и сфабрикованные доказательства в результате позволили ввести проверяющих сотрудников Центрального Банка Российской Федерации в заблуждение. В Банке в очередной раз сработал эффект ширмы.

98. Необходимо отметить, что акционеры Банка и ранее санкционировали использование в хозяйственной деятельности компаний группы «Лайф» подложных документов. Так, например, факторинговый бизнес изначально не был сконцентрирован в ООО «Факторинговая компания «Лайф», а осуществлялся самим Банком. Помимо того, что сделки заключались с техническими «фирмами-однодневками», что в целом соответствует теневому подходу акционеров Банка, первичные документы – товарно-транспортные накладные и пр. – были фальсифицированы. Такого же подхода впоследствии

придерживался генеральный директор  ООО «Факторинговая компания «Лайф» - Виктор Алексеевич Вернов, который был доверенным лицом акционеров Банка (ранее генеральным директором компании был Александра Карелин приблизительно до 2013 года).

99. Одним из спорных результатов работы А.А. Касумяна является увольнение Владимира Алексеевича Пономарева (Руководитель службы финмониторинга Банка). В. Пономарев в силу своих должностных полномочий доподлинно знал о размере «дыры» в балансе Банка и обо всех теневых схемах, используемых в работе Банка. В. Пономарев обращался к А.Д. Железняку и обращал его внимание на то, что все сомнительные сделки необходимо прекратить. Но акционеры Банка игнорировали предостережения В. Пономарева.

100. По результатам проверки Банка России сотрудникам Банка не сообщили о поступивших впоследствии Предписаниях. Акционеры Банка уверяли, что все хорошо и нет поводов для беспокойства.

101. В 2013-2014 годах я видела разительное увеличение количества технических компаний и их обязательств и как экономист понимала, что размер «дыры» в балансе Банка только продолжает расти, и рано или поздно будет невозможно ее закрыть. Мы обсуждали этот вопрос с Я.В. Алексеевым, который высказал мнение о том, что настало время закрыть «дыру» единовременно и это может сделать только С.Л. Леонтьев, вернув в Банк те ценные бумаги, которые были им выведены летом 2009 года. Более того, Я.В. Алексеев обращался к С.Л. Леонтьеву и сообщал, что уже практически исчерпаны ресурсы для сокрытия «дыры», и просил С.Л. Леонтьева вернуть выведенные активы. Но это оказалась тщетно.

102. В 2015 году я видела проект многостороннего соглашения между Банком, Центральным Банком Российской Федерации и техническими компаниями Банка, у которых имеется задолженность перед Банком по сделкам с ценными бумагами со значительной отсрочкой платежа. В соответствии с условиями этого соглашения техническими компаниями должны были быть возвращены Банку ценные бумаги в несколько этапов. Все технические компании – российские, такие как ООО «Реалфинанс», ООО «Бизнес Партнер», ООО «Пи энд Пи» и пр. Так как все эти компании находились на сопровождении моего подразделения, то М.А. Худокормова – сотрудница подразделения Я.В. Алексеева, ответственная за оценку рисков, прислала мне проект указанного соглашения на проверку соответствия его показателям балансов технических компаний Банка.

103. Я не видела подписанный экземпляр этого многостороннего соглашения, но в период с марта 2015 года по май 2015 года осуществлялось частичное исполнение условий указанного соглашения.

104. Вместе с тем, в смежный период времени – с апреля 2015 года по июль 2015 года – значительные денежные средства по непонятным причинам по фиктивным основаниям перечислялись в пользу технических компаний, зарегистрированных в г. Екатеринбург. Эти компании были за пределами периметра моей работы. Я получала указания от Я.В. Алексеева и совершала в соответствии с ними платежи. Ничего более в этой связи мне неизвестно. Однако, с учетом всех обстоятельств теневых схем, используемых Банком, эти платежи представляются более чем сомнительными.

**Часть 13**

105. В день отзыва лицензии Банка я только вышла из отпуска, потому непосредственно предшествовавшие события известны мне, главным образом, со слов моих коллег.

106. 5-6 августа 2015 года в Банке начались проблемы с электронной почтой. В какой-то момент электронная почта сотрудников начала исчезать, в прямом смысле слова. Я открыла свою электронную почту со своего личного ноутбука. Все было как обычно. Отвлеклась на 15 минут, и мой электронный ящик опустел. После этого мне стали приходить письма, которые исчезали сразу по поступлении; я даже не успевала их открыть. Оказалось, что такая же ситуация последовательно наступала у разных сотрудников Банка. 7 августа 2015 года ни о какой электронной почте уже и речи не было. Следует отметить, что электронная почта изчезла не у всех сотрудников Банка, а только у тех лиц, которые тем или иным образом были вовлечены в теневые схемы по выводу активов Банка.

107. Так как абсолютное большинство инструкций и задач ставилось по электронной почте, то ее тотальная ликвидация имела существенное значение для сокрытия следов теневых схем Банка.

108. Поздно вечером 6 августа 2015 года – за день до назначения временной администрации и отключения Банка от системы «БЭСП» – А.В. Ломов вызвал около 5 сотрудников моего подразделения на работу и дал поручение срочно переводить деньги со счетов подконтрольных компаний в Банке на расчетные счета в других кредитных организациях. Платежи так и не были проведены.

109. Насколько мне известно, в преддверие отзыва лицензии Цыбина Е.А. уничтожила ряд документов, которые были в ее распоряжении. Я, в

соответствии с инструкциями руководства Банка, передала документы Сергею Васильевичу Калачеву, Станиславу Владимировичу Туйцыну, Сергею Вячеславовичу Летунову и Дмитрию Валерьевичу Тарасову.

### Часть 14

110. С.Л. Леонтьев и А.Д. Железняк никогда не скрывали, что являются единственными акционерами и бенефициарами Банка. Даже когда в преддверие отзыва лицензии А.Д. Железняк ушел с поста Председателя Правления Банка и де-юре на эту должность был назначен Дмитрий Геннадьевич Дымнов, было очевидно, что Д.Г. Дымнов – лишь номинал, прикрытие, а вся полнота полномочий Председателя Правления Банка осталась за А.Д. Железняком.

111. Рабочий кабинет Сергея Леонидовича Леонтьева всегда находился в офисе на ул. Петровка (г. Москва). Рабочий кабинет Александра Дмитриевича Железняка находился в бизнес-центре Авилон-Плаза (г. Москва).

112. Нет никаких сомнений в том, что С.Л. Леонтьев и А.Д. Железняк совместно принимали все решения, повлекшие создание в Банке теневых структур, деятельность которых была призвана скрыть уже совершенные неправомерные действия акционеров Банка по выводу активов в личных интересах.

113. Акционеры Банка не скрывали заинтересованности в развитии личных бизнес-проектов за счет средств Банка, для чего отчасти и совершались вышеописанные сделки.

114. Вне всяких сомнений, бенефициарами всех активов, выведенных из Банка, являются С.Л. Леонтьев и А.Д. Железняк, даже если структура их владения скрыта за корпоративными пирамидами.

### Часть 15

115. Сразу же после отзыва лицензии стал актуален вопрос о дальнейшей судьбе технических компаний, которые находились у меня на сопровождении. По указанию С.В. Летунова я подготовила и передала сводный отчет по всем российским техническим компаниям с указанием остатка задолженности перед Банком. Насколько мне известно, предоставленные мной сведения должны были быть предметов обсуждения с А.Д. Железняком.

116. После отзыва лицензии я не общалась с акционерами Банка. Был лишь телефонный разговор с А.В. Ломовым, который нельзя назвать содержательным.

117. Примерно через 2 дня после моего ареста, когда руководству Банка стало известно, что я отказываюсь от услуг адвокатов МКА «Железняк и партнеры», управляющим партнером в которой является родной брат А.Д. Железняка, то М.Д. Железняк и адвокат В.В. Казанцева пришли к моему адвокату А.В. Сапронову и пытались оказать на него давление и убедить придерживаться позиции акционеров Банка, заключающейся в молчании и/или отрицании всех обвинений. Подобное поведение является продолжением действий акционеров Банка по содействию сотрудникам, наиболее осведомленным и вовлеченным в теневые схемы, покинуть территорию России и скрыться от правоохранительных органов. Но эти действия связаны исключительно с желанием акционеров Банка повлиять на следствие, создав все возможные препятствия.

118. Со временем я поняла, что все теневые схемы, организованные по поручению акционеров Банка, были ни чем иным как способом личного обогащения посредством хищения имущества Банка. С учетом совета адвоката, мной было принято решение о заключении досудебного соглашения о сотрудничестве с Прокурором и предоставлении настоящих свидетельских показаний. Я надеюсь, что предоставленные мной сведения помогут вернуть те активы, которые были похищены С.Л. Леонтьевым и А.Д. Железняком. Это будет восстановлением справедливости.

_Крылова Марина Михайловна_ М.Кр

Настоящие показания подписаны в моем присутствии моей подзащитной Мариной Михайловной Крыловой 15 мая 2017 года

Адвокат_____ Александр Витальевич Сапронов



Прошито и
пронумеровано
на 23 (двадцати
трех) листах

М.К.рф.