# EXHIBIT 14

ADDITIONAL WITNESS STATEMENT OF MARINA
MIKHAILOVNA KRYLOVA

I, Marina Mikhailovna Krylova, born on March 17, 1973, in addition to the witness statement given by me on May 15, 2017, hereby testify as follows:

1. This Witness Statement will contain my detailed description (to the extent of my knowledge and information) of one of the schemes conceived by Probusinessbank's CJSB OJSC (OAO AKB) shareholders and their fiduciaries (including but not limited to the Bank's employees who were in charge of purposefully created 'shadow' structural subdivisions of the Bank). This scheme had been used in order to mislead the regulator, that is the Bank of Russia, and to cover the "hole" in the Bank's balance sheet that appeared as a result of the asset's transfer (as well as a result of the scheme stated below).

2. For the avoidance of doubt and if not stated otherwise, all abbreviations, terms, positions, surnames, names, patronymics, etc. stated herein will be identical to those stated in my witness statement as of May 15, 2017 (hereinafter, the witness statement).

3. As indicated further, my awareness of the abovestated facts is predominately based on fulfilment of my professional responsibilities determined by the Bank's shareholder as well as information from electronic correspondence forwarded to my e-mail address.

4. For the avoidance of doubt, I declare that this testimony has been given by me voluntarily, and nobody exerts or has exerted any degree of pressure over me or influenced me otherwise. Content of this Witness Statement is true, and it is my belief that all facts stated in this Statement are true to the best of my knowledge.

5. Dates, position titles, and names of the structural subdivisions of the Bank and the controlled companies may be given only approximately. However, they will be detailed as necessary to avoid ambiguous construction or impossibility to identify truthfulness of the facts stated by me.

6. As at this moment, I believe that the Bank's assets have been embezzled by the Bank's shareholders. In order to escape liability, the 'shadow' structural subdivisions of the Bank invented schemes with intent to create artificial grounds in order to improve financial indicators of the Bank, which were subject to regular disclosure before the Bank of Russia and the general public on the Internet. All these schemes went under the name of "Balance Management". Taking into account all the circumstances related to the 'shadow' schemes (described, in particular, in the witness statement), I believe that the abovestated "Balance Management" scheme had been used as a cover in order to transfer the assets out of the Bank, not only to cover the "hole" in the Bank's balance sheet. The term "Balance Management" had been actively used in the Bank (especially when it came to the Valkyrie Directorate) and did not need any further explanation

because the name spoke for itself.

7.  As stated in par. 56-58 of the witness statement, one of the schemes of "Balance Management" had been structured as a chain of sham transactions with the involvement of offshore companies from VELES Capital group (for instance, Sabadell Trading Ltd., etc.), the Bank's shell companies, and the Bank itself.

8.  The scheme had been structured in the following way:

    8.1.  <u>Stage 1</u>: parties to the scheme (the Bank's employees) agreed the range of fees to be paid both to VELES Capital companies group and the shell companies of the Bank, and the range of prices and quotations in transactions with securities at different stages of the scheme. The upper and the lower limit of each range had been identified;

    8.2.  <u>Stage 2</u>: an offshore company from VELES Capital group (the Lender) provided an instrumentary loan (that is the loan in the form of quoted (listed) securities - shares and/or bonds) (Contract-1) to a Russian shell company of the Bank (Company A). Instrumentary loans were quite big transactions. Hence, the parties to the transactions had been chosen accordingly. For instance, Elso OOO, Life Collection Agency OOO.

    Price under Contract-1 had been determined at the lower limit. To ensure the Lender's rights, the Bank executed "safe" (secret) agreements to substitute Company A as a straw borrower with a real and solvent borrower and received the Lender's consent to assign the debt under Contract 1);

    8.3.  <u>Stage 3</u>: Company A sold the borrowed securities to the Bank at the price of the lower limit increased by the amount of fee (appr. 7% p.a.) and small additional amount of appr. RUB 10,000, not exceeding the upper limit in aggregate. The Bank recognized the liquid securities on its balance. In doing so, the Bank improved its balance structure and financial indicators and transferred the monetary funds under Security Sale and Purchase Agreement (Contract 2) to Company A. In addition, based on the specific terms and conditions of Contract 2, the Bank did not receive any yield on allegedly purchased securities. This yield had been received by Company A.

    8.4.  <u>Stage 4</u>: Company A redistributed the funds received under Contract 2 on various grounds between other shell companies of the Bank. These companies returned the funds to the Bank in part. This had a positive effect on the Bank's balance and helped to the cover the "hole";

    8.5.  <u>Stage 5</u>: the reporting date when the Bank submitted its fictitiously

created financial statements.  The Bank attained the main goal of the "Balance Management";

8.6.   <u>Stage 6</u>: the funds sufficient to buy back the same securities from the Bank had been accumulated on the accounts of Company A at the Bank's expense (directly or through the chain of transactions with the involvement of the Bank's shell companies) and on various fictitious grounds. Repurchase and payment of shares by Company A created a profit for the Bank improving its balance structure.

8.7.   <u>Stage 7</u>: Company A returned the borrowed securities to an offshore company from VELES Capital group (the Lender).

9.   Taking into account the reporting dates set forth in the legislation, by which the Bank had to improve its balance sheet, Stages 1-4 had been implemented prior to the dates when the reporting documents had to be submitted to the Central Bank of the Russian Federation; Stages 5-6 had been implemented afterwards.

10.   The circumstances of the abovestated transactions implemented within one chain raise reasonable doubts that all transactions within "Balance Management" scheme (with VELES Capital group involved) were colourable transactions and were necessary to give the impression of moving cash flows and securities, as well as to transfer the assets out of the Bank. The illusion of sound financial standing of the Bank appeared as a result of the transactions helped to cover the "hole" in the Bank's balance sheet as of the reporting dates.

11.   Fees for the companies from VELES Capital group had also been paid during Stages 1-7, together with the relevant payments.

12.   The amount of the fee was subject to approval from K.V. Artemov because he was the 'shadow' treasurer. He made forecasts predicting possible losses during a Stage or during the whole chain of transactions under "Balance Management" scheme when calculating the fee.

13.   Initially, K.V. Artemov proposed to effect payments by transferring them from the accounts of the Russian shell companies of the Bank with reference to a non-existent consulting agreement indicated in the payment purpose section.

14.   Supervising the support of the economic activity of the Russian shell companies of the Bank, I was totally against K.V. Artemov's proposal because such banking transactions with false purpose of payment constitute a characteristic of "fly-by-night companies". They always raise suspicion among

tax authorities and lead to situations when the legality of the payer's and the payee's activity had to be monitored.

15. Further, another K.V. Artemov's proposal had been approved, that is to pay a fee to VELES Capital group using the accounts of the offshore shell companies of the Bank. A.A. Viulkova was the alternate treasurer.

16. To the best of my knowledge, in 2013-2014, the fee had been paid predominately via the accounts of Vermenda Holdings Limited, a company that had been also involved in other 'shadow' schemes of the Bank.

17. "Balance Management" scheme was invented by K.V. Lvov (Deputy Head of the Directorate for Distressed Assets). He reached general arrangements with Stanislav Brodskiy, a top-manager at VELES Capital group. These arrangements were taken into account by the employees of 'shadow' subdivisions when they brought into effect the specific chain of transactions.

18. In general, the following persons had been parties to "Balance Management": A.V. Lomov, K.V. Lvov, Ya.V. Alekseev, E. Rumyantseva, E.A. Tsybina, F.A. Samatets, and A.A. Viulkova. The abovestated persons had been participating in the scheme due to their role in the Bank's and its 'shadow' structures' activity. More detailed information can be found in the witness statement.

19. Therefore, the 'shadow' structures of the Bank, using "Balance Management" scheme, executed and entered into colourable transactions, which were accompanied by fictitious (made just to give an impression) movement of securities and cash flows, in order to create an illusion that the Bank's financial indicators were improving and to submit them to the Bank of Russia

Krylova Marina Mikhailovna

/signature/


This Witness Statement has been signed in the presence of my client Marina Mikhailovna Krylova on May 25, 2017.

Attorney Aleksander Vitalievich Sapronov

/signature/

In total 6 (six) pages are stitched and numbered

\Signature \
\Signature \

# ПРИЛОЖЕНИЕ 14

# ДОПОЛНИТЕЛЬНЫЕ СВИДЕТЕЛЬСКИЕ ПОКАЗАНИЯ
## МАРИНЫ МИХАЙЛОВНЫ КРЫЛОВОЙ

*Дополнительные свидетельские показания М.М. Крыловой*

Я, Марина Михайловна Крылова, 17 марта 1973 года рождения, в дополнение к свидетельским показаниям, данным мной 15 мая 2017 года, настоящим свидетельствую о нижеследующем:

1. В настоящих свидетельских показаниях мной будет подробно, насколько это возможно с учетом степени моей осведомленности, описана одна из схем, придуманная акционерами ОАО АКБ «Пробизнесбанк» (далее – Банк) и их доверенными лицами (включая, но не ограничиваясь, сотрудников Банка, занимавших должности руководителей специально созданных теневых структурных подразделений Банка), которая использовалась для введения в заблуждение регулятора – Банка России, что было обусловлено намерением акционеров Банка скрыть «дыру» в балансе Банка, которая образовалась в результате вывода активов (в том числе в результате описанной ниже схемы).

2. Во избежание сомнений, далее по тексту все сокращения, термины, должности, фамилии, имена, отчества и пр. будут тождественны тем, что использовались в свидетельских показаниях, данных мной 15 мая 2017 года (далее – свидетельские показания), если прямо не указано иное.

3. Как будет указано далее, моя осведомленность об изложенных фактах преимущественно обусловлена выполнением мной должностных обязанностей, определенных акционерами Банка, а также сведениями из электронной переписки, где я была указана в копии.

4. Во избежание сомнений, заявляю, что настоящие свидетельские показания даны мной добровольно, никто не оказывал и не оказывает на меня давления или иного влияния. Содержание настоящих свидетельских показаний достоверно, и я считаю, что факты, изложенные в настоящих показаниях верны, насколько мне известно.

5. Даты, названия должностей, структурных подразделений Банка и подконтрольных компаний могут быть указаны ориентировочно, однако с той степенью ясности, которая позволяет установить достоверность изложенных мной фактов.

6. В настоящий момент я полагаю, что имущество Банка было похищено акционерами Банка. Во избежание привлечения к ответственности, теневыми структурными подразделениями Банка были придуманы схемы по созданию фиктивных оснований для улучшения финансовых показателей Банка, которые подлежат регулярному раскрытию Банку России и неограниченному кругу лиц в сети «Интернет». Все эти схемы в Банке именовались «Управление

Дополнительные свидетельские показания М.М. Крыловой

балансом». Принимая во внимание все обстоятельства осуществления теневых схем (описанных, в частноси, в свидетельских показания), я полагаю, что при реализации нижеописанной схемы «Управление балансом» помимо прикрытия «дыры» в балансе Банка осуществлялся вывод активов. Термин «Управление балансом» активно использовался в Банке (преимущественно в контексте деятельности подразделения «Валькирия») и не требовал дополнительных пояснений, так как название говорило само за себя.

7.  Как было указано в пунктах 56-58 свидетельских показаний, одна из схем по «Управлению балансом» была структурирована как цепочка фиктивных сделок с участием оффшорных компаний группы ВЕЛЕС Капитал (например, Sabadell Trading Ltd. и др.), подконтрольных технических компаний Банка и, соответственно, самого Банка.

8.  Схема структурировалась следующими этапами:

8.1.  Этап 1: между участниками схемы из числа сотрудников Банка согласовывается диапазон размера комиссий (как для группы компаний ВЕЛЕС Капитал, так и для технических компаний Банка), а также диапазон цен и котировок по сделкам с ценными бумагами на разных этапах схемы. Определяется верхняя и нижняя границы каждого диапазона;

8.2.  Этап 2: оффшорная компания группы ВЕЛЕС Капитал (Займодавец) выдает инструментарный заем (котируемыми ценными бумагами – акциями и/или облигациями) (Договор-1) российской технической компании Банка (Компания «А»). Так как сделки с инструментарными займами были довольно крупными, то и контрагенты из числа технических компаний Банка подбирались соответствующие, такие как ООО «Элсо» и ООО «Коллекторское агентство «Лайф».

Цена по Договору-1 определяется по «нижней границе». В качестве гарантий прав Займодавца, Банком оформляются «сейфовые» (секретные) Соглашения о замене Компании «А» как технического заемщика на реального, платежеспособного заемщика (наряду с согласием Займодавца на перевод долга по Договору-1);

8.3.  Этап 3: Компания «А» продает заемные ценные бумаги Банку по цене «нижней границы», увеличенной на размер комиссии (около 7% годовых) и дополнительную (незначительную) сумму порядка 10 тыс. руб., в совокупности не превышающей «верхнюю границу».

*Дополнительные свидетельские показания М.М. Крыловой*

Банк ставит на баланс ликвидные ценные бумаги, тем самым улучшая структуру баланса и финансовые показатели Банка, и перечисляет Компании «А» денежные средства по Договору купли-продажи ценных бумаг (Договор-2).

При этом, в силу особых условий Договора-2, Банк не получает доход по якобы приобретенным ценным бумагам; доход получает Компания «А».

8.4. Этап 4: Компания «А» по различным основаниям перераспределяет полученные по Договору-2 денежные средства между иными техническими компаниями Банка, которые впоследствии частично возвращают денежные средства Банку, что также является положительным показателем для баланса Банка и прикрытия «дыры», и/или по цепочке сделок выводят их на компании, подконтрольные акционерам Банк;

8.5. Этап 5: наступление отчетной даты, когда Банк сдает фиктивно созданную положительную финансовую отчетность. Достижение основной цели схемы «Управление балансом»;

8.6. Этап 6: за счет средств Банка (напрямую или через цепочку сделок с участием технических компаний Банка) по различным фиктивным основаниям на счетах Компании «А» аккумулируются денежные средства, достаточные для обратного выкупа у Банка тех же самых ценных бумаг. Обратный выкуп ценных бумаг и их оплата Компанией «А» образует прибыль для Банка, также улучшая структуру баланса.

8.7. Этап 7: Компания «А» осуществляет возврат заемных ценных бумаг оффшорной компании группы ВЕЛЕС Капитал» (Займодавец).

9. С учетом установленных действующим законодательством отчетных дат, к которым Банку необходимо было улучшить показатели баланса, этапы 1-4 осуществлялись в даты, предшествующие дням предоставления отчетности Банка в Центральный Банк Российской Федерации; этапы 5-6 осуществлялись впоследствии.

10. То, как и при каких обстоятельствах совершались вышеуказанные сделки в рамках единой цепочки, порождает обоснованные сомнения о том, что все сделки в рамках схемы «Управление балансом» (с участием группы компаний ВЕЛЕС Капитал) являлись притворными и были необходимы для создания видимости движения ценных бумаг и денежных потоков и вывода активов. Создание иллюзии благоприятного финансового результата сделок для Банка позволяло скрыть от регулятора «дыру» в балансе Банка на отчетные даты.

~ 4 ~

Дополнительные свидетельские показания М.М. Крыловой

11. Наряду с теми расчетами, которые производились на Этапах 1-7, осуществлялась также выплата комиссии в пользу компаний группы ВЕЛЕС Капитал.

12. Размер комиссии утверждался К.В. Артемовым, ведь именно он был теневым казначеем, который при расчете размера комиссии прогнозировал возможную убыточность этапа или всей цепочки сделок в рамках схемы «Управление балансом».

13. Первоначально К.В. Артемов предложил производить оплату со счетов российских технических компаний Банка, со ссылкой в назначении платежа на несуществующий Договор оказания консалтинговых услуг.

14. Осуществляя контроль за сопровождением хозяйственной деятельности российских технических компаний Банка, я была категорически против предложения К.В. Артемова, ведь подобные банковские операции с фиктивным назначением платежа являются признаком «фирм-однодневок» и всегда вызывают обоснованные подозрения у налоговых органов, а также влекут проверку законности деятельности компании-плательщика и получателя платежа.

15. Впоследствии было утверждено иное предложение К.В. Артемова об оплате комиссии в пользу компаний группы ВЕЛЕС Капитал со счетов оффшорных технических компаний Банка, альтернативным казначеем которых была А.А. Вьюлкова.

16. Насколько мне известно, в 2013-2014 годах оплата комиссии осуществлялась преимущественно со счетов Vermenda Holdings Limited – компании, вовлеченной и в иные теневые схемы Банка.

17. Создателем схемы «Управления балансом» являлся К.В. Львов (Заместитель начальника Управления по работе с проблемными активами). Именно он достигал с том-менеджером группы компаний ВЕЛЕС Капитал – Станиславом Бродским понятийные договоренности, с учетом которых впоследствии сотрудники теневых подразделений Банка реализовывали конкретную цепочку сделок.

18. В целом, участниками схемы «Управление балансом» (с группой компаний ВЕЛЕС Капитал) являлись: А.В. Ломов, К.В. Львов, Я.В. Алексеев, Е. Румянцева, Е.А. Цыбина, Ф.А. Самарец и А.А. Вьюлкова. Участие указанных лиц в схеме обусловлено их ролью в деятельности Банка и его теневых структур, что более подробно было описано в свидетельских показаниях.

Дополнительные свидетельские показания М.М. Крыловой

19. Таким образом, с использованием механизмов схемы «Управление балансом» теневыми структурами Банка организовывалось оформление и заключение притворных сделок, сопровождавшихся фиктивным (исключительно для создания видимости) движением ценных бумаг и денежных потоков, для формирования иллюзии улучшения финансовых показателей Банка, которые представлялись регулятору – Банку России.

_Крылова Марина Михайловна        М. Кр___

Настоящие показания подписаны в моем присутствии моей подзащитной Мариной Михайловной Крыловой 25 мая 2017 года

Адвокат_____ Александр Витальевич Сапронов

~ 6 ~



Прошито и пронумеровано
на 6(шести) листах