UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
                                                    :

In re Application of DEPOSIT INSURANCE     :
AGENCY for an order to conduct discovery
for use in a foreign proceeding,                  :

                           Petitioner.          :  Case No. 1:17-mc-00414-GBD

---------------------------------------------------------x

**RESPONDENT SERGEY LEONTIEV'S REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF HIS MOTION TO QUASH
<u>SUBPOENA ISSUED PURSUANT TO 28 U.S.C. § 1782</u>**

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

*Attorneys for Respondent Sergey Leontiev*

March 13, 2018

**TABLE OF CONTENTS**

|   |   | Page |
|---|---|---|
| A. | The Requested Discovery Would Violate U.S. Sanctions | 1 |
| B. | The Discovery Sought is Not Intended For Use in the Russian Bankruptcy Action | 3 |
| C. | Discretionary Factors Weigh in Favor of Quashing the Subpoena | 4 |
|   | 1. The DIA's Application Is Dependent on False Allegations | 4 |
|   | 2. The DIA's Application Continues to Lack Objective Support | 5 |
|   | 3. The Application Attempts to Circumvent U.S. and Russian Law and Policy | 7 |
|   | 4. The Subpoena Is an Unduly Burdensome and Intrusive Fishing Expedition | 9 |
| D. | Reciprocal Discovery Does Not Mean "Identical" Discovery | 10 |

# TABLE OF AUTHORITIES

Pages

**Cases**

*In re Accent Delight Int'l Ltd.*,
 869 F.3d 121 (2d Cir. 2017)...............................................................................................4

*In re Apotex Inc.*,
 2009 WL 618243 (S.D.N.Y. Mar. 9, 2009) ....................................................................9, 10

*In re Asia Mar. Pac. Ltd.*,
 253 F. Supp. 3d 701 (S.D.N.Y. 2015)..............................................................................8, 10

*In re Appl. of Auto-Guadeloupe Investissement S.A.*,
 2012 WL 4841945 (S.D.N.Y. Oct. 10, 2012)........................................................................7

*Appl. of Consorcio Minero, S.A. v. Renco Grp., Inc.*,
 2012 WL 1059916 (S.D.N.Y. Mar. 29, 2012).....................................................................10

*In re Appl. of Elvis Presley Enterprises LLC*,
 2016 WL 843380 (S.D.N.Y. Mar. 1, 2016)...........................................................................9

*Green Dev. Corp. S.A. De C.V. v. Zamora*,
 2016 WL 2745844 (S.D. Fla. May 10, 2016)........................................................................9

*In re Harbour Victoria Inv. Holdings Ltd.*,
 2015 WL 4040420 (S.D.N.Y. June 29, 2015) ...................................................................3, 9

*Intel Corp. v. Advanced Micro Devices, Inc.*,
 542 U.S. 241 (2004).............................................................................................................4

*Mees v. Buiter*,
 793 F.3d 291 (2d Cir. 2015).................................................................................................7

*In re Appl. for an Order Permitting Metallgesellschaft AG to take Discovery*,
 121 F.3d 77 (2d Cir. 1997).................................................................................................10

*In re Ex Parte Shagang Shipping Co., Ltd.*,
 2014 WL 1744264 (S.D.N.Y. Apr. 28, 2014).......................................................................7

**Statutes**

28 U.S.C. § 1782................................................................................................ *passim*

Sergei Magnitsky Rule of Law Accountability Act of 2012,
 Pub. L. No. 112-208, 126 Stat. 1496, 1504 (2012)..............................................................2

**Regulations**

31 C.F.R. § 584.101 *et seq.*....................................................................................................2, 3

**Other Authorities**

163 Cong. Rec. S8170 ...............................................................................................................8

The DIA, an entity controlled by the Russian state, is participating in an illegitimate campaign to persecute Mr. Leontiev, a pro-Western entrepreneur and successful businessman whose companies and assets have been targeted by the Kremlin for expropriation. Although the DIA attempts to mislead the Court, documents conclusively establish that the campaign is still being led by Andrei Pavlov, a Russian attorney who played a central role in the sham lawsuits that ultimately led to the death of Sergei Magnitsky and who is subject to U.S. sanctions.

The U.S. government has repeatedly recognized the Russian state's disregard for the rule of law and its pattern of unlawful seizure of private assets. Indeed, last year, the U.S. State Department wrote that "unfounded lawsuits or arbitrary enforcement actions remain an ever-present possibility for any company operating in Russia."[1] This Section 1782 action, and the underlying bankruptcy and criminal proceedings pending in Russia, are part of this pattern.

A. **The Requested Discovery Would Violate U.S. Sanctions**

The Subpoena should be quashed to prevent violations of the Magnitsky Act and OFAC sanctions. The DIA's attempts to distance itself from sanctioned attorney Andrei Pavlov, and downplay his involvement here, are disingenuous.[2] S*ee* Opp. at 8. Pavlov purportedly resigned from his law firm, Quorum, *less than one week* before the DIA filed its opposition to Mr. Leontiev's motion to quash. Zhidchenko Decl. ("AZ Decl.") ¶¶ 4, 7. However, Quorum's website continues to list Pavlov as the founder and senior partner, and minutes from a meeting of PRBB's Creditors' Committee that occurred *after* Pavlov's supposed resignation still referenced him as the "Chairman of Quorum." Supp. King Decl. Exs. 3, 4. The DIA does not address the impact of

---

[1] Bureau of Econ. & Bus. Affairs, U.S. Dep't of State, "2017 Investment Climate Statements - Russia," available at http://www.state.gov/e/eb/rls/othr/ics/investmentclimatestatements/index.htm?year=2017&dlid=269946.

[2] For example, it was Pavlov who signed the original September 2, 2015, legal services agreement, and subsequent addenda, between Quorum and the DIA in connection with all PRBB matters. *See* Supp. King Decl. Ex. 1; *see also id.* Ex. 2 (May 2017 news update on Pavlov's involvement in the PRBB bankruptcy proceedings).

Pavlov's purported resignation on his ownership or control of Quorum, suggesting that Quorum itself might remain subject to sanctions even if Pavlov did in fact resign. *See* 31 C.F.R. § 584.410.

Moreover, the DIA fails to disclose that it retained Pavlov *personally*—separate from Quorum—to oversee "legal proceedings in foreign jurisdictions," including "against S. Leontiev in the United States District Court for the Southern District of New York." Monastyrsky Decl. Ex. 2 at 3-4. Both Quorum and Pavlov personally continue to receive substantial compensation in connection with this action and the Bankruptcy Action. *See* Supp. King Decl. Exs. 1, 5.

Allowing discovery here would result in violations of U.S. sanctions, and the DIA's narrow view of OFAC sanctions is wrong. First, the Magnitsky Act bars the transfer of property and property interests *to* a sanctioned person. Magnitsky Act § 406(a)(1); 31 C.F.R. §§ 584.201(a)-(b). Thus, giving anything of value to Pavlov violates the sanctions. *See* 31 C.F.R. § 584.310. Second, a party is subject to OFAC jurisdiction if it avails itself of the U.S. courts. *See* Supp. King Decl. Ex. 6 (finding jurisdiction to hold Taiwanese company in violation of OFAC sanctions for foreign transactions with sanctioned entity based on its participation in U.S. court proceedings). The sanctions not only bar transfers from U.S.-based persons to Pavlov, but they also prohibit the DIA, which submitted itself voluntarily to the jurisdiction of this Court, from transacting business with Pavlov in Russia. The DIA cannot pick and choose which parts of the U.S. Code it will comply with—taking advantage of U.S. law to ask this Court for discovery while simultaneously claiming that it is not subject to the Magnitsky Act. Third, the exception for "informational materials" referenced by the DIA is an extremely narrow one, intended to allow transmission of existing discrete artistic or journalistic works, but not the provision of the discovery sought here—which would require the new collection and production of materials. *See* 31 C.F.R. §§ 584.304(a), 584.206(b)(1)-(2). Fourth, the DIA's retention of Pavlov violates the prohibition on the provision

2

of *services* to or by sanctioned parties. *Id.* § 584.201(b)(1)-(2). Finally, OFAC sanctions prohibit both direct and *indirect* transactions. Thus, any act that ultimately provides something of value to Pavlov, or impacts any property interest belonging to him, is a violation. *See id.* § 584.310.

**B.      The Discovery Sought is Not Intended For Use in the Russian Bankruptcy Action**

There are no pending claims seeking to hold Mr. Leontiev liable in the Bankruptcy Action; the DIA merely invokes that action as a façade. *In re Harbour Victoria Inv. Holdings Ltd.*, 2015 WL 4040420, at *6 (S.D.N.Y. June 29, 2015) ("[T]he Court finds it hard to believe that the discovery Petitioner now seeks is actually intended for use in the [foreign] proceeding."). If genuinely intended for use in the Bankruptcy Action, the DIA's discovery requests would focus only on transactions that could be challenged and unwound there. The drastically broader scope of the Subpoena—including requests relating to entities not alleged to have transacted with PRBB and requests seeking information about Mr. Leontiev's personal financial transactions and assets—belies the DIA's ulterior motive.[3] None of this is relevant to the outcome of the Bankruptcy Action.

Alarmingly, the DIA confirms Mr. Leontiev's suspicions that discovery obtained here "may later be used by prosecutors" (Opp. at 14) to pursue the baseless Criminal Actions overseen by Victor Grin, the Deputy Prosecutor General who, like Pavlov, is on the Magnitsky List and is subject to U.S. sanctions.[4] Monastyrsky Decl. ¶ 26; King Decl. Ex. 13. The DIA does not deny that it regularly communicates with the criminal authorities. Instead, the DIA argues that it does not matter if the requested discovery is "for use" in the Criminal Actions because Section 1782

---

[3] Mr. Leontiev has not, as the DIA incorrectly suggests, characterized any alleged transfers of funds out of PRBB as "personal financial transactions." Opp. at 23. Rather, Mr. Leontiev has explained that the DIA's motivation in bringing this action is to gather information about his personal assets and financial transactions in order to improperly seize said assets or otherwise harm him.

[4] Contrary to the DIA's assertion (AZ Decl. ¶ 42), the General Prosecutor's Office is involved in the Criminal Actions. Indeed, the so-called "witness statements" relied upon by the DIA (*see, e.g.*, Opp at 16) were made pursuant to pre-trial cooperation agreements authorized and signed by Victor Grin. *See* Supp. King. Decl. Ex. 7.

sometimes can be used in aid of foreign criminal actions. Opp. at 13-14. However, the DIA premised its Application on the discovery purportedly supporting the Bankruptcy Action. If the discovery is really "for use" in Victor Grin's Criminal Actions, the DIA's failure to disclose that in its Application is further evidence of bad faith.[5]

C. **Discretionary Factors Weigh in Favor of Quashing the Subpoena**

    1. **The DIA's Application Is Dependent on False Allegations**

The "nature" and "character of the proceedings underway abroad" are relevant considerations for Section 1782 purposes. *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264 (2004). It would be a perverse outcome if sanctioned individuals could secure the aid of U.S. courts with nothing more than allegations manufactured in Russia. Thus, contrary to the DIA's position, evidence demonstrating that the Bankruptcy Action is a sham proceeding—and that allegations made against Mr. Leontiev in Russia are false—is relevant under *Intel*.

Likewise, the DIA cannot hide from the falsity of the allegations in its Application simply by labeling those "merits" issues. Opp. at 15-16. Mr. Leontiev's opening brief provided various examples of such allegations—including purportedly "suspicious" transactions that were completely legitimate, purportedly "valueless" companies that held substantial value, and companies purported to be "shams" with "no assets" or "commercial activities" that were brick-and-mortar companies with tangible assets and visible, public operations. Resp. Br. at 16-18. The DIA's blatant disregard for the inaccuracy of its allegations is a testament to its bad faith.

Moreover, the DIA made new demonstrably false allegations in its Opposition. For example, the DIA misleadingly claims that the transfer of RUB 604 million to its own subsidiary

---

[5] *See In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 135 (2d Cir. 2017) ("[P]arties concerned . . . that a [Section] 1782 applicant is attempting to use foreign litigation as a ruse for obtaining discovery for use in other foreign proceedings can and should bring evidence of such chicanery to the [Section] 1782 court's attention. . . . Should such evidence exist, it . . . might support denying the Section 1782 application altogether.").

4

bank, only days after it wrongfully seized PRBB, occurred "by mistake" due to errors by PRBB employees. Opp. at 7. However, the General Prosecutor's Office described the self-dealing as an "unlawful transfer by the [DIA]" and stated that the DIA employees involved were disciplined. Supp. King Decl. Ex. 8. The DIA also now claims that it was an "error" that its *ex parte* papers listed the PRBB bankruptcy shortfall as only RUB 1,271,128,000 (approximately $19.7 million). Khamchich Decl. ¶ 20 n.1. But that lower figure is from an October 2015 order of the Russian bankruptcy court, issued before the DIA was able to further loot PRBB. Similarly, the DIA makes false allegations about the Investigative Committee's December 2015 decision not to initiate criminal proceedings against any of PRBB's executives. *See* Opp. at 7 n.1. The Committee's order refutes the notion that its investigation was hampered by time restrictions and makes plain that, after repeated extensions, the Committee determined that there was simply no evidence of wrongdoing and that it would not bring any criminal actions. Monastyrsky Decl. Ex. 4.

### 2. The DIA's Application Continues to Lack Objective Support

The DIA's most recent filings still provide no evidentiary support for its reckless allegations. In his motion, Mr. Leontiev highlighted that the only purported evidence proffered by the DIA was the bare declaration of attorney Daria Diachenko, one of Pavlov's subordinates who had no personal knowledge of the "facts" in her declaration. *See* Resp. Br. at 2, 16. In response, the DIA flippantly asserts that Diachenko's "knowledge . . . comes from her review of . . . documents and interviews" (Opp. at 16), but the DIA fails to identify or attach any of these documents or name the anonymous interview subjects, if they even exist. In any event, the DIA's statement confirms that Diachenko's declaration consists entirely of inadmissible hearsay.

The DIA doubles down in its latest filing, submitting another attorney affidavit from a Pavlov colleague who provides no competent evidence. For instance, Zhidchenko claims, without any support, that the clean audits PRBB received in 2014 and 2015 were unreliable because certain

5

information allegedly was not disclosed to PRBB's auditors. *See* Opp. at 4; AZ Decl. ¶ 16. Putting aside the fact that the Central Bank of Russia, which had employees working on-site at PRBB, also signed off on the Bank's financial health, Zhidchenko offers no basis for testifying about what the auditors knew or learned during their audit.

In a belated effort to support its Application with some form of evidence, the DIA cites to "witness statements" signed by two former Bank employees as part of their plea arrangements with Russian criminal authorities. But these statements are of no more value than the unsupported assertions of the DIA's counsel. First, neither was sworn to, and there are ample indicia that the statements were coerced and therefore lack reliability. *See* Declaration of David Aminov ¶¶ 8-15. The DIA repeatedly refers to these unverified allegations as "testimony" (*e.g.*, Opp. at 6), but they are simply devoid of legal value. Second, both employees explicitly concede that they lack first-hand knowledge of the matters they describe, and merely regurgitate hearsay or rumors.[6] They also admit with respect to a number of the purported "facts" at issue that "I am not aware . . . for certain" and "I do not know the specific details." AZ Decl. Ex. 12 ¶ 79; *id.* Ex. 13 ¶ 44.

Finally, while the "witness statements" are heavy on disparaging terms, they are incoherent and utterly lacking in factual detail. Krylova alleges, for instance that "the Bank sold one note (bill) to different parties at the same time and in different transactions." AZ Decl. Ex. 13 ¶ 44. This supposed "scheme," if it occurred, neither implicates Mr. Leontiev nor describes any theft of assets from PRBB. Nor do the witnesses explain why the Bank was harmed by lending money to unaffiliated, creditworthy intermediaries, even if, as alleged, those intermediaries transferred the

---

[6] *See, e.g.*, AZ Decl. Ex. 12 ¶ 26 ("employees of the bank knew"), ¶ 34 ("According to the employees of this subdivision . . ."), ¶ 75 ("According to [Rozhkova] . . ."); *id.* Ex. 13 ¶ 32 ("I am not aware of details and mechanisms of the above stated plan."), ¶ 49 ("I do not know why and how did he do this . . . [others] told me."), ¶ 61 ("I had no information about . . ."), ¶ 81 ("According to [Saltykov] . . ."); ¶ 105 ("[A]ccording to the oral information provided mostly by my colleagues . . .").

funds to entities allegedly controlled by the Bank's shareholders. AZ Decl. Ex. 12 ¶¶ 41-42; *id.* Ex. 13 ¶¶ 34-37. Presumably, the Bank would be entitled to repayment from the intermediary.

In any event, even with these two "witness statements," the DIA still fails to provide any support for the relevance of its requests regarding dozens of individuals and companies. The DIA's Subpoena contains 19 requests relating to 92 named entities: 47 of these—17 of 22 "Leontiev Companies," 26 of 48 "Sham Companies," and 4 entities affiliated or purportedly affiliated with Mr. Leontiev—are not mentioned in any exhibits or even described at all. *See* Supp. King Decl. ¶ 11; *see also id.* ¶ 12 (8 other entities that are not mentioned in any DIA exhibit).[7]

### 3. The Application Attempts to Circumvent U.S. and Russian Law and Policy

"[T]he third *Intel* factor weighs in favor of quashing [the] subpoena" when the petitioner "may have acted in bad faith" in making its Section 1782 discovery request. *In re Appl. of Auto-Guadeloupe Investissement S.A.*, 2012 WL 4841945, at *8 (S.D.N.Y. Oct. 10, 2012); *see also Mees v. Buiter*, 793 F.3d 291, 302 n.18 (2d Cir. 2015) (a § 1782 application "made in bad faith" may be denied outright). Among other things, the DIA's pursuit of discovery here is a bad-faith attempt to investigate Mr. Leontiev's personal assets and financial information. The DIA likely intends to use this asset discovery to harass or harm Mr. Leontiev, but even if not, its efforts are improper. No judgment has been entered against him, and "pre-judgment discovery concerning an opposing party's assets is not permitted." *In re Ex Parte Shagang Shipping Co., Ltd.*, 2014 WL 1744264, at *2 (S.D.N.Y. Apr. 28, 2014) (quashing § 1782 subpoena) (quotation marks omitted). At this point, there is not even an action pending against Mr. Leontiev to hold him personally liable for the PRBB bankruptcy. The DIA does not explain how requests for "bank account numbers" and

---

[7] Many of the conclusory allegations in Diachenko's declaration are expressly based on "information and belief," if anything at all. *See* Diachenko Decl. ¶ 24 (bare allegations "[u]pon information and belief" about Legion Trust, Southpac Trust, and Holdco Ltd.—entities purportedly associated with Mr. Leontiev); *id.* ¶ 49 (mentioning Wonderworks, previously owned indirectly by Mr. Leontiev, for the only time and without any description).

documents detailing "investments" and "ownership" of various entities—including entities purportedly affiliated with Mr. Leontiev that did not transact with PRBB—are justifiable. *See, e.g.*, Subpoena Req. Nos. 8-12; *In re Asia Mar. Pac. Ltd.*, 253 F. Supp. 3d 701, 706 n.7 (S.D.N.Y. 2015) ("[A] request that appears only marginally relevant to the foreign proceeding may in certain cases suggest that the application is made in bad faith, for the purpose of harassment.").[8]

The DIA's bad faith is further shown in its attempts to circumvent U.S. sanctions by obscuring Pavlov's role and financial stake in PRBB litigation. The DIA claims that Pavlov had "limited" involvement and that the DIA "is acting for the benefit of P[R]BB's creditors, and not . . . for the gain of any third parties." Opp. at 8-9. These statements ring hollow in light of the fact that Pavlov executed the contract that entitles Quorum to 15% of any recovery. Supp. King Decl. ¶ 2. Notably, the DIA does not dispute that Pavlov still receives a share of this contingency fee. Moreover, since the DIA retained Pavlov personally in April 2017, Pavlov has received a monthly check for collecting "evidence" of "management's contribution to [PRBB's] bankruptcy." *Id.* Ex. 5. Outrageously, the DIA *increased* Pavlov's personal compensation since his addition to the Magnitsky List—after receiving RUB 1.5 million monthly from April to December 2017, Pavlov was paid RUB 3.5 million in January and RUB 2 million in February 2018. *Id.*

The DIA's continued retention of Pavlov, in blatant violation of the Magnitsky Act, is strong evidence of bad faith. Pavlov's misdeeds—including his "essential role" in the Magnitsky Affair—have been chronicled for years. *See* 163 Cong. Rec. S8170 (noting that Pavlov's addition to the Magnitsky List was "long overdue"). Indeed, in 2014, the European Parliament recommended imposing an EU-wide visa ban on Pavlov for his role in filing the sham lawsuits

---

[8] The Application also is made in bad faith because the DIA is attempting to secure discovery that it knows would be prohibited in Russia and to force Mr. Leontiev's deposition so that a transcript can be delivered to prosecutors in the Criminal Actions, where the testimony of defendants cannot be compelled. *See* Resp. Br. at 20-21.

that led to Magnitsky's death. Supp. King Decl. Ex. 9. That the DIA chose an individual with experience in creating sham lawsuits to oversee its efforts against Mr. Leontiev speaks volumes.

Finally, the DIA does not dispute that Mr. Leontiev won both of the U.S. legal proceedings referenced in its *ex parte* filing. *See* Resp. Br. at 18-20. The DIA now argues that the prior actions it referenced are unrelated to this litigation (Opp. at 16-18), but documents show that the DIA considered joining the prior U.S. litigation. Monastyrsky Decl. Ex. 2 at 4. It was only after the Russian proxies involved in that litigation failed to obtain asset discovery from Mr. Leontiev, and both of those actions were dismissed, that the DIA decided to seek similar asset discovery through this Section 1782 action. *Harbour Victoria*, 2015 WL 4040420, at *1 (denying application "trying to evade the denial of [a prior] discovery request in the U.S." by "seeking the same discovery, but repackaged as petitions pursuant to 28 U.S.C. § 1782"). The DIA's argument is further belied by the fact that the DIA has specifically requested all of the documents produced in those actions (Subpoena Req. Nos. 19(a)-(b)). This lack of candor is yet another example of the DIA's bad faith. *Green Dev. Corp. S.A. De C.V. v. Zamora*, 2016 WL 2745844, at *5 (S.D. Fla. May 10, 2016).

### 4. The Subpoena Is an Unduly Burdensome and Intrusive Fishing Expedition

The Subpoena is unduly burdensome given its extremely broad scope and the minimal relevance, if any, of the requested documents. The DIA seeks six years' worth of documents regarding nearly 100 entities and 50 "Conspirators"—not just "twelve individuals," as the DIA mistakenly suggests (Opp. at 22)—without adequately demonstrating their relevance to the Bankruptcy Action. The DIA's empty speculation regarding the purported ease of responding to these expansive requests should be ignored. *See In re Apotex Inc.*, 2009 WL 618243, at *4 (S.D.N.Y. Mar. 9, 2009) (quashing § 1782 subpoena over petitioner's assertion that the requested documents were "easily searchable"). Without any basis for relevance, the DIA cannot justify any burden on Mr. Leontiev—much less the substantial burden it seeks to impose here. *See In re Appl.*

9

*of Elvis Presley Enterprises LLC*, 2016 WL 843380, at *5 (S.D.N.Y. Mar. 1, 2016) (quashing § 1782 requests that "would impose a heavy burden and that . . . are only minimally relevant to the [foreign] proceeding"). The DIA has not even attempted to explain the relevance of most of the companies and individuals mentioned in the Subpoena, and its argument that this is not an impermissible "fishing expedition" is unavailing. *Asia Mar. Pac. Ltd.*, 253 F. Supp. 3d at 703; *In re Appl. for an Order Permitting Metallgesellschaft AG to take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997) ("[I]f the judge . . . suspects that the [§ 1782] request is a 'fishing expedition' or a vehicle for harassment, the district court should deny the request.") (citation omitted).

The "confidential and highly sensitive nature" of some of the bank account details and financial information requested by the DIA also makes the Subpoena unduly intrusive and burdensome. *Apotex*, 2009 WL 618243, at *4. The DIA does not dispute that the discovery it seeks from Mr. Leontiev would be made public because the case files in the Bankruptcy Action are open to nearly 8,000 purported PRBB creditors. Monastyrsky Decl. ¶ 21.

### D. Reciprocal Discovery Does Not Mean "Identical" Discovery

The DIA misinterprets "reciprocal" discovery to mean "identical" discovery. But Section 1782 reciprocal discovery need only be "closely related" to the foreign action. *Appl. of Consorcio Minero, S.A. v. Renco Grp., Inc.*, 2012 WL 1059916, at *3-4 (S.D.N.Y. Mar. 29, 2012). Mr. Leontiev's proposed discovery requests pertain to the same general subject matter—the Russian Bankruptcy Action—for which the DIA has purportedly filed its Application. The DIA itself partook in the coordinated seizure of PRBB and has overseen the looting of PRBB since August 2015. Thus, to the extent that certain reciprocal requests are not mirror images of the DIA's requests, Mr. Leontiev seeks discovery to expose how the DIA and others misappropriated and improperly distributed PRBB's assets—or, in the DIA's words, to learn "what happened to the assets of Probusinessbank." Opp. at 2. Any discovery granted, therefore, should be reciprocal.

Dated: March 13, 2018
New York, New York

GIBSON, DUNN & CRUTCHER, LLP

By: ___/s/ *Marshall R. King*___
    Robert L. Weigel
        rweigel@gibsondunn.com
    Marshall R. King
        mking@gibsondunn.com
    Alison L. Wollin
        awollin@gibsondunn.com
    Brad L. Schoenfeldt
        bschoenfeldt@gibsondunn.com

200 Park Avenue
New York, NY 10166-0193
Telephone: 212-351-4000
Facsimile: 212-351-4035

*Attorneys for Respondent Sergey Leontiev*