# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
                              :

DEPOSIT INSURANCE AGENCY,             :

            Petitioner,                     :

   -against-                             :

SERGEY LEONTIEV,                   :

            Movant.                       :

                                :  Case No. 1:17-mc-00414-GBD
------------------------------------------------------------------x
                                :  **[PROPOSED] COMPLAINT**

SERGEY LEONTIEV,                   :

            Plaintiff,                      :

   -against-                             :

DEPOSIT INSURANCE AGENCY,             :

            Defendant.                   :

                                :
------------------------------------------------------------------x

Plaintiff Sergey Leontiev, by and through his undersigned attorneys, for his complaint against Defendant Deposit Insurance Agency, alleges as follows:

## INTRODUCTION

1.     This is an action for a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 (the "Declaratory Judgment Act") and Federal Rule of Civil Procedure 57 to determine and resolve a question of actual controversy, raised by the Deposit Insurance Agency (the "DIA") in this Court. The DIA asserted in this Court that Mr. Leontiev "embezzled hundreds of millions of dollars of assets from the Russian bank he co-owned." Dkt. 22 at 1. Mr. Leontiev categorically

1

denies the DIA's false and highly defamatory assertions and asks this Court for a declaration that the statements made by the DIA in this Court are false. Mr. Leontiev <u>did not</u> embezzle or otherwise misappropriate any funds from Probusinessbank ("PRBB"). In addition to seeking a declaration stating this fact, Mr. Leontiev seeks injunctive relief barring the DIA, or anyone acting in concert with the DIA or at its direction, from taking any further steps to claim that Mr. Leontiev embezzled funds from PRBB.

## PARTIES

2. Plaintiff Sergey Leontiev is a Russian national who has been domiciled in the United States since August 2015. He currently resides in New York County, New York.

3. Defendant Deposit Insurance Agency is a state corporation established on the basis of a Russian federal statute in 2004. The DIA acts as the "corporate receiver/liquidator" in "bank liquidation proceedings," oversees the operation of the deposit insurance system, and performs other duties. As an agency or instrumentality of the Russian Federation, the DIA qualifies as a foreign state as defined under 28 U.S.C. § 1603(a).

4. The DIA is headquartered at 4 Vysotskogo Street, Moscow, Russia, 109240. However, it has projected itself into New York and Massachusetts by initiating court proceedings against Mr. Leontiev and his business associate Alexander Zheleznyak in the United States District Courts for the Southern District of New York and the District of Massachusetts, respectively.

## SUMMARY AND NATURE OF THE CASE

5. Mr. Leontiev is a well-known and highly regarded Russian businessman. In 1993, Mr. Leontiev co-founded PRBB, a full-service commercial bank that he successfully managed and grew for over 20 years. In August 2015, Mr. Leontiev was forced to flee Russia

after PRBB's license was unjustifiably revoked, and its assets seized, by the Russian Central Bank (the "Central Bank"). This illegal seizure of PRBB by the Central Bank was conducted under false pretenses, as part of a corrupt effort to consolidate the banking sector and enrich a select group of Kremlin insiders and their affiliates.

6. Since PRBB's illegal seizure, PRBB's assets have been controlled and looted by the DIA, a corrupt agency of the Russian government. Over the past three years, the DIA also has engaged in a global campaign to harass, intimidate, and damage Mr. Leontiev through various means, including bad faith litigation premised on false and baseless allegations.

7. The DIA's malicious campaign against Mr. Leontiev and his associates has been orchestrated by Andrei Pavlov, a Russian lawyer sanctioned by the U.S. for his central role in prior sham lawsuits, including in the infamous "Magnitsky Affair." Under Pavlov's direction, and in furtherance of its efforts to improperly target Mr. Leontiev, the DIA commenced this action in October 2017. The DIA sought this Court's assistance under 28 U.S.C. § 1782 to obtain discovery from Mr. Leontiev, purportedly for use in PRBB's bankruptcy proceeding in Russia. In so doing, the DIA purposefully availed itself of this Court's jurisdiction and judicial authority.

8. The DIA has made a number of fraudulent statements in support of its discovery requests in this action, and as this Court has rightfully concluded, the involvement of "two sanctioned individuals," Pavlov and Deputy Prosecutor General Victor Grin, in litigation concerning PRBB has increased the Court's concerns "about the legitimacy" of the DIA's requests and their potential to be used for "impermissible purposes." *See* Dkt. 28 at 24.

9. Among the false and highly defamatory statements that the DIA has made within this proceeding are the baseless allegations that Mr. Leontiev "embezzled hundreds of millions

3

of dollars of assets from the Russian bank he co-owned" (Dkt. 22 at 7), "that [Mr.] Leontiev embezzled P[R]BB's funds," (*id*. at 19), and that Mr. Leontiev "engaged in a series of transactions to embezzle funds" (*id*. at 29). By propagating these false and damaging allegations about Mr. Leontiev in this Court, the DIA has submitted itself to this Court's jurisdiction with respect to claims directly related to these specific allegations.

10. Mr. Leontiev seeks a declaration that the DIA's allegations are false, as Mr. Leontiev did not embezzle or otherwise misappropriate funds from PRBB. A declaratory judgment is necessary and appropriate to resolve this dispute, which the DIA already has placed at issue in this case. Mr. Leontiev also seeks a permanent injunction preventing the DIA, or anyone acting in concert with the DIA or at its direction, from taking any further action against Mr. Leontiev on any claim that he embezzled funds from PRBB. Both declaratory and injunctive relief are necessary to put an end to the campaign of threats, harassment, and injurious falsehoods levelled by the DIA against Mr. Leontiev.

**JURISDICTION & VENUE**

11. This Court has subject matter jurisdiction over Mr. Leontiev's Complaint pursuant to 28 U.S.C. §§ 1330(a) and 1605(a)(1) because the DIA has waived any claim of sovereign immunity with respect to the subject matter of Mr. Leontiev's Complaint, which has "a direct connection [to] the sovereign's activities in our courts." *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 722 (9th Cir. 1992). The DIA has "deliberately involved" (*id*.) this Court in its fraudulent litigation efforts, including its propagation of the false claim that Mr. Leontiev "embezzled hundreds of millions of dollars of assets from" PRBB (Dkt. 22 at 7). By using this Court's judicial authority to order Mr. Leontiev to comply with certain discovery

4

demands "as part and parcel of its efforts to . . . persecute" Mr. Leontiev (*see Siderman*, 965 F.2d at 722), the DIA waived any sovereign immunity defense with respect to Mr. Leontiev's claim.

12. This Court also has subject matter jurisdiction over Mr. Leontiev's Complaint pursuant to 28 U.S.C. §§ 1330(a) and 1605(a)(2), which withdraws sovereign immunity in actions based "upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere." Mr. Leontiev's Complaint is based on acts that the DIA has performed in the United States—in particular, by falsely alleging that Mr. Leontiev "embezzled hundreds of millions of dollars of assets from" PRBB (Dkt. 22 at 7). And, as the DIA acknowledged, it has sought assistance from this Court for, and in connection with, the purpose of "trac[ing] PBB's assets" (*id*. 22 at 15), purportedly located in Russia or elsewhere, which is a commercial activity.

13. Alternatively, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1367 because the subject matter of Mr. Leontiev's Complaint is "so related to" the DIA's § 1782 application, "of which [this Court] has original jurisdiction" under 28 U.S.C. § 1331, that Mr. Leontiev's Complaint and the DIA's § 1782 application "form part of the same case or controversy under Article III of the United States Constitution" (28 U.S.C. § 1367(a)).

14. This Court has personal jurisdiction over the DIA under 28 U.S.C. § 1330(b), which extends personal jurisdiction over a foreign state (including its agencies) that is not immune from suit and that has been properly served with process pursuant to 28 U.S.C. § 1608.

15. Venue is proper under 28 U.S.C. § 1391(f)(1), as (1) the DIA placed its false claim that Mr. Leontiev embezzled funds from PRBB in controversy in this action pending in this judicial district, and (2) the alleged evidence that, according to the DIA, is supposedly

"critically important" to the DIA's theory of Mr. Leontiev's liability is located in New York (Dkt. 5 at 21).

16. Venue is also proper under § 1391(f)(3), as the DIA is doing business in the Southern District of New York by engaging Morrison Cohen LLP as its counsel in this action.

## FACTUAL ALLEGATIONS

17. In 1993, Mr. Leontiev, together with Mr. Zheleznyak and another business associate, started PRBB, a full-service commercial bank headquartered in Moscow, Russia. The bank grew steadily, and by 2015, PRBB had become the 51st largest bank in Russia in terms of assets, and fourth largest in terms of branches—with more than 700 branches in regions throughout Russia.

### The Politically Motivated and Unlawful Expropriation and Looting of PRBB

18. In parallel to PRBB's growth, Mr. Leontiev established a relationship with the U.S. Embassy, regularly attending meetings and organized discussions of Russian banking issues hosted at the Embassy. As a proponent of Western values, Mr. Leontiev appreciated the opportunity to speak frankly about Russia's political and economic climate. Evidently, the Russian authorities took note of Mr. Leontiev's recurring attendance at these gatherings. Indeed, of the select group of Russian bank owners that frequented such gatherings at the U.S. Embassy alongside Mr. Leontiev, most have had their banks seized and now reside in exile outside of Russia.

19. In addition, in 2012, a subsidiary bank of PRBB called Bank24 reached an agreement to issue a credit card designed to help finance the Anti-Corruption Fund, an organization founded and led by Alexei Navalny, the key opposition figure in Russian politics. Every purchase made with this card would result in a cashback reward to the Anti-Corruption Fund, which in turn would help Mr. Navalny investigate the corrupt activities of Russian

government agencies and officials. Despite efforts to keep this planned joint venture a secret, the Russian authorities learned about it through media reports. Soon thereafter, Bank24's management began receiving hostile and intimidating calls from the Central Bank, which ultimately caused this project to be abandoned due to pressure from the Russian government.

20. In August 2015, PRBB fell victim to the Russian government's corruptly motivated consolidation of the Russian banking sector. PRBB had received multiple clean opinions from its independent auditor, ZAO Deloitte & Touche CIS ("Deloitte & Touche"), as recently as April 15, 2015. Those opinions not only found that PRBB's assets exceeded its liabilities but also determined that PRBB was "in compliance" with the Central Bank's "obligatory ratios" and "mandatory liquidity ratios" and with the "statutory capital ratio." *E.g.*, Dkt. 13-2 at 6, 51, 94, 96.

21. On two occasions, on February 13 and May 7, 2015, the Central Bank issued official letters confirming its satisfaction with PRBB's capital, assets, liquidity, and management quality. Despite the opinions from Deloitte & Touche and the letters from the Central Bank, on August 7, 2015, temporary administrators from the DIA arrived at PRBB's offices and disconnected its access to banking networks.

22. As these events were unfolding, Mr. Leontiev became concerned for his and his family's personal safety. Given the Russian government's standard practice of persecuting businessmen after seizing their assets, and in light of his association with the U.S. Embassy and Mr. Navalny, Mr. Leontiev and his family fled Russia in August 2015.

23. On August 10, 2015, PRBB was reconnected temporarily to banking networks, at which time 604 million rubles (approximately $9.6 million) were transferred to Russian Capital Bank, the DIA's subsidiary. A subsequent investigation by Russian authorities characterized this

7

self-dealing by the DIA itself as "an unlawful transfer." Later that month, a significant portion of PRBB's assets, around 25 billion rubles (approximately $367 million), was transferred to Binbank (a.k.a. B&N Bank), then a well-connected Kremlin favorite.

24.     On August 12, 2015, the Central Bank revoked PRBB's banking license.

25.     PRBB was one of nearly 100 banks to lose its license in 2015 and one of nearly 400 banks since 2013. In the words of one news source, the Central Bank, at the behest of the Russian government, "has been revoking licenses on a near-daily basis" in an effort to consolidate the banking sector. This effort has proved effective—nearly 70 percent of the Russian banking sector was under state control by October 2017.

26.     The primary beneficiaries of this massive consolidation of Russia's banking sector are Russia's state-run banks, government officials, and their allies. Binbank's receipt of a substantial portion of PRBB's assets immediately after PRBB's seizure is representative of this general scheme, wherein Binbank and two other banks, Bank Otkritie and state-owned VTB Bank, functioned as the main recipients and consolidators of expropriated assets for several years. Both Binbank and Bank Otkritie have since been consolidated under Russian state control as part of the same campaign to nationalize the Russian banking sector.

27.     Elvira Nabiullina, the head of the Central Bank who is widely reported to be the driving force behind the forced consolidation of Russia's banking sector, is also the Chairwoman of the DIA's Board of Directors. Of the twelve other members of the DIA's Board of Directors, six hold high-level positions at the Central Bank as well. This exemplifies the level of corrupt entwinement between the Central Bank and the DIA that has facilitated the unjust expropriation and looting of privately-owned Russian banks—a practice to which PRBB fell victim.

28. Several days after revoking its license, the Central Bank filed a petition for bankruptcy on behalf of PRBB and for the appointment of the DIA as the bankruptcy receiver for PRBB, falsely claiming that the bank was insolvent and had violated Russian banking laws.

29. On October 27, 2015, a Russian court granted the Central Bank's bankruptcy petition. Contrary to the wild accusations by the DIA in this Court, the Russian court did not find that Mr. Leontiev "embezzled hundreds of millions of dollars." Instead, the Russian court found only a minor shortfall between PRBB's total assets and liabilities (approximately $19.7 million), nearly half of which could be accounted for by the DIA's illegal transfer of funds from PRBB to Russian Capital Bank, the DIA's subsidiary.

**The Corrupt Individuals at the Helm of the DIA's Wrongdoing**

30. The DIA appointed Vasiliy Bednin as the individual serving on the DIA's behalf in its role as PRBB's bankruptcy receiver and engaged the Quorum law firm and Andrei Pavlov as its legal counsel in the PRBB bankruptcy and other legal proceedings. The DIA and Quorum have effectuated the scheme to deliver PRBB's assets to the Kremlin's inner circle, acting under the direction of Bednin and Pavlov, whose conduct has been consistent with their well-chronicled propensity for illegally pursuing successful Russian businessmen through the use of extortion, sham lawsuits, and other unlawful means.

31. Andrei Pavlov is subject to U.S. sanctions and is on the Magnitsky List, which was created as part of the Sergei Magnitsky Rule of Law Accountability Act of 2012, Pub. L. No. 112-208, 126 Stat. 1496, 1504 (2012). The U.S. government sanctioned Pavlov for his "essential role" in "orchestrating the false claims used in the $230 million tax fraud that Sergei Magnitsky uncovered" prior to his imprisonment, torture, and death. 163 Cong. Rec. S8170. The U.S. Treasury Department's explanation of Pavlov's role in the sham lawsuits that ultimately led to Magnitsky's death is informative: "Pavlov represented two of the illegally re-

registered Hermitage Fund subsidiaries in separate lawsuits brought by a company he helped to register. The Hermitage Fund had no prior knowledge of or acquaintance with Pavlov and never hired him or authorized his appointment."

32. On behalf of the DIA, Quorum and Pavlov have taken various actions against PRBB's former management, including by initiating this § 1782 action against Mr. Leontiev. Indeed, the DIA's § 1782 action is accompanied by unsupported affidavits signed by two Quorum attorneys.

33. Despite his prior arrest and indictment on commercial bribery and extortion claims, Vasiliy Bednin, a senior official in the DIA's bank dissolution department, was tasked with overseeing PRBB's temporary administration and bankruptcy proceeding. The charges against Bednin arose out of his conduct as the representative of the DIA in its role as bankruptcy receiver for another bank and, according to reports, were substantiated by video evidence. Nevertheless, the DIA expressed support for Bednin at the time, and he was allowed to return to work at the DIA soon thereafter.

34. Valery Miroshnikov, the DIA's First Deputy General Director, was the DIA official who publicly expressed support for Bednin following his indictment and arrest. Like Bednin, Miroshnikov himself has been implicated in criminal and extortive conduct in the context of the Russian government's expropriation of private assets. According to U.K. court filings, after the seizure of assets belonging to Russian banker Sergey Pugachev, Miroshnikov, through his representatives, offered to "resolve" the conflict between Pugachev and the Central Bank, so long as Pugachev agreed to transfer $350 million dollars to Miroshnikov personally.

35. Miroshnikov's conduct towards PRBB's former owners and managers has been consistent with this criminal *modus operandi*.

36. Following PRBB's seizure in August 2015, the Investigative Committee of the Russian Federation conducted an investigation into the potential liability of PRBB's former owners and managers in connection with PRBB's bankruptcy. This investigation culminated in December 2015, with the Investigative Committee issuing an "Order to Refuse to Open a Criminal Case," which found "no evidence of crime events" and concluded that "the opening of a criminal case should be refused" "due to the absence of criminal events." Dkt. 11-4 at 5.

37. In January 2016, a month after the Investigative Committee determined that criminal charges in connection with PRBB's bankruptcy were not warranted, Miroshnikov choreographed an attempt to extort Mr. Leontiev and his longtime associate, Mr. Zheleznyak. Miroshnikov contacted Mr. Zheleznyak, who also was forced to flee Russia in the aftermath of PRBB's seizure, and proposed a meeting with a representative of the DIA who works closely with Quorum and Pavlov. Mr. Zheleznyak agreed and attended the meeting.

38. The DIA's representative offered Mr. Zheleznyak a "deal"—in exchange for transferring assets to Quorum, Messrs. Leontiev and Zheleznyak would receive favorable treatment from the Russian authorities and other benefits. Mr. Zheleznyak rebuffed this attempted shakedown.

39. Evidently seeking to exert more undue pressure, Miroshnikov contemporaneously submitted a letter (on behalf of the DIA) to Victor Voronin, then-head of Directorate K of the FSB (the KGB's successor agency), that contained fabricated allegations of wrongdoing relating to PRBB and asked the criminal authorities to investigate these allegations.

40. That the sole purpose of Miroshnikov's letter was an attempt to exert pressure and extract assets from Messrs. Leontiev and Zheleznyak is made clear by his selection of Voronin, an individual known for exploiting his government position in aid of illicit asset seizure schemes,

11

as its recipient. For instance, Voronin started the chain of events that led to the Hermitage Capital tax fraud and culminated in the death of Sergey Magnitsky. Specifically, Voronin fraudulently initiated the criminal case that resulted in the seizure of corporate documents that Pavlov then used to file his sham lawsuits in the Hermitage Capital tax fraud.

41. When the attempted shakedown did not have its desired effect, Voronin authorized the initiation of a baseless criminal case. On February 17, 2016, one month after the attempted shakedown of Mr. Zheleznyak and the bad faith letter from Miroshnikov to Voronin, and just two months after the Investigative Committee concluded that criminal charges in connection with PRBB's bankruptcy were not warranted, the Russian authorities arrested five former managers of PRBB and charged them with embezzlement. Then, on October 17, 2016, Russian authorities commenced criminal proceedings against Messrs. Leontiev and Zheleznyak *in absentia* based on the same unfounded embezzlement allegations. These false and baseless allegations mirror the manufactured claims that Miroshnikov submitted to Voronin in an attempt to further pressure PRBB's former owners.

42. Victor Grin, the Deputy Prosecutor General overseeing the sham criminal proceedings against former PRBB executives in Russia, is, like Pavlov, on the Magnitsky List and is subject to U.S. sanctions for his involvement in the "cover-up of Magnitsky's killing" and "for opening two posthumous cases against Magnitsky."

**The False Allegations Propagated in the DIA's Bad Faith Litigation in this Court**

43. Minutes from PRBB's April 2017 Creditors' Committee meeting show that, in addition to being retained by the DIA in his capacity as a member of the Quorum law firm, in or around April 2017, Pavlov also was retained personally to oversee the DIA's "initiat[ion of] legal proceedings in foreign jurisdictions," including discovery proceedings "against S. Leontiev in the United States District Court for the Southern District of New York."

12

44. On October 26, 2017, the DIA, aided by Pavlov's law firm Quorum, filed an *ex parte* application pursuant to 28 U.S.C. § 1782 seeking an order from this Court to conduct discovery from Mr. Leontiev, purportedly for use in the PRBB bankruptcy proceeding. In doing so, the DIA deliberately involved this Court in a Russian sham court proceeding that is part of the illegal expropriation of PRBB.

45. In seeking this Court's assistance, the DIA made heavy use of claims put forth by Quorum attorneys, while concealing the crucial involvement of Pavlov, and of falsehoods alleged in the sham Russian criminal proceedings that are overseen by Grin.

46. On multiple occasions, the DIA's brief in support of its application falsely alleges that Mr. Leontiev embezzled or directed the embezzlement of funds from PRBB:

   a) "[Mr.] Leontiev's . . . direction of the embezzlement scheme" (Dkt. 5 at 9);

   b) "[Mr.] Leontiev transferred some of the embezzled funds to Vermenda Holdings and then to . . . Legion Trust" (*id*. at 10);

   c) "funds that [Mr.] Leontiev . . . embezzled out of Probusinessbank" (*id*. at 16);

   d) "the embezzlement scheme perpetrated by [Mr. Leontiev]" (*id*. at 21).

47. The DIA also suggested that evidence supposedly "critically important" to the fabricated allegations about Mr. Leontiev is present in New York: "Leontiev has knowledge and possesses or controls evidence concerning the Bank's demise and the embezzlement scheme perpetrated by him." *Id*.

48. After Mr. Leontiev moved to quash the DIA's subpoena (Dkt. 10), the DIA filed its opposition to Mr. Leontiev's motion on February 20, 2018 (Dkt. 22).

49. In its opposition brief, the DIA once again repeatedly propagated its false and baseless accusation that Mr. Leontiev committed embezzlement:

13

a) "Mr. Leontiev[ ] embezzled hundreds of millions of dollars of assets from the Russian bank he co-owned" (*id*. at 7);

b) "[Mr.] Leontiev embezzled P[R]BB's funds" (*id*. at 19);

c) "[Mr. Leontiev] engaged in a series of transactions to embezzle funds" (*id*. at 29).

50. The DIA has voluntarily come to this Court and made reckless accusations that Mr. Leontiev "embezzled hundreds of millions of dollars" from PRBB in an effort to obtain certain relief from this Court. The DIA squarely put the matter of Mr. Leontiev's supposed embezzlement at issue in this Court and thereby waived any immunity that the DIA might otherwise have had concerning the subject.

51. Mr. Leontiev did not embezzle any funds from PRBB. The truthfulness of the DIA's allegations of embezzlement is the subject of an actual dispute between the parties, which the DIA raised in seeking relief from this Court. This dispute arises out of the same "case or controversy" as the existing § 1782 action.

52. In requesting that this Court grant it the authority to take discovery within the district, the DIA has asserted that information supposedly relevant to its allegation that "assets . . . have been embezzled" is located in this forum. Dkt. 22 at 14-15. The existing proceeding, the presence of relevant evidence, and Mr. Leontiev's residence make this a convenient forum to litigate this dispute.

## CAUSE OF ACTION
### (Declaratory Judgment Pursuant to 28 U.S.C. §§ 2201 and 2202)

53. Mr. Leontiev repeats and realleges each and every allegation contained in Paragraphs 1 through 52 above as if fully set forth herein.

54. This Court has the power to grant declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. A dispute within this Court's jurisdiction exists between the parties concerning the DIA's claim that Mr. Leontiev embezzled or otherwise misappropriated funds from PRBB for personal purposes. A declaratory judgment is necessary and appropriate to resolve this dispute and adjudicate the rights of the parties.

55. The DIA's statements in this action alleging that Mr. Leontiev embezzled or otherwise misappropriated funds from PRBB are false, and the DIA cannot provide any evidence to the contrary.

56. Mr. Leontiev is also entitled to injunctive relief preventing the DIA, or anyone acting in concert with the DIA or at its direction, from taking any further steps to claim that Mr. Leontiev embezzled funds from PRBB. Such relief is necessary to put an end to the campaign of threats, harassment, and injurious falsehoods levelled by the DIA against Mr. Leontiev.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

1. Declare that the DIA's statements in this action alleging that Mr. Leontiev embezzled or otherwise misappropriated funds from PRBB are false;

2. Issue a permanent injunction barring the DIA, or anyone acting in concert with the DIA or at its direction, from taking any further steps to claim that Mr. Leontiev embezzled funds from PRBB;

3. Award Mr. Leontiev his costs and reasonable attorneys' fees as appropriate; and

4.      Grant such further and other relief as this Court deems just and proper.

Dated:  October 11, 2018
           New York, New York

GIBSON, DUNN & CRUTCHER LLP

By: */s/Robert L. Weigel*

    Robert L. Weigel
       rweigel@gibsondunn.com
    Marshall R. King
       mking@gibsondunn.com
    Alison L. Wollin
       awollin@gibsondunn.com

200 Park Avenue
New York, New York 10166
T: (212) 351-4000
F: (212) 351-4035

*Attorneys for Plaintiff Sergey Leontiev*