# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Application of DEPOSIT INSURANCE AGENCY for an order to conduct discovery for use in a foreign proceeding.<br><br>                                      Petitioner. | Case No. 1:17-mc-00414-GBD |

**PETITIONER'S MEMORANDUM OF LAW IN OPPOSITION TO RESPONDENT'S MOTION TO QUASH SUBPOENA ISSUED PURSUANT TO 28 U.S.C. § 1782**

MORRISON COHEN LLP
909 Third Avenue
New York, New York 10022
Telephone:    212-735-8600
Facsimile:    212-735-8708

*Attorneys for Petitioner*
*Deposit Insurance Agency*

# TABLE OF CONTENTS

                                                                                                    Page

TABLE OF AUTHORITIES ....................................................................................................... iii

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL BACKGROUND ........................................................................................................2

      The Deposit Insurance Agency (the "DIA") ......................................................................2

      Probusinessbank ("PBB") ..................................................................................................2

      The Central Bank Appoints a Provisional Administrator for PBB......................................3

      PBB's Earlier Audit Reports Were Wrong ........................................................................4

      PBB's Bank License Revoked ............................................................................................4

      Because PBB Was Insolvent, DIA Was Appointed as Receiver .......................................5

      Leontiev's Fraudulent Scheme ...........................................................................................5

      The DIA Does Not Control the Criminal Proceeding.........................................................7

      The Russian State Did Not Loot PBB.................................................................................7

      Andrey Pavlov ....................................................................................................................8

      This Section 1782 Proceeding .............................................................................................8

      The Information Sought Will be Used in the Bankruptcy Proceeding .................................9

ARGUMENT ................................................................................................................................10

A.     The Requested Discovery Would Not Violate U.S. Sanctions .........................................10

B.     The Requested Discovery Is "For Use" in the Russian Bankruptcy Action.....................12

C.     Discretionary Considerations Do Not Support Quashing the Subpoena ..........................14

      1.     The PBB Bankruptcy Action Is A Lawful and Legitimate
             Proceeding and the Merits of the Specific Issues Being Addressed
             in that Proceeding Are Beyond the Scope of this Court's Role
             on a § 1782 Motion .............................................................................................14

2.      DIA's Application Is Supported by Evidence ......................................15

3.      There Was No Lack of Candor Regarding Prior US Litigation............................16

4.      DIA's Application Is Not an Attempt to Circumvent US or Russian
        Law or Policy ..........................................................................................18

        a.  DIA's Subpoena Does Not Interfere With Any Right against
            Self-Incrimination ..........................................................................18

        b.  The Russian Court Would Be Receptive to the Requested
            Discovery ..........................................................................................19

        c.  The Requested Discovery Is Not a "Fishing Expedition" ..............................21

        d.  The Subpoena Is Not Unduly Burdensome; This Boilerplate
            Defense Should Be Disregarded ........................................................22

D.      Leontiev's Request for Reciprocal Discovery Should Be Denied......................24

CONCLUSION.........................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Allison v. Clos-ette Too, L.L.C.*,
  No. 14 Civ. 1618 (LAK)(JCF), 2015 U.S. Dist LEXIS 2826
  (S.D.N.Y. Jan. 9, 2015)........................................................................................24

*Asset Value Fund, Ltd. Pshp. v. The Care Group, Inc.*,
  No. 97 Civ. 1487 (DLC)(JCF), 1997 U.S. Dist. LEXIS 17968
  (S.D.N.Y. Nov. 12, 1997) ....................................................................................23

*In re Bayer AG*,
  146 F.3d 188 (3d Cir. 1998)..................................................................................19

*Carrion v. For the Issuance of a Subpoena Under 28 U.S.C. § 1782(a)*
  *(In re Republic of Ecuador)*,
  735 F.3d 1179 (10th Cir. 2013) ............................................................................15

*Certain Funds, Accounts And/or Inv. Vehicles Managed by Affiliates of*
  *Fortress Inv. Grp. LLC v. KPMG, L.L.P.*,
  798 F.3d 113 (2d Cir. 2015)..................................................................12, 13, 21

*Consorcio Minero, S.A. v. Renco Grp., Inc.*,
  No. 11 MC 354, 2012 U.S. Dist. LEXIS 44317 (S.D.N.Y. Mar. 28, 2012) ...........25

*Euromepa, S.A. v. R. Esmerian, Inc.*,
  51 F.3d 1095 (2d Cir. 1995)..................................................................................25

*Florentia Contracting Corp. v. Resolution Trust Corp.*,
  No. 92 Civ. 1188 (PKL), 1993 U.S. Dist. LEXIS 5275
  (S.D.N.Y. April 22, 1993)....................................................................................23

*Furstenberg Fin. SAS v. Litai Assets LLC*,
  877 F.3d 1031 (11th Cir. 2017) ............................................................................15

*Gerling Int'l Ins. Co. v. Commissioner*,
  839 F.2d 131 (3d Cir. 1988)..................................................................................23

*In re Imanagement Servs.*,
  No. Misc. 05-09, 2005 U.S. Dist. LEXIS 17025
  (E.D.N.Y. Aug. 16, 2005)....................................................................................20

*Intel Corp. v. Advanced Micro Devices, Inc.*,
  542 U.S. 241 (2004)..................................................................................18, 19, 20

*In re Joint Stock Co. Raiffeinsenbank*,
    No. 16-mc-80203-MEJ, 2016 U.S. Dist. LEXIS 152090
    (N.D. Cal. Nov. 2, 2016) .................................................................................20

*In re Letter Request From Crown Prosecution Serv. of United Kingdom*,
    870 F.2d 686 (D.C. Cir. 1989) ........................................................................12

*Mees v. Buiter*,
    793 F.3d 291 (2d Cir. 2015) ............................................................................24

*Minatec Fin. S.a.r.l. v. SI Grp. Inc.*,
    No. 1:08-CV-269 (LEK/RFT), 2008 U.S. Dist. LEXIS 63802
    (N.D.N.Y. Aug. 18, 2008) ...............................................................................25

*Optimal Inv. Serv., S.A. v. Berlamont (In re An Order Pursuant to*
    *28 U.S.C. § 1782)*,
    773 F.3d 456 (2d Cir. 2014), ..........................................................................13

*In re Porsche Automobil Holding SE*,
    No. 15-mc-417 (LAK), 2016 U.S. Dist. LEXIS 20012
    (S.D.N.Y. Feb. 18, 2016) .................................................................................25

*In re Potanina*,
    No. CV 14-19-BLG-SPW, 2014 U.S. Dist. LEXIS 199075
    (D. Mont. Apr. 15, 2014) ................................................................................20

*Searock v. Stripling*,
    736 F.2d 650 (11th Cir. 1984) ........................................................................23

*SEC v. Credit Bancorp, Ltd.*,
    194 F.R.D. 469 (S.D.N.Y. 2000) ....................................................................23

*In re Shagang*,
    No. 14 Misc. 53-PJ(RWS), 2014 U.S. Dist. LEXIS 59313
    (S.D.N.Y. Apr. 28, 2014) .................................................................................21

*United States v. Glob. Fishing, Inc. (In re Premises Located at*
    *840 140th Ave. NE, Bellevue)*,
    634 F.3d 557 (9th Cir. 2011 ...........................................................................20

*United States v. Sealed 1 (Letter of Request for Legal Assistance from*
    *the Deputy Prosecutor Gen. of the Russian Fed'n)*,
    235 F.3 1200 (9th Cir. 2000) ..........................................................................15

*In re WinNet, RCJSC*,
    No. 16 mc 484 (DLC), 2017 U.S. Dist. LEXIS 56985
    (S.D.N.Y Apr. 13, 2017) ..................................................................................17

*Xitrans Fin. Ltd. v. Adelson (In re Accent Delight Int'l Ltd.)*,
  869 F.3d 121 (2d Cir. 2017)..................................................................................14

**STATUTES**

28 U.S.C. § 1782 ............................................................................................. *passim*

31 CFR 584.201 (a)............................................................................................11

31 CFR 584.206 (b) ...........................................................................................11

Criminal Code of the Russian Federation, Article 160.4 ...................................7

Fed. R. Civ. P. 45 .............................................................................................23

**OTHER AUTHORITIES**

S. Rep. No. 1580, 88th Cong., 2d Sess.,
  Reprinted in 1964 U.S. Code Cong. and Admin. News 3782 .................................18

United States Sanctions Human Rights Abusers and Corrupt Actors Across the
  Globe (Dec. 21, 2017) https://home.treasury.gov/news/press-releases/sm0243 ..............11, 12

v

## PRELIMINARY STATEMENT

In an ironic twist worthy of O. Henry, Russian oligarch and fraudster Sergey Leontiev, who embezzled hundreds of millions of dollars of assets from the Russian bank he co-owned, leaving approximately 8,000 creditors with unpaid claims of approximately 84 billion rubles (1.68 Billion US Dollars), argues that he should not have to produce documents or give testimony concerning his fraudulent financial transactions because Russia is corrupt. Leontiev attempts to use a host of other bad acts (whether real, merely alleged, or simply imagined) by a host of other Russian entities involving a host of unrelated transactions and unrelated alleged transgressions to distract from his own wrongdoing. This Court must not let him succeed.

Petitioner in this action seeks only discovery from Leontiev, who as a fugitive from justice in his home country has chosen to hide out while living the high life in New York City. Nevertheless Leontiev recoils from Petitioner's efforts to seek discovery from him as though this action were instead seeking his extradition. Leontiev throws up every argument he can muster – no matter how frivolous – in a desperate attempt to hide from Petitioner's subpoena. Because none of his arguments have merit, his motion to quash must be denied.

Leontiev's argument that compliance with the subpoena would violate United States law because Petitioner's former Russian litigation attorney is subject to certain United States sanctions on his assets would be amusing if the argument was not also entirely frivolous and deceptive. Leontiev also argues that the requested discovery is not intended for use in the Russian Bankruptcy action, but that argument is demonstrably false. Leontiev is also wrong in his arguments that the Bankruptcy proceeding is a sham and that the allegations against him are not supported by competent evidence. Moreover, Leontiev also cannot show that the requested discovery would somehow circumvent the laws of the United States or Russia or that the

requested discovery is in any way overly burdensome or improperly intrusive.

Petitioner merely seeks documents and testimony to assist it with learning the truth of what happened to the assets of Probusinessbank and to assist Petitioner in its attempt to offset the injuries done to the thousands of creditors left holding the bag when the bank failed and Leontiev himself skipped town.   Leontiev's motion to quash Petitioner's subpoena should be denied.

## FACTUAL BACKGROUND

### The Deposit Insurance Agency (the "DIA")

The Russian Federation's State Corporation "Deposit Insurance Agency" (the "DIA"), the Petitioner in this proceeding, is akin to the Federal Deposit Insurance Corporation ("FDIC") in the United States.   When a Russian bank is insolvent and a bankruptcy proceeding is commenced, the DIA is required to participate in the bankruptcy proceeding.   The DIA's role is not discretionary. The DIA does not target banks or individuals based on political or other motivations.   When a bank has failed, the DIA is required to investigate potentially fraudulent transactions of the failed bank and to file motions in the bankruptcy proceeding to undo any fraudulent transactions that may be uncovered.   The DIA uses its best efforts to locate, marshal and obtain assets of the estate that can be used to satisfy creditor claims.  The DIA is expected to investigate and to obtain records as part of this process.  (Declaration of Maksim Khamchich, dated February 19, 2018 ("MK Decl.") ¶ 9; Declaration of Anastasia Zhidchenko, dated February 14, 2018 ("AZ Decl.") ¶ 43).

### Probusinessbank ("PBB")

Leontiev founded Probusinessbank ("PBB"), a Russian bank, in 1993.   PBB owned numerous other banks, and they were organized under the broad financial group "Life" in 2003. (Docket Entry ("DE") 13, Leontiev Dec. ¶¶ 2, 5).   Leontiev was the president of PBB, and

Alexander Zheleznyak was Chairman of the Board.  (DE 4, Diachenko Decl. ¶ 15.)   Leontiev was the largest shareholder of PBB.  Zheleznyak was a minority shareholder.  Together, they owned a controlling interest in PBB through a company in Cyprus named Alivikt Holdings Limited.  (*Id*.)

**The Central Bank Appoints a Provisional Administrator for PBB**

On August 7, 2015, The Central Bank of the Russian Federation (the "Central Bank") appointed a provisional administrator over PBB. Prior to that, the Central Bank had repeatedly ordered PBB to rectify certain violations of regulatory restrictions governing security transactions and violations of depository regulations with respect to certain securities that PBB held that were registered with entities not resident in the Russian Federation. PBB failed to comply with the Central Bank's orders, and as a result, the Central Bank appointed a provisional administrator for PBB. The provisional administrator was tasked with examining PBB's financial standing and the existence of quality of its assets. (KM Decl. ¶ 13; AZ Decl. ¶ 12).

The provisional administrator, pursuant to its duties and authority, performed an examination of PBB and found that PBB had many problem assets.  Specifically, the provisional administrator discovered that PBB had engaged in a policy of high-risk transactions through placing PBB's funds into low quality/high risk assets.  PBB's assets had been placed into foreign depositories and had been pledged to, and were eventually withdrawn by, third parties, to the financial detriment of PBB and PBB's creditors.  (KM Decl. ¶¶ 13-14).

The provisional administrator found that PBB had pledged at least 266 million United States dollars worth of PBB's securities to a depository (Otkritie Capital International Limited) as guarantor to secure obligations of a third party entity: Ambika Investments Limited company. The provisional administrator also found that PBB had pledged at least 360,000 United States

dollars worth of certain of its securities to another depository (BROCERCREDITSERVICE
(CYPRUS) LIMITED) as guarantor to secure obligations of Merrianol Investments Limited
company, another third party company. Both of these secured parties exercised their rights and
seized the PBB securities that were pledged as collateral to secure the guarantees. (KM Decl. ¶
15; AZ Decl. ¶¶ 13-14).

The provisional administrator also uncovered the existence of other fraudulent
transactions by PBB performed through distribution of funds among credit institutions and
companies of the LIFE group and through substantial loans in favor of sham companies. (KM
Decl. ¶ 17).

### PBB's Earlier Audit Reports Were Wrong

Senior management of PBB carefully hid the fact that a significant portion of PBB's
assets were not owned free and clear by PBB but instead had been pledged as collateral to the
foreign depositaries. These secret pledges were not disclosed to PBB's auditor, Delloite and
Touche CIS, nor to bank regulators. For this reason, PBB's audit reports and the 2015
notifications of the Central Bank regarding PBB were based on unreliable and incomplete
reporting and did not reflect the true financial standing of PBB. (KM Decl. ¶ 16; AZ Decl. ¶ 16).

### PBB's Bank License Revoked

Taking into account PBB's repeated failure to comply with prescriptive orders of the
Central Bank, PBB's violation of banking regulations (including capital adequacy ratios), and
PBB's significant and undisclosed loss of assets, the Central Bank revoked PBB's license on
August 12, 2015. (KM Decl. ¶ 18; AZ Decl. ¶ 33).

Although Russian law provides the owners of banks the right to appeal the appointment
of provisional administration or the revocation of a bank's license, and although there are

procedures in place permitting challenges and appeals of Bankruptcy court orders, Leontiev chose not to avail himself of such procedures. Neither Leontiev nor anyone else appealed the revocation of PBB's license or otherwise contended, as Leontiev does now, that PBB was actually solvent. (KM Decl. ¶ 19; AZ Decl. ¶ 18).

**Because PBB Was Insolvent, DIA Was Appointed as Receiver**

PBB's assets were insufficient to satisfy PBB's creditors' claims. As of the date that PBB's license was revoked, PBB had assets equal to RUB 86,910,244,000, but its liabilities to creditors were equal to RUB 127,751,905,000. In other words, PBB's liabilities exceeded its assets by RUB 40,841,661,000. (KM Decl. ¶ 20). As a result, the Central Bank, following established procedures, applied to the Commercial Arbitrazh Court of Moscow and the court issued an order on October 28, 2015 acknowledging PBB's insolvency, initiating the receivership procedure as to PBB Bank, and assigning the functions of Bankruptcy Manager to DIA. (*Id*.)

All activities performed by DIA as the Bankruptcy manager are done for the purpose of attempting to increase the bankruptcy estate and to satisfy PBB's creditors' claims in full. The total number of creditors is 7968 with liabilities totaling 84,244,182,834 rubles 29 kopecks. (KM Decl. ¶ 24). The bankruptcy proceeding is still open. As Bankruptcy Manager, the DIA is charged with, among other things, responsibility for obtaining documents concerning claims of PBB's creditors, assessing PBB's property, investigating and contesting suspicious transactions, searching for PBB's assets, and enforcing PBB's property rights. (*Id*. ¶ 9; Declaration of Peter Maggs, dated February 16, 2018 ("PM Decl.") ¶ 21.)

**Leontiev's Fraudulent Scheme**

A criminal case was initiated against former managers and employees of PBB for

embezzlement through appropriation and misappropriation of funds "on an especially large scale" during 2014 and 2015. Subordinate employees of PBB and Life Financial Group provided detailed evidence to the Russian authorities of Leontiev's and Zheleznyah's direction of the embezzlement scheme. (AZ Decl. ¶ 27-29, 19 and exs. 12-14.)

Former PBB employees N. V. Alekseev and M. M. Krylova have voluntarily given detailed statements detailing Leontiev's fraudulent and illegal actions. Their testimony paints a very different picture of PBB than the one painted by Leontiev. (*Id.* and ¶ 32).

According to Alekseev and Krylova, PBB was faced with problems after the Russian Financial Crisis of 1998. Initially PBB covered its difficulties by transferring its problem credit portfolio to LIFE Debt Collection Agency (LLC) with the purpose of avoiding the establishment of obligatory reserves for possible losses. Subsequently, PBB's management decided to create a number of companies under the control of the management group – called "carousel", and these companies were intended to cover a hole in a balance sheet. (AZ Decl. ¶ 32).

PBB's problems, however, were increasing at an exponential rate. New business directions financed by PBB were not profitable and brought losses, and Leontiev stripped PBB of assets, which he then used for personal purposes. The accounts of the sham companies were used for misappropriation of assets on a grand scale. At the same time, PBB issued sham credits. (*Id.*). According to accomplices, PBB would knowingly provide unsecured, non-performing "loans" to sham companies that do not actually conduct any business and that are controlled by Leontiev and Zhelesnyak. The sham companies then transferred the loaned funds to other accounts controlled by Leontiev and Zheleznyak at PBB. The embezzled funds were then converted to dollars and transferred to the Latvian account of Vermenda Holdings Limited ("Vermenda"), a company Leontiev controls with an address in Cyprus. From there, the

perpetrators, directed by Leontiev and Zheleznyak, transferred the embezzled funds elsewhere. (DE 4, Diachenko Decl. ¶ 23.)

A number of testifying witnesses questioned in the criminal investigation implicated Leontiev as the person who directly gave the orders to perform the activities aimed at stripping the assets of PBB. (AZ Decl. ¶ 32).

## The DIA Does Not Control the Criminal Proceeding

Russian Federation statutes require that investigative bodies independently lead criminal investigations and independently decide whether to commence an investigative or procedural activity. For that reason, Leontiev's suggestion that the DIA somehow improperly influenced the investigation or improperly caused the prosecution is without any basis in fact.[1] (AZ Decl. ¶ 31).

## The Russian State Did Not Loot PBB

Leontiev asserts that "[i]n the aftermath of PBB's unwarranted seizure, the Russian state began to loot the Bank's assets …." (Resp. Br. at 4). But no such looting took place. Leontiev references a 604 million ruble payment to a DIA subsidiary bank, the Russian Capital Bank. (Resp. Br. at 4). But that payment was made by mistake, due to the improper setting up of a register of payments by PBB employees. When the mistake was discovered, DIA requested the return of the funds, and the funds were in fact returned to the PBB. Thus, the error did not harm PBB's creditors. (AZ Decl. ¶ 20).

---

[1]    Leontiev is partially correct that initially (on December 1, 2015) the investigative body issued a decree refusing to initiate the criminal case. (Resp. Br. at 8). But that refusal to initiate the criminal case was because there had been insufficient time to study the evidence regarding the dubious transactions involving PBB. In January 2016, it was confirmed that the decree had been issued preliminarily without review of all of the evidence and without the implementation of necessary procedures. The criminal case was then initiated under a Decree dated February 17, 2016, based on the results of a proper procedural examination following receipt of reports from the Central Bank, DIA, and FSB (Russian Federal Security Service). (AZ Decl. ¶ 26-27).

Through the criminal investigation, the investigative body found grounds for charging Leontiev with a crime pursuant to article 160.4 of the Criminal Code of the Russian Federation (Misappropriation or embezzlement, that is, the stealing of other people's property entrusted to the convicted person, by an organized group or on an especially large scale). (AZ Decl. ¶ 28).

Leontiev also notes that "a significant portion of PBB's assets" were transferred to "Binbank (a.k.a. B&N Bank), a well-connected Kremlin favorite." (Resp. Br. at 4). But that was an approved transfer in accordance with established procedure for DIA's settling of PBB's liabilities. When DIA transferred the assets to BINBANK (PJSC), BINBANK also got the equivalent liabilities of PBB to PBB's creditors. BINBANK (PJSC) accepted all liabilities to individuals (first-category creditors) in the amount exceeding RUB 24 billion, as well as part of PBB's property (funds, receivables, securities, real estate items). The property was evaluated in equal proportion to the amount of liabilities (the assessment was performed on a basis of balance sheet assets). (AZ Decl. ¶ 41).

**Andrey Pavlov**

Quorum, a well-known Russian law firm specializing in dispute resolution, represents the DIA in connection with this matter. Mr. Andrey Pavlov, advocate, member of Moscow bar, was formerly the Chairman of Quorum and one of its partners. He also worked in a limited capacity on this matter. (AZ Decl. ¶ 7-8). After it became known, however, that Mr. Pavlov had been added to the Special Designated Nationals (SDN List) by the United States Treasury Department on December 20, 2017, Mr. Pavlov made the decision to quit the firm. Mr. Pavlov is no longer Charmain of Quorum, and he is no longer a partner in the firm. (AZ Decl. ¶ 7).

**This Section 1782 Proceeding**

The DIA instituted this Proceeding to obtain needed discovery from Leontiev. The documents and testimony sought would greatly assist the DIA in its efforts to maximize recovery for those depositors and creditors of PBB who have suffered. The information that the DIA seeks from Leontiev here is necessary for the DIA to fulfill its duties. Co-conspirators of Leontiev have provided witness statements containing the names of the entities through which

assets were siphoned from PBB. The DIA seeks documents concerning the transactions conducted by these entities in order to trace PBB's assets. This process is not unique to either Leontiev or to PBB. The DIA routinely investigates and obtains documents necessary to trace and recover assets that have been embezzled or illegally siphoned from failed banks. In this case, the individual most likely to have control of this information – Leontiev – has absconded to the United States, so DIA is using the United States procedure for obtaining this information from Leontiev now that he resides in the U.S. (KM Decl. ¶ 10; AZ Decl. ¶ 22). The DIA has specific questions about numerous dubious transactions undertaken by PBB shortly before its bankruptcy. Leontiev's reluctance to cooperate creates grounds for reasonable suspicion that he is withholding information deliberately. (AZ Decl. ¶ 34).

About 8000 creditors and claims worth over 84 billion rubles are listed on PBB's register of creditors' claims. (KM Decl. ¶ 24). As of now, most of the creditors' claims have not been repaid due to the insufficiency of PBB's assets. These claims were brought by various companies, including small enterprises. Creditors lost their savings and assets because of the PBB bankruptcy, and these losses sometimes threatened their very existence. The DIA is acting for the benefit of PBB's creditors, and not for its own gain or for the gain of any third parties. (AZ Decl. ¶ 34).

The Discovery requests are geared to the framework of the PBB insolvency case and are aimed at tracing and securing assets and avoiding harm to PBB's creditors. (AZ Decl. ¶ 53).

**The Information Sought Will be Used in the Bankruptcy Proceeding**

The court presiding over the Russian Bankruptcy Proceeding will accept and consider both documents and sworn testimony that the DIA obtains in this proceeding concerning these transactions. (AZ Decl. ¶ 46-51). Moreover, under Russian law, evidence can be obtained in

accordance with the provisions of the procedural law of the jurisdiction within which the evidence is sought. Therefore, discovery obtained from Leontiev pursuant to 28 U.S.C. §1782 will be qualified as admissible evidence in the Russian bankruptcy proceeding against PBB. (AZ Decl. ¶ 54).

## ARGUMENT

### A.    The Requested Discovery Would Not Violate U.S. Sanctions

Leontiev argues that the DIA's subpoena should be quashed because allowing the DIA to obtain discovery from Mr. Leontiev would violate the Magnitsky Act and the Office of Foreign Asset Control's Specially Designated Nationals and Blocked Persons List. (Resp. Br. at 10). But the DIA's subpoena in no way implicates any U.S. sanctions, and Leontiev's argument that it does is entirely frivolous.

Leontiev argues that the DIA's subpoena would violate U.S. sanctions because it would somehow benefit sanctioned Russian attorney Andrey Pavlov, who was formerly a partner in Quorum, the law firm representing the DIA in connection with the PBB bankruptcy. (Resp. Br. at 10). Pavlov was added to the Magnitsky List on December 20, 2017 because he allegedly provided legal services for two allegedly illegally re-registered Hermitage Fund subsidiaries. Pavlov subsequently resigned from Quorum, and Mr. Pavlov no longer represents the DIA in connection with the PBB bankruptcy. (AZ Decl. ¶¶ 7-8). Thus, the entire premise of Leontiev's U.S. sanctions argument is false.

Moreover, even if Mr. Pavlov were still acting as counsel to the DIA in the PBB Bankruptcy, the DIA's requested discovery would still not violate U.S. sanctions. Leontiev misrepresents the nature of the sanctions as "broadly prohibit[ing] transactions 'in *all property* or interests in property.'" (Resp. Br. at 10) (emphasis added). But contrary to Leontiev's

misrepresentation, the sanctions do not apply to "all property."   The purpose of the sanctions is to keep "bad actors out of the U.S. financial system"[2], and thus, the sanctions apply to the *United States* property *of a sanctioned person*.  *See* 31 CFR 584.201 (a).  The sanctions would prohibit the transfer of property owned by Mr. Pavlov that is in the United States.  *See id*.  But the subpoena at issue here, of course, does not seek anything from Mr. Pavlov.  It seeks information from Leontiev, and Leontiev is not under United States sanctions.  Those sanctions, therefore, do not apply to Leontiev's property, and they do not bar enforcement of the DIA's subpoena.

The sanctions also do not apply here for the additional reason that the subpoena does not compel anyone to transfer *property*.  Rather, the DIA seeks only *information* from Leontiev – in the form of testimony and copies of documents.  And "information and informational materials" are expressly exempt from the sanctions.  *See* 31 CFR 584.206 (b) ("The prohibitions contained in this part do not apply to the importation from any country and the exportation to any country of any information or informational materials ….").

Leontiev also argues – citing no authority – that requiring Leontiev to comply with the DIA's discovery requests would constitute a prohibited provision of benefits to Pavlov because the information might assist the DIA in recovering assets for PBB's shareholders and creditors and Pavlov might then be entitled to certain financial benefits from DIA.  (Resp. Br. at 12).  Leontiev cites no authority for this proposition because it has no support in law.   The sanctions do not prohibit the DIA – which, obviously, is not a United States person – from transacting business with Pavlov in Russia.  And nothing in the sanctions prohibits Leontiev from providing information to the DIA that might assist in an asset recovery that might result in the DIA giving a financial benefit to Pavlov.

---

[2] United States Sanctions Human Rights Abusers and Corrupt Actors Across the Globe (Dec. 21, 2017) https://home.treasury.gov/news/press-releases/sm0243 (last visited February 19, 2018).

The purpose of the sanctions was to take a "strong stand against human rights abuse and corruption globally by shutting [certain suspected] bad actors out of the U.S. financial system."[3] It is sadly ironic that Leontiev has tried to deceptively use those sanctions to improperly shield the suspected evidence of his own alleged corruption. This Court should reject such chicanery.

**B.**     **The Requested Discovery Is "For Use" in the Russian Bankruptcy Action**

Leontiev argues that the "DIA cannot demonstrate, as it must under Section 1782, that the discovery it seeks is intended 'for use' in the Russian Bankruptcy Action rather than for some other purpose.'" (Resp. Br. at 12). But there is no merit to that argument. As explained in the Declaration of Khamchich Maksim Aleksandrovich, the DIA's subpoena is intended to obtain information "for use' in the Russian Bankruptcy proceeding. As Bankruptcy Manager, the DIA is a party to the Bankruptcy Proceeding. Moreover, the DIA has every expectation that the court presiding over the Russian Bankruptcy Proceeding will accept and consider both documents and sworn testimony that DIA obtains from Leontiev in this proceeding. (*See* AZ Decl. ¶ 46-51, 54; PM Decl. ¶ 24.)

Leontiev's suggestion that the DIA must show something more than that is not correct and is not supported by the cases upon which Leontiev relies. Leontiev cites *In re Letter Request From Crown Prosecution Serv. of United Kingdom*, 870 F.2d 686, 691 (D.C. Cir. 1989) and *Certain Funds, Accounts And/or Inv. Vehicles Managed by Affiliates of Fortress Inv. Grp. LLC v. KPMG, L.L.P.*, 798 F.3d 113 (2d Cir. 2015). In *In re Letter Request*, the court held that discovery pursuant to § 1782 can proceed even when no foreign action is pending so long as there are "reliable indications of the likelihood that proceedings will be instituted within a reasonable time." 870 F.2d at 692. Here, the action has already been instituted. In *Certain*

---

[3]     United States Sanctions Human Rights Abusers and Corrupt Actors Across the Globe (Dec. 21, 2017) https://home.treasury.gov/news/press-releases/sm0243 (last visited February 19, 2018).

*Funds*, the court held that the discovery sought was not "for use in a proceeding in a foreign or international tribunal" because the petitioner was not a party to, and had no way to introduce evidence in, the one pending proceeding and the so-called "planned" proceedings were not even "within reasonable contemplation." 798 F.3d at 121-24. Here, the DIA is a party in the Bankruptcy Proceeding, and it is not just contemplated – it is currently pending.

Leontiev argues that the scope of the DIA's discovery requests "go far beyond the scope of PBB's businesses and transactions, and seek information about Mr. Leontiev's personal financial transactions and assets." (Resp. Br. at 12). That suggests, according to Leontiev, that the DIA is seeking discovery for something other than the PBB Bankruptcy Proceeding because "the DIA, as receiver, only has the authority to seek information to challenge transactions where PBB was itself a participant or that were made at the expense of PBB." But Leontiev's premise is wrong. Evidence indicates that Leontiev embezzled PBB's funds through a series of fraudulent conveyances involving puppet entities that he controlled. Thus, information about those transactions is highly relevant to PBB and highly relevant to the DIA's task to determine what became of PBB's holdings. Moreover, that evidence is not in the existing PBB files, which is why the DIA needs the requested discovery notwithstanding its control of PBB as receiver.

Leontiev also argues that the subpoena should be quashed because of the possibility that the discovery might later be used for the "purpose of pursuing baseless criminal charges against Mr. Leontiev." (Resp. Br. at 13). Mr. Leontiev is, of course, wrong to suggest that it would be an abuse of 28 U.S.C. § 1782 to use discovery obtained pursuant to § 1782 in connection with a criminal proceeding. To the contrary, the statute expressly contemplates that discovery can be obtained pursuant to § 1782 for use in a criminal proceedings. *See, e.g.*, *Optimal Inv. Serv., S.A. v. Berlamont* (*In re An Order Pursuant to 28 U.S.C. § 1782*), 773 F.3d 456, 462 (2d Cir. 2014),

(holding that discovery was available to "a Swiss criminal complainant" who sought the production of documents "to provide to a Swiss investigating magistrate overseeing a criminal inquiry related to a Bernard Madoff 'feeder fund' in Switzerland," because that is "exactly the type of proceeding" that § 1782 is "intended to reach."); *Xitrans Fin. Ltd. v. Adelson (In re Accent Delight Int'l Ltd.)*, 869 F.3d 121, 128-35 (2d Cir. 2017) (noting that § 1782 explicitly permits district courts to grant discovery in aid of criminal proceedings including "criminal investigations conducted before formal accusation" and granting § 1782 discovery where criminal complainant made showing that the materials were "for use" in investigation of fraud claims).

Here, however, the DIA is a Bankruptcy administrator – not a prosecutor – and the documents being sought are for use in the Bankruptcy proceeding. The fact that evidence of criminal wrongdoing may later be used by prosecutors against the persons whom those documents implicate in that criminal wrongdoing provides no basis upon which to block the DIA from seeking discovery for use in the Bankruptcy proceeding.

Leontiev's arguments about whether he will receive due process or a fair trial in criminal proceedings against him are not relevant to this motion nor are they ripe for adjudication. This is merely a proceeding seeking discovery for a civil bankruptcy proceeding. This is not an extradition proceeding.

## C.  Discretionary Considerations Do Not Support Quashing the Subpoena

### 1.  The PBB Bankruptcy Action Is A Lawful and Legitimate Proceeding and the Merits of the Specific Issues Being Addressed in that Proceeding Are Beyond the Scope of this Court's Role on a § 1782 Motion

Leontiev argues that this Court should quash the DIA's subpoena because he believes that the bankruptcy proceeding is "politically motivated" and "illegitimate." (Resp. Br. at 15).

Leontiev argues that the Bankruptcy was orchestrated, citing as proof PBB's "clean audit positions issued by Deloitte" and the Central Bank's own statements in advance of the appointment of a receiver for PBB.  (Resp. Br. at 15).  But the clean audit and the Central Bank's statements are explained by the nature of the alleged fraud.  Leontiev made it appear that PBB was solvent when it was not. (*See* AZ Decl. ¶ 33.)  The Russian bankruptcy proceeding is conducted pursuant to an established set of statutes.  (*See* PM Decl. ¶ 21.)  The banking regulations that PBB violated resulted from the Russian Federation's establishment of stricter regulations to conform to international standards.  (*See* PM Decl. ¶ 31, 34.)

Moreover, the merits of the underlying proceeding are not before this Court and have no relevance to determining the § 1782 application.  *See Furstenberg Fin. SAS v. Litai Assets LLC*, 877 F.3d 1031, 1034 n.6 (11th Cir. 2017) (rejecting argument that raised issue of standing to file a criminal complaint along with a claim for civil damages under Luxembourg law because issue went to "the merits, which are not before this Court in a § 1782 proceeding"); *Carrion v. For the Issuance of a Subpoena Under 28 U.S.C. § 1782(a) (In re Republic of Ecuador)*, 735 F.3d 1179, 1182 (10th Cir. 2013) (noting that "in a § 1782 proceeding, there is nothing to be done 'on the merits'" because the "only issue before the district court is discovery" and "the underlying litigation rests before a foreign tribunal.").

Leontiev relies on *United States v. Sealed 1 (Letter of Request for Legal Assistance from the Deputy Prosecutor Gen. of the Russian Fed'n)*, 235 F.3 1200, 1205 (9th Cir. 2000)  But Leontiev's reliance is misplaced.  The Court in that case affirmed the granting of § 1782 discovery to the Russian Federation.  *Id*. at 1206.

**2.    <u>DIA's Application Is Supported by Evidence</u>**

Leontiev argues that the Court should quash the DIA's subpoena because DIA's

application seeking § 1782 discovery was premised on false and unsupported allegations. (Resp. Br. at 15-16). But Leontiev is not correct. The DIA's allegations were made in good faith and are supported by evidence. While Ms. Dianchenko is an attorney, her knowledge of the alleged fraud comes from her review of the underlying documents and interviews of Leontiev's co-conspirators. The DIA has also supplied Witness Statements from Mr. Leontiev's co-conspirators who have direct knowledge of the alleged fraud. (*See* AZ Exs. 13-14.)

Leontiev then dives into the merits of the underlying Bankruptcy case full bore – asserting that alleged "sham companies" had real value. (Resp. Br. at 16-18). But again, such issues are not before this Court.

### 3. There Was No Lack of Candor Regarding Prior US Litigation

Leontiev argues that the DIA's subpoena should be quashed because the DIA's application to take § 1782 discovery omitted key facts about recent United States lawsuits involving Mr. Leontiev. But there is no merit to that argument. The only reason that the DIA referenced those actions in its application at all was to demonstrate that Leontiev was in fact present in New York and that he had even actively availed himself of New York courts. That the federal action was resolved with the defendant in that case – an alleged creditor of Leontiev's – consenting to the entry of summary judgment against the defendant in his personal capacity is not material to this proceeding. Nor is it relevant that the parallel state court proceedings were dismissed apparently on *res judicata* grounds. The DIA was not a party to those cases. Nor does Leontiev argue that the DIA is in privity with the parties in those cases. Instead, Leontiev only asserts that "Russian authorities often operate through proxies who, despite having no official title, pursue their objectives abroad." (Resp. Br. at 19).

Nothing in the way either of those actions was resolved implicates the legitimacy of the

PBB Bankruptcy proceeding or has any bearing on the question of whether Leontiev has control of documents and information material and relevant to that Bankruptcy proceeding. Indeed, only the federal action was resolved with a substantive decision. The state court action was dismissed on procedural grounds, and the court did not reach the merits of any of the claims. And the decision resolving the federal action, was entered on consent, consisted of only a few sentences, and held only that "Sergey Leontiev owes no debt or obligation to defendant Alexander Varshavsky in the defendant's personal capacity with respect to the loans and other debt instruments described in paragraph 32 of the complaint in this case …." *See Leonitev v. Varshavsky,* Case No. 16-cv-03595 (JSR), DE 70.

Nor is it material that there was a protective order in place in the Federal action. If Leontiev believes that something in that order bars him from responding to the DIA's subpoena, it was incumbent upon Leontiev to make that specific argument. His vague references to the protective order are devoid of content and are unavailing. Moreover, Leontiev's argument that refusing to quash the DIA's subpoena would "reward individuals and entities affiliated with the Russian government for taking a third bite at the apple" (Resp. Br. at 19) is absurd. This proceeding is the DIA's first bite. That Leontiev has previously litigated with other Russian individuals or entities provides no basis for denying the DIA's motion. The PBB Bankruptcy has not been previously litigated in this Court or anywhere else. The PBB Bankruptcy Proceeding is pending in Russia, and it is for that proceeding that the DIA seeks discovery.

Nor do the cases upon which Leontiev relies support his argument that the DIA's subpoena here should be quashed. In *In re WinNet*, RCJSC, No. 16 mc 484 (DLC), 2017 U.S. Dist. LEXIS 56985 (S.D.N.Y Apr. 13, 2017), for example, the court found that the petitioner had not adequately explained an adverse decision against it in Russian courts and had failed to point

out that its primary theory of liability had already been rejected by the Russian trial and appellate courts. Nothing like that has happened here. The outcomes in the litigations between Leontiev and another private individual concerning the dealings between them has no bearing whatsoever on the issues being adjudicated in the PBB Bankruptcy proceeding.

4.      **DIA's Application Is Not an Attempt to Circumvent US or Russian Law or Policy**

Leontiev makes an assortment of arguments that the DIA's efforts to obtain discovery here are an improper attempt to circumvent US or Russian law or policy. (Resp. Br. at 20). But none of those arguments are availing.

### a. DIA's Subpoena Does Not Interfere With Any Right against Self-Incrimination

Leontiev argues that, by requesting discovery from him, the DIA is abrogating Leontiev's right against self-incrimination under the Russian Constitution and other applicable Russian law. But Leontiev's argument is meritless. Section 1782 allows a foreign witness in U.S. proceedings to invoke privileges available under foreign law. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 260 (2004)*; see also* S. Rep. No. 1580, 88th Cong., 2d Sess., reprinted in 1964 U.S. Code Cong. and Admin. News 3782, 3790 (Sec. 1782 "provides for the recognition of all privileges to which the person may be entitled, including privileges recognized by foreign law"). The DIA's subpoena is not an effort to abrogate the right against self-incrimination, and Leontiev's unsupported suggestion that it is such is no basis upon which to quash the subpoena.

The question of the applicability and extent of any right against self-incrimination possessed by Mr. Leontiev is not yet ripe. The DIA's subpoena by itself does nothing to negate any right against self-incrimination. The subpoena merely compels Mr. Leontiev to produce documents and to appear for a deposition. If Mr. Leontiev chooses to assert a right against self-incrimination in response to some or all questions asked of him at the deposition, the issue of his

right against self-incrimination would be properly addressed in a subsequent motion to compel – should the DIA choose to make such a motion.  Notably, Leontiev does not even assert that he expects or intends to assert his Fifth Amendment (or equivalent Russian) rights if he is deposed in this proceeding.  The ramifications and implications of such an occurrence need not be addressed until such time – if ever – that it actually occurs.

### b. The Russian Court Would Be Receptive to the Requested Discovery

Leontiev argues that the DIA's subpoena should be quashed because "such discovery would be prohibited if the DIA were to try to obtain it from a Russian court."  (Resp. Br. at 21).  But that is not a persuasive reason to bar the discovery the DIA seeks here.  The Supreme Court has expressly held that Section 1782 permits district courts to order discovery even where such discovery would not be available under the foreign court's rules if the discoverable information were located in the foreign jurisdiction.  *See Intel Corp.*, 542 U.S. at 260 ("nothing in the text of § 1782 limits a district court's production-order authority to materials that could be discovered in the foreign jurisdiction if the materials were located there.").  Moreover, the DIA would have access in Russia to discovery from Leontiev (if he had not absconded to the United States) by virtue of PBB's status as a crime victim.  (*See* PM Declaration ¶ 19; AZ Decl. ¶ 54.)

Thus, the fact that, under Russian procedures, the DIA would not have access to third-party discovery outside Russian does not mean that permitting the DIA's requested discovery here is inconsistent with Russian law and policy.  As the Supreme Court observed in *Intel Corp.*, "'[t]here is no reason to assume that because a country has not adopted a particular discovery procedure, it would take offense at its use.'"  542 U.S. at 261 (citing *In re Bayer AG*, 146 F.3d 188, 194 (3d Cir. 1998)).  Indeed, as the Supreme Court has held, denying discovery on that basis would be "senseless":

> When the foreign tribunal would readily accept relevant
> information discovered in the United States, application of a
> foreign discoverability rule would be senseless. The rule in that
> situation would serve only to thwart § 1782(a)'s objective to assist
> foreign tribunals in obtaining relevant information that the
> tribunals may find useful but, for reasons having no bearing on
> international comity, they cannot obtain under their own laws.

542 U.S. at 262.

Here, of course, the Russian Court is likely to be receptive to the requested discovery: Russian courts have few requirements or formalities regarding the admission of relevant evidence. The court will accept both documents and sworn testimony. Thus, any information obtained pursuant to the DIA's Application before this Court can therefore be used in the Russian Bankruptcy Proceeding. (*See* PM Decl. 24; *see also* DE 4, Diachenko Decl. ¶¶ 47-49.)

That this is so is also supported by the fact that other United States district courts have noted that the Russian court system is receptive to discovery obtained in the United States under Section 1782. *See In re Potanina*, No. CV 14-19-BLG-SPW, 2014 U.S. Dist. LEXIS 199075, at *13 (D. Mont. Apr. 15, 2014) (denying motion to quash subpoena in § 1782 proceeding in part because "Russian courts are generally receptive to receiving discovery obtained through § 1782(a)"); *United States v. Glob. Fishing, Inc. (In re Premises Located at 840 140th Ave. NE, Bellevue)*, 634 F.3d 557, 569 (9th Cir. 2011) (noting that the "§ 1782 process has always been available to the Russian government"); *In re Joint Stock Co. Raiffeisenbank*, No. 16-mc-80203-MEJ, 2016 U.S. Dist. LEXIS 152090, at *17 (N.D. Cal. Nov. 2, 2016) ("Given the lack of authoritative evidence that the Arbitrazh Courts would be unreceptive to discovery from the United States, combined with the presence of case law that Russia may actually be receptive to such discovery, the Court finds this factor weighs in favor of § 1782 discovery.") (citations omitted); *see also In re Imanagement Servs.*, No. Misc. 05-09, 2005 U.S. Dist. LEXIS 17025, at

*18 (E.D.N.Y. Aug. 16, 2005) (granting 1782 application where petitioner sought to obtain discovery for use in Russian court and noting that "resort to § 1782 may be the only avenue by which [petitioner] can obtain the discovery it seeks.").

### c. The Requested Discovery Is Not a "Fishing Expedition"

Leontiev argues that the DIA's subpoena should be quashed because he believes it to be "an improper fishing expedition designed to obtain information about [his] personal financial transactions and assets." (Resp. Br. at 22). Again, Leontiev is wrong. The DIA's subpoena is not a "fishing expedition" because the DIA is seeking specific documents and testimony that is relevant to the ongoing Russian Bankruptcy proceeding. In contrast, in *In re Certain Funds*, upon which Leontiev relies, the court worried that the requested discovery was "a mere fishing expedition" because no judicial action had been commenced nor was one even "within reasonable contemplation." 798 F.3d at 124, n. 14.

Leontiev also relies on cases holding that asset-discovery directed at locating assets from which a judgment could be satisfied should be conducted post-judgment. *See, e.g.*, *In re Shagang*, No. 14 Misc. 53-PJ(RWS), 2014 U.S. Dist. LEXIS 59313 (S.D.N.Y. Apr. 28, 2014) (cited at Resp. Br. at 22). But such cases are inapposite here because the DIA is not seeking asset discovery for potential satisfaction of a future judgment. Rather, the DIA is seeking discovery regarding financial information that is relevant to the Russian Bankruptcy Proceeding. The DIA seeks discovery from Leontiev concerning the transactions pursuant to which the Sham Companies and Leontiev Companies put the assets of PBB outside the Bank's reach. All of the transactions and entities that are the subject of the DIA's document requests are directly relevant to the finances of PBB and the pending Russian Bankruptcy.

### d. The Subpoena Is Not Unduly Burdensome;
###    This Boilerplate Defense Should Be Disregarded

Although Leontiev argues that he "is unlikely to possess responsive materials for many of the requests" (Resp. Br. at 24), he also argues that the requests would require him "to devote substantial resources to perform onerous searches and then review voluminous documents" because the requests list the names of over fifty companies and twelve individuals (Resp. Br. at 23). Obviously, he cannot both lack possession of responsive documents and have to review voluminous documents resulting from a search. Moreover, using the sham company names as search terms in an electronic search of his records would not be "onerous," as Leontiev feigns. That is a simple e-discovery task that parties perform in response to document requests. If, once Leontiev bothers to run his searches, an unreasonable number of "hits" results, the parties can meet and confer to resolve any truly unreasonable burden on Mr. Leontiev. As of now, any such burden is hypothetical, and Leontiev himself casts doubt on its ever becoming a reality.

The notion that the DIA would be more likely than Leontiev to have documents concerning the off-balance sheet transactions that Leontiev masterminded is ludicrous. Such records were not left with PBB, and PBB employees admitted to deleting many records before the DIA took over administration of the Bank. (DE 4, Diachenko Dec. ¶ 42) Obviously, if the DIA had possession of the documents necessary to trace the embezzled funds, this information would be in the PBB bankruptcy file, the DIA would know it, and the DIA would have recovered the assets.

Leontiev's argument that since the sham companies are organized under the laws of foreign jurisdictions like Cyprus and the Cook Islands, documents concerning them are "located abroad" is similarly meritless. Leontiev, who resides in this District, is required to produce documents that are within his possession, custody and control. The advisory notes to

Fed.R.Civ.P. 45 provide that a "person subject to subpoena is required to produce materials in that person's control *whether or not the materials are located within the district or within the territory within which the subpoena can be served*." (emphasis added). "Control" has been construed broadly by the courts as the legal right, authority, or practical ability to obtain the materials sought upon demand. *See Asset Value Fund, Ltd. Pshp. v. The Care Group, Inc.*, No. 97 Civ. 1487 (DLC)(JCF), 1997 U.S. Dist. LEXIS 17968 at *9 (S.D.N.Y. Nov. 12, 1997); *Florentia Contracting Corp. v. Resolution Trust Corp.*, No. 92 Civ. 1188 (PKL), 1993 U.S. Dist. LEXIS 5275 at *3 (S.D.N.Y. April 22, 1993); *see also Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir. 1984). This principle applies where discovery is sought from one corporation regarding materials which are in the physical possession of another, affiliated corporation. *See generally Gerling Int'l Ins. Co. v. Commissioner*, 839 F.2d 131, 140-141 (3d Cir. 1988) (discussing application of "control" rule in cases involving discovery directed at corporations related as parent and subsidiary and as sister corporations); *SEC v. Credit Bancorp, Ltd.*, 194 F.R.D. 469, 471-72 (S.D.N.Y. 2000).

Finally, the documents sought concern business transactions, not Mr. Leontiev's personal accounts. The Sham Companies received and/or participated in the transfer of assets out of PBB. The notion that a party can engage in a series of transactions to embezzle funds from a bank and then contend that the transactions are "personal financial transactions" is untenable. It is akin to the child who killed his parents asking the court for mercy because he is an orphan. Although Leontiev cites the boilerplate defense of "burdensomeness" and "fishing expeditions," these claims are simply not supported.

The Second Circuit has instructed that "it is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by

issuing a closely tailored discovery order rather than by simply denying relief outright." *Mees v. Buiter*, 793 F.3d 291, 302 (2d Cir. 2015). Leontiev has the burden to "justify curtailing" the evidence sought by the DIA. Since he has failed to do so, there is no basis to deny the DIA any of the discovery it seeks. *See Allison v. Clos-ette Too, L.L.C.*, No. 14 Civ. 1618 (LAK)(JCF), 2015 U.S. Dist LEXIS 2826, at *19 (S.D.N.Y. Jan. 9, 2015). Nevertheless, the DIA is willing to meet and confer with Leontiev concerning search terms and parameters as necessary.

### D.   Leontiev's Request for Reciprocal Discovery Should Be Denied

Leontiev purports to seek "reciprocal" discovery from the DIA, but what he actually seeks is nothing of the sort and is not permitted. In his 43 requests, Leontiev essentially seeks each and every document in the bankruptcy file of PBB, in the DIA's files concerning PBB, in the DIA's files concerning other banks, every communication between the DIA and certain other individuals and entities, and all files concerning the administration of PBB since 2015. This is clearly *not* "reciprocal" discovery. The DIA has sought discovery in this proceeding to trace and therefore locate PBB assets that were transferred to the Sham Companies and out of the control of PBB, as described by PBB former employees. Leontiev's requests go far beyond the transfer of assets out of PBB prior to its declaration of insolvency. Many requests expressly seek information solely for the period following PBB's declaration of insolvency, such as the DIA's efforts to recover the lost funds by the administrator of the bankruptcy estate (Requests 25, 28, 37, 39, 43). Similarly, requests for all communications between the DIA and any Russian governmental authority (Request 30), other Russian banks and other individuals concerning PBB (Requests 31-36) are likewise not reciprocal. Leontiev's requests for "all documents" concerning the ownership, administration and operation of other banks for the last 3 years are certainly not reciprocal and are wildly improper. As the discovery Leontiev seeks is, at a minimum, not

reciprocal, Leontiev's request must be denied. *See In re Porsche Automobil Holding SE*, No. 15-mc-417 (LAK), 2016 U.S. Dist. LEXIS 20012, at *33-34 (S.D.N.Y. Feb. 18, 2016).

The cases cited by Leontiev for reciprocal discovery are inapposite and do not support his entitlement to any discovery here. The court in *Euromepa, S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1102 (2d Cir. 1995) did not grant reciprocal discovery. Instead it reversed the district court's denial of the § 1782 application and suggested that reciprocal discovery *may* be available. *Consorcio Minero, S.A. v. Renco Grp., Inc.*, is also inapplicable because the party requesting reciprocal discovery was a party to the underlying action. No. 11 MC 354, 2012 U.S. Dist. LEXIS 44317, at *9 (S.D.N.Y. Mar. 28, 2012). That is not the case here. Similarly, in *Minatec Fin. S.a.r.l. v. SI Grp. Inc.*, both the 1782 applicant and the opposing party were parties to the underlying proceeding, and the applicant consented to reciprocal discovery, which the DIA has not done here. No. 1:08-CV-269 (LEK/RFT), 2008 U.S. Dist. LEXIS 63802, at *28 (N.D.N.Y. Aug. 18, 2008).

## CONCLUSION

Based on the foregoing and accompanying papers, Petitioner respectfully requests that this Court deny in its entirety Respondent's motion to quash the subpoena served upon him.

Dated: New York, New York
      February 20, 2018           Respectfully Submitted,

                                  MORRISON COHEN LLP

                                  By: /s/ Mary E. Flynn
                                    Mary E. Flynn
                                    Jeffrey D. Brooks
                                    Valerie Sirota
                                    909 Third Avenue
                                    New York, New York 10022
                                    Telephone: 212-735-8600
                                    Fax: 212-735-8708
                                    *Attorneys for Petitioner Deposit Insurance Agency*