# EXHIBIT 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
:
In re Application of DEPOSIT INSURANCE :
AGENCY for an order to conduct discovery :
for use in a foreign proceeding, :
:
                                Petitioner. : Case No. 1:17-mc-00414-GBD
:
:
:
:
:
------------------------------------------------------------x

## DECLARATION OF ANDERS ASLUND IN SUPPORT OF RESPONDENT'S MOTION TO QUASH

I, Anders Aslund, hereby declare under penalty of perjury as follows:

1. I am an economist with an intimate knowledge of Russia and the Russian economy. I am currently an adjunct professor at Georgetown University and a resident Senior Fellow at the Atlantic Council in Washington, D.C., where I currently reside. I have held positions at several leading think tanks, including the Peterson Institute for International Economics, the Carnegie Endowment for International Peace, the Brookings Institution, and the Kennan Institute for Advanced Russian Studies at the Woodrow Wilson Center.

2. To date, I have written 10 books and edited 11 books on the Russian economy, and I continue to write extensively on the topic. My previous work experience includes serving as a Swedish diplomat in Russia and working as an economic advisor to the Russian government. I also have served on the Board of Directors of two Swedish companies that invested in Russia. I speak Russian fluently, having lived in Russia and having spent substantial time there over four decades, and I continue to travel to Russia several times each year. Attached hereto as Exhibit 1 is a true and correct copy of my CV and a list of my book publications.

3. I have been retained by Sergey Leontiev ("Mr. Leontiev") to provide an overview of the political and economic conditions in Russia that must be understood to appreciate the circumstances surrounding the Russian government's takeover of Probusinessbank ("PRBB") in August 2015. I make this declaration in support of Mr. Leontiev's Motion to Quash Subpoena Issued Pursuant to 28 U.S.C. § 1782.

A. **Overview of Lawlessness and Corruption in Russia**

4. The political and economic state of affairs in Russia is characterized by an absence of the rule of law, tenuous property rights, profound corruption across government institutions at the highest levels, and an authoritarian regime that distributes wealth and power to cronies and insiders.

5. As many academics, journalists, and commentators have noted in recent years, Russia's governing regime is a kleptocracy that is defined by two overarching objectives: (1) consolidating and retaining power (with the corollary goal of stifling dissent or independence), and (2) increasing the wealth of its leader and a group of loyal insiders.[1]

6. In the 1990s and early 2000s, extortion, theft, and other criminal misconduct was pervasive within Russia's business sphere, but it was dispersed and perpetuated by a variety of competing actors. The current Russian regime has internalized and institutionalized these forms of lawlessness and criminality, engaging in "state predation."[2] As such, the greatest threat to Russian businesses now emanates primarily from one place: the Kremlin. This change has resulted in a consolidated and hierarchical kleptocracy, in which the proceeds from government-sanctioned theft trickle up to a small group of Kremlin insiders.

---

[1] *See, e.g.,* Karen Dawisha, *Putin's Kleptocracy: Who Owns Russia?* New York: Simon & Schuster, 2014.
[2] Jordan Gans-Morse, *Property Rights in Post-Soviet Russia: Violence, Corruption, and the Demand for Law*, New York: Cambridge University Press, 2017, p. 189.

2

7. The "Panama Papers" released in 2016 have confirmed this state of affairs by shedding light on the billions of dollars accumulated by individuals with ties to, or at the top of, the Kremlin hierarchy.[3]

8. The accumulation of wealth by those at the top of the government hierarchy has been enabled in significant part by corruption within the judicial system, coupled with the erosion of property rights.

9. An early illustration of the government-sanctioned expropriation of private assets involved the lawless confiscation of the Yukos Oil Company, Russia's largest and most successful private oil company, which began in 2003.[4] In 2003, the Russian government arrested Mikhail Khodorkovsky, then Chief Executive Officer of Yukos Oil, alleging tax evasion and fraud, based on underlying conduct that in reality constituted legitimate tax planning. Those charges ultimately led to a manufactured bankruptcy of Yukos, the seizure of its assets by the state-owned oil company Rosneft through a rigged bankruptcy process, and Khodorkovsky's lengthy imprisonment.

10. The true motivation behind the arrest of Khodorkovsky and the seizure of Yukos Oil was in part political—Khodorkovsky was wealthy, influential, and willing to publicly critique the government—and in part financial—Yukos Oil's success made it a highly desirable target for seizure. The confiscation of Yukos Oil, Russia's biggest private company at the time, opened the road for, and created the blueprint for, taking over other successful enterprises.

11. In Russia, businesses that thrive without aligning themselves with, and contributing to, officials within the Russian government become targets for expropriation and corporate raiding.

---

[3] Luke Harding, "Revealed, the $2 billion offshore trail that leads to Vladimir Putin." The Guardian, April 3, 2016.
[4] Stephen Fortescue, *Russia's Oil Barons and Metal Magnates*, Palgrave MacMillan, London, 2007, pp. 321-348; Thane Gustafson, *Wheel of Fortune: The Battle for Oil and Power in Russia*, Cambridge, MA: Belknap Press of Harvard University Press, 2012, pp. 306-21.

3

Private businessmen who succeed in Russia without ties to the Kremlin, and who refuse to succumb to government-sanctioned extortion (colloquially known as paying for protection or, in Russian, *krysha*—literally, a "roof"), or individuals who openly question or seek to expose injustices within the governing regime, risk falling victim to deprivations of liberty or life.

12. A particularly chilling example is that of Sergei Magnitsky. Magnitsky was a Russian lawyer who uncovered the theft, through an elaborate tax fraud scheme, of $230 million by senior Russian officials and their co-conspirators. In short, the fraud consisted of government officials from various Russian law enforcement agencies colluding to: raid the offices of Hermitage Capital Management, a Western investment fund, and the offices of its outside counsel; use documents seized in the raids to transfer ownership of three companies belonging to Hermitage Capital Management; and file false court claims to obtain sham judgments for $230 million in fraudulent tax refunds. Instead of being lauded by the government for his efforts, Magnitsky was arrested, charged with planning the very same tax scheme he exposed, and beaten to death while he was held in custody in Moscow in 2009.

13. As part of the Russian officials' cover up of the fraud revealed by Magnitsky, they fraudulently prosecuted Hermitage Capital Management's Chairman, Bill Browder, *in absentia*, and an Interpol red notice, similar to an international arrest warrant, was issued in his name after repeated requests by Russian officials. Over the years, such tactics have become standard procedures employed by Russian authorities to harass and persecute political dissidents and enemies abroad.[5]

---

[5] Andrew Higgins, "How Moscow Uses Interpol to Pursue Its Enemies," *New York Times*, November 6, 2016.

## B. Corruption Specifically Relevant to PRBB's Takeover

14. The Central Bank of Russia ("Central Bank") is a corrupt government entity, and the seizure and forced bankruptcy of PRBB, following the revocation of its operating license by the Central Bank in August 2015, is consistent with the Russian government's pattern of unlawful expropriation of private companies.

15. In recent years, Russia's banking industry has undergone massive consolidation, with Russia's state-run banks, government officials, and their allies being the primary beneficiaries. Over the past 5 years, it has become a common practice of the Central Bank to revoke the licenses of private banks and transfer their assets to state-run banks or other private banks owned by individuals with ties to the Kremlin. During this period, three banks functioned as the main recipients and consolidators of transferred assets—Binbank, Bank Otkrytie and state-owned VTB. Consistent with this general scheme, Binbank received a substantial portion of PRBB assets following PRBB's seizure in August 2015.

16. Mikhail Sukhov, the Central Bank's Deputy Chairman and Director for Bank Regulation at the time of PRBB's takeover, has since been implicated in corrupt practices, including the receipt of payments from Bank Otkrytie while he directed the transfer to them of assets seized from other banks.[6] In October 2016, Sukhov was fired from the Central Bank. My prior research into this matter, which included conversations with two Central Bank insiders, confirmed that Sukhov was terminated for criminal enrichment through bank closures. Lest this be viewed as Russian adherence to the rule of law, one week after Sukhov was fired from the

---

[6] "Zamorozki Sukhova ili 'sukhovskie litsenzii' - 2 (Freezings by Sukhov or Sukhov Licenses - 2)," Politika, May 18, 2015.

*(Cont'd on next page)*

5

Central Bank, the state-owned bank VTB (which has been a primary beneficiary of private bank expropriations) hired him as a Vice President.[7]

17. More recently, in the second half of 2017, the government turned on two private banks it previously favored, Binbank and Bank Otkrytie, shuttering them due to losses which apparently resulted from corrupt self-dealing. However, the closure of these large private banks has merely consolidated the Russian state's control of the banking industry even further, with state-owned banks benefiting greatly from additional seized assets, their increased market share, and number of depositors.

18. The Russian government's attempts to criminally prosecute Mr. Leontiev *in absentia* are also consistent with the Russian government's pattern of unlawful expropriation of private companies. Russian law enforcement agencies regularly violate basic tenets of the rule the law, including due process, by distorting the legal process. Instead of protecting the rights of private citizens, Russian prosecutors are tasked with bringing manufactured charges against private businessmen, including former executives of expropriated companies, to justify the unlawful confiscation of private assets.

19. The Prosecutor General's Office, which oversees the criminal action pending against Mr. Leontiev in Russia, is a highly corrupt entity with nearly unchecked power. Yuri Chaika is the current Prosecutor General of Russia, and he has held that role since 2006. In December 2015, anti-corruption activist Alexei Navalny released a scathing documentary titled "Chaika" which exposed the Prosecutor General as corrupt and detailed wrongdoing by his two sons and one of his deputies, including corporate raiding and organized crime.[8] Despite ample

---

[7] "Iz TsB to VTB (From the Central Bank to VTB)," *Kommersant*, October 10, 2016.
[8] Fund for Struggle against Corruption (FBK), "Chaika," December 1, 2015, https://www.youtube.com/watch?v=eXYQbgvzxdM.

*(Cont'd on next page)*

6

evidence of his corruption, Yuri Chaika was reappointed to a third 5-year term in June 2016.[9] Chaika's reappointment demonstrates an acceptance of misconduct within the Prosecutor General's Office by the highest levels of the Russian administration.

20. In addition to being an anti-corruption activist, Alexei Navalny has, for a number of years, been the primary political opponent of the current, totalitarian Russian regime. As a result of his powerful enemies and Russia's broken law enforcement and judicial systems, Navalny was convicted of manufactured embezzlement charges in a sham criminal case. Though the European Court of Human Rights has since invalidated that conviction, the Russian state has taken steps to maintain the illusion that a crime was committed by Navalny. Indeed, the Russian Central Election Committee has used his past conviction to justify its politically-motivated refusal to accept Navalny as a presidential candidate in the coming 2018 election.

21. The U.S. Congress passed the Sergei Magnitsky Rule of Law Accountability Act of 2012, which uses financial sanctions to punish Russian individuals responsible for the fraud uncovered by Sergei Magnitsky; his imprisonment, torture, and death; the related cover-up; and, more broadly, "those responsible for gross violations of internationally recognized human rights committed against individuals seeking to either expose illegal activity by Russian government officials or obtain, exercise, defend, or promote internationally recognized human rights and freedoms in Russia."[10] As of December 20, 2017, the U.S. Treasury Department had designated a total of 49 individuals to be subject to sanctions under the Magnitsky Act.

22. Among the individuals included on the Magnitsky Act sanctions list with connections to the Russian state's actions against PRBB and Mr. Leontiev are: (1) Quorum

---

[9] "Russia: Prosecutor General is Reassigned Amid Corruption Allegations," Organized Crime and Corruption Reporting Project, June 22, 2016.
[10] Russia and Moldova Jackson-Vanik Repeal and Sergei Magnitsky Rule of Law Accountability Act of 2012, Pub. L. No. 112-208, 126 Stat. 1496, 1504 (2012).

7

attorney Andrei Pavlov, who is representing the DIA in the Russian bankruptcy proceedings and this U.S. litigation, and (2) Deputy Prosecutor General Victor Grin, who is overseeing the Russian criminal action against former PRBB executives.

### C. The Russian State's Use of Private Individuals and Entities As Proxies

23. The power of the Russian state is wielded not only by individuals in official government capacities, but also by individuals and entities with close ties to Russian authorities. It is commonplace for private businessmen with government connections to operate as extensions of the Russian state, carrying the weight of its authority and protection, as its agents or proxies.

24. One recent example involved Prosecutor General Yuri Chaika's utilization of his eldest son, Artem Chaika, a private businessman with no official government title, to carry out various illicit activities. On December 20, 2017, Artem Chaika was designated by the U.S. Treasury Department for inclusion on the sanctions list under the Global Magnitsky Human Rights Accountability Act ("Global Magnitsky Act") of 2016, which applies not only to a "current or former government official" engaged in corruption but also to a "person acting for or on behalf of such an official."[11]

25. Notably, it is standard practice for those at the top of the Russian government hierarchy to pursue their objectives in foreign jurisdictions by enlisting Kremlin cronies as proxies. While the individuals and entities serving as proxies in foreign jurisdictions tend to be unaffiliated with the Russian government as an official matter, they often are closely linked to and dependent upon their patrons in the administration, thus rendering them beholden to the Russian state.

---

[11] US Department of the Treasury, "Issuance of Global Magnitsky Executive Order; Global Magnitsky Designations," December 21, 2017, https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20171221.aspx; Executive Order, "Blocking the Property of Persons Involved in Serious Human Rights Abuse or Corruption," December 20, 2017, https://www.treasury.gov/resource-center/sanctions/Programs/Documents/glomag_eo.pdf.

8

26. Alexander Varshavsky and Avilon Automotive Group ("Avilon"—owned jointly by Varshavsky and Kamo Avagumyan), both parties to prior litigation against Mr. Leontiev in federal and state court, epitomize such a proxy role. Varshavsky is a prominent Russian businessman, who also has an American citizenship, which makes him well-suited to do the Kremlin's bidding in the United States. Varshavsky is closely connected to the Kremlin and to other government officials on both a personal and a professional level—these relationships have been well-documented by Russian investigative journalists.[12]

27. Relatedly, Avilon's success—and, necessarily, Varshavsky's and Avagumyan's wealth—primarily stems from the same close ties to the governing regime, as indicated by Avilon's numerous high-value and long-term contracts to supply automobiles to the Presidential Administration, the Investigative Committee, the General Prosecutor's Office, the Ministry of Interior, the Federal Security Service, and the Federal Protection Service.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 12 day of January, 2018 in Washington, D.C.

_____
Anders Åslund

---

[12] Roman Anin, "Koniukhi 'Merinov' (The Stables of Merins)" Novaya Gazeta, May 17, 2010; "'Kryshi' dvulikovogo Avilona ('Roofs' of the Twofold Avilon)" Argumenty I Fakty, December 19, 2017.

9