# EXHIBIT 16

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

DEPOSIT INSURANCE AGENCY,

        **Petitioner,**

    -against-

SERGEY LEONTIEV,

        **Movant.**

-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __ 7/23/2018

**17-MC-00414 (GBD)(SN)**

**OPINION AND ORDER**

**SARAH NETBURN, United States Magistrate Judge:**

  The Deposit Insurance Agency (the "DIA"), a Russian governmental bankruptcy receiver, has issued a subpoena *ad testificandum* and *duces tecum* pursuant to 28 U.S.C. § 1782 to Sergey Leontiev, the founder and former president of Probusinessbank, a failed Russian commercial bank. Leontiev moves to quash the subpoenas because he contends they violate the Sergei Magnitsky Rule of Law Accountability Act of 2012 (the "Magnitsky Act") and 28 U.S.C. § 1782. Alternatively, Leontiev seeks reciprocal discovery from the DIA.

## BACKGROUND

### I. The Underlying Russian Action

  The DIA seeks discovery from Leontiev as a nonparty to Probusinessbank's ongoing Russian bankruptcy proceeding. The parties sharply disagree as to that proceeding's legitimacy and purpose. Leontiev maintains that elements within the Russian government forced Probusinessbank into bankruptcy in an effort to expropriate the bank's assets and to punish him for his political independence. The DIA, on the other hand, argues that Leontiev drove the bank to insolvency through off balance sheet lending and other fraudulent transactions. The following

facts are taken from the parties' moving papers, affidavits, and exhibits. They are undisputed unless otherwise noted.

Leontiev founded Probusinessbank in 1993 and operated it until 2015. Leontiev Decl. ¶¶ 2-4. During his time at the bank, Leontiev maintained ties to prominent Russian dissidents and the U.S. government. Leontiev Decl. ¶¶ 18-25. In the summer and fall of 2015, the Russian government began to take action against the bank. On August 6, 2015, the Central Bank of Russia (the "Central Bank") issued a prescriptive order against Probusinessbank directing it to make certain operational changes. Khamchich Decl. ¶ 12. On August 7, 2015, the Central Bank appointed the DIA as provisional administrator for Probusinessbank, effectively taking control of the bank away from Leontiev. Monastyrsky Decl. ¶ 4; Khamchich Decl. ¶¶ 13-14. Five days later, the Central Bank withdrew Probusinessbank's license, forcing its assets to be liquidated. Leontiev Decl. ¶ 5.

After assuming the role of temporary receiver, the DIA removed Probusinessbank's access to banking networks. Zhidchenko Decl. ¶ 20. Access was temporarily reinstated on August 10, 2015, at which time approximately $9.6 million was transferred to a DIA-affiliated bank. Leontiev Decl. ¶ 11. Leontiev argues that this transfer was evidence of a DIA attempt to loot the bank, citing a news article that described how the DIA was admonished for the transfer; the DIA responds that it was a quickly rectified mistake. Compare Leontiev Decl. ¶ 11, Ex. 5, with Zhidchenko Decl. ¶ 20. Leontiev also points out that a primary recipient of Probusinessbank's assets was Binbank, a bank with connections to the Russian government. Aslund Decl. ¶ 15. The DIA responds that Binbank's receipt of these assets was in accordance with Russian procedure and that Binbank had to take on an equivalent amount of Probusinessbank's liabilities, making the transaction a wash. Zhidchenko Decl. ¶ 41. On October

27, 2015, the Central Bank determined that Probusinessbank was insolvent and placed it in bankruptcy proceedings before the Commercial Arbitrazh Court of Moscow. Monastyrsky Decl. ¶ 6.

Leontiev contends that the Central Bank's actions are politically motivated because both the Central Bank and the bank's external auditor, Deloitte, had recently declared Probusinessbank to be financially viable. Leontiev Decl. ¶ 9, Exs. 1-4. The DIA rejects this notion, responding that the Central Bank's decision was justified because Probusinessbank had repeatedly failed to rectify banking violations. Khamchich Decl. ¶¶ 13-14. It further argues that the opinions expressed by Deloitte and the Central Bank were invalid because Probusinessbank leadership intentionally hid encumbrances on certain assets from their review. Khamchich Decl. ¶ 16. These undisclosed encumbrances were allegedly part of an scheme implemented by Leontiev and other managers to siphon funds from Probusinessbank creditors. Zhidchenko Decl. ¶ 32. As support for this embezzlement allegation, the DIA cites the witness statements of two former Probusinessbank employees who had personal knowledge of the operation. Zhidchenko Decl. ¶ 19, Exs. 12-14. Leontiev calls into question the integrity of their statements, citing the expert opinion of a Russian criminal attorney who noted that they contained a number of procedural defects. Aminov Decl. ¶¶ 3-16.

The DIA hired Quorum, a Russian law firm, for legal work related to the bankruptcy. Monastyrsky Decl. ¶¶ 9-10. At the time, the chairman of Quorum was an attorney named Andrei Pavlov. Monastyrsky Decl. ¶ 9. Both sides agree that Pavlov's role in a massive Russian tax fraud, known as the Magnitsky Affair, led the United States Congress to sanction him late last year. Aslund Decl. ¶ 22; Zhidchenko Decl. ¶ 7. As a result of these sanctions, the DIA contends that Pavlov resigned from his position at Quorum on February 14, 2018, citing an affidavit from

another Quorum attorney and corporate registration forms that show that he no longer is affiliated with the firm. Zhidchenko Decl. ¶ 7, Exs. 3-4. Leontiev responds that as of March 12, 2018, Pavlov continued to be listed on the Quorum website and Quorum meeting minutes after February 14, 2018, imply that he is still chairman of the board. Suppl. King Decl. ¶¶ 2-4, Exs. 2-4. DIA records also show that it continued to pay Pavlov a retainer for March. Suppl. King Decl. ¶ 6, Ex. 5, p.12.

In addition to the bankruptcy proceeding, Russian criminal authorities have opened an investigation into Leontiev's activities at Probusinessbank. The facts underpinning this investigation are also hotly contested. On December 1, 2015, a senior investigator with the Department for the Investigation of Major Cases of Crimes Against the Government and Financial Crimes declined to open a criminal case against Leontiev for lack of evidence. Monastyrsky Decl. ¶ 22. But after Probusinessbank managers declined to cooperate with the DIA, Leontiev alleges, Russian prosecutors reopened the case. Monastyrsky Decl. ¶ 23-24. The prosecutor leading the case, Victor Grin, is also sanctioned under the Magnitsky Act. Aslund Decl. ¶ 22. The DIA responds that it is unable to influence criminal investigations and that the authorities reopened their investigation only after assessing the full evidentiary record, which was unavailable during their initial investigation. Zhidchenko Decl. ¶¶ 26-29.

## II.    Procedural History in this Court

On October 26, 2018, the DIA submitted an *ex parte* petition requesting leave to seek discovery from Leontiev. Judge Daniels granted the petition, allowing the DIA to serve Leontiev with a subpoena *ad testificandum* and *duces tecum*. The document portion of the subpoena contains 19 separate requests. They seek documents showing the ownership, management, and transfers of funds into and from approximately 70 different companies; documents related to

loans and transfers to certain of these companies, including communications with Alexander

Zheleznyak (another Probusinessbank executive); documents showing the participation of

Zheleznyak or any of 49 other individuals in an alleged embezzlement scheme; documents

related to Probusinessbank loans that were purportedly funneled to Leontiev and Zheleznyak; all

documents produced in two other actions, <u>Leontiev v. Varshavksy</u>, No. 16-CV-03595 (JSR), and

<u>Avilon Automotive Group v. Leontiev, et al.</u>, Index # 656007/2016 (N.Y. Sup. Ct. 2016).

On January 16, 2018, Leontiev timely moved to quash the subpoena.

## DISCUSSION

### I.  Legal Standard

"A district court has authority to grant a § 1782 application where: '(1) the person from

whom discovery is sought resides (or is found) in the district of the district court to which the

application is made, (2) the discovery is for use in a foreign proceeding before a foreign [or

international] tribunal, and (3) the application is made by a foreign or international tribunal or

any interested person.'" <u>Mees v. Buiter</u>, 793 F.3d 291, 297 (2d Cir. 2015) (quoting <u>Brandi–

Dohrn v. IKB Deutsche Industriebank AG</u>, 673 F.3d 76, 80 (2d Cir. 2012). Whether discovery is

"for use in a foreign proceeding" is afforded broad interpretation. The sought-after evidence need

not be admissible, <u>Brandi-Dohrn</u>, 673 F.3d at 82 (2d Cir. 2012), or even discoverable, <u>Intel Corp.

v. Advanced Micro Devices, Inc.</u>, 542 U.S. 241, 260 (2004), under the rules of the foreign

jurisdiction. Nor does an applicant need to seek the discovery in the foreign proceeding before

applying in an American court. <u>Application of Malev Hungarian Airlines</u>, 964 F.2d 97, 100 (2d

Cir. 1992). In fact, the foreign proceeding need not even yet be under way, so long as it is

"within reasonable contemplation." <u>Intel</u>, 542 U.S. at 259.

An applicant may use § 1782 discovery in other proceedings, just as he or she could in domestic discovery. In re Accent Delight Int'l Ltd., 869 F.3d 121, 135 (2d Cir. 2017). If the petitioner credibly shows, however, that the applicant "'is attempting to use foreign litigation as a ruse for obtaining discovery' for use in other foreign proceedings,'" the court may enter a "protective order prohibiting use of the discovery in other proceedings" or even "deny[] the Section 1782 application altogether." Id. (quoting Glock v. Glock, Inc., 797 F.3d 1002, 1009 (11th Cir. 2015)). But "it is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief outright." Mees, 793 F.3d at 302 (quoting Euromepa S.A. v. R. Esmerian, Inc., 51 F.3d 1095, 1101 (2d Cir. 1995)). That said, "if the district court determines that a party's discovery application under section 1782 is made in bad faith, for the purpose of harassment, or unreasonably seeks cumulative or irrelevant materials, the court is free to deny the application *in toto*, just as it can if discovery was sought in bad faith in domestic litigation." Euromepa, 51 F.3d at 1101.

"Once the statutory requirements are met, a district court may order discovery under § 1782 at its discretion, taking into consideration the 'twin aims' of the statute, namely, 'providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts.'" Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P., 798 F.3d 113, 117 (2d Cir. 2015) (quoting In re Metallgesellschaft, 121 F.3d 77, 79 (2d Cir. 1997)). The Supreme Court has identified four factors to guide the district court's discretion: "(1) whether 'the person from whom discovery is sought is a participant in the foreign proceeding,' in which case 'the need for § 1782(a) aid generally is not as apparent'; (2) 'the nature of the foreign tribunal, the

character of the proceedings underway abroad, and the receptivity of the foreign government or

the court or agency abroad to U.S. federal-court judicial assistance'; (3) 'whether the § 1782(a)

request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of

a foreign country or the United States'; and (4) whether the request is 'unduly intrusive or

burdensome.'" <u>Mees</u>, 793 F.3d at 298 (quoting <u>Intel</u>, 542 U.S. 241, 264-65 (2004)) (the "<u>Intel</u>

factors").

## II.    Analysis

Leontiev argues that, as a threshold matter, the § 1782 analysis is unnecessary because

providing any discovery to the DIA would violate American sanctions. But because the <u>Intel</u>

factors specifically require the Court to consider whether granting an application would violate

American policy, the Court finds it appropriate to reserve discussion for that juncture.

### A.    The "For Use" Requirement

Leontiev does not dispute that the DIA meets the first and third statutory requirements

under § 1782: Leontiev is located in this district and the DIA is an "interested person." His

argument instead centers on whether the discovery the DIA seeks will actually be "for use" in the

Russian bankruptcy proceeding. Leontiev acknowledges that the Russian bankruptcy proceeding

is underway. He contends, however, that the DIA plans to relay any discovery to Russian

prosecutors, who will use it to concoct criminal charges against him and seize his personal

assets. He points to the wide-ranging scope of the subpoenas as evidence that the information

sought goes far beyond matters related to the bankruptcy, especially because the DIA is limited

in the information it can use under Russian law. Because this discovery is allegedly not intended

for the bankruptcy proceeding, he contends that it cannot be "for use."

But the relevant inquiry at this juncture is whether there is actually an ongoing (or imminent) proceeding, not the validity of the proceeding itself. The doubts Leontiev raises about the propriety of the Russian bankruptcy proceeding do merit consideration—they are simply better addressed to the Court's exercise of discretion, not whether these requests are "for use" as a matter of law. See In re Edelman, 295 F.3d 171, 175 (2d Cir. 2002) (explaining that § 1782's statutory elements are construed as a matter of law). Further, as with domestic discovery, § 1782 does not "regulate what litigants may do with discovery after it lawfully has been obtained." Accent Delight, 869 F.3d at 135. That the DIA may provide this discovery to the Russian criminal authorities is of no moment (as to this element) so long as the Court is convinced that the documents are also relevant to the bankruptcy proceeding. To the extent that this discovery extends to issues outside of the scope of the Probusinessbank bankruptcy, the Court may fashion a protective order to limit the requests by time and substance. Fed. R. Civ. P. 26(c); see also 28 U.S.C. § 1782(a) ("To the extent that the [Court's] order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.").

Because Leontiev is located in the Southern District of New York, the requested discovery is "for use" in the bankruptcy proceeding, and the DIA is interested person, § 1782's statutory requirements are met.

### B.    Discretionary Factors

#### 1.    Participation in the Foreign Proceeding

Leontiev admits that he is not a party to the Russian bankruptcy proceeding. This factor therefore weighs in favor of denying his motion to quash.

8

**2.    The Nature of the Foreign Tribunal and Character of the Proceedings
Underway**

Leontiev argues that the bankruptcy proceeding is a vehicle to harass him because of his
links to Russian dissidents and the American government. As evidence, he cites to the
declaration of an economist with expertise in Russian markets, Anders Aslund. Aslund paints a
convincing portrait of crony capitalism in Russia, wherein independent businesses are often
forcibly subsumed into state-run or government-friendly firms to the benefit of corrupt officials
and their accomplices. But this generalized allegation does not mean that all Russian court
proceedings are corrupt. Indeed, courts have continued to enforce subpoenas pursuant to § 1782
intended for use in Russian courts. In re: Application of Joint Stock Co. Raiffeinsenbank, No.
16-MC-80203 (MEJ), 2016 WL 6474224, at *6 (N.D. Cal. Nov. 2, 2016); In re MTS Bank, No.
17-MC-21545 (EGT), 2017 WL 3155362, at *9 (S.D. Fla. July 25, 2017). The only evidence that
specifically suggests that the bankruptcy proceeding is suspect is the involvement of Pavlov,
whose role in a tax fraud involving sham litigation led to congressionally-imposed sanctions late
last year. While his role in the Magnitsky Affair is reprehensible, his involvement with
Probusiness bankruptcy is insufficient to condemn the entire proceeding as a sham.

Because any evidence showing that the nature of the foreign tribunal and character of the
proceedings underway is fraudulent is too general or tangential, this factor is neutral as to the
Court's decision to quash or modify the subpoenas.

**3.    Circumvention of U.S. and Russian Law and Policy**

Leontiev contends that producing the requested discovery would violate: (1) U.S.
sanctions imposed under the Magnitsky Act; (2); Russian discovery rules forbidding pre-trial

depositions; (3) U.S. and Russian law that permits criminal defendants to protect themselves from self-incrimination and (4) American law prohibiting pre-judgment asset discovery.

The DIA responds that discovery does not fall within the ambit of U.S. sanctions, and that in any case, Pavlov does not stand to gain from a favorable ruling in this action. The DIA also argues that Leontiev may assert his right against self-incrimination at deposition, that Russian courts are receptive to discovery obtained in American courts, and that it seeks information about Leontiev's assets in order to learn about the alleged fraudulent conveyances, not as pre-judgment asset discovery.

### a. Background on the Magnitsky Act

A short aside on the Magnitsky Affair is in order. The incident and related sanctions regime are named after Sergei Magnitsky, a Russian lawyer who investigated and uncovered a massive, complex tax fraud. The gist of the scheme was that Russian officials and others raided and took control of certain companies owned by an American-run investment firm called the Hermitage Fund. See United States v. Prevezon Holdings Ltd., 839 F.3d 227, 230 (2d Cir. 2016). After installing themselves at the former Hermitage companies, these individuals faked contracts between the Hermitage companies and certain sham companies that they also created. These contracts indicated that the former Hermitage companies owed the sham companies large sums of money. Id. The sham companies then sought and won judgments against the former Hermitage companies to recoup these falsified losses; as a result, the Hermitage companies altered their balance books for the previous years to show a loss. Id. The former Hermitage companies (still controlled by the fraudsters) then sought tax refunds based on their revised books, which the Russian government paid out. Id. The corporate raiders then transferred these funds from the Hermitage companies to their personal bank accounts hidden across the globe. Id.

Case 1:17-mc-00414-GBD-SN   Document 28   Filed 07/26/18   Page 12 of 25

Hermitage, naturally up in in arms about this set of affairs, hired Magnitsky to investigate. Id. After Magnitsky uncovered the fraud, Russian authorities arrested and jailed him—not the fraudsters. Id. Magnitsky was tortured and eventually died after being denied medical treatment. Id. at 231. As a result, the United States Congress passed the Magnitsky Act, which sanctions individuals involved in the tax fraud, Magnitsky's death, and other human rights violations in Russia. Magnitsky Act § 404(a).

Among its other strictures, the Magnitsky Act prohibits the transfer of property to people who were involved with the tax fraud that led to Magnitsky's death. 31 C.F.R. § 584.201(a). This interdiction is wide-ranging, prohibiting sending and receiving any funds, goods, or services to or from a sanctioned individual. 31 C.F.R. § 584.201(b). This includes any transaction that is intended to "create, surrender, release, convey, transfer, or alter, directly or indirectly, any right, remedy, power, privilege, or interest with respect to any property." 31 C.F.R. § 584.312. The regulation additionally disallows any transaction that has the purpose of evading or avoiding sanctions, or that causes a violation of the sanctions. 31 C.F.R. § 584.205(a).

The ban applies to transactions between sanctioned individuals and any person in the United States, and includes interests in property of "any nature whatsoever, direct or indirect." 31 C.F.R. §§ 584.305, 584.314. One relevant exception is for informational materials, which includes "publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds." 31 C.F.R. § 584.304.

On December 20, 2017, Congress placed Andrei Pavlov, the founder of the Russian law firm representing the DIA in the Probusinessbank bankruptcy on the Magnitsky List for his "essential role" in "orchestrating the false claims used in the $230 million tax fraud that Sergei Magnitsky uncovered." 163 Cong. Rec. S8170.

### b.        Discovery as Violation of Magnitsky Act

Leontiev argues that the requested discovery would violate the Magnitsky Act because it would deliver property to Pavlov. He further argues that Pavlov will receive pecuniary benefit for any successes achieved in these proceedings, thereby causing an indirect violation of the statute. Finally, Leontiev contends that having availed itself of the American court system, the DIA itself is currently in violation of the Magnitsky Act by transacting with Pavlov.

The DIA contends that Pavlov is no longer a partner at the firm representing them in matters concerning Probusinessbank's bankruptcy proceedings. It further contends that transferring property from Leontiev (who is not under sanctions) to the DIA does not fall within the rubric of the Magnitsky Act because the Act only prohibits the transfer of American assets of sanctioned individuals. He further argues that the discovery materials constitute information, not property, and therefore fall within the "informational materials" exception to the Act. It finally argues that there is nothing that prohibits the DIA from engaging Pavlov as its counsel in Russia.

The Court may deny requested relief if doing so would violate United States sanctions. See Empresa Cubana del Tabaco v. Culbro Corp., 399 F.3d 462, 474 (2d Cir. 2005) (declining to enforce a trademark because it would transfer a property right to an embargoed Cuban business). It is undisputed that Pavlov is a sanctioned individual under the Magnitsky Act. The key questions before the Court are (i) is the DIA a "United States person," such that its business relationship with Pavlov would violate sanctions? And (ii) would the production of discovery itself violate U.S. sanctions? The Court answers both in the negative.

As a threshold issue, there is some debate as to whether Pavlov continues to be associated with Quorum. Leontiev points to documents showing that the DIA continues to pay him in connection with the Probusinessbank bankruptcy, his name is on Quorum's website, and that he

is referred to as the Chairman in meeting minutes that post-date his alleged resignation.

Moreover, Leontiev argues that it is suspicious that Pavlov resigned so shortly before the DIA

filed its opposition to the motion to quash. The DIA points to a document that shows that another

attorney from Quorum assumed the role of Chairman as the sole evidence that Pavlov no longer

remains at the firm he founded. The Court finds that the weight of the evidence shows that

Pavlov continues to be a member of Quorum, if not its chairman, and thus continues to receive

pecuniary benefit from its business operations.

### i.     United States Person

Only United States persons are prohibited from transacting with sanctioned individuals.

31 C.F.R. § 584.201. Therefore, to fall within the Magnitsky Act's ambit, the DIA, a Russian

governmental organization, must be a United States person. The implementing regulations define

a United States person as "any United States citizen, permanent resident alien, entity organized

under the laws of the United States or any jurisdiction within the United States (including foreign

branches), or any person in the United States." 31 C.F.R. § 584.314. The DIA plainly does not

fall within the first three categories. Thus the DIA must be "a person in the United States" to be

covered by the Act.

The Court finds it unlikely that Congress, or the Treasury Department, intended for a

foreign governmental agency to be included in the term United States person. Indeed, absent

explicit statutory direction, courts have been reluctant to expand the definition of United States

person to a foreign corporation with an American owner or a foreign corporation with branches

within the United States. United States v. Chalmers, 474 F. Supp. 2d 555, 558 (S.D.N.Y. 2007)

(company with American owner is not a United States person; Ofisi v. BNP Paribas, S.A., 278 F.

Supp. 3d 84, 99 (D.D.C. 2017), order vacated in part not relevant here, 285 F. Supp. 3d 240

(D.D.C. 2018) (bank with American branches is not a United States person); see also Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 379 (2000) (construing United States person to exclude foreign corporations). Indeed, in both Chalmers and Ofisi, the defendants' mere presence in an American courtroom did not render them United States persons.

Leontiev supports its claim that the DIA is a United States person by citing a recently issued U.S. Treasury Department "Finding of Violation." In that administrative order, the Treasury Department found that a Taiwanese shipping corporation, B Whale Corporation, had violated sanctions by purchasing Iranian oil while in an American bankruptcy proceeding. King Suppl. Decl. ¶ 7, Ex. 6. In determining that it was a "United States person," the Treasury Department noted that the company had availed itself of the American court system and, moreover, its assets had become property of the bankruptcy estate, which was itself located in the United States. Id. Leontiev argues that the DIA is similarly a U.S. person because it availed itself of this Court's jurisdiction for the § 1782 proceeding. But as discussed earlier, mere participation in the American court system does not mean that an entity is a United States person. Further, unlike in a bankruptcy proceeding, there is no indication that the DIA has somehow placed any assets within the United States.

Finally, unlike the regulations promulgated by the Treasury Department, the Magnitsky Act defines a United States person as "a United States citizen or an alien lawfully admitted for permanent residence to the United States" or "an entity organized under the laws of the United States or of any jurisdiction within the United States, including a foreign branch of such entity." Magnitsky Act, § 403. This definition, which does not include the term "person in the United States" indicates that Congress did not intend the definition of United States person to sweep so broadly as to include foreign governmental agencies. Accord Ofisi, 278 F. Supp. 3d at

99 ("Plaintiffs' argument that BNPP qualifies as a 'United States person' as that term is defined in 31 C.F.R. § 538.315 and Executive Order 13607 is inapposite because those provisions utilize different language than the definition in § 2332d.").

The Court concludes that the DIA is not a United States person, and therefore its relationship with Pavlov alone does not violate the Magnitsky Act.

### ii.  Property Interest in Discovery Materials

The next question is whether producing discovery to the DIA would violate the Magnitsky Act. Pavlov, as the leader of the law firm directing this litigation, could potentially receive the discovery documents produced by Leontiev. But assuming that he does, the Court remains unconvinced that this transfers a property interest to Pavlov. A production of materials in discovery does not confer a concomitant property interest in those materials. See Gary Alan Green & Broadway Sound & Video, Inc. v. Jackson, 36 F. App'x 663, 669 (2d Cir. 2002) (affirming district court finding that there is no federal intellectual property right in discoverable materials).

This principle is reflected in the day-to-day function of the Court, as parties routinely request the return of their materials after the end of litigation and seek protective orders that prevent an opposing side from using sensitive materials outside the discovery context. These practices are inconsistent with a finding that the recipient of a document in discovery gains a property right. And, to the extent that Leontiev argues that Pavlov would somehow gain a property interest in the physical copies of the documents, this argument is precluded by the informational materials exception to the statute, which excludes CD-ROMs and related materials from the sanctions regime. Finally, to the extent that anyone gains any property right as a result of this proceeding, it would be the DIA, not Pavlov.

The issue of whether Pavlov stands to gain indirectly from a successful § 1782 application is thornier. Pavlov appears to make significant sums individually and as a member of Quorum for the purpose of managing the foreign litigation arising out of the Probusinessbank bankruptcy action. Leontiev further argues that Pavlov will get an even more direct pecuniary benefit if the Court orders the requested discovery because of a contingency arrangement that allows him 15% of any recovery. King Suppl. Decl. ¶ 2, Ex. 1, p. 24. This transfer, however, would take place between the DIA and Quorum and would therefore not fall within the statutory prohibition on transfers of property between a United States person and the sanctioned individual. Again, because the DIA is not a United States person, its relationship with Pavlov does not violate American sanctions.

### c.  Pre-trial Depositions and Discovery

Section 1782 does not require that the discovery materials necessarily be admissible or discoverable in the foreign proceeding. Mees, 793 F.3d at 303. That said, "authoritative proof that a foreign tribunal would reject evidence obtained with the aid of § 1782 . . . would provide helpful and appropriate guidance to a district court in the exercise of its discretion." Id. at 303 & n.20 (quoting Euromepa, 51 F.3d at 1100); see also Schmitz v. Bernstein Liebhard & Lifshitz, LLP., 376 F.3d 79, 84 (2d Cir. 2004) (denying discovery because "the German government was obviously unreceptive to the judicial assistance of an American federal court" after it requested the court deny petitioner's § 1782 application). Thus, "[r]ather than deny a § 1782 request because it suspects that the evidence gathered would ultimately be rejected by the foreign tribunal, a U.S. district court should presumptively allow discovery to the extent that such a grant would promote the statute's goals of efficiency and comity." In re Kreke Immobilien KG, No. 13-MC-110 (NRB), 2013 WL 5966916, at *5 (S.D.N.Y. Nov. 8, 2013).

Leontiev cites to guidance from the State Department for the proposition that "[t]he Russian Federation does not permit the taking of voluntary depositions of willing witnesses in civil and commercial matters."[1] He also submits the declaration of Yuri Monastyrsky, a Russian attorney with experience in insolvency proceedings, who cites the Russian code to support his position that the Russian Arbitrazh court would deny both the document requests and the DIA leave to depose Leontiev pre-trial. Monastyrsky Decl. ¶¶ 19-20. But all this shows is that Russian courts do not permit parties to *seek* this type of discovery—not that they would *reject* the discovery if provided from an American court. Absent definitive proof that the Russian courts would reject the discovery materials obtained from this proceeding—and Leontiev proffers none—the Court must assume that the Russian courts would accept that evidence. Indeed, other courts have found that Russian courts may be amenable to accepting § 1782 discovery procured despite being unavailable in Russian proceedings. See, e.g., Raiffeinsenbank, 2016 WL 6474224, at *6; MTS Bank, 2017 WL 3155362, at *9.

### d.     Right against Self-Incrimination

American law affords defendants in civil cases a privilege against self-incrimination. Louis Vuitton Malletier S.A. v. LY USA, Inc., 676 F.3d 83, 97 (2d Cir. 2012). Leontiev has put forth persuasive evidence that Russia does as well. In a declaration, Russian attorney Yuri Monastyrsky explains that "[c]riminal defendants in Russia have a right to avoid self-incrimination." Monastyrsky Decl. ¶ 25. He attaches a translation of Article 51 of the Russian constitution, as well as the relevant rules of Russian criminal procedure, which indicate that witnesses may invoke a privilege to avoid self-incrimination. Id., Exs. 9-11; see also Craig M.

---

[1] Country Information, Russian Federation, U.S. Department of State – Bureau of Consular Affairs, https://travel.state.gov/content/travel/en/legal/Judicial-Assistance-Country-Information/RussianFederation.html.

Bradley, <u>Interrogation and Silence: A Comparative Study</u>, 27 Wis. Int'l L.J. 271, 289 (2009)

("Only in the United States and Italy, and nominally in Russia, can the suspect or his attorney cut

off questioning by the assertion of the right to silence."). The DIA does not dispute that Russian

law affords defendants this right; for purposes of this motion, the Court will proceed with the

understanding that the right is coextensive with its American counterpart. <u>See</u> Fed. R. Civ. P.

44.1 ("In determining foreign law, the court may consider any relevant material or source,

including testimony, whether or not submitted by a party or admissible under the Federal Rules

of Evidence.").

      Nothing prevents Leontiev from asserting his right to avoid self-incrimination at

deposition. And while courts have, at their discretion, stayed civil proceedings where a party was

under criminal indictment, Leontiev is not a party to the Russian bankruptcy proceeding. <u>Sec. &</u>

<u>Exch. Comm'n v. Shkreli</u>, No. 15-CV-7175 (KAM)(RML), 2016 WL 1122029, at *3 & n.3

(E.D.N.Y. Mar. 22, 2016) (collecting cases). Thus, there would be no adverse inference to his

assertion of the right to avoid self-incrimination—assuming, of course, that Russian civil law

permitted such an inference to be made. <u>See</u> <u>Louis Vuitton Malletier S.A. v. LY USA, Inc.</u>, 676

F.3d 83, 97 (2d Cir. 2012) (discussing possibility of an adverse inference where a criminal

defendant invokes his right to silence in a civil proceeding). Thus, the Court finds that the right

to avoid self-incrimination does not weigh in favor quashing the subpoenas, though Leontiev

may assert the right during his deposition.

### e.      Discovery into Personal Assets

      "[P]re-judgment discovery concerning an opposing party's assets 'is not permitted . . .

unless it is relevant to the merits of a claim.'" <u>In re Ex Parte Shagang Shipping Co., Ltd.</u>, No. 14-

MC-P1 (RWS), 2014 WL 1744264, at *2 (S.D.N.Y. Apr. 28, 2014) (quoting <u>Sequa Corp. v.</u>

Gelmin, No. 91-CV-8675 (DAB)(MHD), 1995 WL 404726, at *3 (S.D.N.Y. July 7, 1995)). This is because "collecting documents in anticipation of obtaining confirmation of the award is, at this juncture, highly speculative." Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp., No. 14-CV-8445 (WHP), 2017 WL 3491975, at *4 (S.D.N.Y. Aug. 15, 2017). Further, courts should be wary of fishing expeditions in which § 1782 applicants seek new tidbits they can use as the basis to bring litigation, rather than support the claims they have already made. In re Certain Funds, Accounts, &/or Inv. Vehicles Managed by Affiliates of Fortress Inv. Grp. LLC, No. 14-CV-1801 (NRB), 2014 WL 3404955, at *6 (S.D.N.Y. July 9, 2014), aff'd sub nom. Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P., 798 F.3d 113 (2d Cir. 2015) (warning that courts "must guard against efforts by parties to engage in fishing expeditions before actually launching litigation."); Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd., 785 F. Supp. 2d 434, 438 (S.D.N.Y. 2011) (describing fishing expedition used to seek information for future lawsuits).

Because the DIA is already involved in the Russian bankruptcy proceeding, the Court does not need to concern itself with reeling in any fishing expedition. Further, while the Court finds certain aspects of the DIA's account of Leontiev's purported wrongdoing dubious, it finds no evidence—apart from his lawyers' say-so—that the DIA will use this discovery to seize his assets. Finally, to the extent that this discovery is irrelevant, a better solution would be to tailor the subpoena, rather than reject it outright.

Thus, the nature of the tribunal and the proceedings underway do not tip the scale in the Court's weighing of whether to quash the subpoenas.

### 6.    Burden and Intrusion

"[A] district court evaluating a § 1782 discovery request should assess whether the discovery sought is overbroad or unduly burdensome by applying the familiar standards of Rule 26 of the Federal Rules of Civil Procedure." Mees, 793 F.3d at 302. Leontiev claims that the subpoenas seek documents related to sensitive personal information, information that the DIA already possesses, and documents found outside of the United States. But the DIA claims that it is willing to modify the subpoenas to make them less burdensome. This factor weighs in favor of modifying the subpoenas, but not quashing them.

### B.    Bad Faith

Leontiev argues that even if the DIA technically meets the statutory requirements and the Intel discretionary factors weigh in favor of allowing discovery, the DIA's unsupported and false allegations and lack of candor indicate that it is acting in bad faith.

### 1.    Lack of Evidentiary Support and False Allegations

Leontiev alleges that the DIA's version of events surrounding the Probusinessbank bankruptcy lacks evidentiary support beyond self-serving affidavits submitted by its Russian attorneys or the DIA bankruptcy administrator. He supports his critique with affidavits from two Russian lawyers, an expert in Russian affairs, and numerous exhibits. The DIA disputes these facts with its own affidavits from a Russian expert and lawyer, and further argues that Leontiev's argument improperly goes to the merits of the bankruptcy proceeding.

In a § 1782 proceeding, "[t]he only issue before the district court is discovery; the underlying litigation rests before a foreign tribunal." Republic of Ecuador v. For Issuance of a Subpoena Under 28 U.S.C. Sec. 1782(a), 735 F.3d 1179, 1182 (10th Cir. 2013). Leontiev does not seek exoneration for his role in the Probusinessbank bankruptcy, nor does he seek to prevent

discovery because he believes the DIA's case is not meritorious. Instead, by pointing out
inconsistencies and holes in the DIA's account, Leontiev seeks to demonstrate that this
application was concocted in bad faith to harass him.

By way of example, to support its claims of fraudulent conveyance, the DIA provides two
witness statements from former Probusinessbank employees that indicate that Leontiev created a
scheme to loan money to a series of sham companies that he controlled. But a Russian criminal
attorney explained that these "witness statements" lacked certain procedural safeguards,
indicating that they were obtained illegitimately. Aminov Decl. ¶¶ 5-14. Furthermore, these
documents appear to have been signed by Grin, the prosecutor sanctioned for his role in human
rights abuses. Suppl. King Decl. Ex. 7. As another example, the affidavit submitted in support of
the DIA's *ex parte* application appears to exaggerate Probusinessbank's losses. Compare
Diachenko Decl. ¶ 17 (Probusinessbank "lost all of its assets"), with King Decl. Ex. 6 (Order
from Russian court showing Probusinessbank with over $146 billion rubles in assets at the time
its license was revoked).

Other assertions by DIA attorneys rest only on affidavits without other documentary
evidence. For example, Leontiev explained in his initial motion to quash that auditors and the
Central Bank reviewed Probusinessbank's books shortly before its banking license was revoked
and found no deficiencies. The DIA responds that Leontiev and others hid information from their
auditors, such that Probusinessbank's clean bill of health was itself fraudulently obtained. But
the DIA cites nothing, other than the declarations of its Russian counsel and the DIA bankruptcy
administrator, to support this important factual contention. Khamchich Decl. ¶ 16; Zhidchenko
Decl. ¶ 16.

To the extent that a factual finding has been necessary in these proceedings, the Court has weighed the evidence appropriately. But the Court does not find that these allegations are sufficiently conclusive of bad faith to quash the subpoena based on them alone. Instead, they are more indicative of a disputed version of the facts underlying the bankruptcy action, which the Court is not permitted to resolve at this time.

### 2.      Lack of Candor Regarding Similar Litigation

Courts have quashed § 1782 subpoenas for misrepresenting related actions involving the same parties. These cases generally involve applicants who misrepresent or omit pertinent adverse rulings in the underlying litigation from their application. See, e.g., In re WinNet R CJSC, No. 16-MC-484 (DLC), 2017 WL 1373918, at *9 (S.D.N.Y. Apr. 13, 2017) (denying application for failure to disclose adverse rulings from Russian court); In re Application of Auto-Guadeloupe Investissement S.A., for an Order to Take Discovery Pursuant to 28 U.S.C. Section 1782, No. 12-MC-221 (RPP), 2012 WL 4841945, at *7 (S.D.N.Y. Oct. 10, 2012) (narrowing subpoenas where the applicant misrepresented the outcome of certain proceedings and neglected to disclose others).

Leontiev alleges that the DIA intentionally misrepresented the outcomes of two related lawsuits involving Russian creditors pursuing Leontiev in its initial motion papers. These actions involved Russian investors, Alexander Varshavksy (in federal court) and Avilon Automotive Group (in New York state court). The DIA described these litigations as "closed," rather than pointing out that Leontiev had prevailed. Leontiev argues that the DIA should have elaborated upon its description of Varshavsky and the related state litigation because the parties in that case were specifically denied leave to share discovery with Russian governmental entities. He contends that Varshavsky and others in related litigation were merely Russian proxies, such that

allowing this discovery now would reward the Russian government for seeking "a third bite at the apple."

Read in context, the DIA's brief statement that the <u>Varshavsky</u> litigation was "closed" is not misleading because it was provided only as support for the proposition that Leontiev lives within the Court's jurisdiction. Further, it appears from the DIA's meeting minutes that the DIA in fact contemplated joining the <u>Varshavsky</u> litigation, implying that it had a separate strategy and interests. Monastyrsky Decl. Ex. 2 at 4. While the <u>Varshavsky</u> action is related insofar as it concerns Leontiev's actions during the demise of Probusinessbank, the DIA's relationship is too attenuated to impose any preclusionary effect from the outcome of those cases to this one.

## RECIPROCAL DISCOVERY

In the alternative to quashing the subpoenas, Leontiev seeks reciprocal discovery. "Consistently, the Second Circuit and the Supreme Court, have suggested that a district court could condition relief under 28 U.S.C. § 1782 upon a reciprocal exchange of information, as such would lend parity to the disclosure mix." <u>Application of Consorcio Minero, S.A. v. Renco Grp., Inc.</u>, No. 11 MC 354, 2012 WL 1059916, at *3 (S.D.N.Y. Mar. 29, 2012) (formatting and quotations omitted). But in <u>Consorcio</u>, and other cases Leontiev cites permitting reciprocal discovery, the subpoena recipient was a party to the underlying litigation. Thus, reciprocal discovery is consistent with American discovery practice that seeks to ensure that all parties have the information they need to assert their claims and defenses. By contrast, Leontiev is not a party to the underlying bankruptcy litigation. Thus, it is unclear what purpose reciprocal discovery would serve, other than as a prophylactic against a wide range of hypothetical actions against him. The Court therefore DENIES Leontiev's request for reciprocal discovery.

**CONCLUSION**

Because statutory and discretionary factors require this conclusion, the Court DENIES

Leontiev's motion to quash the subpoena. The Court, however, is not blind to Leontiev's claims

that the discovery sought here is intended for other proceedings or impermissible purposes.

Leontiev has marshalled substantial evidence to support this view, which is rebutted by the DIA

largely with inconsistent statements or hearsay declarations. Moreover, the Court's concern

about the legitimacy of these requests is heightened by the involvement of two sanctioned

individuals. Accordingly, the parties are ORDERED to meet and confer to modify the scope of

the subpoena to reduce the burden on Leontiev and to narrow its focus to only those topics

relevant to the Probusinessbank bankruptcy proceeding, including discovery related to any

alleged "Conspirators." Such discussion should include whether a protective order is necessary.

The parties may then petition the Court for judicial intervention if they are unable to come to a

resolution. Absent further information, the Court is not inclined to allow any discovery into

documents held abroad. See In re Fuhr, 13-CV-6753 (TPG), 2014 WL 11460502, at *2

(S.D.N.Y. Aug. 6, 2014) (collecting cases). The parties shall report to the Court on the status of

these negotiations by September 28, 2018.

The Clerk of the Court is respectfully requested to terminate the motion at ECF Nos. 8

and 27.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:      July 23, 2018
            New York, New York