J1VHDepO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DEPOSIT INSURANCE AGENCY,

                    Petitioner,

          v.                          17 MC 414 (GBD)(SN)

SERGEY LEONTIEV,
                                      Oral Argument

                    Movant.

------------------------------x
                                      New York, N.Y.
                                      January 31, 2019
                                      2:10 p.m.

Before:

                    HON. SARAH NETBURN,

                                      Magistrate Judge

                         APPEARANCES

MORRISON COHEN, LLP
     Attorneys for Petitioner
BY:  JEFFREY D. BROOKS

GIBSON, DUNN & CRUTCHER, LLP
     Attorneys for Movant
BY:  ROBERT L. WEIGEL
     ALISON LEIGH WOLLIN
     BRAD SCHOENFELDT

1        (Case called)

2        THE DEPUTY CLERK:  Counsel, would you please state

3    your appearance for the record.

4        MR. BROOKS:  Jeffrey Brooks from Morrison Cohen,

5    counsel for petitioner, Deposit Insurance Agency.

6        THE COURT:  Thank you.

7        MR. WEIGEL:  Robert Weigel, Alison Wollin, and Brad

8    Schoenfeldt, for respondent Mr. Leontiev.

9        THE COURT:  Thank you.

10        I've read the parties' submissions and am prepared to

11    rule today.  Mr. Weigel, why don't I give you an opportunity,

12    since this is your motion, if there's anything you'd like to

13    add to what you've provided here.  The one question I have for

14    you is if you're aware of any case that has permitted the type

15    of action that you're requesting, a plenary action arising out

16    of a 1782 motion?

17        MR. WEIGEL:  Your Honor, we have scoured the

18    landscape, and it is true that there is no specific case

19    dealing exactly with 1782 and in this context.  I would suggest

20    that the Zidenberg case out of the Ninth Circuit is --

21    *Siderman*, is actually quite close.  It relates to letters

22    rogatory that were brought in California by the Argentine

23    government, and in that case, the Ninth Circuit held that the

24    Argentine government expected that a U.S. court would get

25    involved in the very substance of what was at issue in that

1    case and therefore that they had agreed, essentially an

2    implicit waiver of their sovereign immunity.

3            It is clear that there's no exception under 1367 for

4    false affidavits or false statements to a court.  The same

5    obligations that a litigant has in any other action, the

6    litigant has those same obligations here.  Judge Kaplan in the

7    *Chevron* case, for example, we cite it in our papers, but there

8    was also subsequent trial, Judge Kaplan found that submitting a

9    false affidavit in a 1367 petition in that case was obstruction

10   of justice and was indeed a predicate act for the RICO

11   violations that he found.  The Second Circuit affirmed on that

12   point.  They don't get --

13           THE COURT:  That seemed far afield from where we are

14   here.  Can we just focus on the *Siderman* case for a moment?

15           MR. WEIGEL:  Yes, your Honor.

16           THE COURT:  A couple of questions for you as to

17   whether or not you think it matters.  The biggest one is the

18   Second Circuit, which I think has at least, if not explicitly,

19   implicitly rejected the reach of the *Siderman* case.  But even

20   *Siderman* itself, I think, is narrow such that your case would

21   not fall within its confines.  To begin with, the case was

22   remanded to the district court, so there wasn't a specific

23   finding, I don't think, that, in fact, Argentina had implicitly

24   waived its immunity, but rather that it looked like it did and

25   remanded to the trial court for further findings.

1          But secondly, the Ninth Circuit makes quite clear that

2     its holding is not to permit open jurisdiction whenever a

3     sovereign uses the U.S. courts to litigate an issues and makes

4     clear that there needs to be a "direct," that's a quote,

5     connection between the initiating litigation brought by the

6     sovereign and the subsequent litigation brought against the

7     sovereign.  Here, I guess I'd be curious to hear how you would

8     define the initiating litigation and the subsequent litigation

9     in order to say that they are directly connected, as *Siderman*

10    suggests needs to happen.

11         MR. WEIGEL:  Sure.  The *Cabiri* case, *Cabiri* case, I

12    don't know how you pronounce it, *Cabiri*, in the Second Circuit

13    which I think --

14         THE COURT:  It's C-a-b-i-r-i, for the court reporter's

15    assistance.

16         MR. WEIGEL:  -- is the case that you say distinguishes

17    *Siderman*, and it does question and makes a couple of sort of

18    almost snide comments about the adventuresome panel in the

19    Ninth Circuit.  But in that case itself, they did hold that the

20    sovereign had waived sovereign immunity as to a claim that was

21    related.  In that case it was a breach of contract claim, and

22    they held that the sovereign had waived it because it was

23    related to, what was there, an eviction.  The Ghanaian diplomat

24    had resided in Ghanaian state-owned housing out in Long Island.

25    I guess the state owned a house.  His family lived there.  They

1    were trying to evict the family, and the Second Circuit held

2    that the claim as to whether they had breached his employment

3    contract was sufficiently related to the claim of eviction that

4    they had jurisdiction; that there had been an implicit waiver.

5         The Ninth Circuit in *Siderman* references the House

6    Report, the underlying legislative history of the Foreign

7    Sovereign Immunities Act, which is also referenced in the

8    Second Circuit cases as well.  That sets forth three elements

9    as examples.  It's not limiting, but examples of the kind of

10   connection that is necessary in order to have an implicit

11   waiver.  First would be that the foreign state has agreed to

12   arbitrate in another country where a foreign state has -- or

13   where a foreign state has agreed that the law of a particular

14   country should govern a contract, and then they also include a

15   situation where a foreign state appears but doesn't raise

16   sovereign immunity.

17        Now, here I have a situation where we contend, and we

18   believe we can prove -- and, your Honor, we're just seeking at

19   this point in time permission to file a complaint.  They'll be

20   able to move to dismiss it.  Perhaps we'll get some discovery.

21   We could do this on a fuller record -- but what we have here is

22   that they submitted affidavits to this Court, two affidavits, I

23   think three.  All of those affidavits contained the language

24   that has an implicit waiver.  They say at the very last bit:

25   "I affirm under penalty of perjury under the laws of the United

1  States that the foregoing is true and correct."  These

2  affidavits were submitted in this Court by agents, the law

3  firms that represented these folks, in behalf of their argument

4  that your Honor should issue 1367 discovery.  So they came to

5  this Court.  They said we're submitting --

6  THE COURT:  You keep saying 1367.  Do you mean 1782?

7  MR. WEIGEL:  Yes, I certainly do, your Honor.

8  THE COURT:  Good.

9  MR. WEIGEL:  I don't know why I have 13 --

10 THE COURT:  I thought maybe I went to the wrong

11 courtroom.

12 MR. WEIGEL:  No, maybe I just -- I was out skiing last

13 week, and maybe my mind got a little jumbled.  But 1782 is

14 exactly what I'm talking about.  I apologize.

15 THE COURT:  That's all right.

16 MR. WEIGEL:  But they came to this Court and submitted

17 affidavits and said we're willing to be judged by the laws of

18 the United States, and that's really all we're asking your

19 Honor to let us do.  We want to be able to adjudicate --

20 THE COURT:  What would be the limits of that holding

21 if I concluded that the submission of an affidavit under the

22 penalty of perjury in the United States would subject such

23 affiant to jurisdiction here?  Would there be any limitation to

24 that?  How would we control that?  It seems like we would

25 become the final arbiter of all disputes.

1          MR. WEIGEL:  Your Honor, I don't think there's any

2     doubt that by signing that, they are indeed agreeing that they

3     could be subject to perjury in the United States.  The limit is

4     what's contained in the affidavit.  I mean, I couldn't sue them

5     on some unrelated tort because they did that.  But what we're

6     asking for is that they took the position in this Court in the

7     papers they filed and in the affidavits they filed, that my

8     client had embezzled hundreds of millions of dollars.  They

9     don't say there is a lawsuit pending in Russia in which it is

10    alleged that my client embezzled hundreds of millions of

11    dollars.  If that lawsuit existed, that could be a factually

12    true statement, and your Honor would not necessarily be in a

13    position to decide anything other than whether it was true, in

14    fact, that there was such a lawsuit.

15          But they don't say that, and your Honor in your

16    decision expressly noted in denying us discovery that

17    Mr. Leontiev isn't party to that lawsuit.  They haven't named

18    him there.  But they come into this courtroom and they make

19    assertions against Mr. Leontiev that he embezzled hundreds of

20    millions of dollars, and then your Honor granted their

21    discovery.  Now, I know and you know and everybody in this

22    courtroom knows that you didn't make any adjudication as to

23    whether or not that allegation was truthful or not, but they

24    made that allegation to persuade your Honor, and then your

25    Honor did grant the discovery, and it leaves a cloud over my

1    client's head.

2          They came to this courtroom.  They didn't have to

3    bring this issue into this courtroom.  They came here, and this

4    is an implicit waiver.  They submitted themselves to the

5    jurisdiction of this Court.  They took the position here that

6    we're making factual statements to you, and we're making those

7    statements under penalty of perjury of the laws of the United

8    States, which I would say is virtually identical to agreeing in

9    a contract, as the House Report says, that the laws of New York

10   would govern a contract.

11         The limit that -- you asked me what the limit was.

12   The limit is what's in the affidavit.  It's not a general

13   waiver of all purposes for jurisdiction, but as in *Siderman*,

14   what we're seeking is directly related to what they said in

15   this courtroom.  The first sentence of their preliminary

16   statement in, I think it is, their opposition to our motion to

17   quash says Mr. Leontiev embezzled hundreds of millions of

18   dollars.  We're trying to ask -- what we want is a fair forum

19   in which we can prove that what they said to this Court in an

20   attempt to persuade this Court to do something is false.

21         THE COURT:  How much overlap would a proceeding in the

22   nature that you're discussing in order to prove that that

23   allegation was false, how much overlap would that have with any

24   of the underlying litigation and proceedings going on in

25   Russia?

1          MR. WEIGEL:  Well, my client is not a defendant in the

2    Russian bankruptcy proceeding.  There is currently no

3    proceeding against him in the Russian bankruptcy, which is what

4    the 13 -- 1782 was filed for.  So there isn't overlap because

5    there isn't a proceeding currently against Mr. Leontiev in

6    which it is charged that he, in fact, embezzled hundreds of

7    millions of dollars.  So currently this would be the first

8    place where that is being adjudicated, and we would submit that

9    there's nothing wrong with that.  They came from Russia.  They

10   came here.  They said there's evidence here.  They said there's

11   evidence here that's relevant to our charge that he embezzled

12   hundreds of millions of dollars, and so we're saying, Fine, you

13   came here.  You asserted it.  You didn't qualify it.  You

14   didn't say it's alleged here or something like that.  They said

15   it as a fact.  Affiants came and said based on personal

16   knowledge or what I've been told, this is what happened, and

17   they've made those assertions for the purpose of persuading

18   your Honor to issue a ruling that allowed them to take

19   discovery here.  And we're asking that they be held to the same

20   standard any other litigant has and that we be entitled to

21   evaluate under a fair forum whether or not that statement is

22   true.

23          THE COURT:  If I were to permit the action to proceed

24   here, where would the discovery be located?

25          MR. WEIGEL:  Well, presumably there would -- they took

1  the position that they don't --

2          THE COURT:  They came here looking for some discovery

3  in furtherance of their bankruptcy proceeding.  That they

4  believe Mr. Leontiev had either documents or his own personal

5  testimony in furtherance of a foreign proceeding as is

6  permitted under Section 1782.

7          MR. WEIGEL:  Sure.

8          THE COURT:  So it sounds to me that the goal of your

9  proceeding, which I take it is to prove that it is false, that

10  Mr. Leontiev engaged in malfeasance.

11          MR. WEIGEL:  Not just general malfeasance, but the

12  specific malfeasance they alleged.

13          THE COURT:  The specific embezzlement?

14          MR. WEIGEL:  Yes.

15          THE COURT:  My question is if I were to permit you to

16  pursue that litigation, where would the discovery be?

17          MR. WEIGEL:  Well, I suspect it would be -- there

18  would certainly be discovery here because Mr. Leontiev is not

19  going to Russia anytime soon unless somebody forced him under

20  gunpoint to do so, because he's confident what would happen to

21  him if he went there.  They took the position -- your Honor may

22  remember that we said they've got all the documents.  They've

23  got the bank records.  They're claiming that my client, who

24  basically fled the country very quickly, they said, he's got

25  all the records.  Well, we said they're the receiver.  They've

1    got all the bank records.  You know what they said?  They came

2    back and they said, well, we don't have those records, your

3    Honor.  So they took the position that they don't have a lot of

4    discovery in Russia.  Whether that's true or not, we'll find

5    out.

6            But, your Honor, it's fairly common in these

7    circumstances, your Honor chose in this case not to award us

8    reciprocal discovery because there wasn't, in fact, a

9    proceeding against Mr. Leontiev yet, but they can't really

10   complain too loudly if they have to produce some documents here

11   that they have in Russia if, in fact -- they took the position

12   that they can prove this stuff.  They said it in affidavits.

13   So some of the discovery would be here, some of the discovery

14   would be in Russia, or in perhaps, probably more likely,

15   Helsinki, which is where one tends to take depositions because

16   Russia doesn't seem to even allow even consensual depositions.

17   But, you know, it would be a lawsuit.  Somebody's going to be

18   inconvenienced no matter where this lawsuit is brought, and

19   Leontiev is here; they're in Russia.  They came to this Court.

20   They asked this Court for relief.  They made statements that we

21   contend were false, knowingly false, and they knew when they

22   made those statements that your Honor could have said, as other

23   judges have in the context of 1782, let's have a hearing, and

24   they could have been -- we could have put somebody in the box

25   and asked them questions, and your Honor could have made

1    factual findings.  Your Honor decided you didn't need to do

2    that, but that was certainly a risk that they had when they

3    made these filings.  So presumably they're prepared to prove it

4    up, and all we're saying is let's go.

5           THE COURT:  Do you want to address your, I think it is

6    the secondary argument, that the commercial activity exception

7    in the Foreign Sovereign Immunity Act would also waive the

8    DIA's immunity?

9           MR. WEIGEL:  Certainly, your Honor.  It is sort of

10   counterintuitive, but the laws are pretty clear on this that

11   you look at the objective nature of the conduct not the

12   subjective intent.  So even purchasing bullets and military

13   uniforms or machine guns is a commercial activity in the United

14   States.  It's not the subjective intent.  The question is, is

15   this something that a commercial actor could do, or is this

16   something only a state can do?  Operating an embassy is clearly

17   not commercial activity, but I would submit that in this

18   courtroom and in the one next to it on a daily basis creditors

19   come in all the time and they say, I want to find the assets of

20   this person.  I need discovery.  I've got a fairly decent

21   practice of my own trying to collect large judgments from

22   miscreants, and I am not a state actor.  We take discovery all

23   the time.  We try to find out where people have put their

24   assets.

25           THE COURT:  But the DIA is not a creditor.  It's like

1    a trustee.  It's a receiver.

2             MR. WEIGEL:  Well, I think if they're not a creditor,

3    then they don't -- the question is not are they or are they not

4    a creditor, but the question is are they acting like a

5    creditor?  Are they doing something that objectively a

6    non-state actor could be doing, would do regularly?  And the

7    answer is yes, that is exactly what they're doing.  Certainly,

8    you have bankruptcy receivers all the time, but all sorts of

9    receivers, your standard real estate foreclosure case you get a

10   receiver appointed.  They go out and find the assets.  It's not

11   a state act.  It is something that creditors do all the time

12   who are looking to collect money that they contend they are

13   owed.  That's exactly what they are trying to do.  They're

14   saying Mr. Leontiev stole hundreds of millions of dollars is

15   basically what they say.

16            THE COURT:  So they're acting as like a commercial --

17            MR. WEIGEL:  We want to find out where it is.

18            THE COURT:  It's like a commercial debt collector?

19            MR. WEIGEL:  Yes, exactly.  That's exactly what

20   they're trying to do, and it is objectively something that

21   people do every day that are not sovereigns.  They're not

22   amassing a military.  They're not operating a diplomatic

23   mission.  They have come here in a commercial capacity to

24   collect money, just like any other person who claims they're

25   owed money.  So my position is I think it's quite clear that

1  this is a commercial activity, that that's what they're doing.

2          THE COURT:  OK.  Understood.

3          MR. WEIGEL:  Thank you.

4          THE COURT:  Mr. Brooks.

5          MR. BROOKS:  Thanks, your Honor.

6          The first point I'd like to make about the *Siderman*

7  case, which I think is radically different from this case and

8  has been somewhat misrepresented by the respondent, in

9  *Siderman*, they were letters rogatory that were sent, but

10  Argentina was not seeking discovery from Mr. Siderman.  They

11  had instituted criminal proceedings against him in Argentina,

12  and they were serving process in those criminal proceedings via

13  letters rogatory.  So they were trying to coerce him, order him

14  to come back to Argentina so they could torture him.

15          Then the suit that the Ninth Circuit was deciding

16  whether it should proceed or not was a tort action based on the

17  fact that he had, in fact, been kidnapped by Argentina and

18  tortured.  They weren't deciding whether Argentina had opened

19  themselves up to litigate the underlying criminal action

20  against Mr. Siderman in the Ninth Circuit, and that's what the

21  respondent is asking here.  He's saying let's come here and

22  litigate whether Mr. Leontiev actually embezzled any money or

23  not.  But the Ninth Circuit, that's way beyond what the Ninth

24  Circuit was doing.  The Ninth Circuit was deciding a tort case

25  about torture that part of it involved coming to California

1    courts to try to coerce him to come back to be tortured.

2         This action has nothing -- the question of whether

3    Mr. Leontiev embezzled funds, as your Honor suggested, would be

4    answered by looking at the Russian bank records, looking at the

5    wire transfers that aren't here, talking to Russian witnesses,

6    all of his coconspirators, everyone, the thousands of employees

7    that worked -- hundreds of employees who worked at

8    Probusinessbank in Russia.  This is all stuff that happened in

9    Russia.  It's not here.  It's not related to the fact that the

10   DIA came here and sought discovery in a 1782 action.

11        I think that that's also the key point on the

12   commercial activity exception as well is that their action --

13   in the commercial activity cases, the case itself has to be

14   about the commercial activity.  It has to be connected.  It has

15   to be the same thing.  Here, there's no connection.  They

16   try -- they're not suing us --

17        THE COURT:  Could you speak a little bit more slowly

18   so we can get everything recorded.

19        MR. BROOKS:  Sorry.  We're not asking for -- they're

20   not bringing a suit claiming that we defamed them in this case.

21   They're not saying that we did something wrong in New York.

22   They're asking for a declaration that what we said was wrong,

23   which was really a substantive determination that Mr. Leontiev

24   didn't embezzle funds in Russia.  So there's no connection

25   between whether Mr. Leontiev embezzled funds in Russia and any

1    commercial thing that the DIA might have done as a receiver.

2    It's totally unrelated.

3              THE COURT:  What do you say, I was asking counsel

4    about sort of what the discovery would look like and how much

5    overlap there would be between any potential litigation that I

6    might permit here in New York and the ongoing proceedings in

7    Russia, and Mr. Weigel said because the proceedings in Russia

8    don't directly involve Mr. Leontiev as an individual, as I

9    recognized in my decision on the subpoena, that there wouldn't

10   be that much overlap.  Do you want to speak to that point?

11             MR. BROOKS:  Sure.  I think that it's not true there

12   wouldn't be overlap.  It's essentially the exact same issue,

13   right?  Mr. Leontiev is not a party to the Russian bankruptcy

14   proceeding because of the way that Russian bankruptcy law

15   works.  He fraudulently conveyed money, but he doesn't have to

16   become a party to that action.  He is a party to the criminal

17   proceedings, and some of his coconspirators have already been

18   convicted for activities involving him.  And then there are

19   actions that the DIA has taken in other countries where some of

20   these fraudulent transfers were made, and he is a party to

21   those actions.

22             THE COURT:  OK.

23             MR. BROOKS:  So I think, to answer the broader

24   question, even in the bankruptcy proceeding what they're trying

25   to decide is were these transfers, were these loans, were they

legitimate or were they fraudulent conveyances?  And the

question of whether they were legitimate or not is the same

question as whether Mr. Leontiev embezzled the money or whether

these transactions that he authorized and supervised, whether

they were legitimate.  It's the same question.

THE COURT:  Thank you.

Mr. Weigel, anything you'd like to add?  Let me ask

you a question.

MR. WEIGEL:  Yes, your Honor.

THE COURT:  In a hypothetical world in which I permit

you to proceed and conclude that it was, in fact, false, the

statements that your client embezzled the funds, and I

essentially exonerate your client, and then in Russia the court

does the opposite and concludes that the transfers were all

fraudulent and that all of the assets of the bank should be

seized, what sort of crisis does that create as far as

international relations?

MR. WEIGEL:  Your Honor, we don't have high

expectations that we are going to get a fair shake in Russia.

Mr. Pavlov, who was the head of Quorum, then he was not the

head of Quorum when we suggested that he was sanctioned, and

then when we went to negotiate the scope of the protective

order --

THE COURT:  Protective order.

MR. WEIGEL:  -- suddenly he's back at Quorum.  It was

J1VHDepO

just a little interlude.  He's on the Magnitsky Act because he

orchestrated a false judgment against one of Mr. Browder's

companies that Mr. Magnitsky investigated, found out about, and

then died in prison because of it.

        We don't think we're going to get a terribly fair

shake in Russia, but what they would do eventually, we believe,

is they would -- they would know better than us, but our

concern, and I don't think I'm giving away any great state

secrets here, is that they're going to get some sort of corrupt

judgment out of Russia and then try and come at Mr. Leontiev in

the United States.  And if your Honor has fairly determined by

the court or the jury or however we -- I think it's a bench

trial, that there was no embezzlement, then when they try to

bring that corrupt Russian judgment to the United States, we

will say that shouldn't be enforced because that is contrary --

        THE COURT:  Why couldn't you at that time raise these

arguments?  If it comes to pass that Russia gets a judgment

against your client and then they want to come to the United

States to enforce it, why couldn't you at that time bring an

action to prevent the enforcement in the United States against

his assets here and raise those concerns at that time?

        MR. WEIGEL:  Because, your Honor, the grounds for

opposing the domestication of a foreign judgment are somewhat

limited because there has been a forum, so we would be forced

to challenge -- now, there isn't such a proceeding now, as you

1    just heard.  We would like this to be decided in the first

2    instance by a fair forum.  We would like to get a fair shot

3    rather than have to try and prove up that the Russian

4    proceeding, that doesn't exist yet, was corrupt.  We think

5    we're entitled to it.  They've come here, they've raised it,

6    and we want to have a fair forum decide whether or not my

7    client embezzled hundreds of millions of dollars.

8            He shouldn't live under this cloud.  They've made

9    these accusations.  They should be prepared to stand up and

10   prove them.  They made them in this Court and they made them

11   subject to the penalty of perjury and the laws of the United

12   States, and all we're asking is for a fair shot in front of a

13   fair court, fair judge, to prove up that my guy didn't do it.

14           Thank you.

15           THE COURT:  Thank you.

16           All right.  Thank you, everybody, for your arguments

17   and your excellent briefs.  I appreciate all of that.

18           As I said, I'm prepared to rule today.  I think I'll

19   dispense with the background of this case because I think

20   everybody is familiar with what gets us here.  I'll certainly

21   note for the record that discovery, I understand, is ongoing

22   right now in connection with the subpoena that I authorized,

23   and that while that discovery is proceeding, that Mr. Leontiev

24   has moved for leave to file a complaint and to commence a

25   plenary action against the DIA.

1          As we've been discussing, Mr. Leontiev seeks a

2     declaration from the court that the actions that support the

3     DIA's discovery under the 1782 action are false, and he argues

4     that the jurisdiction over these claims arise under

5     Section 1330 and the Foreign Sovereign Immunities Act because

6     DIA qualifies as a foreign state under the Foreign Sovereign

7     Immunities Act.  I understand that the DIA opposes the motion,

8     and I conclude that the Court does not have jurisdiction to

9     hear this claim and that even if it did, that the DIA would be

10    immune from litigation, so I'm denying Leontiev's motion.

11         Leontiev first argues that by bringing the 1782

12    motion, that DIA has created a case or controversy in this

13    court.  For example, he argues that the DIA's allegation that

14    Leontiev has embezzled hundreds of millions of dollars of

15    assets from Probusinessbank is false and that this court is the

16    proper forum to adjudicate that issue because it is the basis

17    on which the discovery was granted.

18         Leontiev argues that the discovery sought by the DIA

19    arises from a common nucleus of operative facts, and therefore,

20    exercising jurisdiction would promote judicial economy,

21    convenience, and fairness.  I think the opposite is true.

22    Allowing a plenary action which essentially would serve as a

23    check on the underlying bankruptcy proceeding, as counsel has

24    noted, an effort to try to get a more fair proceeding here,

25    would multiply the judicial resources.  This Court has already

1   issued a ruling in the 1782 motion, and expanding the scope of

2   this case to a plenary action would require substantially more

3   judicial involvement, much of which is already being supervised

4   by the Russian courts.  Second, most of the records and the

5   witnesses that would be sought in any plenary action are

6   located in Russia.  Third, the Court is not prepared to rule on

7   the record here that Mr. Leontiev is not unable to protect his

8   rights and promote his interests in the Russian courts.

9          I appreciate Mr. Weigel's arguments and concerns, but

10  I don't think on the record that I have here I'm prepared to

11  make a sort of broad statement about the state of the judicial

12  system in Russia.

13         Leontiev claims that the declaratory judgment will

14  clarify and settle the legal claims between the parties,

15  including whether Leontiev is actually guilty of the conduct

16  about which he is accused in Russia, but as I've suggested, the

17  Southern District of New York cannot serve as the Supreme Court

18  of Russia.  I find that the 1782 twin goals of efficient

19  assistance to a foreign proceeding and the promotion of mutual

20  respect between the U.S. and foreign judicial systems would be

21  undermined here if this Court were to weigh in on whether the

22  bankruptcy proceeding and receivership were brought in good

23  faith.

24         As we've been discussing, Leontiev relies on *Siderman*

25  *de Blake v. Republic of Argentina*, that's the 1992 case out of

1   the Ninth Circuit, arguing that the DIA has implicitly waived

2   its immunity in connection with these claims by commencing the

3   1782 case.  In *Siderman*, which was not a 1782 case and as we've

4   discussed, I think no one is aware of any case where a plenary

5   action was brought out of a 1782 motion.  In *Siderman*, the

6   plaintiff brought claims for torture and persecution against

7   Argentina.  He alleged that as part of a scheme, Argentina had

8   initiated a pretextual criminal proceeding against him and that

9   it had used the United States courts to serve him with process

10  in California.  The Ninth Circuit concluded that having

11  allegedly enlisted the U.S. courts in its scheme to persecute

12  *Siderman*, that Argentina had implicitly waived its immunity

13  from all suits over claims related to that persecution.  The

14  Ninth Circuit then remanded for the district court to engage in

15  fact-finding.

16          As I mentioned, the Ninth Circuit emphasized its

17  limited ruling in that case.  Specifically, that in order to

18  imply a waiver because of the use of the U.S. courts, there had

19  to be a direct connection between the initial court proceeding

20  and the subsequent action.

21          I decline to rely on an out-of-circuit decision to

22  vastly expand the scope of this Court's jurisdiction.  I think

23  a ruling from this Court that a governmental entity waives its

24  immunity and subjects itself to the Court's jurisdiction in a

25  plenary action by acting on a statute that expressly permits

1    targeted discovery in the United States would do great damage

2    to international relations.  It would also add an exception, an

3    additional exception, to the act which already enumerates

4    specific exemptions, the Foreign Sovereign Immunities Act, that

5    is, which allows for exceptions to immunity, including for

6    counterclaims that arise out of a transaction or occurrences of

7    the subject matter of the initial claim.  As we've been

8    discussing as well, the Court of Appeals in this circuit has

9    already concluded that the reach in *Siderman* was –– I believe

10   "dubious" was the word in that decision and was disinclined to

11   follow that expansive reach.

12          In any event, as we've also been discussing, the facts

13   of *Siderman* are not the same.  Leontiev cannot establish that

14   the DIA's use of the American courts was part and parcel of its

15   allegedly corrupt bankruptcy proceeding.  Argentina needed the

16   U.S. courts to persecute *Siderman*, and here, Russia does not

17   need the U.S. courts to continue its bankruptcy proceeding.

18          Secondly, Leontiev argues that the Foreign Sovereign

19   Immunities Act's commercial activity exception applies here,

20   and for the reasons largely stated in the DIA's brief, I find

21   that the commercial activity exception does not apply.  In

22   relevant part, the foreign sovereign immunity does not apply

23   where a sovereign performs an act in the United States in

24   connection with a commercial activity.  The act Leontiev wants

25   to sue about is his conduct in Russia, namely, whether he

1    committed the misconduct that he's accused of committing.  The

2    act that the DIA performed in the United States is the filing

3    of the 1782 motion.  Thus any waiver of immunity would be

4    limited to the DIA's act of bringing that motion.  But more

5    fundamentally, there's no connection with commercial activity.

6    The DIA's efforts to obtain information for use in the

7    bankruptcy proceeding are not commercial in nature, and I'm

8    relying on the *Granville Gold Trust-Switzerland* case out of the

9    Eastern District of New York (1996) for that proposition.

10          Finally, I'll note that I agree with an argument

11   that's raised only in a footnote by the DIA that the

12   Declaratory Judgment Act is not the proper basis to obtain the

13   relief that Leontiev seeks.  As the DIA presents, the

14   Declaratory Judgment Act is designed to obtain a judicial

15   declaration of a party's rights.  It's not intended to make a

16   factual declaration about who did what and when.

17          In conclusion, I find that permitting Leontiev to

18   proceed in the fashion that he requests would be a gross

19   overreach of the Court's jurisdiction, and the motion for leave

20   to file the complaint is denied.

21          As I referenced, I understand that the parties are

22   continuing in their discovery.  I issued my ruling last week

23   with respect to Mr. Leontiev's deposition.  I understand that

24   that deposition is going to take place, I believe, in the next

25   week or two.  What I thought I would do was to set a deadline,

1    maybe 60 days out, to ask for the parties to report back to the

2    Court on where things stand with respect to discovery.

3    Obviously, if there's disputes that arise before then, the

4    parties are directed to engage in the meet-and-confer process,

5    and if you can't resolve it, you can bring that motion to me.

6    But as a stopgap, I would set a deadline 60 days out for status

7    letter.

8         All right.  Anything further from either side?

9         MR. WEIGEL:  Just one minor matter which hopefully

10   won't ever percolate to your Honor, but we had set a date for

11   Mr. Leontiev's deposition.  I believe the 7th of February.

12   Unfortunately, about a month ago the First Department in

13   another case had asked me for my available dates, and I gave

14   them.  And apparently, while I was at lunch today, they decided

15   that 2 o'clock --

16        THE COURT:  That was the date?

17        MR. WEIGEL:  -- 2 o'clock on the day that we're

18   scheduled to do Mr. Leontiev's deposition is when they would

19   like me to come to Madison Square.  So we're going to try and

20   work out another date.

21        THE COURT:  I assume you can do that.

22        MR. WEIGEL:  We should be able to do that.  If there's

23   an issue, we will get back to you, but I'm sure we can work

24   something out.

25        MR. BROOKS:  We'll try to work it out.  My client has

J1VHDepO

1    people several from Russia, so they don't have all that much

2    flexibility, but we'll work with them.

3              THE COURT:  Good.  Stay warm, everybody.

4              MR. WEIGEL:  Thanks, your Honor.

5              (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25